*REDACTED TRANSCRIPT*

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Jacksonville, Florida |
| Plaintiff, | Case No. 3:22-cr-141-TJC-PDB |
| vs. | July 17, 2023 |
| SCOTT ANDREW HOLLINGTON, | 8:35 a.m. |
| Defendant. | Courtroom No. 10D |

EXCERPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

GOVERNMENT COUNSEL:

**ASHLEY WASHINGTON**, **ESQ**.
**KIRWINN MIKE, ESQ**.
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, Florida  32202

DEFENSE COUNSEL:

**CURTIS SCOTT FALLGATTER**, **ESQ**.
Fallgatter, Farmand & Catlin, PA
200 East Forsyth Street
Jacksonville, Florida  32202

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street #150
Jacksonville, Florida  32202
Telephone:  (904)549-1307
dsmabishop@yahoo.com

(Proceedings recorded by mechanical stenography;
transcript produced by computer.)

*REDACTED TRANSCRIPT*

2

# T A B L E   O F   C O N T E N T S

<u>Page No.</u>

WITNESSES FOR THE GOVERNMENT:

**AGENT DAVID MARTIN**
Direct Examination................................  5
Redirect Examination.............................  48
      A▮▮ N▮▮▮▮ B▮▮▮▮▮▮▮
Direct Examination................................  51
Redirect Examination.............................  60
      E▮▮▮▮▮▮ L▮▮▮ M▮▮▮
Direct Examination................................  64
Redirect Examination.............................  82

*Shannon M. Bishop, RDR, CRR, CRC ~ dsmabishop@yahoo.com*

*REDACTED TRANSCRIPT*

E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

1A, 1B, 1C, and 1E................................  14
1K and 1L.......................................  42
2A, 2B, 2C, 2D, 2E, 2F, and 3A..................  26
4A, 4B, 4C, and 5A..............................  30
6A, 6B, 6C, 7A, and 8A..........................  34
7B and 7C.......................................  34
9A, 9B, 9C, 9D, 9E, and 10A.....................  36
11A, 11B, and 11C...............................  38
12A, 12B, 13A, 13C, 14A, 15A, and 15B...........  44
15D, 15E, and 15F...............................  45
16A and 16B.....................................  42

*REDACTED TRANSCRIPT*

P R O C E E D I N G S

July 17, 2023                                      8:35 a.m.

* * * * *

THE COURT:  I'm going to go ahead and let the government call its first witness.  We'll take a break about a quarter to 11:00, but let's go ahead and see if we can get about 20 minutes in.

Who's the first witness?

MR. MIKE:  We'll call DEA diversion investigator David Martin.

THE COURT:  Okay.  And, ladies and gentlemen, while we're waiting for the witness, if you want to just stand up and stretch for a minute, feel free.

(The witness enters the courtroom.)

COURTROOM DEPUTY:  Do you solemnly swear that the testimony you are about to give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please state your full name and spell your last name for the record.

THE WITNESS:  David Martin, D-a-v-i-d, M-a-r-t-i-n.

COURTROOM DEPUTY:  Please be seated.

THE COURT:  Mr. Mike, you may proceed.

MR. MIKE:  Thank you, Your Honor.

*Shannon M. Bishop, RDR, CRR, CRC ~ dsmabishop@yahoo.com*

*REDACTED TRANSCRIPT*

5

**AGENT DAVID MARTIN, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. MIKE:

Q.    Mr. Martin, can you please tell the jury what do you do for a living.

A.    I'm a diversion investigator with the Drug Enforcement Administration.

Q.    What's a diversion investigator?

A.    A diversion investigator is responsible for enforcing the Controlled Substance Act, in addition to the Code of Federal Regulations.

A diversion investigator would be a little different from a special agent, as in we are responsible for DEA registrants.  Those are individuals such as doctors, pharmacies, manufacturers, distributors of controlled substances.

Q.    Okay.  What type of training and education do you need to become a diversion investigator?

A.    I have a bachelor's degree in criminal justice.  In addition to that, we have to go to Quantico, Virginia, for three months' intensive training involving all aspects of becoming a diversion investigator, learning about controlled substance, the Controlled Substance Act, and the Code of Federal Regulations.

Q.    You said Controlled Substance Act.  What is that?

*REDACTED TRANSCRIPT*

6

A.   Title 21 of that is involving all controlled substances, anything to do with distributing, dispensing -- the illegal distributing or dispensing of controlled substances, in regards to not only doctors, but citizens on the street.

Maybe what you're more familiar with with DEA and special agents and what they do as far as the illegal drugs, we're more responsible for I guess what you would call prescription drugs, or legal.

Q.   Okay.  So within your -- within your investigations, do you investigate doctors and pharmacists?

A.   They do, numerous investigations involving doctors and pharmacies in regards to what they're doing, making sure they're following those regulations.

Our job is mainly a regulatory role in that, but there's also the civil and criminal side that we deal with as well.  But we're responsible for making sure that there's -- all those regulations are being followed.

There's a lot of them in that book.  But our main one that we look for, especially in regards to doctors, is making sure that the prescriptions they're issuing are for a legitimate medical purpose in the course of professional practice.

Q.   And can you talk to me a little bit about schedules and what is a -- what is a schedule when it pertains to controlled substances?

*REDACTED TRANSCRIPT*

7

A.    Sure.    The Controlled Substance Act -- and DEA has divided controlled substances into five different schedules.    You have your Schedule I controlled substances, which are what we would call illegal drugs.    There's no medical use for them, a very high potential for abuse.

You have Schedule II drugs, which would be a high potential for abuse, but there is a medical use for those. Those would be drugs such as opiates, amphetamines such as Adderall.

You've got Schedule IIIs, which have a moderate dependency for abuse on them.    Those would be your drugs such as buprenorphine, testosterone, ketamine, things like that.

Your Schedule IV drugs have a lower potential for abuse.    Those would be your Xanax, or alprazolam.

And then you have Schedule V, which would be considered the lowest potential for abuse, maybe something like Lyrica or...

Q.    Okay.    So I'm going to draw your attention to the investigation in this case.    How did you become involved in this investigation?

A.    This case started back in 2021, the summer of 2021.    We were contacted by the St. Johns County Sheriff's Office.

MR. FALLGATTER:    Your Honor, I object to the hearsay on that and ask that he restrict the testimony to the charges in the indictment.

*REDACTED TRANSCRIPT*

THE COURT:  I'm going to overrule the objection.  I mean, I agree there shouldn't be much hearsay, but this is the -- this is the effect on him and how he initiated the investigation.  So I'm going to overrule the objection.

Mr. Mike, ask -- ask targeted questions, and then -- but I'm going to overrule the objection.

Go ahead.

BY MR. MIKE:

Q.   Please continue.  How -- as far as your investigation, how was it initiated?

A.   Sure.  Like I said, multifaceted.  Originally we were contacted by the St. Johns County Sheriff's Office in regards to if we were aware of a Dr. Scott Hollington.

At that time we were aware of Dr. Scott Hollington. They provided information to us that they received in regards to Dr. Hollington exchanging sexual favors for prescriptions.

MR. FALLGATTER:  Again, Your Honor, all hearsay, and --

THE COURT:  Yeah.  I'm going to sustain the objection there.  Let's -- let's do it this way.  And I'll ask the jury to disregard the last answer.

Mr. Mike, I think you can elicit testimony that it was based on information they received and any other -- generically, but let's leave it at that for now.

MR. MIKE:  Yes, Your Honor.

*REDACTED TRANSCRIPT*

9

THE WITNESS:  Okay.  In addition to that, a DEA officer received a tip -- received --

THE COURT:  That's fine.  That's fine.  It's fine.

THE WITNESS:  We received a tip -- without going into detail to prevent an objection, we received a tip as well anonymously from some individuals.  At that time we decided to initiate our investigation into Dr. Scott Hollington.

BY MR. MIKE:

Q.   Okay.  And how did you begin doing that?

A.   That started with some background research we do when we initiate a case.  I belong on the tactical diversion squad at DEA.  So as a diversion investigator, I'm assigned to a group that is mostly made up of special agents.

My partner and I, Special Agent Hollingsworth, initiated this case.  As part of that we do some background research, check our internal systems to see if there's any previous interactions with Dr. Hollington.  So we did that.

In addition, you know, just some basic open-source research, involved checking websites.  At that time we discovered that there was a website for Sawgrass Health which was operated by Dr. Hollington.

While researching on that website, we noticed what we would call red flags in diversion, right?  So when we initiate cases, we're looking for what we call red flags.  That's kind of how we build our cases.  Red flags could be anything from,

you know, patients traveling long distances, individuals receiving high dosages of medication.

MR. FALLGATTER:  Your Honor, I object to this, which has nothing to do with this case.  If he's red flagging other cases, they have nothing to do with this case.

THE COURT:  All right.  Mr. Mike, let's restrict it to the red flags, if there were any, that draw -- drew the attention of law enforcement in this case, please.

MR. MIKE:  Yes, Your Honor.

BY MR. MIKE:

Q.   What type of red flag did you notice in this case?

A.   Well, after we ran the Prescription Drug Monitoring Report, which is the PDMP that Florida provides us -- you can obtain those for any doctor or pharmacy.

And what that tells you is any prescription that has been written or filled by a pharmacy.  It includes information such as the patient name, address, birth date, the prescription they received, the date they received it, refills, the doctor who prescribed it, among many other things.

Going through that PDMP, we noticed some red flags that I was discussing earlier, high cash payments, patients traveling long distances, and those things.

In addition, back to the website -- when we were on there, there was a few red flags on there for what we would consider a normal practice.

*REDACTED TRANSCRIPT*

There was a couple of statements on the website that stated "No new patients from Putnam County," "No new alprazolam patients or Xanax patients from Putnam County."

Some odd hours listed on the website, only open Saturday, Sunday, and for an hour Monday night, in addition to a statement that said "No phone calls.  Texts only."

Like I said, just red flags that we noticed.  It helps build our investigation to a totality of where we're going to go.

Q.   And -- and in this PDMP report, does it tell you the amount of controlled substances that the doctor prescribed?

A.   It does.  It breaks it down by a schedule of controlled substances.  You can obtain that in an Excel spreadsheet to pull the information you need.

So however many prescriptions he wrote for, say, alprazolam or buprenorphine, or any drug that you're looking at, you could see if they've paid cash or not, addresses -- and you could determine if there's numerous people at the same address receiving the same medications on the same dates, things like that.

So there's a lot of information in that PDMP that is useful to our investigations to help us know if what's going on at that office is a cause for concern or not.

