<pre>
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                 JACKSONVILLE DIVISION

 3  UNITED STATES OF AMERICA,      Jacksonville, Florida

 4          Plaintiff,             Case No. 3:22-cr-141-TJC-PDB

 5  -vs-                           July 21, 2023

 6  SCOTT ANDREW HOLLINGTON,       10:30 a.m.

 7          Defendant.             Courtroom 10D
    _____

 8

 9                  EXCERPT OF JURY TRIAL
                (TESTIMONY OF RACHAEL PITTALA)
10         BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                UNITED STATES DISTRICT JUDGE
11

12              A P P E A R A N C E S

13  GOVERNMENT COUNSEL:

14       Kirwinn Mike, Esquire
         Ashley Washington, Esquire
15       United States Attorney's Office
         300 North Hogan Street, Suite 700
16       Jacksonville, FL  32202

17

    DEFENSE COUNSEL:
18
         Curtis Fallgatter, Esquire
19       Fallgatter, Catlin & Varon, P.A.
         200 East Forsyth Street
20       Jacksonville, FL  32202

21

    OFFICIAL COURT REPORTER:
22
         Shelli Kozachenko, RPR, CRR, CRC
23       221 North Hogan Street, #185
         Jacksonville, FL  32202
24       Telephone:  (904) 301-6842

25                       (Proceedings reported by stenography;
                             transcript produced by computer.)
</pre>

1                    T A B L E   O F   C O N T E N T S

2

3  GOVERNMENT WITNESS:                                    Page No.

4     RACHAEL PITTALA

5        DIRECT EXAM (CONTINUED) BY MR. MIKE....... 4

6        CROSS-EXAMINATION BY MR. FALLGATTER....... 28

7        REDIRECT EXAMINATION BY MR. MIKE.......... 93

8

9

10

11                    E X H I B I T S   R E C E I V E D

12  DEFENDANT'S EXHIBITS:                                  Page No.

13   DEFENDANT'S EXHIBIT 4B........................ 32

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2    July 21, 2023                                    9:07 a.m.

3                        *   *   *   *   *

4        (In the presence of the jury:)

5            THE COURT:  So you recall yesterday that Ms. Pittala

6    was on the stand, and we interrupted her testimony because I

7    had a legal issue that I had to resolve.

8            And I've now resolved that legal issue, and we're

9    just going to pick her right back up where we left off, okay?

10   So she was the witness right before this witness.  We

11   interrupted her.

12           She's still under oath.  Mr. Mike was asking her

13   questions.

14           And I'm saying your name wrong.

15           How do you say your name?

16           THE WITNESS:  Pittala.

17           THE COURT:  I am so sorry.

18           THE WITNESS:  That's okay.

19           THE COURT:  Yeah.  They just told me I'm saying your

20   name wrong, so -- Pittala?

21           THE WITNESS:  Pittala.

22           THE COURT:  All right.  I apologize.

23           Ms. Pittala is getting -- we're getting ready to

24   resume her testimony.

25           And, Mr. Mike, you may proceed.

1          MR. MIKE:  Thank you, Your Honor.

2          RACHAEL PITTALA, GOVERNMENT'S WITNESS, SWORN

3              DIRECT EXAMINATION (CONTINUED)

4   BY MR. MIKE:

5   Q.   Now, Ms. Pittala, when we last ended your testimony, we

6   were talking about Thomas Breo.

7          Do you recall who Thomas Breo was?

8   A.   Yes.

9   Q.   Okay.  And, again, how did you hear about Thomas Breo?

10  A.   The patient was assigned to me.

11  Q.   Okay.  And how was he assigned?

12  A.   Dr. Hollington first sent me a text message, and then he

13  called me --

14  Q.   Okay.  What --

15  A.   -- and --

16  Q.   I'm sorry.  Go ahead.

17  A.   Told me the patient, you know, was waiting to hear from

18  me.

19  Q.   And can you explain that call, like, what all took place

20  in that call, that telephone conversation?

21  A.   So the patient said that he, you know, had been in to see

22  Dr. Hollington and that he was -- you know, had to wait to see

23  me so that he can get his prescriptions.

24  Q.   Okay.  I was -- sorry.  That was my confusing question.

25          Your call with Dr. Hollington regarding a new

1    patient, can you tell us about that conversation.

2    A.    It was a text message with the patient's name and the

3    urine drug screen.  I didn't respond right away.  I was doing

4    something else; I didn't respond.

5              But then I got a call just stating that the patient

6    was waiting to hear from me.

7    Q.    Did he state it -- did he tell you what the patient

8    needed?

9    A.    He told me the patient was requesting Adderall and Xanax.

10   Q.    Did he go -- in this conversa- -- within this conversation

11   on the phone, did you go over the fact that he had an initial

12   medical encounter with Thomas Breo?

13   A.    He didn't go into detail.  He said the -- Mr. Breo was in

14   his office.  He saw him yesterday or -- I can't recall if it

15   was earlier that day or the day before.  I don't remember when

16   I made contact with Mr. Breo exactly.

17             But he just told me that he was in the office and

18   that he was requesting to be treated and paid already and ...

19   Q.    Before you reached out to Thomas Breo, did you -- was

20   there any record that documented the defendant's interaction

21   with Thomas Breo that you could review beforehand?

22   A.    No.

23   Q.    Why not?

24   A.    I initiated the record.  There was no record for him

25   already established in the medical -- electronic medical

1  record.

2  Q.    Okay.  Would it have been helpful if you would have had an

3  opportunity to review Dr. Hollington's initial interaction with

4  Thomas Breo before you had your phone call with him?

5  A.    Yes.

6  Q.    Why?

7  A.    It would have provided just additional details about the

8  conversation that he had with the patient or the treatment

9  plan.

10  Q.    Were you aware at the time that the defendant told Thomas

11  Breo that Adderall was a legitimate prescription for cocaine?

12  A.    I was not aware of that.

13  Q.    If you would have been aware of that, would that have

14  helped you in your assessment when talking with Mr. Breo on

15  that phone call?

16  A.    I would have pursued more questioning about the cocaine

17  use, how often he was using that or where he was getting it

18  from, continued to reinforce, you know, that it was dangerous.

19  Q.    Were you aware that the defendant was prescribing -- or he

20  had -- that he would prescribe Adderall for cocaine?

21  A.    I was aware that Adderall would be used to treat

22  addiction.

23  Q.    Have you ever had any questions with the -- well, during

24  your time working with the defendant, have you ever had any

25  discussions with him about the way he was prescribing

1  controlled substances, for instance, Adderall and buprenorphine

2  and anxiety medications?

3          MR. FALLGATTER:  Your Honor, we have a single patient

4  here, so I would ask that the questions be limited to Mr. Breo.

5  That's the only one she dealt with.

6          THE COURT:  Mr. Mike?

7          No.  I'm going to overrule the objection.  Go ahead.

8  BY MR. MIKE:

9  Q.    During your time working with the defendant, have you had

10  any discussions about the way he was prescribing controlled

11  substances, for instance, like Adderall or buprenorphine?

12  A.    Yes.

13  Q.    What was those discussions about?

14  A.    We would use buprenorphine for opioid use disorders.  It

15  was used to treat -- in some instances, for pain.  It would be

16  used for patients that had chronic pain.  And Adderall could be

17  used to help patients that were using illicit street drugs such

18  as methamphetamine.

19  Q.    Did you agree with that?

20  A.    At the time I understood addiction medicine.  I didn't

21  question it.

22  Q.    You didn't question it, but did you -- did you agree with

23  the way he was prescribing?  Did you feel that that was the

24  right manner in which it was prescribed?

25          MR. FALLGATTER:  Whether she questioned it or not is

PITTALA - DIRECT                                                              8

1    not really a question for this jury.

2              THE COURT:  Overruled.

3              THE WITNESS:  As I understood addiction medicine and

4    the conversations that I had regarding methamphetamine

5    addiction, it was my understanding, and I believed, that it

6    would be a successful treatment to help patients with

7    methamphetamine, so I did agree.

8    BY MR. MIKE:

9    Q.   And you believed that because of what?

10   A.   Because Dr. Hollington -- what Dr. Hollington told me.

11   Q.   Okay.  Did you ever stop prescribing Adderall at some

12   point?

13   A.   I never -- I never -- Dr. Hollington would fill the

14   prescriptions for Adderall.  I would see a patient that had

15   Adderall, for example, and I would message Dr. Hollington and

16   ask him to fill those prescriptions.

17             THE COURT:  Ma'am, can you do me a favor?  Pull that

18   microphone down just a little bit and keep your voice up.

19             Thank you very much.

20             THE WITNESS:  Okay.  Thank you.

21             THE COURT:  Okay.

22   BY MR. MIKE:

23   Q.   And as far as prescribing Adderall, could you prescribe

24   Adderall at that time?

25   A.   I could prescribe it for seven days.

1    Q.    Okay.  And anything over seven days, you could not

2    prescribe it?

3    A.    No.

4    Q.    All right.  And who would have to authorize that

5    prescription?

6    A.    Dr. Hollington.

7    Q.    Did you ever disagree with the manner in which

8    Dr. Hollington was running his practice?

9    A.    Yes.

10   Q.    Did you raise those concerns with him?

11   A.    Yes.

12         MR. FALLGATTER:  Again, Your Honor, she's here to

13   talk about one patient.  General disagreements with the running

14   of this clinic, I would ask the Court to preclude it.  It's not

15   relevant to this narrow topic.

16         THE COURT:  Overruled.

17   BY MR. MIKE:

18   Q.    What did you say to him?

19   A.    It was the -- regarding the benzodiazepines and Xanax.

20   You know, I didn't agree with increasing certain -- for certain

21   patients, increasing Xanax or benzodiazepines.

22         MR. FALLGATTER:  Again, neither of those were the

23   drugs that she prescribed, Your Honor.  I object to that

24   discussion.

25         THE COURT:  Overruled.

1    THE WITNESS:  Or Klonopin, which in this case was

2    prescribed to Mr. Breo.

3    And I was -- you know, I was trying to reduce

4    patients' dosages, and there would be conflict with that

5    sometimes because the patients would, you know, go back to

6    Dr. Hollington and complain that I was not, you know, working

7    with them to alleviate their anxiety or prescribe higher doses

8    of Klonopin or other medications.

9    BY MR. MIKE:

10   Q.   Okay.  So I just want to break that down a little bit.

11   So you're saying that the -- the patients would come

12   to you wanting more as far as -- you mean -- when you say more,

13   you mean as far as milligrams?

14   A.   Increase.  Increase the dosage.

15   Q.   Okay.  And when you decided not to do that, what would

16   happen?

17   A.   They would -- they would contact Dr. Hollington.

18   Q.   And then what would Dr. Hollington do?

19   A.   The patient would be assigned -- or request to be assigned

20   to a different nurse practitioner, or he would assume

21   responsibility back for the patient.

22   Q.   Have you seen instances where he would increase the dosage

23   of that medication after you decided not to do so?

24   A.   Yes.

25   Q.   Have you approached -- did you ever approach him about

1    that issue?

2    A.    I didn't go into big discussions about how he practiced or

3    what he did with his patients once they were no longer my

4    patient.

5    Q.    Did Dr. Hollington ever have a meeting with you or other

6    nurse practitioners about prescribing higher dosages to

7    patients?

8    A.    We had one phone -- group phone meeting where he was just

9    outlining some of his recommendations to treat pain.  For

10   example, the dosing of buprenorphine, he would say that, you

11   know -- I can't recall verbatim everything, but the Klonopin,

12   the dosages that -- safe doses could go up to, you know, 12

13   milligrams.

14          And that's pretty much what I recall of the

15   conversation, his outlining to us what was considered

16   appropriate and safe to treat.

17   Q.    Did you agree with that?

18   A.    No.

19   Q.    Why?

20   A.    Because we had already established -- I had already

21   established the maximum dosing that I would use for opioid use

22   disorders, for the buprenorphine.  And I wasn't using it for

23   pain.

24   Q.    Okay.  So Dr. Hollington was also seeing patients dealing

25   with pain issues, correct?

1  A.    There were some patients that suffered with chronic pain

2  as a result of various injuries or ...

3  Q.    So why did you see it inappropriate to prescribe

4  buprenorphine for pain?

5          MR. FALLGATTER:  Your Honor, this is not a case about

6  any of the patients there for pain.  I would object to that

7  line of inquiry.

8          THE COURT:  Overruled.

9          THE WITNESS:  The MAT training, the

10  medication-assisted treatment training that I completed, the

11  24-hour training that I had did not indicate, in those modules

12  or in the training, that buprenorphine could be used for pain.

13          It's -- it was -- it's indicated for opioid use

14  disorders, persons that, you know, were suffering from opioid

15  use because of having taken, you know, Oxycontin or Percocet

16  for long periods of time.  That's what the buprenorphine was

17  indicated for.