Q.   Did you then do any research on Dr. -- the defendant and whether he had a DEA license, what --

A.    I did.

Q.    -- he was licensed to practice in Florida?

A.    Yeah.  After -- after researching the website, we noticed not only Dr. Hollington on that website as the primary provider.  There was also numerous mid-level practitioners listed on there.  Upon getting their names from the website and running them through our internal systems, we learned that --

THE COURT:  Let me -- let me see counsel at sidebar briefly, please.

(Sidebar conference:)

THE COURT:  You know, I deferred on this memorandum agreement in 2020.  And so I assume he's not going to talk about that, is he?

MR. MIKE:  No, he's not going to talk about that.

THE COURT:  Okay.  Does he know that?

MR. MIKE:  Yes.

THE COURT:  Okay.  All right.

(The following proceedings occurred in open court, in the presence of the jury:)

THE COURT:  I apologize, ladies and gentlemen.

All right.  Mr. Mike, ask your question again, please.

MR. MIKE:  Yes, Your Honor.

BY MR. MIKE:

Q.    You were talking about doing some research and you noticed

*REDACTED TRANSCRIPT*

that he had some nurse practitioners and you did some research on them.  Were you getting to the point where you researched their licenses and DEA registrations?

A.    Correct.  After learning their names and Dr. Hollington's name, we were able to pull up their Department of Health medical license to see if they were registered with the state of Florida as a medical doctor or nurse practitioner.

Q.    Okay.  Did you come across any of Dr. Hollington's -- the way he ran his office, policies on his website, anything of that nature?

A.    I did.  There was -- one of the tabs on his website included a office policy, 30-something questions that was supposed to be signed by every patient in regards to how his practice was ran and what was expected of patients.

MR. MIKE:  Your Honor, may I approach the witness with what's been marked for identification as 1A, 1B, 1C, and 1E?

THE COURT:  Yes, sir.

MR. FALLGATTER:  No objection, Your Honor.

THE COURT:  Well, if there's no objection, let's just go ahead and admit them now, and then you can ask the witness about them.

What are the numbers again, Mr. Mike?

MR. MIKE:  1A, 1B, 1C, 1E.

THE COURT:  But not 1D; is that correct?

*REDACTED TRANSCRIPT*

14

MR. MIKE:  Not 1D.

THE COURT:  Okay.  1A -- Government's 1A, 1B, 1C, and 1E will be admitted without objection.

(Government's Exhibits 1A, 1B, 1C, and 1E received into evidence.)

THE COURT:  You may proceed.

MR. MIKE:  Thank you, Your Honor.

All right.  I want to pull up 1E.

Permission to publish, Your Honor?

THE COURT:  Yes, sir.

MR. MIKE:  Your Honor, do you mind if we hit the light right there?  It might be easier.

THE COURT:  Yeah.  The one on the screen there.  It might be easier to --

MR. MIKE:  Okay.

BY MR. MIKE:

Q.   Is the -- oh, you have it in front of you.

What is -- what are we looking at here with 1E?

A.   1E is the policy that was located on that website that I was speaking of.

Q.   Okay.  And when this -- when did this policy become effective?

A.   According to the policy, February 2021.

Q.   All right.

THE COURT:  I'm a little -- so this is -- this is

*REDACTED TRANSCRIPT*

15

something that was on Dr. Hollington's website?

THE WITNESS:  That's correct.  Yes, sir.

THE COURT:  All right.  Go ahead.

BY MR. MIKE:

Q.   And this is the policy of his addiction clinic for Sawgrass Health?

A.   That's correct.

Q.   All right.  Can you -- can we zoom into paragraph 1 for me so you can read that.

A.   Sure.

Q.   I just want to -- I have a couple of paragraphs I want to highlight.

Can you read paragraph 1 for us?

A.   I can.  Paragraph 1 states, "I understand that buprenorphine is a narcotic/controlled drug.  I know that taking buprenorphine regularly can lead to physical dependence and that if I abruptly stop taking it, I could experience systems of opioid withdrawal."

Q.   Okay.  And what is buprenorphine?

A.   Buprenorphine is a Schedule III drug that is used to treat opioid dependence.

Q.   Okay.  When you say "opioid dependence," that would be like heroin?

A.   Oxycodone, heroin -- any sort of opiate:  oxycodone, heroin, hydrocodone.

*REDACTED TRANSCRIPT*

Q.   Okay.

MR. MIKE:   Can you zoom in paragraph 3 for me, please, Melita?

Thank you.

BY MR. MIKE:

Q.   Can you read paragraph 3 for me?

A.   I can.

"I understand the risks and benefits of Suboxone, including potential side effects.  I understand that in order to be a satisfactory candidate for Suboxone, I must follow certain safety precautions for the treatment and comply with the treatment the scheduler prepared for me by my attendant physician/NP/PA.  Additionally, my attendant physician/NP/PA has discussed this agreement with me and explained what is expected of me in the program."

Q.   What is Suboxone?

A.   Suboxone is the brand name for buprenorphine.  It's the same drug.  Buprenorphine would be the generic and Suboxone the brand.

Q.   Okay.

MR. MIKE:   Can you zoom in to paragraph 7.

Thank you.

BY MR. MIKE:

Q.   All right.  Just the -- the first paragraph for 7, can you please read that?

A.    Sure.

      "I understand that it can be dangerous to mix Suboxone with alcohol or other sedatives, such as Valium, Ativan, Xanax, clonopin, librium, benzodiazepines, so dangerous that it could result in accidental overdose, oversedation, organ failure, comma, or death."

Q.    Okay.  Stop right there for a moment.

      What is a benzodiazepine?

A.    Benzodiazepines would be your Schedule IV, such as Xanax, or alprazolam, Valium, those type of drugs.

Q.    So is dangerous -- Suboxone is a Schedule III; is that correct?

A.    Suboxone, correct.

Q.    Okay.  All right.  One sec.

      MR. MIKE:  Can you zoom in on paragraph 8.

BY MR. MIKE:

Q.    Can you read that for me?

A.    I can.

      "I agree to abstain from all drugs, including alcohol, marijuana, and other street drugs.  I understand that continued use of drugs can interfere with my attempts at recovering from opioid dependence.  I also understand that buprenorphine, as found in Suboxone, is designed to treat opioid dependence, not addiction to other classes of drugs."

Q.    All right.  And paragraph 15?

*REDACTED TRANSCRIPT*

18

A.   Paragraph 15 states, "I understand that my buprenorphine provider will monitor my medication compliance by doing oral swabs, drug screens every two months.  I consent to testing for this purpose.  And I understand that it is a requirement of my participation in the buprenorphine clinic, drug screens will be supervised, and that a staff person will be required."

Q.   Okay.  And just a couple more.

Paragraph 19.

A.   19:  "I understand that if I relapse when I have been taking buprenorphine, at first I may not get high from the other opioids because buprenorphine blocks their effect.  I understand that if I keep using larger and larger amounts to try to get high, I could stop breathing and die."

Q.   Okay.  And then paragraph 23?

A.   Paragraph 23 states:  "The first dose of your buprenorphine should be obtained from the pharmacy and then taken in the clinic.  This is a precaution against 'precipitated withdrawal,' a reaction to buprenorphine."

Q.   Okay.  Thank you.

All right.  So --

THE COURT:  Mr. Mike, are you done with that exhibit?

MR. MIKE:  Yes, Your Honor.

THE COURT:  All right.  Then it's time for our morning break.  We'll go ahead and do that.

Ladies and gentlemen, it's a quarter until 11:00.

*REDACTED TRANSCRIPT*

We'll be on a 15-minute break until 11 o'clock.  So if you'd be back in the jury room at 11 o'clock, ready to come back out, and then we'll go to about 12:30.

Remember, don't discuss the case with anybody or with each other.  But -- you can either stay in the jury room; you can go down to the first floor, but have a nice break, ladies and gentlemen.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury exits, 10:45 a.m.)

THE COURT:  And, sir, if you'll be back on the stand at 11:00.  Okay?

THE WITNESS:  No problem.

THE COURT:  All right.  We are in recess until 11 o'clock.

(Recess from 10:46 a.m. to 11:03 a.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Let's have the jury, please.

COURT SECURITY OFFICER:  All rise for the jury, please.

(Jury enters, 11:03 a.m.)

THE COURT:  Y'all can be seated.

Welcome back, ladies and gentlemen.

Mr. Mike, you may proceed.

MR. MIKE:  Thank you, Your Honor.

*REDACTED  TRANSCRIPT*

BY MR. MIKE:

Q.   Okay.  Mr. Martin, we left off right after your -- your investigation.  Doing some research on this website, you discovered the policy form.

What was the next steps in your investigation?  What did you do next?

A.   After that, gathering some more information about the nurse practitioners and their PDMP history, we decided it was time to send a confidential source into the clinic.

That was done in order for us to see how the clinic worked, as far as getting an appointment and what occurred inside the office, what the office looked like inside prior to us sending undercover officers in.

Q.   Okay.  And what did you -- what did that reveal?

A.   That happened on January 31st, 2022, when the CS went in.  It revealed --

MR. FALLGATTER:  Again, Your Honor, relevance.  There's no such charge in this case.  We've got five fake patients and four real ones.

THE COURT:  Mr. Mike, what's the -- I'm not sure what -- where we're going here.

MR. MIKE:  Yes, Your Honor.  This is where he said he sent in a -- sources to get an evaluation of the clinic before sending in the undercovers to get --

THE COURT:  I'll overrule the objection.

BY MR. MIKE:

Q.   So how did that help the investigation before sending in the undercover agents?

A.   It gave us an idea, like I said, of the layout of the clinic, what was expected of patients when they went, if they were -- needed to provide a urine test, and how the interviews with the doctor went.

Q.   Okay.  So when did you decide to send in the undercover agents?

A.   Our first undercover agent went in on February 14th, 2022. At that time we sent in a detective with the name of Kevin Lee. He went in under our direction with audio and video recordings.

At that time he was told to try and obtain a prescription without giving a medical reason for that prescription.  Those were the instructions he provided to us. And as I stated he had audio/video recording on him.  He went to the clinic.

MR. FALLGATTER:  Your Honor, I object to the instruction.  The issue is what was said, not what this man told somebody to do or say.

THE COURT:  Overruled.  Go ahead.

THE WITNESS:  He went in to the clinic and left. Afterwards was told to contact -- or he would be contacted by a mid-level practitioner.  And he was able to obtain a prescription at that time.

*REDACTED TRANSCRIPT*

BY MR. MIKE:

Q.   All right.  Was it the -- the goals of the investigation -- or this actual undercover to reveal that he was an addict?  Or what was -- what was his role as an undercover?

A.   His role as an undercover was to go in without a purpose to get that prescription.  He was told not to give a medical reason for the prescription at all.  He was told to try and be very vague in answering his questions when speaking with the doctor and not to present with any known condition.