18  BY MR. MIKE:

19  Q.    And what about Adderall?  Could you -- is it appropriate

20  to prescribe Adderall for opioid use disorder?

21  A.    No.

22  Q.    Why?

23  A.    Because Adderall is not indicated to treat opioid use.

24  It's indicated to treat attention-deficit/hyperactivity

25  disorder.

1   Q.    Knowing all this and, as you mentioned, having some

2   disagreements with the manner of how he was prescribing, why

3   did you continue to prescribe medications for him?

4   A.    For my patients.  I was helping my patients.

5   Q.    Right.  But you also said Dr. Hollington would send you

6   text messages or give you patients to prescribe for him as

7   well.

8   A.    Right.

9   Q.    Why did you continue doing so if you disagreed with the

10  manner of how he was practicing?

11  A.    Can you -- so can you rephrase this question?  Why did I

12  continue to take care of the patients that I was already taking

13  care of?

14  Q.    The patients that Dr. Hollington would assign to you --

15  A.    Because --

16  Q.    -- and prescribe the medications that he asked you to,

17  knowing that you disagreed with some of his methods.

18  A.    Because not every patient was someone that I disagreed

19  with the -- with the way they were being treated.  Not every

20  patient was -- you know, caused me concern or question --

21  questioned my ability to treat this patient.

22  Q.    Have you prescribed medications for patients -- for

23  Dr. Hollington's patients before?

24  A.    They're all his patients.

25  Q.    Okay.  Do you remember a patient of Dr. Hollington by the

1  name of Danielle Ashley?

2  A.    I only had that patient one time, as I can recall.

3  Q.    Was she your -- was she your patient, or was she actually

4  Dr. Hollington's patient?

5  A.    As far as I can recall, I believe she was Dr. Hollington's

6  patient.

7  Q.    Okay.  When you say you only had her one time, tell us

8  about that one time.

9  A.    The patient -- I received a text message asking me to do a

10  follow-up visit with Ms. Ashley.

11  Q.    Okay.  And what was -- what was your goals through that

12  follow-up visit?  Did you -- did you actually -- did you obtain

13  any cash or any payment for that?

14  A.    No.  I was told that the patient would be going into the

15  office to pay in cash and not to -- and just to complete the

16  visit, the televisit.

17  Q.    Okay.  Did you prescribe any medication to Ms. Ashley?

18  A.    I did.  I continued the medications that she had been

19  prescribed already.

20  Q.    Did Dr. Hollington tell you what medication to prescribe

21  him -- to prescribe her?

22  A.    There was already a chart in the system for her, so I knew

23  which medications she had already been taking.

24  Q.    But to be clear, you never received any -- any payment for

25  that.

1   A.   I didn't collect payment from her because the patient

2   paid --

3   Q.   Okay.

4   A.   -- or had already paid or was going to pay.

5   Q.   How do you know that the patient had paid or was going to

6   pay?

7   A.   Because Dr. Hollington sent me a text message indicating

8   that I was not to collect payment for this patient.

9   Q.   Okay.  Typically on calls like this, were you the one to

10  collect payment from patients?

11  A.   We collected the majority of payments, credit card

12  payments.

13  Q.   All right.  Were there any issues with pharmacies filling

14  prescriptions for Sawgrass Health?

15  A.   There were several pharmacies that would not fill --

16  Q.   Why --

17  A.   -- prescriptions.

18  Q.   Sorry.

19       Why -- why do you say that?

20  A.   I never spoke to the pharmacists, but they would just --

21  the patients would say, "We can't get our medications filled at

22  this pharmacy.  They have indicated that they would not fill

23  prescriptions for Sawgrass."

24  Q.   Were there more than one pharmacy?

25  A.   The pharmacy that I recall is CVS Pharmacy.

1    Q.    Okay.  Did you ever address these issues with

2    Dr. Hollington?

3    A.    He was aware of the issues.  We had discussed it, and

4    there was recommendations of which pharmacies could be used.

5    Q.    Who provided those recommendations of what pharmacies to

6    use?

7    A.    Between -- some of the nurse practitioners would say, you

8    know, "This pharmacy will fill for the practice."

9          In one case Dr. Hollington suggested a pharmacy

10   called Thrive Pharmacy.  I never used them, but that was a

11   pharmacy that was filling prescriptions.  The majority of my

12   patients were already established with pharmacies, so I didn't

13   encounter it that often.

14   Q.    Okay.  So you were aware of multiple pharmacies that were

15   not filling prescriptions for Dr. Hollington?

16   A.    Based on what the patients would tell me, that they were

17   having difficulty getting their prescriptions filled.

18            MR. MIKE:  I'd like to publish Government Exhibit 1K,

19   Your Honor, which is medical records.

20            THE COURT:  Yes, sir.

21            MR. MIKE:  And if we could go to page 64 of

22   Government Exhibit 1K.

23            Zoom in to the top paragraph.

24   BY MR. MIKE:

25   Q.    All right.  So this is a different format from probably

1    what you're used to, Ms. Pittala, because Practice Fusion sent

2    this over to us in Excel format.

3                But do you recall what this note is --

4    A.    Yes.

5    Q.    -- on Exhibit 1K?

6                What is that?

7    A.    It's a note sort of just -- if the patient is denying --

8    it's more like a subjective note.  Like, if the patient

9    denies -- denies using this, denies suicidal intentions ...

10   Q.    Is this -- so this is -- what day was this note created?

11   A.    April 5th, 2022.

12   Q.    All right.  So this is Thomas Breo's record.

13               Do you recall putting in this note for Thomas Breo

14   from your encounter with him on April 5th, 2022?

15   A.    Yes.

16   Q.    Now, on -- within the note it mentions, "Admits to street

17   meds."

18               Do you remember having that conversation with Thomas

19   Breo?

20   A.    Yes.

21   Q.    And also within that note it mentions anxiety.

22               Do you remember having that conversation with

23   Mr. Breo?

24   A.    Yes.

25   Q.    Did he mention that he was -- that he had anxiety?

1    A.    No.

2    Q.    Within that -- those notes, there's also a list of --

3              MR. MIKE:  If you could zoom down to line 8.

4    BY MR. MIKE:

5    Q.    There is -- it talks about compliance.  It's got little

6    stars around it.  It says patient contract.

7              Did you review the patient contract?

8    A.    I did not.

9    Q.    Did you know that the patient contract was for

10   buprenorphine and not for Adderall?

11   A.    No, I did not.

12   Q.    Would knowing that have changed the way you encountered

13   Mr. Breo on that day?

14   A.    Yes.

15   Q.    Why?

16   A.    Because I thought the contract included all treatment

17   options for addiction.

18   Q.    Okay.  Was there such a contract within Sawgrass Health

19   that -- that included all treatment options for addiction?

20   A.    Not that I'm aware of.

21   Q.    The compliance also mentioned PMP checks with the patient.

22              Did you evaluate or review his PMP report?

23   A.    I did.

24   Q.    And within that PMP report, was there -- was there any

25   information on there?

1    A.    There was none.

2    Q.    Would that have been a red flag, that a -- that a patient

3    at his age has never been prescribed medications ever?

4    A.    The patient did not report that they were getting

5    prescribed meds, medications.  They were getting it from the

6    street, getting it from a friend --

7    Q.    Okay.

8    A.    -- so I didn't really expect to see anything in the PMP.

9    Q.    Okay.  So it also within there says, "Patient's living

10   situation/job situation are generally improving," and it says,

11   "Patient's situation has improved."

12         That implies that -- I mean, do you agree that that

13   implies that he --

14   A.    That I had seen him --

15   Q.    That's correct.

16   A.    -- more than once?

17   Q.    Right.

18         Did you see him more than once?

19   A.    No.

20   Q.    I know you mentioned earlier in your testimony yesterday

21   that sometimes there's a, as you quote, cookie-cutter

22   copy-and-paste.

23         Do you -- was this sort of the same thing here?

24   A.    Yes.

25   Q.    Thank you.

1          I'm going to pull up Government Exhibit 1F.

2          MR. MIKE:  If you could zoom in to that for me,

3    please, Ms. Ganoe.

4          Thank you.

5    BY MR. MIKE:

6    Q.    Do you recall this email, which is Government Exhibit 1F,

7    being sent to you and other nurse practitioners?

8    A.    I do.

9    Q.    What was this email about?

10   A.    It was dated on November 30th, 2022, and as indicated in

11   the email, it was to update the staff as to -- as it's stated

12   here, the plan is to keep us in the loop as to what's going on.

13   Q.    Did you just -- have you had any conversations with

14   Dr. Hollington after he was indicted?

15   A.    I had one conversation with him that I told him that my

16   DEA license was suspended.  And we had another conversation

17   with some brief conversations just about what had -- what had

18   occurred.

19   Q.    Why was your DEA license suspended?

20   A.    Because of this incident and my prescribing.

21   Q.    And specifically what incident?

22   A.    With -- regarding Mr. Breo and the prescriptions that I

23   provided to Mr. Breo.

24          MR. MIKE:  Can you turn, Ms. Ganoe, to the second

25   page of this attachment?

1   BY MR. MIKE:

2   Q.    Did you remember seeing this attachment to the email?

3   A.    I remember the attachment.

4   Q.    We've already reviewed it with the jury, but would you

5   agree that his --

6            MR. MIKE:  Could you zoom in to the top part where it

7   says complaint.

8   BY MR. MIKE:

9   Q.    What is he -- what is he talking about here?  Was that --

10  would this be your patient that he's describing?

11  A.    This is the patient Mr. Breo.

12  Q.    Okay.  Now, within this he mentioned that "This might be

13  the most serious of it."

14           Did you -- did you read his assessment of how he

15  would have dealt with Mr. Breo?

16  A.    I read it.

17  Q.    Did you agree with it?

18  A.    It was his assessment.  It was -- it had no relevance to

19  me and my -- my situation with the -- Mr. Breo.

20  Q.    Right.  Did you -- did you agree with what he -- what he

21  said?

22  A.    Um ...

23  Q.    For instance, we'll zoom in to paragraph 3.

24  A.    Okay.  "This is a strong indicator of both addiction and

25  underlying ADHD."

1           This is regarding questions that would have been more

2    helpful --

3    Q.    All right.

4    A.    -- to get -- determine more information about why Mr. Breo

5    was taking the Adderall.

6    Q.    So this says, "He liked taking it."  That was in the

7    interview.  So he said, "This is a strong indicator of both

8    addiction and underlying ADHD."

9           Do you agree with that assessment, that someone just

10   saying he liked taking it is a strong indicator of addiction?

11   A.    No.

12   Q.    Why?

13   A.    Because not everybody that takes Adderall is addicted.

14          MR. MIKE:  Can you zoom in to the next paragraph for

15   me, Ms. Ganoe?

16          Thank you.

17   BY MR. MIKE:

18   Q.    It says, "He purchased Adderall off the street, another

19   strong indication of addiction."

20          Just on someone saying they purchased Adderall off

21   the street, do you agree with that assessment?

22   A.    I don't agree with it.

23   Q.    Why?

24   A.    Because not everyone who takes Adderall or asks somebody

25   for Adderall, or any medication for that matter, is addicted.

1    More information should be gathered.

2    Q.    Okay.

3              MR. MIKE:  You can take that down, Ms. Ganoe.  Thank

4    you.

5              All right.  I want to go back to 1K, which is the

6    medical record, and this time I want to turn to page 66 of the

7    demonstrative and zoom in to that paragraph.

8    BY MR. MIKE:

9    Q.    Again, we're back into Thomas Breo's medical record.

10              What is the date associated with this note?

11   A.    November 16th, 2022.

12   Q.    You didn't put -- did you put this note in to his record,

13   to Thomas Breo's record?

14   A.    I didn't see that patient on November 16th.

15   Q.    Okay.  You didn't operate his -- his medical record on

16   November 16th either?

17   A.    I didn't document in his record after the initial visit

18   that I had with him.

19   Q.    Okay.  Did you have a conversation with -- I mean, do you

20   recall having a conversation with the defendant on November 16,

21   2022, about Thomas Breo and his medical conditions?

22   A.    No.

23   Q.    Did you tell the defendant any of this information at all

24   regarding Thomas Breo and his medical conditions?

25   A.    I did not have a conversation about Mr. Breo --

1   Q.    Okay.

2   A.    -- with Dr. Hollington.

3   Q.    Okay.   Thank you.

4           MR. MIKE:  One moment, Your Honor.

5           THE COURT:  Yes.

6       (Pause in proceedings.)

7   BY MR. MIKE:

8   Q.    Have you seen any warning signs about the manner in which

9   the defendant was operating his business during the time of

10  your employment there?

11          MR. FALLGATTER:  Again, Your Honor, she's here on

12  that single patient.