Q.   Okay.  And what was he -- was he provided a prescription of Adderall?

A.   I believe he was, yes.

MR. MIKE:  Your Honor, may I approach the witness with what has been previously marked for identification as Government's Exhibits 2A, 2B, 2C, 2D, 2F, 2E, and 3A?

THE COURT:  Yes, sir.

MR. FALLGATTER:  Your Honor, may I approach for a second?

THE COURT:  Yes, sir.

(Sidebar conference:)

MR. FALLGATTER:  So the government is offering the undercover recordings and transcripts.  I have no objection, subject to me putting in mine at some point.

But they're also listing 2E, a prescription, and 3A,

*REDACTED TRANSCRIPT*

23

a prescription.  I'm told that the drugs were obtained.  I've seen reports that say that, but to my knowledge none of the drugs have ever been tested.  So this is a case about distributing drugs.

And I understand that can be done through issuing a prescription and they get the drugs, but they have to be drugs. I've never had a drug case where the government didn't have proof that what they were prosecuting the client for was actually drugs.

So this is a piece of paper.  This is a prescription. I do think they have the drugs in their possession in some place.  But according to the reports I've seen, they've never been tested.

So a fundamental issue in this case is whether or not the government can prove that there was a distribution of drugs.  They can't just put in a piece of paper.  They've got to prove they are drugs.  I don't believe they have that proof. I've never seen it in the discovery.

So I object to putting in a prescription without the government representing to the Court that they are prepared to prove the prescription did contain a controlled substance, which to my knowledge has never been tested.

THE COURT:  Mr. Mike?

MR. MIKE:  Yes, Your Honor.  In itself, this -- even in the jury instructions that you're giving, writing the

**REDACTED TRANSCRIPT**

24

prescription is itself enough to -- writing the prescription -- a prescription itself is enough to satisfy the element of dispensing/distributing controlled substances.

THE COURT:  When you say "instructions," that's in the --

MR. MIKE:  That's in the -- that's provided in the jury instructions; as well that's been used here in the Eleventh Circuit.  I mean, that -- writing the prescription alone is enough.

MR. FALLGATTER:  Not alone.  It's enough to get to the point of proving there was a distribution.  You still have to prove it's a controlled substance.  What if it's sugar in there?

THE COURT:  Well, if the doctor's writing it, isn't it his intention that that's what be dispensed?

MR. FALLGATTER:  He's not charged in the substantive counts with intention.  He's charged with distribution.  And it has --

MR. MIKE:  And dispense.

MR. FALLGATTER:  And dispense.  And you can't -- dispense is defined as distribution.  They're the same thing. And you can't distribute it if it's not really a drug.

THE COURT:  Okay.  Well, this is not an issue that was raised pretrial or that I've had an opportunity to consider, but my initial thought is that the government can

*REDACTED   TRANSCRIPT*

proceed.

If you want to make an issue of it on cross, or however you want to do it, I think that's fine.  But I don't think that the government is disabled from proceeding having not -- having not tested the substances that were actually prescribed.

I assume there's going to be testimony that they went to a pharmacy and picked them up and got them.  And so I think -- I think the government would be entitled to rely upon that, subject to cross-examination.  So I'm going to overrule your objection.

MR. FALLGATTER:  Yes, Your Honor.

(The following proceedings occurred in open court, in the presence of the jury:)

MR. MIKE:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MR. MIKE:  I'm handing the witness what's been previously marked for identification of Exhibit 2A and 2B, 2C, 2D.

MR. FALLGATTER:  Your Honor, if it will help, again, no objection other than those rendered at sidebar to those exhibits.

THE COURT:  Yes.

MR. MIKE:  2E, 2F, and 3A.

THE COURT:  All right.  So without objection I'm

*REDACTED  TRANSCRIPT*

26

going to be admitting Government's 2A, 2B, 2C, and 2D.

Over objection I'm going to be admitting Government's 2E and 2F.

All right.  You may proceed.

MR. MIKE:  Your Honor, did you mention 3A?

THE COURT:  Oh, I'm sorry, I didn't hear that 3A was part of this.  Hold on a second.

MR. MIKE:  Yes, Your Honor.

THE COURT:  All right.  And that's part of the same sequence?

MR. MIKE:  Yes, Your Honor.

THE COURT:  Okay.  It just has a different number?

MR. MIKE:  Yes, Your Honor.

THE COURT:  All right.  Then over objection I will admit Government's 3A.

(Government's Exhibits 2A, 2B, 2C, 2D, 2E, 2F, and 3A received into evidence.)

MR. MIKE:  Okay.  Your Honor, permission to publish Government's Exhibit 2E?

THE COURT:  Yes, sir.

BY MR. MIKE:

Q.   All right, Mr. Martin.  What are we looking at here?  I'm sorry it's a little blurry.

A.   That's all right.  I have this copy.

It's a prescription for Kevin Lee, the undercover

officer that was sent in for Adderall, 10 milligrams, seven-day supply.

Q.   Okay.  And what is the date that this prescription was -- can you see the date it was written?

A.   I believe it was February 14th, 2022.

Q.   Okay.  And who was this written by?

A.   This prescription was written by Molly Christensen.

Q.   And who is Molly Christensen?

A.   She's one of the mid-level practitioners that was employed by Dr. Hollington.

Q.   All right.  Thank you.

MR. MIKE:  And permission to publish Government Exhibit 3A, Your Honor?

THE COURT:  Yes, sir.

BY MR. MIKE:

Q.   Can you tell me what we're looking at here?

A.   Yes.  This is also a prescription for Kevin Lee for Adderall, 10 milligrams, this time a 23-day supply, written on February 20th, 2022, by Molly Christensen as well.

Q.   Okay.  Thank you.

Now, you mentioned Molly Christensen was a mid-level practitioner.  What does that mean?

A.   A mid-level practitioner -- or in this case she was an advanced practice nurse -- is someone who is -- in some cases, if granted authority to do so, write controlled substance

*REDACTED TRANSCRIPT*

prescriptions with the oversight of a doctor.

Q.    All right.  And from this part of your investigation, how did -- how did he run his operation, from your -- from what you gleaned from the investigation?

A.    From the investigation we learned that Dr. Hollington was the main provider at the clinic.  And I guess we would say underneath of him he had numerous mid-level practitioners that operated with his clinic, but by telemedicine.  They -- they were all done over the phone.

      Throughout the investigation we learned that individuals would go to the clinic and either they would receive their prescription from Dr. Hollington or he would have them call or be called by one of the mid-level practitioners in order to receive the prescription.

Q.    Who would perform the initial interview with the -- or the initial medical encounter with the undercover?

A.    In all our cases the initial encounter was done at Sawgrass Health with Dr. Hollington.

Q.    Okay.  And what would normally happen in that initial encounter?

A.    The initial encounter consisted of obtaining an appointment by a text message.  Upon arriving at the office, the undercover would meet with Dr. Hollington, who was usually in his office there.

      They would have to do a urine drug screen.  They

*REDACTED TRANSCRIPT*

would tell him what medications they wanted.  And they would receive the prescription from Dr. Hollington himself or be referred to one of the mid-level practitioners at that time.

Q.    Okay.  What time of day did you send in the undercovers to his office?

A.    Ours were always done on Monday evening, for the most part.  And it was anywhere between 7:00 and 8 o'clock at night generally.

Q.    Okay.  And do you know if Kevin Lee gave a urine sample?

A.    Kevin Lee did not provide a urine sample, no.

Q.    All right.  I want to turn your attention to the second undercover visit on March 21st, 2022.

What was the plan for that day?

A.    The plan on that day, March 21st, 2022 -- we decided at that time to send in Kevin Lee again.  But this time he was going under the guise of bringing his girlfriend with him, Amanda Fleming.

So prior to sending them in, we met again and briefed about what we were looking for, as far as going in with no medical purpose, not giving a medical reason to obtain prescriptions, and, once again, under the guise that they were boyfriend and girlfriend.

Also, at that time Kevin Lee had spoke previously to Molly Christensen.  And he was told to try and get a prescription this time from Dr. Hollington, once again, under

*REDACTED TRANSCRIPT*

30

the guise that he wasn't happy with Molly Christensen.

Q.    Okay.  What -- were they going in to portray to be addicts?

A.    They were told not to go in with any medical conditions, or to try and be as vague as possible.

Q.    Okay.  And were prescriptions -- did they leave with prescriptions?

A.    They both did, yes.  They also were audio and video recorded as well, as were all our visits.

Q.    All right.

MR. MIKE:  Your Honor, permission to approach with what's been marked previously as Government's 4A, 4B, 4C, and 5A?

THE COURT:  Mr. Fallgatter, I'm assuming that -- if we're following along the same pattern here, you would -- the objections you would have would be to 4C and 5A; is that correct?

MR. FALLGATTER:  Yes.  Thank you, Your Honor.

THE COURT:  Okay.  And no objection to 4A, 4B; is that correct?

MR. FALLGATTER:  Correct, Your Honor.

THE COURT:  All right.  So I'll admit 4A, Government's, and 4B, Government's, without objection.  I'll admit 4C and 5A over objection.

(Government's Exhibits 4A, 4B, 4C, and 5A received into

evidence.)

THE COURT:  All right.  You may proceed.

MR. MIKE:  Thank you, Your Honor.

Handing the witness 4A, 4B, 4C, and 5A.

Your Honor, permission to publish 4C?

THE COURT:  Yes, sir.

BY MR. MIKE:

Q.    Mr. Martin, what is 4C?

A.    4C contains two prescriptions issued by Scott Hollington to Amanda Fleming on March 21st, 2022.  One of the prescriptions is for Adderall, 30 milligrams, a 30-day supply. And the other prescription is for buprenorphine, 8 milligram -- I'm unable to read the day supply.

Q.    Okay.  What --

A.    I believe there's 30 of them.

Q.    All right.  And which date -- the date on the second one for buprenorphine?

A.    The date on the second one is also March 21st, 2022.

Q.    Okay.  And who prescribed both of these medications?

A.    Dr. Scott Hollington.

Q.    Okay.  And buprenorphine, again, that is -- what schedule is that?

A.    That's a Schedule III.

Q.    All right.  And that is the same -- the drug that was listed in the policy that we went over?

A.    That is correct.

Q.    Okay.  Do you know if the undercover signed that policy?

A.    I don't recall, but I believe -- I believe they all did.

Q.    Okay.  I want to -- after that investigation that happened with the undercover visit on March 21st, did you do another undercover visit?

A.    Yes, we did.  Our next undercover visit was conducted on April 4th, 2022.  On this occasion we sent in three individuals.  This time the plan was to have Amanda Fleming bring two of her friends with her to the office, so there was three individuals total.  Amanda Fleming, Thomas Breo, and Joseph Mast all went on this occasion.