13          THE COURT:  Overruled.

14          THE WITNESS:  Could you repeat that?

15  BY MR. MIKE:

16  Q.    Yes.

17          Have you seen any warning signs regarding the manner

18  in which the defendant was prescribing medications during the

19  time that you were working in this -- working with Sawgrass

20  Health LLC?

21          MR. FALLGATTER:  Again, I have a second objection.

22  Warning signs is incredibly nebulous.  We're here on a criminal

23  case.  I don't know what warning signs mean, and I would object

24  to that broad brush.

25          THE COURT:  Overruled.  I think the witness, if she

1    doesn't understand what he's meaning, can ask Mr. Mike to

2    clarify it.  But I'm going to overrule the objection.

3           THE WITNESS:  They were concerns.  I had concerns and

4    voiced those concerns with some of the other nurse

5    practitioners regarding the dosing and the dosages of certain

6    medications.  And --

7    BY MR. MIKE:

8    Q.   What were some of your concerns?

9    A.   The concerns were that my patients wouldn't agree with my

10   treatment plan for them, and they would, you know, request to

11   be transferred out of my care because they wanted higher doses

12   of medications.

13          And I -- those patients, you know, would -- you know,

14   were taken away from me, removed from my care, even after I

15   felt that I had established, you know, a safe plan of care and

16   we were moving in a good direction.

17          But I lost patients because of -- they were wanting

18   the higher doses of medications.

19   Q.   So in your opinion, why were these patients returning to

20   keep coming back to Dr. Hollington's office?

21          MR. FALLGATTER:  Her opinion is not relevant, Your

22   Honor.  Objection.

23          THE COURT:  Yeah.  You'd better -- you can ask the

24   question.  You just need to rephrase it.

25   BY MR. MIKE:

1    Q.   Why were these patients returning to Dr. Hollington's

2    office regularly?

3            MR. FALLGATTER:  Again, same objection, Your Honor.

4    She can't read their minds.

5            THE COURT:  I think she can give her understanding.

6    I'll overrule the objection.

7            THE WITNESS:  Can you repeat the question one more

8    time, please?

9    BY MR. MIKE:

10   Q.   Yeah.

11           Why were patients returning to Dr. Hollington's

12   office regularly?

13   A.   They were coming regularly to get their prescriptions

14   filled for their opioid use disorder or their anxiety.

15   Q.   Was it also the manner of how they were getting their

16   prescriptions filled?

17   A.   It was the convenience of being able to complete the visit

18   via telemedicine.

19   Q.   And what about giving them Adderall and benzodiazepines?

20   Was that -- would that keep patients coming back?

21   A.   It would keep the patients returning.

22   Q.   And if you did that at the patient's requested dosage, do

23   you agree that would keep them coming back?

24   A.   If they -- if they got the dosages that they wanted, and

25   if -- they could keep coming back.  But if they didn't get what

1   they wanted from the nurse practitioners, then they would

2   request to be transferred to someone else.

3   Q.   And Dr. Hollington had spoke with you about ensuring that

4   you were a little more lenient in your dosage increases; isn't

5   that correct?

6   A.   Repeat that?

7   Q.   Dr. Hollington did speak with you --

8           MR. FALLGATTER:   Your Honor, that's not a question.

9   I object to that.

10          THE COURT:   Sustained.  Ask a question, Mr. Mike,

11  please.

12          MR. MIKE:   Yes, Your Honor.

13  BY MR. MIKE:

14  Q.   Dr. Hollington had a conversation, as you mentioned, with

15  you and the practitioners about dosages, correct?

16  A.   Oh, correct, yes.

17  Q.   And what was that conversation about?

18  A.   It was just going over the medications that were being

19  used.  The Klonopins, you know, safe dosing -- dosages that

20  could be up to as much -- X, Y, Z.  I don't recall the exact

21  dosages that he said.

22          But same for buprenorphine.  Modafinil was discussed

23  at that phone conversation, which is used to treat narcolepsy

24  but can also be used to treat focus and concentration, as I

25  understood it.

1    So he just guided what would be considered

2   appropriate.  But he would also make other suggestions, things

3   like Strattera we could use for ADHD and other -- other

4   options.

5    Like Clonidine, he made mention to me personally that

6   Clonidine was a good option for anxiety.

7   Q.   Did Dr. Hollington ever become upset with you about not

8   wanting to see Adderall patients anymore?

9   A.   I don't recall having a specific conversation about not

10  seeing an Adderall patients.  He always -- he would prescribe

11  the Adderall.

12    MR. MIKE:  One moment?

13    THE COURT:  Yes.

14    (Pause in proceedings.)

15    MR. MIKE:  No further questions, Your Honor.

16    THE COURT:  Cross-examination?

17    MR. FALLGATTER:  Yes, sir.

18                         CROSS-EXAMINATION

19  BY MR. FALLGATTER:

20  Q.   Ms. Pittala, I am Curtis Fallgatter.  I represent

21  Dr. Hollington.

22  A.   Good morning.

23  Q.   And I have to say you must have one of the most soothing

24  voices I've ever heard.  I assume that helped you with your

25  patients, did it not?

1   A.    I don't know.  I've never been told that.

2   Q.    Well, I'll tell you that.

3         So I'll be asking you a few questions about your

4   treatment of Mr. Breo.  And Thomas Breo, as you know now, was

5   an undercover police officer that was pretending to be a real

6   patient?

7   A.    Yes.

8   Q.    You didn't know that at the time, of course, right?

9   A.    No.

10  Q.    So we heard a little bit about your background and

11  training.

12        Did you go -- and I apologize if I forgot.  Did you

13  go straight into the graduate program from your nursing, or did

14  you have a little working hiatus?

15  A.    I graduated with my family nurse practitioner in 2017 and

16  worked as a family nurse practitioner for two years.  And then

17  in 2022, January, I went back and got a post-master's

18  certification in psychiatry.  I started my coursework in

19  January 2022.

20  Q.    And do I understand you're close to being certified with

21  psychiatry?

22  A.    I'm waiting to take the exam.

23  Q.    So you've taken all the classes and whatnot to prepare

24  yourself for the exam?

25  A.    Yes.

1  Q.   So graduated from nursing school in 2017.  Four-year

2  program started in 2013?

3  A.   It was a long -- I graduated as a registered nurse in

4  2007, and graduated with my bachelor's degree in 2011, and

5  graduated with a master's degree in 2014, and graduated with my

6  other master's degree in 2018, and graduated with my

7  post-master's certification -- I'm a career student.

8  Q.   So if we go back from your undergrad, you graduated

9  in '07.  If it's a four-year program, you started your

10  education in 2003, give or take?

11  A.   I started my education?

12  Q.   Your college education.

13  A.   Started -- it started -- let me think here.

14        I had kids, so I had to stop several times.

15  Q.   All right.  We heard a little voice in the background on

16  one of those calls.  That was one of your --

17  A.   Yeah.  I think I, you know, started taking coursework --

18  perhaps it was maybe 1999.

19  Q.   Anyway, we're talking about over 20 years of your life

20  dedicated to getting to where you are today with your training

21  and education, right?

22  A.   Yes.

23        THE COURT:  Let me see counsel at sidebar just

24  briefly.

25      (At sidebar, out of the hearing of the jury:)

1           THE COURT:  Two things.  I assume we'll just keep

2    moving along, which is fine.

3           It occurred to me, Mr. Fallgatter, you asked me about

4    whether it was acceptable to ask if somebody had a lawyer, and

5    I told you it was.  I do not, however, want you to ask this

6    witness anything about the circumstances under which Mr. Grant

7    came to be representing her.

8           MR. FALLGATTER:  I promise you.  I had the same

9    thought last night.  And, you know, again, Judge, my goal is to

10   try to be an officer of the court.  And I saw that as a concern

11   and thought it was something I absolutely should stay away

12   from, and I promise you I will.

13          THE COURT:  Okay.  Thank you.

14       (End of discussion at sidebar.)

15   BY MR. FALLGATTER:

16   Q.   We're back.

17   A.   We're back.

18   Q.   Thank you, Ms. Pittala.

19          So I introduced myself, but -- but until a little

20   yesterday and today, I've never had an opportunity to speak

21   with you previously, have I?

22   A.   It was just a -- you called me once to ask me for the name

23   of my attorney.

24   Q.   Right.  But we didn't -- and we've never spoken about any

25   possible testimony that you might provide?

1    A.    No.

2    Q.    You have been -- not by me, but you've been interviewed by

3    the government attorneys and the DEA investigators?

4    A.    Yes.

5    Q.    And do you remember when that was?

6    A.    (No response.)

7    Q.    Let me apologize.  I'm going to show you a document.

8          Do you remember getting a letter from the U.S.

9    Attorney's Office that you had to sign?

10   A.    Yes.

11         MR. FALLGATTER:  May I approach with Exhibit 4B?

12         THE COURT:  Yes.  I'm sorry.

13         THE WITNESS:  Yes.

14   BY MR. FALLGATTER:

15   Q.    Do you recognize that letter?  It has your -- purportedly

16   your signature on page 3.

17         Can you verify that's your signature?

18   A.    Yes, it is.

19         MR. FALLGATTER:  Your Honor, I'd offer Exhibit 4B.

20         THE COURT:  Be received.

21      (Defendant's Exhibit 4B was received in evidence.)

22   BY MR. FALLGATTER:

23   Q.    So the date on that letter's April 12th, 2023.

24         And do you recall then meeting with the government

25   officials on or about that date?

1    A.    Yes.

2    Q.    Was it the same day, or did you come up a day or two

3    earlier -- later, rather?

4    A.    Was it the same day?  I think it was perhaps the same day

5    by Zoom.

6    Q.    By Zoom?

7    A.    By Zoom, like a --

8    Q.    Yeah, I know.

9    A.    -- teleconference.

10   Q.    Sure.  So do you remember who was on the Zoom call?  Was

11   Mr. Mike on the Zoom call?

12   A.    Yes, sir.

13   Q.    And was Mr. Hollingsworth with DEA on the Zoom call?

14   A.    I believe so, yes.

15   Q.    And do you recognize Mr. Martin back there in the blue

16   suit in the second chair?

17   A.    Yes.

18   Q.    Was he on that call, on that Zoom?

19   A.    I think he was there, yes.

20   Q.    Do you remember any other government officials that were

21   present on the Zoom?

22   A.    There were other people there, but I don't know who they

23   were.

24   Q.    So you were talking to a large number of government

25   officials, and they were asking you questions?

1    A.    I was just talking to Mr. Mike.

2    Q.    And the others -- he was asking the questions.  The others

3    were there listening?

4    A.    That's correct.

5    Q.    So before he started asking you questions, you were

6    required to sign this three-page document?

7    A.    That's correct.

8    Q.    And let me make it clear to you.  You probably never

9    wanted to get a letter like this in your life, did you?

10   A.    No.

11   Q.    So, again, I'm not going to ask you questions to embarrass

12   you.  I just want to point out what it is they put in their

13   letter, okay?

14   A.    Okay.

15             MR. FALLGATTER:  So if we can publish 4B with page 1.

16   BY MR. FALLGATTER:

17   Q.    And at the top it has the official letterhead of the

18   Department of Justice, United States Attorney's Office?

19   A.    Yes.

20   Q.    And the date of April 12.

21             The gentleman it's addressed to was the lawyer you

22   had at the time?

23   A.    Yes.

24   Q.    And if we go on down into the letter, the very first line,

25   "The government is investigating allegations of criminal

PITTALA - CROSS                                                          35

1   wrongdoing involving the conspiracy to commit unlawful

2   distribution of controlled substances."

3           That's kind of a scary sentence, isn't it?

4   A.   Yes.

5   Q.   Did you think you were part of any conspiracy to

6   unlawfully distribute controlled substances?

7   A.   I was not involved in a conspiracy.

8   Q.   And line 3 says, "Rachael Pittala has requested the

9   opportunity to present a proffer ..."

10          Do you know what that little word means, proffer?

11  A.   An agreement?

12  Q.   No.  It's a fancy word for an interview.  You've agreed to

13  be interviewed.

14          And did you request it, or do you recall the

15  government saying they wanted to talk to you?

16  A.   My attorney, Mr. Santos --

17  Q.   Arranged --

18  A.   -- discussed it with me and --

19  Q.   Arranged all this?

20  A.   -- arranged -- yes.

21  Q.   Then if we look down on the fourth line to the right, this

22  letter confirms that the government -- and the government means

23  all these people over here, right?

24  A.   Yes.

25  Q.   The government explained -- pardon me.  The government

1  confirms it presently "views Pittala's status as that of a

2  potential subject or target of the investigation."

3          And you knew that was a target of that drug

4  investigation that the first sentence talks about, right?

5  A.    Yes.

6  Q.    Did they tell you what a target was?

7  A.    They did not.

8  Q.    Do you know what a target is?

9  A.    A target is someone that may be involved in a criminal --

10  criminal investigation.