Q.    Okay.  And, again, this was audio and video recorded?

A.    It was.

Q.    Was prescriptions retrieved after that visit?

A.    They were.

Q.    And was it under the same guise as you mentioned previously?  Can you explain that?

A.    It was.  Correct.  Once again, they were given instructions prior to going in that -- to give as little information as possible; if possible, don't give a medical reason for the prescriptions, pretty much as little information as possible, and see what -- what you're able to obtain.

        MR. MIKE:  All right.  Your Honor, can I approach the witness with what's been previously marked for identification

as 6A, 6B, 6C, then 7A, 8A?

THE COURT:  Let's run through that again.

So where are we starting, 6A?

MR. MIKE:  We're starting at 6A.

THE COURT:  All right.  That's the DVD.

6B is the transcript, right?

MR. MIKE:  Yes, Your Honor.

THE COURT:  6C is one of the -- that's the prescription?

MR. MIKE:  Yes, Your Honor.

THE COURT:  7A.  And then you said 8A?

MR. MIKE:  8A, yes, Your Honor.  That's another prescription.

THE COURT:  And is it connected to the same --

MR. MIKE:  Yes, Your Honor.

THE COURT:  So you're skipping over 7B and 7C?

MR. MIKE:  I have 7B and 7C.  And I'm going to admit it after I get him to explain it.

THE COURT:  All right.  And, Mr. Fallgatter, I'm assuming your position remains the same?

MR. FALLGATTER:  Yes, Your Honor.

THE COURT:  So that means, then --

MR. FALLGATTER:  Yeah, just --

THE COURT:  Yeah.  So that means --

MR. FALLGATTER:  -- 7A and --

*REDACTED TRANSCRIPT*

THE COURT:  6A, 6B will be admitted without objection.  6C is admitted over objection.  And 8A is admitted over objection.

All right.  You may proceed.

(Government's Exhibits 6A, 6B, 6C, 7A, and 8A received into evidence.)

MR. MIKE:  And, Your Honor, since we just discussed it just now, we might as well.  I have 7B and 7C.  That's the audio recording of the phone call, as well as the transcript.

THE COURT:  All right.  Those will be admitted without objection.

MR. FALLGATTER:  Yes, Your Honor.

THE COURT:  Okay.

(Government's Exhibits 7B and 7C received into evidence.)

MR. MIKE:  Your Honor, I'm going to approach the witness with 8A, 7A, and 6C, which are the prescriptions.

THE COURT:  Yes, sir.

MR. MIKE:  I'm handing the witness 8A, 7A, and 6C.

Permission to publish 6C?

THE COURT:  Yes.

BY MR. MIKE:

Q.   All right.  What is 6C, Mr. Martin?

A.   6C is a prescription for Amanda Fleming issued by Dr. Scott Hollington on April 4th, 2022, for diazepam, 5 milligrams.

*REDACTED  TRANSCRIPT*

Q.    Okay.  And who wrote this prescription?

A.    Dr. Scott Hollington.

Q.    All right.

          MR. MIKE:  Permission to publish 7A and 8A?

          THE COURT:  Yes.

BY MR. MIKE:

Q.    Okay.  What is 7A?

A.    7A is two prescriptions that were issued to the undercover by the name of Thomas Breo.  They were prescribed by Rachael Pittala on April 5th, 2022.  One is for amphetamine-dextroamphetamine, which is Adderall, a 30 milligram.  And the other is for clonazepam, 1 milligram.

Q.    Okay.  And who is Rachael Pittala?

A.    Rachael Pittala is another mid-level practitioner that works -- or worked for Dr. Scott Hollington in Sawgrass Health.

Q.    And are you aware of what the max dose is of Adderall that Dr. Hollington could have prescribed?

A.    30 milligrams is the max dose.

Q.    All right.  I want to turn to May 23rd, 2023 [sic], the fourth undercover visit.  Can you tell us about that?

A.    Yeah, the fourth undercover visit, like you said, occurred on May 23rd.  That was done, again, with Amanda Fleming and the undercover Ricky Johnson.

Q.    Okay.  Was it the same objective?

A.    Same objective.  Once again, they were equipped with

*REDACTED TRANSCRIPT*

audio/video.  They were told to go in and try and obtain a prescription, giving as little information as possible, without a medical reason to obtain that prescription.

Q.    All right.  Was prescriptions obtained that day?

A.    They were.

MR. MIKE:  Your Honor, may I approach the witness with what's been previously marked as Government's Exhibit 9A, 9B, 9C, 9D, 9E, which is the prescription, and 10A, which is the prescription?

THE COURT:  All right.  Consistent with the previous rulings and understandings, I'll admit Government's Exhibit 9A, 9B, 9C, and 9D without objection.  I'll admit 9E and 10A over objection.

(Government's Exhibits 9A, 9B, 9C, 9D, 9E, and 10A received into evidence.)

MR. MIKE:  Permission to approach with the prescription, Your Honor?

THE COURT:  Yes.

MR. MIKE:  Permission to publish?

THE COURT:  Yes.

MR. MIKE:  9E.  Thank you.

BY MR. MIKE:

Q.    Mr. Martin, what is Government's Exhibit 9E?

A.    9E contains three prescriptions to Amanda Fleming issued by Dr. Scott Hollington on May 23rd, 2022.

*REDACTED TRANSCRIPT*

Q.    Okay.  What's the first prescription?

A.    The first prescription is for Adderall, 30 milligrams, a 30-day supply.  The second prescription is buprenorphine, 8 milligram, also a 30-day supply.  And the third prescription is alprazolam, or Xanax, a 30-day supply as well.

Q.    Okay.  And what's the dates on all the prescriptions?

A.    All prescriptions contain the date of May 23rd.

Q.    All right.  And were they all issued by Dr. Hollington?

A.    Yes, they were.

Q.    And what is 10A?

A.    10A is a copy of a prescription issued to Ricky Johnson, one of the undercovers.  This one is issued for amphetamine-dextroamphetamine, which is Adderall, 20 milligrams, a 30-day supply.

Q.    Okay.  All right.  Did you conduct another undercover visit after May 23rd, 2023 [sic]?

A.    We did.  We conducted one more undercover visit that occurred in July, July 18th, 2022.  And that was just with Amanda Fleming.  Once again, she was equipped with audio/video, and under the same premise of not giving a medical reason when she went in.

Q.    Okay.  And did she retrieve any medications that day?

A.    She did, yes.

         MR. MIKE:  Your Honor, permission to approach with what's been marked for identification as 11A, 11B, and 11C.

THE COURT:  Is 11A part of this, or not?

MR. MIKE:  No, Your Honor.

THE COURT:  Okay.  All right.  Consistently, I will admit Government's Exhibits 11A -- so let me make sure I've got this right.  So it's 11A and 11B.

And then over objection I'll admit 11C.

All right.  You may proceed.

MR. MIKE:  Thank you, Your Honor.

Permission to publish 11C?

(Government's Exhibits 11A, 11B, and 11C received into evidence.)

THE COURT:  Yes.

BY MR. MIKE:

Q.   What is 11C?

A.   11C is a copy of the prescription issued to Amanda Fleming on July 18th, 2022, for buprenorphine.

Q.   Okay.  And when was it written?  You said --

A.   July 18th, 2022.

Q.   Okay.  And it was written by?

A.   Dr. Scott Hollington.

Q.   All right.  This is the second page to 11C.  What prescription is this?

A.   This is a prescription also issued to Amanda Fleming on July 18th, 2022, by Dr. Scott Hollington for Adderall, 30 milligrams.

Q.    Okay.  And on page 3 of 11C, can you tell us about that prescription, please?

A.    Yes.  This is another prescription issued by Dr. Scott Hollington on July 18th, 2022, to Amanda Fleming.  This time for alprazolam, 1 milligram, or Xanax.

Q.    Now, for all five of these undercover visits, how did you actually get the controlled substances?

A.    The controlled substances were picked up by each undercover at RX-Mart Pharmacy.  At that time they were turned over to us at DEA, where we processed into our evidence.

Q.    Okay.  In reviewing the undercover footage and speaking with the agents, were there any concerns about the visits with the defendant?

A.    There was.  Going back to those red flags -- we talked about numerous red flags.

MR. FALLGATTER:  Again, as we did at sidebar -- what they told him after the fact about concerns is hearsay.

THE COURT:  Mr. Mike?

MR. MIKE:  Your Honor, I asked him also with his review of the videos themselves, which he reviewed, and it's -- it's in evidence.

MR. FALLGATTER:  Which is also hearsay.  And, of course, they speak for themselves.

THE COURT:  Let me see counsel a minute.  I'm not sure exactly what we're trying to do here.  Hold on.

*REDACTED TRANSCRIPT*

(Sidebar conference:)

THE COURT:  Where are you going with this?

MR. MIKE:  Any red flags when he reviewed the video -- I was asking about any red flags that happened in the video.  We didn't get into any substantive portions of the videos, but -- and then the red flags that sort of initiated the next steps to the investigation.

MR. FALLGATTER:  So he's going to be doing their closing argument, summarizing the evidence?  He's not designated as a witness or expert to do that.  They've got the tapes.  They're going to be played.

You know, the witnesses will be on the stand.  They can testify about what was said and what was done.  How does he qualify as an expert to start interpreting tape-recordings?

MR. MIKE:  Well, he's qualified under other --

THE COURT:  Are you asking him -- are you asking him whether based on his review of the tapes he saw red flags?

MR. MIKE:  Yeah.  It was -- yeah.  What was the red flags that was noted in the investigation that decided to move --

THE COURT:  I'm going to sustain it at this time.  And we'll -- I'm not saying you can't circle back, but I think -- I think we need to let the -- the tapes play --

MR. MIKE:  Okay.

THE COURT:  -- before we start talking about what he

thought about them.

MR. MIKE:  Okay.

(The following proceedings occurred in open court, in the presence of the jury:)

BY MR. MIKE:

Q.    Okay.  Mr. Martin, did you, throughout the course of your investigation, gather any medical records?

A.    After the -- after the arrest of Dr. Hollington we did send a search warrant to Practice Fusion, who is the medical record provider that he used.

After serving that search warrant -- the purpose of that was to see if the records were complete and accurate for the individuals we sent in as undercovers.  They responded to that search warrant and provided us the requested records in an Excel format, as well as a few PDF documents.

THE COURT:  Do you need some water?  Can we get some water for the --

JUROR:  Thank you.

THE COURT:  Yes, ma'am.  Sure.

MR. MIKE:  Your Honor, permission to approach the witness with Government 1K and 1L, which has been marked for identification?