11  Q.    The way the Department of Justice defines a subject is

12  someone whose conduct is within the scope of the investigation,

13  but a target is someone they want to prosecute.  It's a

14  putative defendant, they call it.

15          Did anybody explain that to you?

16  A.    No.

17  Q.    You did not want to be a subject or a target of their

18  investigation, did you?

19  A.    No.

20  Q.    And down at the bottom, paragraph 2 says you've got to be

21  completely truthful and forthright.

22          And you were and are, are you not?

23  A.    Yes.

24  Q.    Top of page 2, paragraph 3 says, "In the event Pittala is

25  prosecuted ..."

PITTALA - CROSS                                                      37

1           You understood that term to mean criminally

2    prosecuted?

3    A.    Yes.

4    Q.    So they've, on a second occasion, warned you that they

5    could prosecute you in this same letter?

6    A.    Yes.

7    Q.    Paragraph 4 says the government may use any statements or

8    information you provide in that proffer, that interview, in a

9    prosecution -- again, another prosecution -- for false

10   statement, obstruction of justice, or perjury.

11           So, again, another way they could prosecute you,

12   right?

13   A.    Yes.

14   Q.    We can look down at paragraph 6.  They also said the

15   government can use that information, in line 2, during any

16   prosecution of you.

17           For the fourth time they've told you that they could

18   prosecute you, right?

19   A.    Yes.

20   Q.    And they can use it also in bail and detention

21   proceedings.

22           You know what bail is, right?

23   A.    Can you repeat that?

24   Q.    You know what bail is?

25   A.    Bail.

1    Q.    Someone gets arrested.  They try to bail out so they can

2    get back into their liberty and not be in custody?

3    A.    Yes.

4    Q.    But did you know what the word "detention" meant in

5    federal court?

6    A.    What paragraph?

7    Q.    It says bail/detention.  Third line of paragraph 6.

8          I'm sorry.  It's paragraph 6, the third line.

9          MR. FALLGATTER:  Let's bring that down a little bit.

10         THE WITNESS:  Including during bail/detention.

11   BY MR. FALLGATTER:

12   Q.    Yeah.  It says bail.

13         You know that word, but you probably don't know what

14   detention is, do you?

15   A.    No.

16   Q.    So in federal court you can actually get arrested, and you

17   can be detained and not even get out until your trial's

18   completed.  You don't get to go anywhere.  You've got to stay

19   in jail.

20         Did anybody explain that to you?

21   A.    No.  My lawyer did not.

22   Q.    And paragraph 8 says you will not seek disqualification of

23   any government attorney from any court proceedings or trial

24   because of their participation in the proffer, meaning that

25   interview.

1          So whatever was said, you or your lawyer could never

2    ask that Mr. Mike or any of the prosecutors be disqualified.

3    A.    Which paragraph?  Oh, "Pittala will not seek ..."

4          Yes, I see that.

5    Q.    Okay.  So in addition to them asking you questions, do you

6    remember -- well, let me ask you.  Do you know Mr. Martin's

7    role in the DEA?

8    A.    He's an investigator.

9    Q.    He's a diversion investigator, and he is one of the people

10   that took your license away, right?

11   A.    The administrative law judge.

12   Q.    He testified and asked the judge to take your license

13   away?

14   A.    That's correct.

15   Q.    That man in the second table in the blue suit?

16   A.    Can you repeat that?

17   Q.    That man right there, Mr. Martin, the man in the blue

18   suit, he testified at a hearing where you're trying to save

19   your license, and he was trying to take it away.

20          And he was successful, wasn't he?

21   A.    Yes.

22   Q.    At the meeting that you had with the U.S. Attorney's

23   Office up here, did they warn you that they might try to do

24   that?

25   A.    No.

PITTALA - CROSS                                                              40

1    Q.    But they did it.

2    A.    But they did?

3    Q.    Take your license away?

4    A.    Yes.

5          MR. MIKE:  Objection, Your Honor.  That's --

6    that's -- he's got the facts all misconstrued there.  The

7    meeting happened way after all that was taken care of.

8          THE COURT:  I'll let you clear that up.

9          Mr. Fallgatter, do you have your time right?

10         MR. FALLGATTER:  Well, I don't know the time.

11   BY MR. FALLGATTER:

12   Q.    But either way, they took your license away, whether

13   before or after the meeting, right?

14   A.    Correct.

15   Q.    So at the time you met with him, you'd already lost your

16   license.  Is that true?

17   A.    Yes.

18   Q.    And that's a bad thing to happen to you, right?

19   A.    Yes.

20   Q.    It would be even worse if they turned around and

21   prosecuted you criminally, right?

22   A.    Yes.

23   Q.    So that meeting was really scary because they'd already

24   taken away your license, and now you're threatened repeatedly

25   with a criminal prosecution, right?

PITTALA - CROSS                                                           41

1    A.    Yes.

2    Q.    And you would not want to sit in that chair in a courtroom

3    with a jury judging your fate, would you?

4    A.    No.

5    Q.    And, ma'am, you've told us of two decades of education,

6    training, and work to be in what we call the healing

7    profession.

8          That's what you're in, right?

9    A.    Yes.

10   Q.    Is that your sole means of livelihood?

11   A.    Yes.

12   Q.    So these actions by the government are very harmful for

13   you?

14   A.    Yes.

15   Q.    As you sit here on the witness stand, these government

16   attorneys have not told you that you're no longer a target.

17   They could still prosecute you, correct?

18   A.    Yes.

19   Q.    You don't want that to happen.

20   A.    No.

21   Q.    They get to hear every word you say on the witness stand,

22   correct?

23   A.    Yes.

24   Q.    Someday they're going to make a decision whether to

25   prosecute you or not, right?

PITTALA - CROSS                                                        42

1    A.    Perhaps.

2    Q.    And you don't want them to decide to prosecute you.

3    A.    No.

4    Q.    Now, the action that Mr. Martin helped that took your

5    license away, you know that's just a regulatory action.  It's

6    not a criminal one, right?

7    A.    Correct.

8    Q.    And when they took that regulatory action against you, you

9    couldn't go to jail for that.  It was an important license, but

10   you would never go to jail or be a felony defendant, right?

11   A.    As I understood it from my attorney.

12   Q.    So -- so back to your Sawgrass Health.

13         When you joined them, you knew that their primary

14   practice area was addiction medicine, including treating

15   addicts?

16   A.    Yes.

17   Q.    And you applied your training and talents to help with

18   that mission?

19   A.    Yes.

20   Q.    And did you believe that mission was important?

21   A.    Yes.

22   Q.    And real addicts oftentimes have a medical need for

23   prescriptions to keep them off street drugs?

24   A.    Yes.

25   Q.    And for a dedicated addiction doctor or his highly trained

PITTALA - CROSS                                                          43

1    advanced practice registered nurse like yourself, for street

2    drug users, you consider it a legitimate medical purpose to

3    give them prescriptions to help save their lives?

4    A.   Can you repeat that?

5    Q.   For a dedicated addiction doctor and a dedicated advanced

6    practice registered nurse like yourself, when you have a

7    patient who's a street drug user, you agree it's a legitimate

8    medical purpose to give them lawful prescriptions to help save

9    their lives.

10   A.   Yes.

11           MR. FALLGATTER:  We can take that exhibit down,

12   please.

13   BY MR. FALLGATTER:

14   Q.   And so with regard to saving lives, the one patient

15   they've asked you about, Mr. Thomas Breo, the fake patient,

16   have you listened to the recording of your April 5th, 2022,

17   conference with him?

18   A.   Not in its entirety.  Only excerpts.

19   Q.   Did the government play excerpts for you?

20   A.   During the administrative hearing.

21   Q.   Okay.  Have you been provided with a transcript of that

22   hearing?

23   A.   I have it.

24   Q.   I don't mean hearing.  I'm sorry.  A transcript of the

25   recording, the April 5th, '22, recording with Mr. Breo, have

1  you been provided with a transcript?

2  A.    Yes.

3  Q.    So I'm going to ask you a couple questions.  If you don't

4  remember and want to see the transcript, let me know.  But the

5  jury's heard it; they've seen the transcripts, and if I can --

6  A.    If I can have the transcript, if you're going to question

7  me.

8  Q.    Well, let's see if you recall it.  If you don't, let me

9  know and --

10  A.    Okay.

11  Q.    -- the transcript's right here.

12  A.    Okay.

13  Q.    But I'll try to share some quotes with you.

14         It's between Mr. Breo and yourself on the occasion of

15  the first April 5th consult with him.

16         And you asked him where he gets the -- his street

17  drugs, and he said --

18         THE COURT:  Mr. Fallgatter, the witness wanted to see

19  the transcript.  If you're going to be reading from it, I

20  think -- can we -- can we give her a copy?

21         MR. FALLGATTER:  Sure.

22         THE COURT:  So do we -- are you -- do you have the

23  one that's in evidence?

24         MR. FALLGATTER:  It's 11C-1B.

25         THE COURT:  All right.

PITTALA - CROSS                                                        45

```
 1              MR. FALLGATTER:  And I just --

 2              THE COURT:  We can just give her the original then if

 3    we have it there.

 4              MR. FALLGATTER:  May I just ask one --

 5              THE COURT:  And since the witness asked for it, I

 6    think it's fair enough.

 7              MR. FALLGATTER:  Well, let me -- let me find the

 8    page, Your Honor.  And I'll try to be -- go through as much as

 9    I had.  Let me try to find a couple pages so I can be a little

10    more efficient with the Court.

11              THE COURT:  That's fine.

12              But do we have a copy of it though?

13              MR. FALLGATTER:  Yeah, yeah.  It's in evidence.  It's

14    11C-1B, and it's been --

15              THE COURT:  Ms. Manrique, can you get -- can you get

16    that?

17              MR. FALLGATTER:  Well, I'll pull it up, if it's all

18    right.

19              THE COURT:  That's fine.

20              MR. FALLGATTER:  Yeah.  I'll pull it up right now.

21              THE COURT:  Okay.

22    BY MR. FALLGATTER:

23    Q.   Our exhibit -- Ms. Pittala, this has been published

24    before.

25              MR. FALLGATTER:  If we could go to page 11, please.
```

PITTALA - CROSS                                                              46

1    BY MR. FALLGATTER:

2    Q.    And if we go to line 10, there's -- there's a discussion

3    on line 10.  You say, "That's probably not real stuff, all the

4    stuff that's on the street right now."

5          And you're talking about street drugs, correct?

6    A.    Street drugs.

7    Q.    And line 13, Thomas Breo:  "Yeah, yeah.  No, that's why --

8    that's what scares me."

9          He was telling you he was scared about getting street

10   drugs, right?

11         And you say, "Uh-Huh."

12         And then he volunteers, at line 16, "I don't want to

13   be flopping around on the ground."

14         You understood that to mean an overdose death or a

15   serious injury, correct?

16   A.    Correct.

17   Q.    Then you tell him, on line 18:  "No, no.  There's so much

18   overdoses right now."

19         And he says, "I know."

20         You say, "So much."

21         And then before I ask you about line 22, it talks

22   about NARCAN.  You know what NARCAN is, right?

23   A.    That's right.

24   Q.    NARCAN is what is administered to someone who's suffering

25   a potential opioid overdose death --

1    A.    Correct.

2    Q.    -- and you -- and you give NARCAN to try to revive them?

3    A.    To try to reverse it.

4    Q.    And so at line 22 you discuss that.  You say, "The problem

5    is that NARCAN won't even work for that," meaning some of these

6    dangerous street drugs, right?

7    A.    Yes, fentanyl.

8    Q.    Then you specifically say -- you're going, "You know,

9    fentanyl is 50 times stronger than heroin," which is why it's

10   so dangerous, right?

11   A.    Yes.

12   Q.    So if Mr. Breo -- you're basically telling him if Mr. Breo

13   was out there getting street drugs that had fentanyl in it,

14   even NARCAN wouldn't save him.

15   A.    Correct.

16   Q.    But a lawful prescription could save him, right?

17   A.    Correct.

18             MR. FALLGATTER:  Let's go back to page 2, since the

19   document's on the screen here.

20   BY MR. FALLGATTER:

21   Q.    And you recall the discussion started out with him talking

22   about wanting Adderall, correct?

23   A.    Yes.

24   Q.    So at the bottom of page 2, you specifically say, "So you

25   came to see Dr. Hollington basically because you feel like you

1   need to take some Adderall" -- and at the top of the next

2   page -- "to help you a little bit?"

3           And he says, "Right."

4           And you know the term "craving," right?

5   A.   Craving?

6   Q.   Yes, ma'am.

7   A.   Yes.

8   Q.   Drug addicts have cravings?

9   A.   Yes.

10  Q.   And when they have cravings, they feel like they need to

11  have the drug?

12  A.   Correct.

13  Q.   Lines 5 through 8, Thomas Breo, "Yeah, I take it.  I

14  don't -- I buy it from a friend.  I just don't want -- I just

15  don't want to buy it from a friend anymore."