THE COURT:  Yes.

MR. FALLGATTER:  No objection, Your Honor.

THE COURT:  Okay.  So that's 1K and 1L.  They'll be

received without objection.

(Government's Exhibits 1K and 1L received into evidence.)

THE COURT:  Ms. Manrique, while you were gone, I admitted 1K and 1L.

BY MR. MIKE:

Q.   All right.  So were there any other subsequent -- did the undercovers ever go back into Dr. Hollington's office?  Or was it just the one visit?

A.   They never went back to the office, but Kevin Lee received a phone call from Dr. Hollington on November 4th, 2022, after his arrest.

Q.   Okay.  Was that -- was that phone call audio recorded?

A.   That phone call was audio recorded, yes.

MR. MIKE:  Your Honor, approach the witness with what's been previously admitted as 16A and 16B?

THE COURT:  Yes, sir.

MR. FALLGATTER:  No objection, Your Honor.

THE COURT:  I'll go ahead and admit them without objection, Government's 16A and 16B.

(Government's Exhibits 16A and 16B received into evidence.)

MR. MIKE:  One moment, Your Honor.

THE COURT:  Yes.

BY MR. MIKE:

Q.   All right.  I want to talk about any -- as far as the next

*REDACTED TRANSCRIPT*

steps in your investigation, after receiving that call, evaluating that call, how did the investigation proceed?

A.    After that the St. Johns County Sheriff's Office put out through the media a request for any individuals that had contact with Dr. Hollington as a patient, and if they had concerns about any of the medications they received to contact their sheriff's office to continue the investigation.

Q.    Did you work in conjunction with the St. Johns Sheriff's Office?

A.    We did.  Throughout this investigation it was jointly run by us and the DEA and the St. Johns County Sheriff's Office.

Q.    All right.  Did anyone come forward that you had a chance to speak with or interview?

A.    We did.  There was four females that came forward who had concerns about the prescriptions they received.  At that time, in order to corroborate their stories and what they were telling us in regards to their status as a patient, we subpoenaed some of their prescription records from local pharmacies in order to determine if they were patients of his and the prescriptions they said they received from him.

In addition to that, we also went to a local Best Western hotel to obtain a copy of a receipt that was paid for by Dr. Hollington in regards to one of the patients.

MR. MIKE:  Your Honor, permission to approach the witness with what's been previously marked for

**REDACTED TRANSCRIPT**

identification --

THE COURT:  Yes, sir.

MR. MIKE:  -- 12A, 12B, 13A, 13C, 14A, 15A, and 15B.

MR. FALLGATTER:  I apologize, Your Honor.  I lost that listing.

THE COURT:  Yeah.  Let me -- so 12A, 12B.

MR. MIKE:  13A.

THE COURT:  13A, 13C, 14A, 15A, and 15B.

I'll give you a minute, Mr. Fallgatter, to take a look and see.

MR. FALLGATTER:  Yes.  No, thank you, sir.  Other than that objection -- my standing objection, I guess -- if I could rely on that?

THE COURT:  I'll go ahead -- because these are all in the nature of prescriptions and records revolving around the prescriptions?

Is that correct, Mr. Mike?

MR. MIKE:  Yes, Your Honor.

THE COURT:  I'm not sure -- I'm not sure in what context you'll need to establish that with the witness.  But assuming you can do that, I will admit -- I will admit 12A, 12B, 13A, 13C, 14A, 15A, and 15B over objection.

(Government's Exhibits 12A, 12B, 13A, 13C, 14A, 15A, and 15B received into evidence.)

MR. MIKE:  And, Your Honor, I do want to move into

*REDACTED TRANSCRIPT*

45

evidence -- I apologize.  I left out 15D, E, and F.

THE COURT:  All right.

All right.  Mr. Fallgatter, the same --

MR. FALLGATTER:  No objection, Your Honor.

THE COURT:  No objection?

So 15D, E, and F will be received without objection. All right.

MR. MIKE:  Thank you, Your Honor.

(Government's Exhibits 15D, 15E, and 15F received into evidence.)

MR. MIKE:  One moment, Your Honor.

THE COURT:  Yes.

BY MR. MIKE:

Q.   Mr. Martin, was one of the -- one of the women you obtained a prescription for A█ B█████████?

A.   Yes.

Q.   All right.

MR. MIKE:  Permission to publish 12A, Your Honor?

THE COURT:  Yes.

BY MR. MIKE:

Q.   Okay.  What is 12A?

A.   12A is a prescription that was written to A█ B█████████ on -- it looks like August 30th of '20, for buprenorphine.  And that was issued by Dr. Hollington.

Q.   Okay.  And one of the women you investigated or obtained

the prescriptions for was Ms. W▮▮▮, K▮▮▮ W▮▮▮?

A.    Yes, it was.

Q.    Was the other woman E▮▮▮ M▮▮?

A.    That is correct.

Q.    And was the fourth one D▮▮▮ A▮▮?

A.    Yes, sir.

MR. MIKE:  Permission to publish 13A, 14A, and 15A, Your Honor?

THE COURT:  Yes, sir.

BY MR. MIKE:

Q.    What's 13A?

A.    13A is a prescription issued to patient K.W.

Q.    That's K▮▮▮ W▮▮?

A.    Yeah, K▮▮▮ W▮▮.  I wasn't sure if I could say that. It was blacked out.  K▮▮▮ W▮▮ is patient K.W., for Adderall, 20 milligram.  That was issued on September 27th, 2020.

Q.    Okay.  And 14A?

A.    14A is a prescription for patient E.M., who is E▮▮▮ M▮▮, on February 21st, 2021.  The prescription was issued by Dr. Scott Hollington for buprenorphine.

Q.    Okay.  And the second page to 14A, please?

A.    14A is another prescription issued to patient E.M., or E▮▮▮ M▮▮, on February 21st, 2021.  This prescription was issued by mid-level practitioner Hope King for alprazolam,

*REDACTED TRANSCRIPT*

2 milligram.

Q.   And then 15A?

A.   That's a little harder to read.

Q.   Sorry about that.  We'll zoom in some more.

A.   No worries.

     This one is a prescription issued to patient -- it would be D.A., D███████ A█████.  It was issued on August 22nd, 2022, by mid-level practitioner Rachael Pittala.  And the prescription is for buprenorphine as well.

Q.   Okay.  And page 2 to 15A, what was that prescription?

A.   This is a prescription issued, again, to D███████ A█████ by Rachael Pittala for Klonopin, half a milligram, on August 21st, 2022.

Q.   And what is Klonopin?

A.   Klonopin, I believe, is clonidine -- or I can't remember off the top of my head.

Q.   It's a controlled substance?

A.   It is a controlled substance, yeah.  But it's the generic for a name brand.

     MR. MIKE:  A moment to confer?

   (Counsel confer.)

     MR. MIKE:  No further questions at the moment, Your Honor.

                         *  *  *  *  *

     THE COURT:  Any redirect?

*REDACTED TRANSCRIPT*

MR. MIKE: Yes, Your Honor.

Your Honor, permission to publish Government's Exhibit 1E?

THE COURT: Yes, sir.

MR. MIKE: Specifically I want to zoom in on paragraph 20, once Ms. Ganoe gets it up.

**REDIRECT EXAMINATION**

BY MR. MIKE:

Q. Mr. Martin, there was some talk about NARCAN spray, NARCAN nasal spray, and what it is and if you're familiar with that. I wanted to point you to a policy at Sawgrass Health, LLC, paragraph 20 on Exhibit 1E.

Can you read that for us?

A. I can.

"If I take other medications, benzos, muscle relaxers, neuroleptics, SSSRIs, et cetera, in combination with buprenorphine that can cause depression of CNS or cause respiratory depression, I will be required to obtain a NARCAN nasal spray once a year and know how to use it in emergency situation."

Q. Are you aware of any undercovers who went into his office and received buprenorphine -- did they ever get a NARCAN spray from the defendant?

A. No, no one did.

Q. Were they ever instructed on NARCAN spray from the

*REDACTED TRANSCRIPT*

49

defendant?

A.    They were not.

MR. MIKE:  Thank you.

BY MR. MIKE:

Q.    Mr. Hubert -- he talked about Mr. Hubert going into the --
to the office, the confidential source who received a
prescription.

Are you aware if he provided a urine sample?

A.    I don't recall.

Q.    Okay.

A.    I believe he did, but I don't recall.

Q.    Okay.  Are you aware if -- if his vitals were ever ran by
the doctor when he went to visit?

A.    They were not.

Q.    Are you aware if he -- if his blood pressure was checked
at all?

A.    There was no medical exam done.

Q.    Okay.  But did he also leave with a prescription?

A.    He did, yes.

MR. MIKE:  That's all I've got, Your Honor.  Thank
you.

THE COURT:  All right.  You may step down.

Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Who is the government's next witness?

*REDACTED TRANSCRIPT*

MR. MIKE:  Your Honor, the government calls A█ B██████.

THE COURT:  As I said, ladies and gentlemen, in between witnesses if you want to stand up for a minute, you're welcome to.

(The witness enters the courtroom.)

COURTROOM DEPUTY:  Do you solemnly swear that the testimony you are about to give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, ma'am.

COURTROOM DEPUTY:  Please state your full name and spell your last name for the record.

THE WITNESS:  A██ N█████ B████████, B██████████████.

COURTROOM DEPUTY:  You may be seated.

THE COURT:  All right.  Ma'am, I can see you're a little bit nervous.  And I understand that.

THE WITNESS:  Sorry.

THE COURT:  That's all right.  That's very common.  This is not a usual thing for anybody to do.  So here's the way this is going to work, though.  If you could just scoot up a little bit so that -- and keep your voice up, that will help us.

The questions are going to come from the podium over

*REDACTED TRANSCRIPT*

there.  Mr. Mike represents the government.  He'll ask you some questions.

Mr. Fallgatter then represents Dr. Hollington.  He'll have some questions.

And just do the best you can and -- and it will be fine.  All right?

THE WITNESS:  Okay.

THE COURT:  Mr. Mike, go ahead.

MR. MIKE:  If you need a break, just -- once we begin, just let us know.  All right?

**A█ N████ B████████, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MR. MIKE:

Q.   All right.  So please introduce yourself to the jury.

A.   I'm A██.

Q.   Where are you from, Ms. B████████?

A.   From St. Augustine.

Q.   How long have you lived in St. Augustine?

A.   37 years.

Q.   What do you do in St. Augustine?

A.   I clean vacation rentals.

Q.   Okay.  How long have you been doing that?

A.   For a couple of years off and on.

Q.   Do you -- do you know the defendant?

A.   Yes, sir.

*REDACTED TRANSCRIPT*

Q.    Do you recognize him?

A.    Yes, sir.

Q.    Can you identify him with a -- well, is he --

A.    Yes, sir.

Q.    -- standing up?

A.    Yes, sir.

Q.    All right.

        MR. MIKE:  Let the record reflect Ms. B███████  has identified the defendant standing up in the courtroom.