16          Again, a reference to the street drugs, right?

17  A.   Correct.

18  Q.   And down at lines 13 through 14, he tells you how often he

19  uses it.

20          And you ask him, "Okay.  Once a day?"

21          He says, "Yeah."

22          So he's used it every single day, correct?

23  A.   Correct.

24  Q.   Which to some clinicians is a symptom of addiction, when

25  you have to use a particular drug because you need it every

1  day, correct?

2  A.    It could be -- it could be considered an addiction, but

3  there are other prescribed medications that will be taken every

4  day because --

5  Q.    Yeah.  There's a lot you could take.

6         But some that are addictive, if you're taking it

7  every day, it's a concern for you as a clinician, is it not?

8  A.    Yes.

9  Q.    And I'm asking you these, Ms. Pittala, because we're going

10 to -- you prepared the patient charts, so I'm going to ask you

11 that.

12        And ultimately what you put in the patient chart was

13 based on your discussion with him in this recorded call, right?

14 A.    Yes.

15 Q.    And then you made your professional diagnosis, right?

16 A.    Yes.

17 Q.    So we're going to look at a few things in here that --

18 that appeared -- from my reading of the patient chart, that

19 were matters that you documented in the patient's chart as part

20 of your diagnosis.  But we'll look at the patient chart when we

21 get through a couple more of these.

22        MR. FALLGATTER:  Page 7 and down at line 13.

23 BY MR. FALLGATTER:

24 Q.    And you typically ask them about their social background

25 and life -- do you not? -- work, employment, housing.

PITTALA - CROSS                                                      50

1    A.    Yes.

2    Q.    All those are symptoms and issues about them that you take

3    into account for purposes of your diagnosis?

4    A.    Yes.

5    Q.    So at line 13:  "Now, you said you're -- you're living

6    with friends right now?"

7          Thomas Breo, line 15:  "Yeah.  I usually just couch

8    surf."

9          And you understood couch surf meaning he didn't

10   really have a place to stay.  He was pretty much homeless.

11   He'd have to go from home to home to find a place to sleep?

12   A.    That's correct.

13   Q.    And you would agree that that -- that that is oftentimes a

14   symptom of a person who is suffering from addiction and can't

15   afford housing, can't afford a place to stay, doesn't have the

16   financial capability.  They're unsettled.

17         That's one of the reasons you ask it, is it not?

18   A.    Yes, instability.

19   Q.    And then you turn to line 19 to ask him if he's working.

20   "Are you working currently?"

21         And his answer, "Yeah, here and there, whenever I

22   can."

23         He did not tell you he had a real job, did he?

24   A.    No.

25   Q.    And, again, one of the symptoms of addiction is people

1  can't hold down a job because of their drug habit, right?

2  A.    Correct.

3  Q.    Which is why you, with your training, ask that question.

4  A.    Yes.

5          MR. FALLGATTER:    Page 8.

6  BY MR. FALLGATTER:

7  Q.    And at lines 11 through 15, you're back asking him some

8  questions about his use of the drugs and why.

9          And you say, "Okay.  So you just -- like, a friend

10  just let you try it out, and it just gives you energy, and it

11  helps you concentrate better."

12          He says, "Yeah."

13          Correct?

14  A.    Yes.

15  Q.    Now, folks with ADHD have difficulty concentrating, don't

16  they?

17  A.    Yes.

18  Q.    And when he told you that the drug helped him concentrate

19  better, you, as a clinician, understood that was a symptom of

20  ADHD, lack of concentration.

21  A.    Yes.

22          MR. FALLGATTER:    Page 15.

23          And at the top of 15.

24  BY MR. FALLGATTER:

25  Q.    And you are asking the question, "But do you feel anxious?

1    Do you get anxious sometimes, or it just helps you relax more?"

2              Thomas Breo:  "More relaxed, I guess."

3              And folks with ADHD have anxiety, do they not?

4    A.    Sometimes they can be comorbid or -- the anxiety and

5    attention deficit.

6    Q.    And when he answered your questions in that fashion,

7    again, that was part of your diagnostic tools to eventually

8    come up with your diagnosis for this patient, was it not?

9    A.    Yes.

10   Q.    And during your encounters with him, you made him promise

11   to not use anything on the street?

12   A.    That's correct.

13             MR. FALLGATTER:  Can we go to page 18, please.

14             If we go down to lines -- the bottom third, starting

15   at line 19.

16   BY MR. FALLGATTER:

17   Q.    And, Ms. Pittala, I've called this the angel's speech.

18             Do you remember giving him the -- what I call the

19   angel's speech?

20   A.    I do.

21   Q.    So --

22   A.    Yes, I do remember.

23   Q.    All right.  Well, let's read it at line 19.

24             You're saying, "You know, you did the right thing by

25   coming to Dr. Hollington.  You did, because sometimes, you

1  know, there's angels out there watching over you and just

2  guiding you."

3          And you were sincere when you told him that, right?

4  A.   Yes, I was.

5  Q.   And you're telling him that angels brought him to

6  Dr. Hollington to help save him from dying with street drugs.

7  A.   I felt that way at the time, yes.

8          MR. FALLGATTER:  Let's go to page 19, line 7.

9  BY MR. FALLGATTER:

10 Q.   And I'd ask you that, but let's go ahead and read it.

11         You say, "So please don't purchase nothing, okay --

12         Mr. Breo, "All right."

13         Rachael:  -- from nobody."

14         Again, telling him, "Do not buy those dangerous drugs

15 off the street" that he told you he was getting and didn't want

16 to be flopping on the ground, right?

17 A.   Correct.

18 Q.   So you gave him that speech because you were genuinely

19 concerned and wanted to help him --

20 A.   Yes.

21 Q.   -- the angel speech.

22 A.   Yes.

23 Q.   And that's what an addiction clinic and talented advanced

24 practice registered nurses like yourself do, right?

25 A.   Yes.

1  Q.   On direct examination Mr. Mike asked you about some

2  pharmacies not filling opioid prescriptions?

3  A.   This is true.

4  Q.   And do you remember that there was a national class action

5  lawsuit filed -- not by me because I don't do that, but a bunch

6  of lawyers filed class actions against the big chain

7  pharmacies, CVS, Walgreens.

8          Do you remember hearing that on the news?

9  A.   I don't.

10  Q.   That they were sued for distributing opioids and settled

11  by paying the government and some states millions of dollars?

12          MR. MIKE:  Objection, Your Honor.  She said she

13  doesn't know.

14          THE COURT:  Sustained.

15  BY MR. FALLGATTER:

16  Q.   Do you remember anything about a lawsuit and --

17          THE COURT:  Sustained.

18          Mr. Fallgatter, if she doesn't know anything about

19  it, you can't keep asking her questions about it.

20          What's your next question?

21  BY MR. FALLGATTER:

22  Q.   Well, you have no idea why certain big-box pharmacies

23  would decide to no longer honor opioid prescriptions?

24  A.   I don't know.

25  Q.   Right.  And you said some of the patients said they have

1    difficulty.

2            That difficulty could include the pharmacies being

3    out of stock on a particular medicine?

4    A.    In some instances we were told -- I would be told that

5    they had already reached their limit.  They could accept so

6    many patients for buprenorphine, and if they'd reached their

7    maximum limit, then they would have to find another pharmacy.

8    Q.    So that pharmacy would have a business reason to not fill

9    a prescription, not because they didn't like you or

10   Dr. Hollington.

11   A.    As I understood it, some of the patients would tell me

12   that they were told that they could not fill their -- the

13   pharmacy told them they would not fill any prescriptions from

14   Sawgrass.

15   Q.    Do you remember which pharmacy that was?

16   A.    CVS.

17   Q.    So that's one of the big-box pharmacies, right?

18   A.    Yes.

19   Q.    Let me ask you about the patient chart.

20           And you indicated on your direct examination that it

21   is your job, as the advanced practice registered nurse, to

22   initiate this chart for the patient that gets referred to you?

23   A.    A new patient.

24   Q.    A new patient, yes, ma'am.

25           And -- and that's the protocol of Sawgrass, is that

 1  Dr. Hollington would generally meet them, maybe get a urine

 2  test, and then they'd be referred to one of you talented

 3  advanced practice registered nurses?

 4  A.   That's correct.

 5  Q.   Okay.

 6          MR. FALLGATTER:  So if we can publish 11C-5, the

 7  patient chart.

 8  BY MR. FALLGATTER:

 9  Q.   Have you seen the whole chart, ma'am?

10  A.   I have, yes.

11          MR. FALLGATTER:  So if we can go to page 3.

12  BY MR. FALLGATTER:

13  Q.   And we see at the bottom your encounter, your conference

14  with Mr. Thomas Breo on April the 4th, 2022.

15          Do you see your name, Rachael Pittala?

16  A.   Yes.

17  Q.   And, again, you know these charts.  The early entry's on

18  the top.

19          So from page 3, we'll slip over to page 4, and we

20  will see, up at the top under the chief complaint, those are

21  your notes about what Mr. Breo told you in the recorded phone

22  call?  You didn't know it was recorded, but in the call you had

23  with him?

24  A.   Yes.

25  Q.   And you do your best to summarize what he told you?

1   A.    Yes.

2   Q.    So we read the first line:  "Thomas Breo is a 45-year-old

3   male ..."

4         M for male, right?

5   A.    Correct.

6   Q.    "... who presents today seeking to establish care with

7   Sawgrass Health for the treatment and management of his anxiety

8   disorder and ADHD."

9         Now, ultimately those are the diagnoses that you

10  attach to his chart, right?

11  A.    Yes.

12  Q.    And let me interrupt myself a second.

13        MR. FALLGATTER:  And we can go to page 1.

14  BY MR. FALLGATTER:

15  Q.    And, again, Thomas Breo, the top page, see the big word

16  diagnoses, the bold?

17  A.    Yes.

18  Q.    And those are your entries.  In the first one it says

19  attention-deficit/hyperactivity disorder.

20        That's your entry?

21  A.    Unspecified, yes.

22  Q.    And the medication for that is amphetamine, which is the

23  Adderall?

24  A.    Yes.

25  Q.    And then you have -- below that you have a generalized

1    anxiety disorder.  That was your second diagnosis?

2    A.   Yes.

3    Q.   And the same -- another medication of the --

4    benzodiazepine, which is a -- clonazepam is a form of

5    benzodiazepine, is it not?

6    A.   Yes.

7    Q.   It's like Xanax or Valium?

8    A.   Yes.

9    Q.   And that's used to treat anxiety disorders?

10   A.   Yes.

11   Q.   So let's go back, then, to page 4.

12        So we read the line where he's presenting -- down to

13   line 2, you note he lives with friends and roommates.

14        That's the couch surfing that he told you about,

15   right?

16   A.   Right.

17   Q.   And then he works on and off doing handiwork.  No real

18   job.

19        That's what he told you, right?

20   A.   Right.

21   Q.   He completed UDS -- that's the urine screen -- in the

22   office?

23   A.   He did.

24   Q.   And if we go on over -- well, let me back up.

25        He's positive for amphetamine.  That's the Adderall?

1    A.    Yes.

2    Q.    And benzodiazepines.  That was your second prescription

3    for the clonazepam?

4    A.    Yes.

5    Q.    And then he reports he'd been buying these drugs off the

6    street, and he's very worried and concerned about the fentanyl

7    overdoses.

8          And that hearkens back to your discussion about

9    flopping on the floor and fentanyl being 50 times stronger than

10   heroin?

11   A.    Yes.

12   Q.    Next line down, he does not want to buy drugs off the

13   street without the supervision of a physician anymore.

14         And that means Sawgrass Clinic and your assistance to

15   him as a medical professional, right?

16   A.    Yes.

17   Q.    Because he wants to be in compliance and manage his

18   diagnosis properly.

19         And manage, of course, means manage it in a lawful

20   fashion with prescription drugs?

21   A.    Yes.

22   Q.    And, again, these are things he told you, and these are

23   the things you were trying to do to help him, right?

24   A.    Yes.

25   Q.    He reports he does not have a primary doctor.

1          Very few addicts have primary doctors, do they?

2    A.    That's correct.

3    Q.    So that was another clue?

4    A.    Yes.

5    Q.    He reports symptoms of anxiety, and we read that from the

6    transcript, right?

7    A.    Yes.

8    Q.    But denies any recent panic attacks or symptoms of

9    depression.

10         If he had depression, with your psychiatric

11   background, you would ask maybe some more questions about the

12   use of these drugs for someone who might have some other

13   additional mental health issues?

14   A.    Yes.

15   Q.    So that report to you also helped you with your diagnosis?

16   A.    Yes.

17   Q.    He also endorses difficulty concentrating, which is

18   exactly what he told you, right?