        THE COURT:  Yes, sir.

BY MR. MIKE:

Q.    How do you know the defendant?

A.    He was my doctor.

Q.    What were you going to see him for?

A.    Originally it was for Subutex, Suboxone.

Q.    Okay.  And why were you on Suboxone?

A.    Because I was a heroin addict.

Q.    I want to talk about that for a little bit.  How long have you been struggling with that addiction?

A.    I started opiates when I was 12, but I've been struggling with heroin for about seven or eight years.

Q.    And you've been trying to get some assistance, some help, and Suboxone is one of the medications you've been trying to receive as far as to help you?

A.    Yeah, the Subutex was, until things happened.  And now I

**REDACTED TRANSCRIPT**

go to the methadone clinic.

Q.    Do you mind sharing -- how did you get hooked on this opioid?

A.    Well, my dad was murdered when I was about 8 or 9 years old.  And my mom hooked up with a pretty bad guy.  And so being passed around to guys, molested and beaten and stuff as a kid, I would take Lortabs to ease the pain and stuff, or any kind of pain medicine to, you know, forget.  It was my -- just my way to cope.

And when I got pregnant when I was 14, the doctors prescribed me Lortabs.  And I was never able to get back off of them.  It just progressed.

Q.    Okay.  When did you first go to the defendant to receive treatment?  About approximately what year?

A.    2020.

Q.    During this time frame, where were you living?

A.    I was homeless.

Q.    How was your financial situation at the time?

A.    I was doing whatever -- I didn't really have a financial state at all.  I was -- I was just -- I guess what you call hustling in the streets to take care of my fix and to survive, to eat --

Q.    Okay.

A.    -- lay my head down somewhere.

Q.    How did you come to hear about the defendant's clinic?

**REDACTED TRANSCRIPT**

A.    My sister.

Q.    Why did she refer you there?

A.    Because she was scared that I was going to die.

Q.    So tell me about the first visit you had with the defendant in 2020 -- his office is in St. Augustine, correct?

A.    Yeah.

Q.    Okay.  Describe what happened when you walked into his office.

A.    When me and my sister went there, there was no one else there.  We walked in.  It was just me and her.  We walked into the office.  He shut the front door and locked it.

We walked in.  She introduced me to him.  She walked out.  He shut his office door.  And he asked what I needed the Subutex for.  And he asked, you know, a little bit about my history.  He had me pee in a cup.  And then he prescribed my medicine to me.

Q.    Okay.  Describe his office setup when you walk in there.

A.    When you first walk in there is -- it's just a room.  It had like a little opening over here.  He had a couple of odds-and-end chairs, like from a yard sale or antique store, just crappy chairs in his office.

And then he had like another office right here, where you would think a receptionist would be, but there wasn't.  He had a refrigerator in there.  He always got you a water or Coke every time you came into his office.  And then the bathroom was

*REDACTED TRANSCRIPT*

over to the right and his office was to the left.

Q. Okay. And when you walked into his office, what did you see?

A. You had his desk, two chairs, and then his couch.

Q. So he had a couch fixed -- right beside -- behind his desk?

A. Right behind his desk, yes.

Q. Okay. During your first visit, did he -- did he check your vitals or anything?

A. No.

Q. Okay. I want to -- I want to just -- I want to reference August 30, 2020. Do you remember seeing the defendant on that day?

A. Yes.

Q. How did you initiate that visit?

A. I -- it was time for me to get my scrip again. I didn't have any money or any way to pay for my visit or my prescription, so he told me to come to the office and we could talk about it. So I came to his office.

Q. How did you communicate with him?

A. My cell phone, through text messages. And sometimes he would call. But mostly just through texting.

Q. Okay. All right. Tell me what happened when you walked into the office.

A. I -- I walked in and -- I think that day that I -- I

wanted to add Valium or something else to my prescription besides just the Subutex for anxiety or, you know, whatever.

I told him that -- I was crying and upset, because I didn't have any way to pay for it and I didn't know what I was going to do. And so he told me not to worry about it and told me I could come over and have a seat on his couch, proceeded to tell me how pretty I was and how beautiful I was.

Q. Was there anybody else in the office?

A. No. We were locked in there, just me and him.

Q. When you say "locked in there," describe what you mean.

A. The front door to the office was -- the original door that you walked in to get into the doctor's office was locked and his office door was locked.

Q. How do you know it was locked?

A. Because I watched him lock it.

Q. So you watched him lock the front door to the entire building and then his office door?

A. Yes, sir.

Q. Okay. So you mentioned that he told you to come sit -- he was going to take care of you, come sit next to him on the couch.

What happened after that?

A. He started rubbing his hand through my hair and down my back, telling me how pretty I was, that he wanted to taste me, that he would make sure that -- that I would be able to pay for

my prescriptions and everything if I just let him taste me.

Q.   When -- did you know exactly what he was -- when he said he'll take care of you, what that meant?

A.   Yes, sir, because I've been prostituted out before.  So I know what that means, yes.  It wasn't hard to read between the lines.  I gave him what he wanted and I got what I needed.

Q.   So I know it may be a little difficult, but can you explain to the jury what happened after he gave you that proposition?

A.   I just knew what he wanted.  And I told him that I was going to need a couple hundred dollars and he -- it's not a problem.

So I stood up.  I was wearing yoga pants.  I pulled -- I'm sorry.  I pulled down one of my pants legs and left the other one on and I laid down on the couch and I let him eat me out.

And I pretended to cum, acted like I enjoyed it, because he kept asking me if it felt good and if I liked it. So I figured that if I acted like I did and got it over with that I could get my pants on and I could get out of there.

Q.   Did he -- so you got up quickly.  Did he write you a prescription?

A.   The prescriptions were already written.  He already wrote them -- he already did everything in the computer.  He -- at that point it was just about getting the money to get the

*REDACTED TRANSCRIPT*

prescriptions out.

Q.    Did he give you money as well?

A.    Yes.

Q.    How much did he give you?

A.    He gave me three $100 bills.

Q.    Did he say anything else to you before you left?

A.    If I needed anything, to text him.  And I left.

Q.    How did -- how did this experience -- how did that affect the way you -- you look at Subutex or that buprenorphine that helps you with your addiction?

A.    You know, it's -- Subutex was -- it was saving my life, you know, because Subutex -- I could get up and I could take my medicine and I could not have to worry about where I'm going to get my next fix or what I'm going to have to do to get my next fix, you know, or how am I not going to be sick, or, you know, what I was going to do that day to survive, you know, or what -- you know, I didn't -- I didn't let -- I didn't let, you know, whatever him and I had going on interfere with what I thought about the medicine.  Like, I knew the medicine -- the medicine does help.  You know, the medicine does help.  It helps it, you know.

Q.    Okay.  Did he charge you for the visit?

A.    No.  I never paid a dollar.

Q.    Out of all the times you visited him, you never paid one dollar?

*REDACTED TRANSCRIPT*

A.   No.

Q.   Did he ask you --

A.   Excuse me.  That's a lie.  When I went to jail for my year and got out and went back to him, then I paid.

Q.   Okay.

A.   Then it was legit.

Q.   Okay.  Did he ask you any questions about -- any medical questions during that visit?

A.   Just -- I mean, are you talking about the very first time or...

Q.   No, just this time that you just explained.

A.   No, no.  There was no questions or anything after -- after the very first time.  We never did any of that again.

Q.   Did he ask you to -- for a urinalysis during that visit?

A.   No.

Q.   I'm assuming your vitals were not checked at all?

A.   No.

Q.   Did he check your pulse?

A.   No.

Q.   Did you give him any information about your background, medical history?

A.   The very first time maybe.  I -- after -- after we engaged in the sexual thing -- I'm not proud to say it, but I will say it -- I took advantage of what I could.  I figured if I had to lay down underneath him, then I was going to get what I could

*REDACTED TRANSCRIPT*

get out of him.

So I started hammering on prescriptions:  Adderall, Xanax, Klonopin, gabapentin, Subutex.  Anything I could get from him, I got it.

Q.   You mentioned that you had a -- a history in the past of -- of -- I think you mentioned like pimped out, or however you said it.

Was he aware about your previous conditions --

A.   Yes, sir.

Q.   -- or your past history?

A.   Yeah.  The very first time we sat down, when he was asking all the questions, when I told him about the PTSD and the bipolar and the reason why, all of that, yes, he knew -- he knew -- he knew my history.

Q.   Okay.

MR. MIKE:  One second.

(Counsel confer.)

MR. MIKE:  No further questions, Your Honor.

* * * * *

THE COURT:  Any redirect, Mr. Mike?

MR. MIKE:  Very, very briefly, Your Honor.

THE COURT:  Okay.  Almost done, ma'am.

THE WITNESS:  As long as it's over with, I'm good.

**REDIRECT EXAMINATION**

BY MR. MIKE:

*REDACTED TRANSCRIPT*

61

Q.    Okay.  Ms. B_____, you testified that you did not pay for any visits, but at a later point you did.  Why did you believe you started paying?

A.    Because I did not need his help anymore.  I could take care of myself at that time.  I was working.  I had a full-time job.  I had money.  I could pay for my prescriptions.

Q.    And was this after --

A.    After I did my year in the jail, yes.

Q.    Okay.  But previous -- previous to that you didn't pay for any prescriptions?

A.    Not one.  No, sir.

Q.    Okay.  And was he still giving you money?

A.    When I got out of the jail this past time?

Q.    Before.  The times you were not paying for --

A.    Yeah, yeah.  Before I went to jail, yes, he was giving me money all the time, any time I called or text.

Q.    And were you still engaged in the sexual activity?

A.    Yes.

Q.    Approximately how many times?

A.    At least -- every single visit, and sometimes in between.  Whenever I needed money for cigarettes or food or whatever, he would -- I would go to the office.

Q.    Okay.  And there was a few things on the records that would -- Mr. Fallgatter was showing.  Each one of the medical records stated that you were receiving counseling.

*REDACTED TRANSCRIPT*

A.    I was not.

Q.    Okay.  Each one of these showed -- also mentioned that you were urine drug tested every time.

A.    Was not.

Q.    Also that you guys went over the -- each one of --

A.    Never.

Q.    -- each one said you went over patient contracts.  No?

A.    No.

Q.    Now, back in the time when you say you first visited him in July 2020, I believe you told the jury -- is this correct, that you were homeless at the time?