19   A.    Yes.

20   Q.    He says -- next line down -- he had been prescribed

21   Adderall in the past for his diagnosis, which he states that

22   significantly helps, but really you could not find any

23   prescription record for him, could you?

24   A.    Not in the E-FORCSE.  It only goes back for two years.

25   Q.    So if he had --

1    A.    So if he had --

2    Q.    If he had it before, that wouldn't show?  So if he'd been

3    using -- which -- let me ask you this.

4          Since it wasn't there -- if he'd been telling you the

5    truth and there should have been a prescription, if it's not

6    there in the last two years, that would tell you that he was

7    using street Adderall at least for the past two years?

8    A.    Yes.

9    Q.    And the last line on the right, "Follow up in four weeks

10   or sooner if needed."

11         That was the standard 30-day keep them on the

12   treatment plan, follow up with them, make sure they're safe,

13   right?

14   A.    Correct.

15   Q.    If we scroll on down under subjective, there's a couple of

16   highlighted entries.  Street meds, obviously he admitted it.

17   Anxiety, he admitted that.

18         And at the bottom you typically list the goal of the

19   treatment, do you not?

20   A.    Yes.

21   Q.    And the goals are, "No street meds.  Medically stable,"

22   meaning using the lawful prescriptions that you were issuing,

23   right?

24   A.    Yes.

25   Q.    And then, "Decrease dependence on medications."

1          So not only get him off the street drugs but get him

2     off the lawful prescriptions too.

3     A.    Correct.

4     Q.    If we go to the next page, 5, the plan kind of reiterates

5     what we just read.  "Continue medications, tapering as

6     tolerated."

7          And tapering means you wean them off a little bit?

8     A.    Correct.

9     Q.    But only if they can tolerate and not have some kind of a

10    withdrawal?

11    A.    Relapse.

12    Q.    If we look at the assessment -- and, I'm sorry.  "Mood

13    anxious," is repeated there.

14         If we look down at the assessment about halfway down,

15    maybe a little more, we have the same assessments we've read,

16    the ADHD and the GAD, which stands for what?

17    A.    Attention-deficit/hyperactivity disorder and general --

18    generalized anxiety disorder.

19    Q.    And those terms are repeated.  I didn't highlight them,

20    but the actual words are then spelled out in that next

21    paragraph, right?

22    A.    Yes.

23    Q.    The plan is to use the MAT program.  We've talked about

24    that about being medically assisted treatment for drug

25    addiction, and that's precisely what you were trying to fashion

1  for him, were you not?

2  A.   Yes.

3  Q.   And, again, at the -- I mean, the third line down is, "All

4  policies were discussed."

5       The key things you discussed with him was, "Don't get

6  drugs off the street and don't sell your drugs," right?

7  A.   Correct.

8  Q.   Those are the two most important things for policies

9  within an addiction clinic on dealing with an addict, right?

10  A.   Take their medications as prescribed.

11  Q.   And don't get them off the street.

12  A.   And don't buy them from the street.

13  Q.   And don't sell your lawful prescriptions.

14  A.   And don't sell your lawful prescriptions.

15  Q.   Again, you note the next appointment is in one month.

16  A.   Yes.

17       MR. FALLGATTER:  Let's go back to page 1, please.

18  BY MR. FALLGATTER:

19  Q.   And, again, the diagnoses, the two that we've talked

20  about, the ADHD and the generalized anxiety disorder, when you

21  wrote this, you were relying on what he told you, correct?

22  A.   Yes.

23  Q.   And you believed it to be a correct diagnosis.

24  A.   Yes.

25  Q.   You did not think you were committing some type of crime

1  writing that diagnosis, did you?

2  A.    No.

3  Q.    And let me ask you again.  I think it's clear.

4         All of those entries that we've just gone through

5  were entries that you put in the chart, not Dr. Hollington.

6  A.    Yes.

7  Q.    And anyone with your training, whether it be a doctor or a

8  nurse with addiction training, would read your report and your

9  diagnoses and would believe you had correctly prescribed those

10 two medications.

11 A.    Yes.

12 Q.    Just like you believed at the time that you prescribed

13 them.

14 A.    Yes.

15 Q.    Mr. Mike pointed out one other entry.

16        MR. FALLGATTER:  If we can turn to page 3.

17 BY MR. FALLGATTER:

18 Q.    And up at the top it has the November 16th, 2022, entry

19 and that's by Dr. Hollington, is it not?

20 A.    Yes.

21 Q.    And that date was about three weeks after he was indicted.

22        Do you know that he got indicted in late October of

23 2022?

24 A.    Yes.

25 Q.    Have you ever seen the indictment?

1   A.   No.

2   Q.   So in the indictment it lists Mr. Breo as the patient, and

3   it has his name, Thomas Breo.

4            It doesn't have his real name; it has the name that

5   he dealt with you and used with the clinic, Thomas Breo.

6   A.   Yes.  I guess I don't -- I didn't see it.

7   Q.   Thank you.

8            So you would agree that you didn't realize Thomas

9   Breo was really somebody else, right?

10  A.   No.

11  Q.   Nobody at the clinic knew he was not really Thomas Breo.

12  A.   No.

13  Q.   But after the indictment was returned, the government had

14  disclosed that.  And he's testified in front of this jury, gave

15  us his real name.  So now we know he's an undercover officer.

16           Do you know that?  Have they told you he's really a

17  cop?

18  A.   Yes.

19  Q.   And you know now he's not a real patient, right?

20  A.   Yes.

21  Q.   So if you look at the entries that Dr. Hollington put, the

22  first line, "This is a person presenting under false

23  pretenses."

24           That's absolutely true, isn't it?

25  A.   Yes.

1    Q.    Second line, "His intent was not to seek therapy, rather

2    to mislead medical practitioners."

3          That's true, isn't it?

4    A.    Yes.

5    Q.    Line three, "He was not seeking to divert drugs, but was

6    rather paid just for deception."

7          Paid may be too strong a term, but he certainly gets

8    a salary to pretend to be an undercover police officer and

9    engage in deception, but --

10         MR. MIKE:  Objection, Your Honor.

11         THE COURT:  I'll sustain it.  Just rephrase the

12   question, please.

13   BY MR. FALLGATTER:

14   Q.    It's true he was not really seeking to get lawful drugs.

15   He was just paid there to be an actor?

16   A.    Yes.  He was not seeking to divert drugs but was paid for

17   deception, it says.

18   Q.    And then the next thing -- there are some bullet points,

19   but it starts out a with sentence, "Historical points that this

20   patient falsely stated."

21         And you would agree that all of those bullet points

22   come from the notes you made in the chart.

23   A.    I didn't document in my chart that he claimed a history of

24   ADHD.

25   Q.    Do you remember when he said he'd gotten a prior

1   prescription for it?

2   A.    Oh.

3   Q.    He told you in the video --

4   A.    Okay.

5   Q.    -- he'd gotten a prior prescription for it?

6   A.    Yes.

7   Q.    And it wasn't in -- in the prescription records so it had

8   to be some two or more years earlier?

9         Do you remember that?

10  A.    Right.

11  Q.    So let's just go through the list.

12        The second one, "Tested positive for amphetamine and

13  benzodiazepine."

14        That's what you wrote in your chart, right?

15  A.    Yes.

16  Q.    Next line, "Claimed to be worried about the safety of the

17  street meds he was using."

18        That's in your chart, right?

19  A.    Yes.

20  Q.    Next line, "Claimed history of anxiety."

21        And he did that, and you put down the diagnosis, the

22  GAD, correct?

23  A.    He -- he told me that he was taking the medication for --

24  to help him relax.

25  Q.    Right.  But he told you he had anxiety, and your specific

1  diagnosis was generalized anxiety disorder.

2  A.   I would have to review the transcript.  I'm sorry.

3  Q.   Well, I'm not - I don't mean the transcript.  I mean --

4  A.   The conversation again.  I can't --

5  Q.   Yeah, not the conversation.  I'm talking -- these are -- I

6  apologize, Ms. Pittala.

7       I'm asking you if what we see here is what was

8  documented in the notes you put in the patient chart.

9  A.   Yes.

10 Q.   These are just summaries of what you put in the patient

11 chart.

12 A.   Okay.  Yes.

13 Q.   And so, again, I'm making sure that you're satisfied that

14 each one of these bullet point entries are coming out of the

15 notes that you put in there the prior April.

16 A.   Okay.  Yes.

17 Q.   So next line down, "Claimed difficulty concentration."

18      You noted that in your chart, right?

19 A.   Yes.

20 Q.   "Claimed difficulty with focus at work."

21      He didn't really have much work.

22 A.   Correct.

23 Q.   That's in your chart.

24 A.   Yes.

25 Q.   "Claimed history of Adderall prescription."

1    Couldn't find it, but he told you he had it, right?

2  A.   Yes.

3  Q.   "Claimed he was in counseling."

4    Do you remember him saying he'd had some prior

5  counseling?

6  A.   I don't recall him saying that.

7  Q.   All right.  "Claimed history of benzodiazepine and that

8  benzodiazepine was helpful."

9    Off the streets, basically, is what he's telling you,

10  isn't he?

11  A.   Yes.

12  Q.   And then the last line out of the bullet points, "All this

13  information and everything he said is considered to be false."

14    And as far as you know now, it was false, wasn't it?

15  A.   Yes.

16  Q.   "I am informed that he's a professional deceiver," meaning

17  someone that lies as part of their employment.

18    You understood, as an undercover police officer, he

19  was a professional deceiver?

20  A.   Yes.

21  Q.   Patient charts from one doctor can be used by another

22  doctor, can they not?

23  A.   Patients' records can be reviewed by one provider to

24  another provider, yes.

25  Q.   I may have misrecalled, but yesterday did -- did you say

1  that you thought you made a -- might have made a couple

2  mistakes in the chart?

3  A.    Yes.

4  Q.    Now, mistakes aren't criminal, are they?

5  A.    No.

6  Q.    They have not told you that a mistake is criminal, have

7  they?

8  A.    No.

9  Q.    The government hasn't indicted you for making a mistake,

10 have they?

11 A.    No.

12         THE COURT:  How much more do we have, Mr. Fallgatter?

13         MR. FALLGATTER:  If this is a good time for a break,

14 I can be even --

15         THE COURT:  No.  No.  I'd like to finish the witness.

16         MR. FALLGATTER:  Oh, I'm sorry.

17         THE COURT:  I was just wanting to get an estimate

18 from you.

19         MR. FALLGATTER:  If I can have a moment, Your Honor,

20 I'll try to ...

21     (Pause in proceedings.)

22 BY MR. FALLGATTER:

23 Q.    I believe -- correct me if I'm wrong -- that you also said

24 yesterday that you now wished you'd asked more questions?

25 A.    Documented more information in the record.

PITTALA - CROSS                                                                71

1   Q.    But we're in July, and this was back in April, so 17

2   months later you can second-guess yourself, can't you?

3   A.    Yes.

4   Q.    But until Dr. Hollington heard you say that yesterday, you

5   never told him you'd wished you'd asked more questions of

6   Mr. Breo, did you?

7   A.    Say that again?  I'm sorry.

8   Q.    You never told Dr. Hollington --

9   A.    No.

10  Q.    -- in the last 17 months, you wished you'd asked more

11  questions?

12  A.    No.

13  Q.    And if these folks hadn't brought you in and given you

14  letters where they said you were a target, you wouldn't be

15  thinking about asking more questions of Mr. Breo, would you?

16  A.    No.

17  Q.    And on Mr. Breo you were the one that actually issued

18  these prescriptions, were you not?

19  A.    Yes.

20  Q.    So, in fact, you never even discussed those prescriptions

21  for Mr. Breo with Dr. Hollington.

22  A.    No.

23  Q.    You just issued them.

24  A.    Yes.

25  Q.    And the diagnosis that you recorded in the chart was

1  entirely your diagnosis, not Dr. Hollington.

2  A.   Correct.

3  Q.   But he's the one that's indicted for Mr. Breo.  You

4  understand that?  Your prescription, he stands indicted for.

5        Did you know that?

6  A.   No.

7  Q.   In the medical profession, things are not entirely black

8  and white, are they?

9  A.   No.

10 Q.   So there's a lot of differences of opinion about the types

11 of medicine and how much, what to use, all based on diagnoses,

12 based on the practitioners' levels of experience.

13        Is that true?

14 A.   Yes.

15 Q.   And you mentioned that you had some meetings with

16 Dr. Hollington and the staff about those issues, dosages,

17 what's right, what's wrong.

18        You agree that his addiction training greatly exceeds

19 yours, do you not?

20 A.   Yes.

21 Q.   And you mentioned that you were -- had some patients that

22 were taken away from you --

23 A.   Yes.

24 Q.   -- because the patient had some dispute with your

25 professional judgment?

PITTALA - CROSS                                                      73

1    A.    Yes.

2    Q.    But that's what it was -- right? -- was a professional

3    judgment.  He's entitled to his; you're entitled to yours?