A.    I was bouncing around between my aunts' houses.

Q.    In Dr. Hollington's note it mentioned that the patient's living situation and job situation are generally improving, on course.

A.    Yep.

Q.    Is that a correct assessment?

A.    Like a month or so later I moved in with my Aunt Sharon. So at the beginning, yes, I was homeless, but I moved in with her.  And then I stayed there for a few months, but then I had to move out of there, too, so...

Q.    But at the time of this visit, you --

A.    I was homeless, yeah.

Q.    Okay.  And it also mentioned that you were a pregnant patient with anxiety.  Were you pregnant at that time?

*REDACTED TRANSCRIPT*

63

A.    Never pregnant.  My tubes are cut, tied, and burned, sir.

MR. MIKE:  No further questions, Your Honor.

* * * * *

THE COURT:  All right.  Thank you, ma'am.  You are now done.

THE WITNESS:  Thank you.

THE COURT:  Who is the government's next witness?

THE WITNESS:  Have a great day.

MS. WASHINGTON:  The United States calls E███████ M████.

THE COURT:  Can somebody please escort the witness.

(The witness exited the courtroom.)

(The witness entered the courtroom.)

COURTROOM DEPUTY:  Do you solemnly swear that the testimony you are about to give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  (Nods head affirmatively.)

COURTROOM DEPUTY:  Yes?

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Please state your full name and spell your last name for the record.

THE WITNESS:  E████████ L█████ M████, M█████████.

COURTROOM DEPUTY:  You may be seated.

THE COURT:  So, ma'am, I'm sure you're nervous.  And

*REDACTED TRANSCRIPT*

64

I understand that, so -- but what's going to happen is that Ms. Washington is going to ask you some questions.  You just answer them to the best you can.  If you don't understand, she can clear it up for you.

And then this gentleman, Mr. Fallgatter, who represents Dr. Hollington, may have some questions, too.  All right?  And if you need -- do you need any water or anything?

THE WITNESS:  I need a glass of water.

THE COURT:  Yeah.  We'll get you some water.

All right.  Ms. Washington, you may proceed.  And if you'll turn and try to answer into that microphone and keep your voice up.  Okay?

THE WITNESS:  Thank you.

THE COURT:  Yes, ma'am.

**E███████ L█████ M████, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. WASHINGTON:

Q.   Ms. M████, where do you currently live?

A.   In St. Augustine, Florida.

Q.   How long have you lived there?

A.   I was born and raised.

Q.   And are you currently working?

A.   Not at this time.

Q.   What did you do when you last worked?

A.   I had a successful cleaning business.  I also managed two

doctors' offices, two very busy doctor offices.

Q.    What did you do in those doctor offices?

A.    I was office manager.

Q.    Now, currently, are you suffering from any sort of medical conditions?

A.    I lost my mother.  And I -- I was an only child -- thank you.  And she was a single mother, so she was my best friend. And I -- when I lost her, I just became a broken person.

Q.    And what year did that happen?

A.    2020.

Q.    I'm very sorry to hear that.

Prior to that time, had you been diagnosed with any conditions?

A.    I was -- I was excelling at life.  Life was great.  I couldn't -- I was like the model of perfection.  Everything was -- couldn't have been better.

Q.    And after you lost your mother, were you diagnosed with anything?

A.    I had been seeing a doctor for an addiction to painkillers that I developed in my early 20s after dental assisting for four years.

I had back problems.  And after abusing pain medication, I saw a doctor for Subutex.  He was my doctor for 13 years.  And I'm not sure if he diagnosed me with anything. I never really asked him to see my chart.

Q.   Okay.  And what kind of pain medications were you taking?

A.   On the street or from my doctor?

Q.   Initially from your doctor.

A.   Suboxone.

Q.   So you mentioned having some sort of injury and being on pain medications.  What pain medications did you have initially for that injury?

A.   The Lortab.

Q.   And so did you progress from there at some point?

A.   I did.

Q.   And what did you progress to?

A.   Oxycodone.

Q.   Was that something being prescribed to you?

A.   No.

Q.   Okay.  And how were you getting the oxycodone?

A.   On the street.

Q.   How long were you taking that?

A.   Three years.

Q.   So you also just mentioned Suboxone.  When did you start taking that?

A.   In 2007, the day that Obama became elected.

Q.   And was that working well for you?

A.   It saved my life.

Q.   And you also indicate something about seeing a doctor -- was it for 13 years?

*REDACTED TRANSCRIPT*

A.    Dr. Prudencio.

Q.    At some point were you unable to see him further?

A.    Shortly after COVID his wife became ill and she passed away.  He was already in his 80s.  So I was already preparing to have to transfer, but I hadn't yet found a physician for sure that I was going to switch to.  It's very hard to find a Suboxone doctor.  So, you know, his wife passed away and he shut down his business.  And it was very abrupt.

Q.    So did you eventually find a new doctor?

A.    Not exactly, no.

Q.    Okay.  About how long did it take you to find a new doctor after that practice got shut down?

A.    Are you calling Dr. Hollington a doctor?

Q.    Well, let's phrase it this way.  When did you next obtain a prescription for Suboxone?

A.    Through Dr. Hollington.

Q.    And approximately how long was that after you lost your previous doctor?

A.    Seemed like forever.  I'm going to say it was around ten months.

Q.    And how did you find Dr. Hollington?

A.    Well, considering I had only heard of Dr. Hollington being almost like the Wizard of Oz, that you can't get in to see him -- you know, too many patients and he was just unattainable, I -- I didn't think I was ever going to be able

to see him.  But a friend of mine told me that she could get me in.

Q.   And did she get you in?

A.   Yeah.

Q.   Do you remember approximately when that was when you first saw him?

A.   It was 2/21/21.

Q.   And by "2" do you mean February?

A.   Yes, ma'am.

Q.   And could you recognize that individual, Dr. Hollington you saw, if he was in the courtroom today?

A.   Yes.

Q.   And is he seated here today?

A.   Yes.

Q.   Okay.  And can you describe him or where you see him in the courtroom?

A.   He's the gentleman standing.

        THE COURT:  He just stood up.  So the record will so reflect.  All right.

BY MS. WASHINGTON:

Q.   Now, that first day you went to see Dr. Hollington, tell me what you were feeling, in terms of what you had hoped to accomplish from that visit.

A.   I was elated.  I was looking forward to finally having a physician, especially because I had been driving an hour and a

*REDACTED TRANSCRIPT*

half for so long to see Dr. Prudencio.  I thought this was just going to be a dream come true.  It was only five minutes from my house.  I -- I was just -- I couldn't believe this was finally happening.  I was excited.

Q.   And do you recall when you first saw him the time of day, in terms of morning, afternoon, evening?

A.   She said that my -- she had called and spoke with me and my appointment was at 4 o'clock.  So the sun was going down. It was in wintertime.  So when we arrived it was looking in the evening time.

Q.   So you just mentioned "she" and "we."  Who are you referring to?

A.   The woman that spoke with Dr. Hollington prior -- and to me prior to me arriving there.

Q.   Okay.  And the day you arrived, do you go to his office?

A.   Yes, ma'am.

Q.   And can you tell me what it was like when you walked in the door, what you saw?

A.   I walked in and there were no patients in the waiting room.  I was kind of taken aback by the fact there was no staff.

I looked to my left and there was no receptionist. So I didn't really know what to do.  I sat down and I asked her, actually, if there was any paperwork.

And she said, "No.  He'll see you in a few minutes.

*REDACTED TRANSCRIPT*

Just hang on."

He was with a patient and his door was closed.  And it looked like -- that I was going to be the last patient.

Q.   And, again, you said "she" and "her."  Is this the same person you were --

A.   Same -- same woman.

Q.   All right.  So at some point do you end up seeing Dr. Hollington that day?

A.   (Nods head affirmatively.)

Q.   And at that point are there any other patients there?

A.   No.

Q.   Okay.  And so what happens when you do finally sort of lay eyes or see him at that point?

A.   She opened -- no, I'm sorry.  The patient -- the last patient that left the building opened the door.  And I looked in there and saw Dr. Hollington.  He was sitting at his couch desk.  And he was casually dressed, barefooted.  I thought it was kind of bizarre, but...

It seemed very -- like a pleasant, laid-back atmosphere.  I still didn't think anything was wrong.

Q.   And so do you go into the office?  What happens once you see this patient leave?

A.   He told me to come on in.

Q.   Do you go in?

A.   Yes.  I went in and sat down in one of the two chairs that

*REDACTED TRANSCRIPT*

was in front of his desk.

Q.   And what happens after that?

A.   He began to ask me the normal questions that you would ask -- usually were asked by a -- prior to seeing the actual physician, but he -- started to begin with age, date of birth, the normal questions that you would fill out on paperwork.

Q.   Okay.  And do you go through your medical history?

A.   Not so -- briefly.

Q.   What do you recall you briefly may have said?

A.   My medical history I think was to the extent of, "What are you here for?"

Q.   And do you recall what you told him you were there for?

A.   I told him that -- about Dr. Prudencio.  He said he was aware that he had had a -- he had a lot of patients recently switching to his office from there --

Q.   Okay.

A.   -- and it had been very busy for him.

Q.   And at that point -- or any point during that visit, is your pulse checked?

A.   No.

Q.   What about your temperature taken?

A.   No.

Q.   What about your weight?

A.   He asked me what my weight was.

Q.   Okay.  Did you see any medical equipment in the office?

A.   No.

Q.   So do you remain in the seats that you just talked about the whole time?  Or do you change at any point?

A.   I take that back.  Not in his office.  But in the bathroom there was a scale.

Q.   Okay.  Thank you for that.

And turning back to where you're in the office, so does your position remain the same?  Or do you move about at any point during that visit?

A.   After the first few questions, he -- he pat the -- the couch beside him and said, "Come on -- you can come over here and sit by me."

Q.   Okay.  And did you do that?

A.   I did.

Q.   What happened after that?

A.   He continued to look on his screen and -- at my -- what he was typing in for me.

Q.   And does he talk to you at this point?

A.   He continued to ask me things like how tall am I, am I married, single.

Q.   And then how does the visit progress from there?

A.   He asked me -- when I said I wasn't married, did I have a boyfriend.

Q.   Did you tell him?

A.   I told him no.

Q.   And what were you thinking at this point when you get asked that question?

A.   That I -- everything had shifted gears in my mind.  And I was wondering why my physician was asking me if I had a boyfriend.

Q.   And what happens after that question?

A.   He put his hand on my leg.

Q.   Okay.  And do you -- does he do or say anything when he does that?

A.   He continued to look at his monitor and go down the list of medications that he was viewing that I had received from Dr. Prudencio.