4    A.    Yes.

5    Q.    And with regard to any dosages that any patient got from

6    Dr. Hollington, you would agree that any such dosage was within

7    the lawful limits, correct?

8    A.    Yes.

9    Q.    And I think you talked about the meeting with the staff,

10   and he would provide guidance on what was appropriate?

11   A.    In some cases, yes.

12   Q.    The government asked you about a November 20th -- 30th,

13   I'm sorry, 2022, email that was sent out.

14         And it -- you understood that -- that the email was

15   really about Thomas Breo and your assessment of him, right?

16   A.    At -- when reading it, I realized that it was about

17   Mr. Breo.

18   Q.    And in the email he let you know -- let all of you know

19   that he'd been charged, right?

20   A.    Yes.

21   Q.    And he assured you-all that he didn't believe anyone had

22   acted in bad faith.

23         Do you remember him telling you that?

24   A.    I remember the email, yes.

25         MR. FALLGATTER:  I'm sorry.  We can take that exhibit

1    down.

2    BY MR. FALLGATTER:

3    Q.    Do you remember him saying that he didn't believe anyone

4    had acted in bad faith, right?

5    A.    Yes.

6    Q.    And you don't think you acted in bad faith, do you?

7    A.    No.

8    Q.    He told you that those patients were pretending to be

9    patients, and they weren't real?

10   A.    Yes.

11   Q.    Mr. Mike asked you about one paragraph in there where

12   Mr. Breo said he liked taking it.

13          We discussed earlier that someone who's been using

14   street drugs and likes taking it is a way of them expressing to

15   you they have a craving for it.

16   A.    Yes.

17   Q.    And so when -- and let me ask you.  So it really dealt

18   with your diagnosis.

19          Did -- when you read this, did you see it as

20   Dr. Hollington trying to share with you kind of what I'm doing

21   today, that "You did okay.  You were tricked, but you did

22   okay"?

23          Isn't that the message here?

24   A.    In the email?

25   Q.    Right.

1   A.   Yes.

2   Q.   And to assure you that you weren't acting in bad faith, he

3   applied some of his multiple years of medical skill and board

4   certification to share with you a few other thoughts as to why

5   what you did was fine.

6   A.   Yes.

7            MR. FALLGATTER:  May I have one moment, Your Honor?

8        (Pause in proceedings.)

9            MR. FALLGATTER:  To answer your question, I think

10  maybe 10 minutes.

11           THE COURT:  All right, sir.  Let's get it done.

12           MR. FALLGATTER:  All right.

13  BY MR. FALLGATTER:

14  Q.   You're not aware of the indictment, but there's -- there's

15  a count dealing with Amy Brewington.

16           Do you remember her?

17  A.   I don't off the top of my head.

18  Q.   She has testified.  Her patient chart has been put into

19  evidence.

20           And let me represent to you that the evidence in her

21  chart shows that she paid 21 visits to the Sawgrass Clinic

22  between July 26th of 2020 and September 25th of 2022, for a

23  26-month period, and you saw her one time on her 21st visit.

24           Any of that ring a bell?

25  A.   I'd have to see the record.

PITTALA - CROSS                                                              76

1             MR. FALLGATTER:  Can I see 14A-1.

2             If we go to the top of the page.

3    BY MR. FALLGATTER:

4    Q.   You see her name, Amy Brewington?

5    A.   Yes.

6    Q.   And -- well, here we're on page 5.

7             MR. FALLGATTER:  So I guess I -- thank you,

8    Ms. Pennington.

9    BY MR. FALLGATTER:

10   Q.   Page 5 is a visit, and I'm not going to bore you with our

11   number count but September 25th, 2022.

12            That's your name, Rachael Pittala?

13   A.   Yes.

14   Q.   And seeing her name there -- I know you saw a lot of

15   patients, but does that ring a bell that you saw her?

16   A.   I -- yes.  The name looks familiar to me.

17   Q.   Well, let me kind of -- going down to the next page -- and

18   it will probably help you a little more.  It's a long entry.

19            That's your entry, correct?

20   A.   Yes.

21   Q.   And it says that she presents via telemedicine for a

22   routine follow-up appointment.

23            Now, you had at that time access to the entire chart,

24   right?

25   A.   Yes.

1    Q.   Which means you would have had information about the

2    previous 20 visits.

3    A.   Yes.

4    Q.   And you would review that to be informed as to how to deal

5    with this patient?

6    A.   Yes.

7    Q.   And then she says -- "She reports she's doing well on her

8    current treatment regimen and seeks" -- or regime, I'm sorry,

9    "and seeks to obtain refills.  She reports problems with paying

10   attention, concentrating, focusing, and is requesting to resume

11   her treatment for diagnosis of ADHD."

12            And let me digress a second.

13            MR. FALLGATTER:  If we can go back to page 1.

14   BY MR. FALLGATTER:

15   Q.   And I think it might be helpful, Ms. Pittala, if we took a

16   peek at the diagnoses in terms of me asking you questions.

17            So there's diagnoses at the top, and the first one is

18   opioid dependence.  And on down, we see anxiety disorder and,

19   unfortunately, bipolar disorder also, major depressive

20   disorder.

21            So then it talks about the medicines.

22            MR. FALLGATTER:  Let's go back now to page 6.

23   BY MR. FALLGATTER:

24   Q.   And so we talked about line 3.  She wants to resume her

25   treatment for a diagnosis of ADHD, which was one of the

1   official diagnoses in her patient chart, correct?

2   A.   Yes.

3   Q.   If we go down about halfway, and it's on the right, you

4   see the 1.5 tabs a day?

5          And then to the right of that it says, "The previous

6   MAT provider" -- again, that's an acronym for medically

7   assisted treatment?

8   A.   Yes.  Correct.

9   Q.   "... was Dr. Roy," so that's some prior physician?

10  A.   Um ...

11  Q.   You follow me?

12  A.   Yes.  It says the previous provider was Dr. Roy.

13  Q.   And she was receiving Adderall, 30 milligram.

14         That's the most you can get, right?

15  A.   Yes.

16  Q.   BID is twice a day?

17  A.   Yes.

18  Q.   Subutex, which is the buprenorphine, to help with opioid

19  addiction?

20  A.   Yes.

21  Q.   And Xanax, which helps with anxiety?

22  A.   Yes.

23  Q.   Three years ago.

24         So when she told you that, you took that into account

25  in determining what her drug addiction history was?

1  A.   Yes.

2  Q.   And it goes on, "The patient was first introduced to

3  Lortab ..."

4        What is Lortab?

5  A.   That's an opioid medication for pain.

6  Q.   Yes, ma'am.

7        "... at the page of 14 when she was pregnant due to

8  back pain, and thus began her addiction to opioids," which are

9  the most powerful addiction drugs around, are they not?

10  A.   Yes.

11  Q.   And you continued to report she began buying Lortab,

12  Percocet ...

13        That's another opioid?

14  A.   Opioid.

15  Q.   Oxy, which is Oxycontin, which is an opioid?

16  A.   Yes.

17  Q.   Roxy, which is Roxycontin, which is an opioid?

18  A.   Opioid.

19  Q.   And Dilaudid, which is an opioid.

20  A.   Yes.

21  Q.   And Dilaudid, am I correct that it's one of the most

22  powerful opioids?

23  A.   Yes.

24  Q.   So she's moving her way up on opioids.  She basically hit

25  the harshest, hardest opioid, did she not?

1    A.    She did.

2    Q.    And by the way, this is a real patient --

3    A.    Yes.  This is my --

4    Q.    -- right?

5    A.    Yes.

6    Q.    And all of it off the streets.

7    A.    Yes.

8    Q.    Dangerous, right?

9    A.    Yes.

10   Q.    And then heroin and fentanyl, also very dangerous, right?

11   A.    The most dangerous.

12   Q.    She says she's been using Subutex, which is to help her

13   avoid the opioid addiction, right?  That's what the

14   buprenorphine does?

15   A.    Yes.

16   Q.    On and off for the past five years.

17         Long time, right?

18   A.    Yes.

19   Q.    Well, particularly long since she started at age 14.

20         And if we go on down about the fifth line -- fourth

21   line from the bottom, she had relapsed on heroin on June 25th

22   of 2022, which is only about three months previously, right?

23   A.    I'm sorry.  I've got to find that line.  What's --

24   Q.    Yeah.  It's the fourth line from --

25   A.    Okay, yes.

1    Q.    Fourth line from the bottom, "Relapsed on heroin last

2    year, 6/25/22."

3            The line right below that, right below there,

4    "Purchasing Adderall 30 milligram off the street."

5    A.    Correct.

6    Q.    So she presented to you on that occasion as someone with a

7    very, very serious drug addiction history?

8    A.    Yes.

9    Q.    And if we look at the subjective down at the bottom, you

10   documented that she had attention and concentration problems

11   since early childhood, the first line?

12   A.    Yes.

13   Q.    Bottom right, "The patient was diagnosed with

14   attention" -- and we'll flip over -- "deficit/hyperactivity

15   disorder in psychological testing in school."

16           You had no reason to doubt the accuracy of that,

17   right?

18   A.    No.

19   Q.    And, "The patient has tried Adderall and Ritalin

20   previously and found them helpful for concentrating on work."

21           Again, all powerful symptoms of the need for

22   Adderall, correct?

23   A.    Yes.

24   Q.    And if we flip over to page 8, you have an assessment of

25   OUD.

1          Tell the jury what that stands for.

2    A.   Opioid use disorder.

3    Q.   And then anxiety disorder, which are the same diagnoses we

4    saw on page 1 of the report, right?

5    A.   Yes.

6    Q.   And if we flip on over to page 9, you have a lot more

7    notes about her and warned her about misuse.

8          But if we look down to the medications, we see the

9    clonazepam and Adderall and buprenorphine is what you

10   prescribed for her?

11   A.   Clonazepam, Adderall, buprenorphine.

12   Q.   Based on her addiction history and your expertise, were

13   you satisfied that prescribing Ms. Brewington those

14   prescriptions were for a legitimate medical purpose and in the

15   usual course of your professional practice?

16          MR. MIKE:  Objection, Your Honor.  That's for the

17   jury to decide, not for the witness.

18          THE COURT:  Let me see counsel at sidebar a minute.

19      (At sidebar, out of the hearing of the jury:)

20          THE COURT:  What's your objection, Mr. Mike?

21          MR. MIKE:  He's asking her if -- if it was --

22   whatever was prescribed in there was for a legitimate medical

23   purpose and in the usual course of professional practice.

24          MR. FALLGATTER:  So -- so they get to ask about red

25   flags, and I can't ask the key issue in this case?  I don't --

1    I can rephrase it, Your Honor, if you feel like I need to --

2              THE COURT:  I think you can -- I think, you know,

3    there's always an issue about the issues that are before the

4    jury and what a witness can testify to.  I certainly think you

5    can ask her whether she was satisfied that it was the

6    professionally correct thing to do or something like that.

7              MR. FALLGATTER:  I'll take that.

8              THE COURT:  Yeah.

9              MR. FALLGATTER:  And I may have been a little long on

10   my ten minutes.  I apologize.

11             THE COURT:  Okay.  We need to get this done.

12             MR. FALLGATTER:  Okay.

13       (End of discussion at sidebar.)

14   BY MR. FALLGATTER:

15   Q.   In short, you were satisfied you were giving her a correct

16   prescription?

17   A.   Yes.

18   Q.   And there are multiple advanced practice registered nurses

19   in the Sawgrass Clinic, correct?

20   A.   Yes.

21   Q.   So if you noted from the chart, she'd seen two others

22   before you.  She saw Hope King.

23             You know Hope King?

24   A.   Yes.

25   Q.   She's a talented advanced practice registered nurse, is

PITTALA - CROSS                                                         84

1   she not?

2   A.   Yes.

3   Q.   Saw her on the third visit, and her notes reflect she got

4   the same prescriptions.

5   A.   Yes.  I -- I don't have the whole record.

6   Q.   And then Joan Cappell, C-a-p-p-e-l-l, you know her to be

7   another advanced practice registered nurse?

8   A.   Yes.

9   Q.   And Ms. Brewington saw her on visits 17, 18, 19, and 20.

10          So she saw at least five -- on five of her visits she

11  saw advanced practice registered nurses, not Dr. Hollington,

12  and got the same diagnoses and same prescription?

13  A.   I don't have the record, but ...

14  Q.   Well, I'll move on.  Thank you, ma'am.

15          But if it's in there, you would agree --

16  A.   If it's --

17  Q.   If the records show that all four of you -- or three of

18  you advanced practice registered nurses saw her, same

19  diagnoses, same prescription, you would feel --

20          MR. MIKE:  Objection, Your Honor.  That would be

21  speculation.

22          THE COURT:  I'll -- I'm going to let him do it.

23  BY MR. FALLGATTER:

24  Q.   If the records reflect that, you would see that as

25  confirming the accuracy of your prescription, would you not?

1    A.    Yes.

2    Q.    You were asked about Danielle Ashley.  Do you remember

3    seeing her for about three visits?

4          You were asked on direct examination about her.  Do

5    you remember?

6    A.    I remember seeing her at least once.

7    Q.    So we will pull the chart out if you want, but if I can

8    ask you questions -- let me know if you want to see the chart,

9    but I'll try to zip through this if I can.

10         I will represent to you that the chart, which is

11   Exhibit 14D-1, shows that she paid 23 visits to the clinic

12   between December 29th, 2019, and August 21st, 2022, for a

13   period of 32 months.

14   A.    Okay.

15   Q.    And that you helped her with visits 21, 22, and 23,

16   meaning the last three visits that she came to the clinic.

17   A.    Okay.

18   Q.    Again, you would have had access to her entire chart prior

19   to dealing with her?

20   A.    Yes.

21         MR. FALLGATTER:  If I can have 14D-1 and publish one

22   portion of it, starting at page 9.

23   BY MR. FALLGATTER:

24   Q.    And there's Rachael Pittala, March 13th, 2022, and

25   Danielle Ashley's on the left.  And, of course, as they do, we

1    scroll over to the next page, and we'll see your notes.

2            And, again, these notes, Ms. Pittala, are notes that

3    you made during that particular conference with her?

4    A.    In March.

5    Q.    And it says, "Danielle Ashley presents for a routine

6    monthly follow-up."

7            That's what you were there to help her with, right?

8    A.    Yes.

9    Q.    "She states she's living in a motel with her daughter,

10   who's 12 years old, and she's waiting for her disability to be

11   approved."

12           So a motel environment is somewhat indicative of an

13   addiction issue when you don't have permanent housing, right?

14   A.    Yes.

15   Q.    "She states she is safe and optimistic about her future

16   and is doing well, but she doesn't have money for her

17   prescriptions, and she's been getting help with friends to gain

18   access to some of her medications."

19           You would not want her getting drugs from friends for

20   medication, would you?

21   A.    No.

22   Q.    "She states she realizes that this is not safe and wishes

23   to obtain the refills legitimately from a doctor and a

24   pharmacy."

25           And that would be a lawful prescription you could

PITTALA - CROSS                                                         87

1   help her with, right?

2   A.   Yes.

3   Q.   "UDS," is urine drug screen, "completed in the office

4   today was positive for benzodiazepines and buprenorphine."

5        Those are drugs she was addicted to -- correct? --

6   and some she was getting as lawful medication.

7   A.   Yes.

8   Q.   And she agreed to an initial dose reduction of Subutex.

9        Again, Subutex is that drug of choice to help with

10  opioid addictions?

11  A.   Yes.

12  Q.   And it talks about that and the clonazepam.

13       If we go down a couple lines to the right, "She

14  reports feelings of anxiety at times."

15       Do you see that entry?

16  A.   She --

17  Q.   Reports feelings --

18  A.   Reports feelings of anxiety.

19  Q.   And Adderall helps with anxiety, right?

20  A.   Yes.

21  Q.   "... but states that it's mostly manageable when taking

22  her prescriptions as provided."

23  A.   She reports --

24  Q.   And that, again --

25  A.   -- feelings of anxiety --

1  Q.   -- was the lawful purpose of those prescriptions, right?

2  A.   Correct.

3  Q.   You saw her again, if we look at the bottom page 6 -- and

4  I skipped one of them, but this is the last time you saw her.

5  It's the 23rd visit.

6  A.   So the -- the first one that you showed me was March, and

7  then there was another visit between March and --

8  Q.   Yeah.  Do you want to see the date?

9  A.   Yes.

10  Q.   Okay.  Let me grab that real quick for you.  March ...

11         MR. FALLGATTER:  Let's go to page 12.

12  BY MR. FALLGATTER:

13  Q.   I'll show you the first one that --

14  A.   Yeah.  The very first -- this was the first encounter that

15  I had with her -- right? --

16  Q.   Yeah.

17  A.   -- was that March.

18  Q.   No.  It was November.

19  A.   It was November.

20  Q.   Yes, ma'am.  So -- but it was kind of a continuation.

21         But if you want to see it, let's go to the bottom of

22  page 12, and you'll see November 2nd.

23         And if we scroll over to the top of the next page --

24  A.   Oh, okay.

25  Q.   -- you'll see again the reference to living in a motel

1  with her daughter.

2  A.   Okay.

3  Q.   "Introduced to morphine, then later opioids."

4          It's a little shorter version?

5  A.   A little shorter, and then I saw her in March.

6  Q.   Right.

7  A.   Okay.

8  Q.   So if -- and that's the one we read, so -- that's the

9  second one.  So we'll go to the third one, page 6, third time

10  that you saw her.  And it does jump five months later.

11         Do you know why?

12  A.   I do remember.

13  Q.   Okay.  So bottom of page 5, there's the August 21st, and

14  if we go to the top of page 7, it explains, "Danielle presents

15  for follow-up appointment.  The patient has been incarcerated

16  since April of this year."

17         You know she was in there for drugs, right?

18  A.   Yeah.  She -- she told me she had been in prison.

19  Q.   "And is currently on probation.  She reports having

20  cravings for opioids since being released."

21         Now, she had been detoxed basically for the five

22  months she'd been in jail, but her addiction was so powerful

23  that --

24         MR. MIKE:  Objection, Your Honor.

25         THE COURT:  Sustained.

1   BY MR. FALLGATTER:

2   Q.   You understood she'd been incarcerated for several months?

3   A.   She had -- that's what she reported, that she had been

4   incarcerated.

5   Q.   And she reports having cravings for opioids since being

6   released.

7        You knew that meant released from jail, right?

8   A.   That's what she told me, yes.

9   Q.   And was it concerning for you that someone who had

10  theoretically no access to any drugs would immediately have

11  cravings for opioids upon being released?

12  A.   Yes.

13  Q.   That's a pretty good clue that they have a powerful

14  addiction, right?

15  A.   Getting out of jail, they can fall back to their ways.

16  Q.   And relapses are fairly common in the addiction field, are

17  they not?

18  A.   Yes.

19  Q.   And it goes on at line 2, "She also reports increased

20  levels of anxiety and does not want to relapse."

21  A.   Correct.

22  Q.   And part of your medically assisted treatment is to help

23  her from a relapse, right?

24  A.   Yes.

25  Q.   And, again, if we look down at the bottom of that page,

1    you list the goals.  "No street meds.  Medically stable.

2    Decrease dependence on medications."

3              If we go to the next page, midway down there's the

4    assessment.  And it's got the same anxiety disorder, OUD, which

5    is the opioid use dependence, right?

6    A.    Opioid use dependence.

7    Q.    That she'd had since age 14?

8    A.    Yes.

9    Q.    OCD is obsessive-compulsive disorder?

10   A.    Yes.

11   Q.    Not uncommon with bipolar conditions too, right?

12   A.    Correct.

13   Q.    And then you have the refills down below, the

14   buprenorphine and the clonazepam, which is another term for

15   benzodiazepine, right?

16   A.    Buprenorphine, clonazepam --

17   Q.    Right?

18   A.    -- levothyroxine, yeah.

19   Q.    So, again, this chart would reflect that she got those

20   same prescriptions with really all 23 of her visits.

21             Is that your understanding?

22   A.    Yes.

23   Q.    And you believed that was a perfectly proper prescription

24   to give this young lady who had been battling addiction for as

25   long as she had?

1   A.   Can you scroll it a little bit?

2   Q.   To what part would you like?

3   A.   It just -- I need to see.

4            So I started her on the paroxetine.

5   Q.   Okay.

6   A.   Okay.  I was just reviewing that because I was -- I saw

7   there was sertraline there too, and I wanted to make sure that

8   was mine.

9            Okay.  So, yes, I started her on the paroxetine and

10  continued her buprenorphine and clonazepam.

11  Q.   You saw her on visit Nos. 21, '2, and '3.  She was seen on

12  visit 20 by Casie McCallister.

13           You know her as being an advanced practice registered

14  nurse?

15  A.   Yes.

16  Q.   And she's highly trained as well?

17  A.   Yes.

18           MR. FALLGATTER:  Thank you, Your Honor.  I have no

19  further questions.

20           THE COURT:  Redirect?

21           MR. MIKE:  Yes, Your Honor.

22           THE COURT:  Ladies and gentlemen, I apologize.  I

23  know we're going a little bit over, but I'd like to get this

24  witness finished.  I will -- and I don't think it will be very

25  long.

1          You may proceed, sir.

2          MR. MIKE:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. MIKE:

5    Q.   Ms. Pittala, you mentioned before that Thomas Breo was

6    referred to you by Dr. Hollington, correct?

7    A.   Yes.

8    Q.   And Dr. Hollington had the initial interview or intake

9    with Thomas Breo, correct?

10   A.   Yes.

11   Q.   Did you believe that during that initial interview that

12   Dr. Hollington was doing a thorough examination?

13   A.   I wasn't --

14         MR. FALLGATTER:  She wasn't there.  How would she

15   know?  I object, Your Honor.

16         THE COURT:  How would she know?

17         You'd better rephrase your question or --

18   BY MR. MIKE:

19   Q.   Is it standard practice for -- during an initial intake,

20   that a physician would do a -- would check vitals of that

21   patient and perform other physical examinations?

22   A.   The standard for going to see a doctor would be to take --

23   you know, have consent signed, history taken, vital signs

24   taken, in most offices.

25   Q.   Was it your belief that that was taking place at Sawgrass

1   Health?

2   A.    I did not have knowledge of whether or not that was taking

3   place.

4   Q.    So you didn't know what happened inside -- during the

5   initial visit with Dr. Hollington.

6   A.    I did not.

7   Q.    So within that, you mentioned on your medical records that

8   all the policies were discussed with Thomas Breo.

9         You didn't discuss those policies with him, correct?

10  A.    I did not discuss those policies.

11  Q.    Did you think Dr. Hollington --

12  A.    Would be --

13  Q.    -- discussed those policies?

14  A.    Yes, with signing the consent form and -- that's my

15  understanding, that that's what the initial visit entailed, was

16  just discussing what the protocols are for being a patient at

17  the practice.

18  Q.    In your interview with him, you didn't discuss any of the

19  MAT program with Thomas Breo?

20  A.    No.

21  Q.    Did you believe that Dr. Hollington discussed the MAT

22  program with Thomas Breo?

23  A.    The treatment, medication-assisted treatment?

24  Q.    Yes.

25  A.    I -- I would have -- yes, I did.

1  Q.   Okay.

2  A.   He was seeing the patient initially, so yes.

3  Q.   You put also in the notes that it was a positive urine

4  sample for amphetamine and benzos, benzodiazepines.

5        How did you receive the results of the urinalysis --

6  of his urinalysis?

7  A.   It was sent to me by text.

8  Q.   By who?

9  A.   By Dr. Hollington.

10 Q.   And did you believe that a proper drug screening took

11 place during the interview with Thomas Breo?

12 A.   Yes.

13 Q.   Did all of that go into your evaluation when you -- when

14 you diagnosed him with ADHD --

15 A.   Yes.

16 Q.   -- Thomas Breo?

17       Okay.  Now, also in your notes it does mention that

18 he said it was difficult concentrating.

19       Did he ever tell you he had difficulties

20 concentrating or that it helps him concentrate?

21 A.   He said -- when I asked him, "Do you take it for energy

22 and," I think my wording was, "to focus?" he said, "Yes."

23 Q.   Okay.  But he never told you he had difficulties

24 concentrating?

25 A.   No.

1   Q.   Okay.  There was talk about craving and drug cravings.

2        Do you believe it's proper to prescribe controlled

3   substance for the purpose -- the main purpose is for a craving

4   of an addict?

5   A.   Well, with medication-assisted treatment, the patients do

6   experience cravings.

7   Q.   So is cravings alone enough to prescribe controlled

8   substances like Adderall to a patient?

9   A.   Not -- not alone.  It would -- there would have to be

10  other factors.  If they were craving, let's say, opioids or

11  heroin, then that would be expected, and you would use

12  buprenorphine.

13  Q.   So it's important to find out why that patient is craving?

14  A.   To understand.

15  Q.   All right.  And would that be also evaluating and asking

16  questions regarding symptoms?

17  A.   Yes.

18  Q.   Okay.

19       MR. MIKE:  No further questions, Your Honor.

20                    *   *   *   *   *

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4  UNITED STATES DISTRICT COURT )

5  MIDDLE DISTRICT OF FLORIDA   )

6

7          I hereby certify that the foregoing transcript is a

8  true and correct computer-aided transcription of my stenotype

9  notes taken at the time and place indicated therein.

10

11         DATED this 25th day of January, 2024.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```