Q.   And after that happens, what happens next in the visit?

A.   He stopped looking at his screen after we got to the point where he saw alprazolam, which is Xanax.  And he said, "Now, Ms. M____, we don't do Xanax here in this office, so we can talk about that."

     And he walked to his front -- out of his office to the front door.  And he locked out the girl that I came with outside.  And as he was doing so, I was trying to mouth to her help me.  And she pointed that she was going to get cigarettes. And he locked that door and then he went back in his office and closed his doors.

Q.   What made you mouth the words "help me" to your friend?

A.   I could see that this was going in a direction that I was

*REDACTED TRANSCRIPT*

a little -- I still didn't -- would never have comprehended what ended up happening, but I -- I was beginning to get nervous.

Q.   So what happens when he returns to the office?

A.   He closed his door and he said, "About the Xanax, like I said, we don't really do Xanax here in this office, but maybe we can work out a deal."

Q.   Okay.  And what did you understand that to mean?

A.   I was confused, considering I had just been on the medication.  I had explained to him how I lost my mother and I wasn't quite sure what "a deal" meant or why he would even say that to me.

Q.   And does Dr. Hollington do or say anything after that?

A.   Yes.  He came towards me.  And he was in front of me with his knees down between my legs and talking to me with his hands on my knees.

Q.   And does he say anything at that point?

A.   Yes.

Q.   What does he say?

A.   That he wanted to have oral sex with me.

Q.   Does he use those words?

A.   No.

Q.   What does he say specifically?

A.   Specifically?

Q.   Yes.

*REDACTED TRANSCRIPT*

75

A.   "Can I eat your pussy?"

Q.   And what do you say in response, if anything at all?

A.   "Oh, my God."

     I said, "Oh, my God.  I know you did not just say that.  I just got out of the waiting room with pictures of your wife and child painted on the wall.  I know you're a married man.  Wow."

Q.   And does he respond to that?

A.   He got up and he put himself as close to my body as he could, on my right-hand side.  And with his hands still on my knees said to me, "My wife is a very sick woman."

     I said, "Sick how?  Physically or mentally?"

     He said, "She's just very ill."

Q.   So what happens after that?

A.   So he -- after saying those words, he slipped down back into the position that he was in and asked me again what he had asked me before.

Q.   And by "before," you're referring to the oral sex?

A.   Yes, ma'am.

Q.   So what do you say to -- in response, if anything, at that point?

A.   I said, "No, no, no, no, no.  Yeah, no, that's not going to happen."

Q.   And does he comply and not do anything?

A.   No.  He said, "Come on.  Just -- you need to relax.  Just

*REDACTED TRANSCRIPT*

76

relax."

And he began to take his hands up my legs.  And I had yoga pants on that day.  And he began to pull my yoga pants down off my hips.  And I was wiggling and squirming, trying to pull them back on to my hips, because I did not want them to come off of my -- I did not want my underwear to come down off my butt.

And so we were -- we were battling with my yoga pants.  And I could hear the threads popping.  And as you can see, he's a much larger individual than I am.  I was losing the battle.  And before I could even get it out of my mouth, he had his -- his finger inside me.

Q.   Okay.

A.   He wasn't able to go much further than that because I was on my period.  And I said, "Stop, stop, stop.  I have to use the bathroom.  I'm on my period."

And he got up and he let me go to the bathroom.  And so I went into the bathroom and tried to collect my thoughts.  And I was -- looking back on it now, I was talking to myself and trying to figure out what I was going to do in this situation.  How did this get -- how did this happen?  What am I going to do?

And I knew -- it was almost like -- I knew it was going to be a battle of words and what I was going to have to say to get out of there and just pay for my visit and leave.

And I didn't know how I was going to go about doing that and making him not mad at me.

Q.    Now, when you're in the bathroom, does Dr. Hollington say anything to you?

A.    He said, "Are you all right in there?  Do you need anything?"

I said, "No, I'm all right."

Q.    And were you all right at that point?

A.    No.

Q.    Did you --

A.    I was breaking down.

Q.    Did you think about leaving at that point?

A.    No.  I thought that I could -- I thought I could -- I could -- I can get out of this.  I can -- I can figure out a way to get out of this and -- and still have him, you know, understand that I need my medication.  And -- and I -- I didn't think it was -- it was going to be, you know, a wrestling match or -- or rape or anything.

Q.    And so at some point do you leave the bathroom?

A.    I came back into his office, yes.  And I, of course, wanted to sit in the seat.  And he says, "No, no, no.  Come back over here."

And so I went back to the couch.  And he proceeded to beg me this time, pleading with me to please, please allow him to perform oral sex on me.

And I said, "I just told you I'm on my period.  This is crazy."

And he said, "I don't care.  I don't care.  It doesn't matter."

And I said, "That's ridiculous."

I said, "There will always be next month, but I -- but I got to go right now."

Q.    And so does he, again, try to touch you physically?

A.    Yeah.  He -- he continued to struggle with my pants, getting them down.  And we were -- it was a battle over my pants coming down.  And I was jerking them up.  He was pulling them down.

And I was asking him to please stop, please stop, and no.  I couldn't have said it any louder without just literally screaming at him.

But I was begging him to stop and -- because he wasn't stopping.  Finally he got my underwear off of my butt.  And I didn't have pockets in my yoga pants.  So I had my money for that visit and some other cash on me rolled up in the side of my underwear.

And when he got my underwear past my hips, the money -- the roll of money that had popped out on to the floor and popped loose and -- there were bills rolling around on the couch and on the floor.  So I thought this is the perfect way I can get out of this position.

*REDACTED TRANSCRIPT*

So I began to get up.  And he still had me by the pants.  And I said, "I need to get my money."

And he said, "Don't worry about it.  Don't worry about it."

I said, "No, please.  I -- just please" -- and he finally let go of my underwear.  And I grabbed my money off the floor and I went to the other side of the room.  And he could see that it wasn't going to happen.

And I said, "Can I please pay you?"

And -- and, you know, "I really got to go."

I said, "My stepdad is probably calling my phone.  I need to go."

And he had initially said that the visit would be 120.  And he said -- in a very angry way, he said, "Yeah.  It's 140 for today."

And I didn't argue with him.  I just gave him the 140.  And I waited for him to hand me a paper prescription, but he didn't.  He said, "I'll call your scrips in."

Q.   Did he call your scrips in?

A.   He did.

Q.   For what medications?

A.   The three medications that I was getting from Dr. Prudencio, which were Subutex, alprazolam, and Adderall, but he cut my doses from 90 to 60, from 60 to 30, and from 60 to 30.

*REDACTED TRANSCRIPT*

Q.   Were you given a reason why the doses changed?

A.   He said, "We don't -- we don't usually prescribe that much here at this office."

Q.   Now, did you end up ever returning to Dr. Hollington's office?

A.   I didn't tell anybody except the girl that was with me, which she wasn't happy about that.  And so I was back in the same position of being depressed.

And my stepdad had gotten word through a neighbor lady that I had -- I had met an older lady who had a daughter that went to Dr. Hollington.  And she -- I finally told my story to her.  And she told my stepdad.  So my stepdad came to me and he said, "Oh, you're not going to -- you're not going back without me -- you're going to go back, but you're not going back alone.  You're going to go with me."

So I had missed a month.  And I went back finally with him.  And he said, "I want to see this guy.  I want to -- I want to see what he has to say when I'm there."

Q.   And why did you miss a month?

A.   I wasn't going to go back to him.

Q.   Did you need that medication?

A.   I did.

Q.   And so did you end up returning with your stepfather?

A.   I did.

Q.   And was that visit anything like the previous visit you

*REDACTED TRANSCRIPT*

had?

A.    No.

Q.    Did you see Dr. Hollington alone?

A.    Well, the -- I walked in and it was full.  The waiting room was full of patients.  There were no seats.  We had to stand.  And there was no receptionist.

We were called in by Dr. -- or, I'm sorry, I was called in by Dr. Hollington.  And when I had seen he wasn't closing the door for the patients before me and then I walked in and he closed the door behind me, I immediately became nervous.

And he looked at me with these eyes like a wolf.  And I said, "You don't remember me, do you?"

And he just shook his head.  And I said, "Well, I brought my stepdad with me.  He wants to see you, too, as a new patient."

And I opened up the door and he walked in.  And he said, "Hi."

He introduced himself.  And I said, "Can he be in the visit with me?"

And he said, "Go ahead and sit -- you guys can sit down."

And he quickly told me that he was going to -- I'll just call in your medications.

And I said, "Okay.  Thank you."

And I walked out.

He saw my stepdad in the matter of maybe three to five minutes.  And my stepdad came out saying that he had been prescribed Subutex and Valium, which I was confused.  My stepdad has never taken a pain pill.

Q.    And did you see Dr. Hollington again after that visit?

A.    No.

Q.    Did you end up seeing nurse practitioners there?

A.    He became aggravated, I'm assuming, with me.  And he said, "From now on you'll be talking to a nurse practitioner."

Q.    And why did you think he was aggravated?

A.    I could -- I felt -- I could feel he was highly annoyed with me bringing my stepdad in and keeping the door open.

MS. WASHINGTON:  Your Honor, may I have a moment, please?

THE COURT:  Yes.

(Counsel confer.)

MS. WASHINGTON:  Nothing further, Your Honor.

* * * * *

THE COURT:  Any redirect?

MS. WASHINGTON:  Just a little bit, Your Honor.

**REDIRECT EXAMINATION**

BY MS. WASHINGTON:

Q.    Ms. M▇▇▇, I just wanted to go over a few of the things from the medical records just reviewed.

REDACTED TRANSCRIPT

Did you do a urine test on the first visit?

A.   No.

Q.   Did you sign a contract?

A.   No.

Q.   Did you discuss the Twelve Step program with Dr. Hollington?

A.   No.

Q.   Did some of those records you just reviewed contain information that you did not give to the nurse practitioner?

A.   Yes.

Q.   When you met with the nurse practitioners, was it ever face-to-face?

A.   Never.

Q.   Was it by video?

A.   No.

Q.   Was it strictly by phone?

A.   Strictly by phone.

Q.   Some of the records mentioned alcohol.  Do you drink alcohol?

A.   I was an occasional drinker when she asked me how I -- when I first initially spoke with her, I told her I had a couple of drinks a week.  I'd just lost my mom.

Q.   And were you going to school at any point during the time that you were seeing Dr. Hollington or the nurse practitioners at Sawgrass?

*REDACTED  TRANSCRIPT*

A.    No.

MS. WASHINGTON:  Nothing further, Your Honor, with this witness.

THE COURT:  All right.  Thank you very much. Appreciate it.  You may step down.

THE WITNESS:  Thank you.

* * * * *

## CERTIFICATE

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


     I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


     DATED this 23rd day of July, 2023.


                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC