IN THE UNITED STATES DISTRICT COURT
                         MIDDLE DISTRICT OF FLORIDA
                          JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

            Plaintiff,           Case No. 3:22-cr-00141-TJC-PDB-1

 v.                              February 6, 2025

SCOTT ANDREW HOLLINGTON,         10:05 a.m. to 12:11 p.m.

            Defendant.           Courtroom No. 10-D
_____
                          SENTENCING
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                 UNITED STATES DISTRICT JUDGE

 COUNSEL FOR GOVERNMENT:
        KIRWINN MIKE, ESQUIRE
        DOJ-USAO-Jacksonville Division
        300 North Hogan Street
        Suite 700
        Jacksonville, Florida 32202

        ASHLEY WASHINGTON, ESQUIRE
        US Attorney's Office-FLM
        300 North Hogan Street
        Suite 700
        Jacksonville, Florida 32202


 COUNSEL FOR DEFENDANTS:

        CURTIS SCOTT FALLGATTER, ESQUIRE
        Fallgatter & Catlin, P.A.
        200 East Forsyth Street
        Jacksonville, Florida 32202

 COURT REPORTER:

        Heather Randall, RPR
        221 North Hogan Street, #185
        Jacksonville, Florida 32202
        Telephone:  (904) 549-1307
        randall4817@yahoo.com

(Proceedings recorded by mechanical stenography; transcript
produced by computer.)

## E X H I B I T S   R E C E I V E D

GOVERNMENT EXHIBITS:                                        Page No.
  1............................................... 40
  2............................................... 40

P R O C E E D I N G S

February 6, 2025                                      10:05 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session, the Honorable Timothy J. Corrigan presiding.

Please be seated.

THE COURT:  Good morning.  United States v. Scott Hollington.  That's 3:22-cr-141.  Ms. Washington represents the government, Mr. Mike as well.  Mr. Fallgatter represents Dr. Hollington, and they are both present.

We're here today for sentencing in this case. I've reviewed -- of course, I presided over the trial so I have a recollection of the evidence.  And I've also received a lot of material to review, which I have.  The -- that includes the PSR.  It includes the attachments to it.  It includes the sentencing memorandum filed by Mr. Fallgatter, which also had attachments to it.

There are two pending motions, which I thought I had ruled on, but apparently I haven't.  There's a motion for post-verdict judgment of acquittal, Doc. 200.  There is a motion for a new trial, Doc. 201.  They were both filed in July of '23, right after the trial.  And, of course, the government filed a response in opposition at Doc. 210.

I've considered those motions carefully.  And, of

1   course, as I said, I was present at the trial, so I'm aware of

2   the evidence and what occurred.  And I think both of those

3   motions are due to be denied.  So I'll -- I'm denying them on

4   the record, and I'll enter a brief written order that will take

5   care of that as well.

6           I also have a preliminary order of forfeiture that I

7   entered in March of '24 regarding Dr. Hollington's medical

8   licenses.

9           So I think I have read the materials that were

10  provided to me.  And we'll start where we always do, with the

11  presentence report.

12          Does the government -- Mr. Mike, does the government

13  have any objections to the PSR or to the scoring?

14          MR. MIKE:  No, Your Honor.

15          THE COURT:  All right.  Mr. Fallgatter, I believe you

16  did register some objections.  Do you wish to be heard on those

17  today?

18          MR. FALLGATTER:  Thank you, Your Honor.  Good

19  morning, sir.

20          THE COURT:  Good morning.

21          MR. FALLGATTER:  The -- when the final PSI was

22  issued, it addressed the sum of my objections, and we

23  appreciate that.  It's always a conundrum to me because I don't

24  like -- I don't think it's appropriate to give Your Honor a

25  sentencing memo too close to the sentencing date.  So I filed

1    the memo a couple of weeks earlier.  And then when the final

2    was published on the 30th, the next day I filed a supplement,

3    the sole purpose of which was to try to collate where I stood

4    with my objections.  And obviously you can tell me what you

5    deem appropriate in terms of how to handle it.

6            But I -- there was one that was withdrawn.  A number

7    of those that I suggested, if you're -- find acceptable, to

8    simply have me rely on the record in terms of the objections I

9    filed in the sentencing memos and whatnot.

10           And then that left three items that I asked you to

11   consider hearing brief argument on, which --

12           THE COURT:  I want to make sure that I -- I did -- I

13   read your supplemental memorandum, but I didn't -- I don't

14   think I brought it down with me.

15           So can we print that out, Tim, please?

16           MR. FALLGATTER:  It's Document 248.

17           THE COURT:  Okay.

18           MR. FALLGATTER:  And I identified the objections by

19   paragraphs, so hopefully that will be helpful.

20           THE COURT:  Yes.  Let me get that and then we'll --

21   because if there's -- if there's objections that you're

22   maintaining but you're not going to argue, I need to make sure

23   I know what they are because I want to be able to, of course,

24   rule on all objections so that the record is clear.

25           MR. FALLGATTER:  Yes, sir.

6

1          THE COURT:  And --

2          MR. FALLGATTER:  I do -- I hoped I would streamline

3    these matters and not unduly burden Your Honor or counsel or

4    the probation office.

5          THE COURT:  Okay.  So objections withdrawn are to

6    paragraphs 18 to 21.

7          MR. FALLGATTER:  Yes, sir.

8          THE COURT:  All right.  So the ones you're going to

9    stand on are the -- without further argument are paragraphs 24,

10   paragraphs 29, paragraphs 32 and 44.  All right.  So I will --

11   I'll rule on everything at one time.  But now I've got those in

12   mind again and I will rule on those.

13         So you've asked to be heard this morning on

14   paragraph 43, Adjustment for Role in the Offense; paragraph 46,

15   Acceptance of Responsibility; and paragraph 49, Criminal

16   History.

17         MR. FALLGATTER:  Yes, sir.  That's it.

18         THE COURT:  Those are the three?

19         MR. FALLGATTER:  Yes, Your Honor.

20         THE COURT:  All right.  I'll hear from you.

21         MR. FALLGATTER:  Again, as I said --

22         THE COURT:  If you could, Mr. Fallgatter, pull that

23   microphone down a little bit, please.

24         MR. FALLGATTER:  Is that better?

25         THE COURT:  Thank you.  Yes, that's better.  Thank

1  you.

2          MR. FALLGATTER:  Your Honor, as always, in federal

3  court we -- it's all in writing, so my apologies for having a

4  summary done as I'm explaining this to you.

5          But -- so let me first address the role.  And the

6  basis for that is the special skill, meaning that he's a

7  physician.  And obviously we don't dispute the fact that he had

8  that special skill.  He had his medical license.  However, that

9  special skill is possessed by every physician, and so there's

10  nothing truly special about Dr. Hollington in terms of being a

11  doctor charged with this drug distribution.  And, also, we rely

12  on the fact that -- the fake patients, the real patients all

13  presented themselves as drug addicts who needed life-saving

14  prescriptions.

15          But here is -- what I think is the meat of it, Title

16  21 is not used to prosecute doctors unless -- the government's

17  theory is the doctor is issuing prescriptions that they

18  shouldn't.  So the only way to have a Title 21 prosecution of a

19  physician is if they are a doctor.

20          The indictment, of course, recites the fact that he's

21  a Florida-licensed medical doctor.  Indictment at 1, they

22  allege the fact that the basis exists for distribution of

23  prescriptions, which, of course, only a physician can authorize

24  and issue.

25          So, in short, this crime could not have been

1    committed but for Dr. Hollington having his medical license.

2    And the underlying Title 21, a crime would not exist, again,

3    but for him being a doctor.  So I don't know if it's

4    technically double counting, but I respectfully submit that a

5    Title 21 prosecution of a doctor cannot be done but for the

6    fact that they're a doctor.

7           So picking up another adjustment for special skills

8    for being a doctor that you're indicted because you were, you

9    know, just -- in a sense is a form of double counting.

10   Alternatively I'd ask you to consider that it would overstate

11   the seriousness of that adjustment.

12          With regard to acceptance of responsibility, as my

13   supplement notes, I would ask you to defer ruling on that until

14   you hear the sentencing statement of Dr. Hollington.  He has

15   put a lot of work into that and -- several drafts and a few

16   more this morning.  So I would ask that you hear what he has to

17   say about that before you render a decision.

18          I will point out, of course, that we never disputed

19   any of the facts.  We saw the facts as being different.  You're

20   a drug addict, you come to see a doctor, he should give you a

21   prescription.  Obviously the jury and Your Honor saw it a

22   different way.  But we were challenging the factual basis for

23   the case.  Of course, he never testified, so -- but I would ask

24   you to wait and hear what he has to say.

25          Let me also point out to you that he's here now,

1    having pled to a simple battery down in Volusia County.  He was

2    charged with sexual battery.  I was in communication with his

3    public defender during the time.  It was a single-witness case.

4    And it was disclosed, as the case was getting ready to be

5    tried, that that witness had admitted she had dementia and

6    could not even remember anything that happened.  So there was

7    still a plea.

8          I share that with Your Honor, because in terms of

9    acceptance of responsibility, we're here after the conclusion

10   of a long state process in no small part because he showed

11   acceptance of responsibility down there as well.

12         The third one, Your Honor, is criminal history.  And

13   we knew -- we've known from when the case got continued that

14   he, if convicted in Volusia County, would pick up criminal

15   history points, which he has.  So I don't dispute that he's

16   entitled to those three points.  Obviously the PSI correctly

17   recites the three points.

18         But, you know, it's been, let's see, 15 months since

19   the July 28th verdict.  I believe, still do, the continuance

20   was a wise use of judicial economy and resources for probation

21   and my office and Dr. Hollington's best interest.

22         But you'll recall that in one of our earlier joint

23   status reports on January 10, 2024, which was, I guess, about a

24   year ago now, we specifically -- I did, dropped a footnote,

25   Mr. Mike was kind enough to allow me to stick it in there,

1    stating, "Counsel for Dr. Hollington is mindful that a

2    conviction in a state case might adversely affect the federal

3    sentencing guidelines but remains hopeful the Court will

4    recognize that is a consequence of the parties adhering to the

5    principles of judicial economy, in suggesting any federal

6    sentencing hearing should be abated pending the outcome of the

7    state case."

8              THE STENOGRAPHER:  Mr. Fallgatter, please slow down.

9              MR. FALLGATTER:  Yes, I can.  My apologies.  I care.

10             That's at page 6.  I cite it again at page 6 of our

11   supplement.

12             So, again, we knew it was coming.  And I don't have a

13   time machine, but Your Honor has, of course, the authority to

14   consider him still to be a zero-points candidate.  And that

15   means -- because of the three points that were added, that

16   means he is a Category II instead of a Category -- Criminal

17   History Category II instead of Criminal History I.

18             So when the dust settles, I'd ask Your Honor to take

19   that into account, because it is kind of a double whammy

20   because he jumps up to a Criminal History II and he loses the

21   two-level reduction.  So I think the combination, that's about

22   a four-level shift if my understanding of the guidelines is

23   accurate.  So I'd ask the Court to consider that, at least a

24   variance.  Those are those three points, Your Honor.

25             THE COURT:  All right.  Thank you, sir.

1          THE COURTROOM DEPUTY:  The volume is --

2          MR. FALLGATTER:  When it is time, I have a single

3   witness, Ms. Hollington.  Dr. Hollington's wife would like to

4   address the court.

5          THE COURT:  We have audio issues, and we hope to get

6   that straightened out.

7          Does the government wish to respond on any of the

8   objections that Mr. Fallgatter has raised?

9          And just so the record's clear, there are -- there

10  are -- objections as to paragraphs 18 and 21 have been

11  withdrawn.  Maintaining objections as to paragraph 24, dealing

12  with the sexual relations; paragraph 29, Obstruction;

13  paragraphs 32 and 44, Adjustment for Obstruction.  And then

14  Mr. Fallgatter just argued paragraph 43, Adjustment for Role in

15  the Offense; paragraph 46, Acceptance of Responsibility; and

16  49, Criminal History.

17         Does the government wish to be heard on any of those?

18         MR. MIKE:  Your Honor, on the ones he did not address

19  but he maintains --

20         THE COURT:  Why don't you come on up to the podium,

21  please, sir.

22         MR. MIKE:  Yes.  Good morning, Your Honor.

23         The ones that he maintains his objection but didn't

24  address to the Court, regarding paragraph 24, I'm not going to

25  speak on that, as well as the obstructions, those were sort of

1    rehashing argument that was -- that seems like the jury already

2    decided here.  So I'm not going to rehash those, Your Honor.

3            I will speak on the enhancement for public trust.  I

4    mean, in 3B1.3, the definitions, it refers to a position of

5    public or a private trust characterized by professional or

6    managerial discretion.  And even within that --

7            THE COURT:  Mr. Mike, I apologize.

8            I meant to mention before you stood up, when I

9    introduced those at the bar this morning, I neglected to

10   mention that Special Agent Hollingsworth and Special Agent

11   Martin from the DEA are also present here today.  So I wanted

12   to get that in for the record.

13           MR. MIKE:  Thank you, Your Honor.

14           THE COURT:  Go ahead.

15           MR. MIKE:  What's more important in the application

16   notes here is that it lists some examples.  And one of the

17   example it lists is a physician.  And it lists physician, say,

18   for the criminal sexual abuse of a patient by a physician under

19   the guise of an examination.  I mean, sort of what had happened

20   in this case.  So, Your Honor, we believe that the notes

21   actually talk about that.

22           And so the fact that we're saying just because the

23   language within the elements of the statute that we use in

24   order to determine whether he was authorized to give those

25   prescriptions or not already incorporated -- or essentially

1    doubles the penalty on this, Your Honor, I just -- the United

2    States doesn't agree and believes that the commentary properly

3    addresses this.

4            As well as acceptance of responsibility, we went to

5    trial, he never accepted responsibility.  And even within his

6    objections he is objecting to obstruction of justice, which is

7    what he was sentenced to.  So he's still not accepting

8    responsibility on that and essentially maintains his innocence

9    on that he did what he was supposed to do with the medical

10   records and that he did not try to obstruct justice when he was

11   essentially covering up his tracks of what happened with the

12   patients.

13           So, Your Honor, with that -- those are the only two I

14   want to address.  It seems like Mr. Fallgatter said even with

15   the sentence that he received down in Volusia County, that he

16   -- he didn't argue that the guidelines were correct on, I

17   believe, the points that were given.  So, Your Honor, I'm not

18   going to address that factor as well.

19           THE COURT:  Thank you.

20           MR. FALLGATTER:  May I make a comment, one comment?

21           THE COURT:  Yes, sir.

22           MR. FALLGATTER:  On the obstruction, again, we didn't

23   deny.  We raised the entries that were made and explained why

24   to clarify the record.  So at no point did we deny

25   responsibility for doing that.  The government's theory that

1    that was obstruction.

2         And, of course, you may recall that one of them was

3    verbatim what one of the officers told him.  So the entries are

4    entirely accurate to clarify that these weren't real patients

5    and that they were pretexts.  And if you would reserve on that

6    one as well, I would appreciate it.  Because I think

7    Dr. Hollington can share with Your Honor some medical insights

8    to the medical necessity for correcting records that are

9    erroneous based on false information provided by patients.

10        Thank you, sir.

11        THE COURT:  All right.  Well, we've got two things

12   going on here.  One is whether the guidelines are properly

13   constituted and scored.  And another is any mitigation or

14   statement that Dr. Hollington wishes to make that could address

15   some of these issues.

16        But the -- in terms of the way the guidelines are

17   being scored, I'm not finding any legal deficiency in that.

18   And so being specific -- being specific, the -- and I will just

19   go through these in the order in which they were put forward.

20        The -- paragraph 24, the content regarding

21   A. Brewington, I don't find any legal deficiency with that.

22   And I'll overrule that objection.

23        Paragraphs 29 and 32 and 44, all dealing with

24   obstruction of justice, I certainly understand what

25   Mr. Fallgatter is saying.  I'm certainly understanding that

1   they don't agree with it, but -- and I -- and that point was

2   made to the jury at trial.  The jury convicted of obstruction.

3   I think within the guidelines construct, the obstruction has

4   been properly scored.  I'm certainly happy to hear from

5   Dr. Hollington as to any way that he wants to be heard, and I

6   will take what he has to say into account when the time comes.

7            But for now I think the obstruction is properly

8   accounted for in the -- in the presentence investigation

9   report.  And so the objections to paragraph 29 and the

10  objections to paragraphs 32 and 44 are overruled.

11           With respect to paragraph 43, the adjustment for role

12  in the offense, I don't agree with Mr. Fallgatter's argument

13  that a doctor who's charged with a drug crime in this context

14  cannot get a role adjustment.  And I think in this case a role

15  adjustment is appropriately scored based on the evidence that

16  was adduced at trial.  So I'm going to overrule the objection

17  to paragraph 43.

18           With respect to acceptance of responsibility, the --

19  it is possible to get acceptance of responsibility if you go to

20  trial, but I don't -- I don't see that in this scenario.  I

21  suppose if Dr. Hollington says something in his allocution that

22  causes me to change my mind, I guess I could do so.  But at

23  this point I think that under the prevailing construct of what

24  acceptance of responsibility means in -- under the sentencing

25  guidelines, that Dr. Hollington is not entitled to it and,

1    therefore, the objection is overruled.

2           And with respect to criminal history, I think -- so

3    that's paragraph 46.

4           Paragraph 49, with respect to criminal history,

5    Mr. Fallgatter has maintained the point that Dr. Hollington was

6    convicted in this court; but before I could sentence him, he

7    was charged and then pled guilty in state court.  So now he

8    has a -- he's getting scored for some criminal history in this

9    case that he wouldn't have had if he'd been sentenced

10   beforehand.  I certainly understand that.  I don't think -- and

11   I don't think Mr. Fallgatter has argued that it's improperly

12   scored.  It's just something for me to keep in mind.  And I

13   will do so.  But to the extent that there's an objection to the

14   criminal history scoring at page -- or at paragraph 49, that

15   objection is overruled.

16          I believe that takes care of all of the objections.

17   And so I will now --

18          I want to make sure that, Mr. Fallgatter, have I

19   addressed all of the objections?

20          MR. FALLGATTER:  You have, Your Honor.  Thank you.

21          THE COURT:  All right.  So now we will -- as we

22   typically do, now -- so at the moment, with the possible

23   exception of -- I mean, I can -- if I hear something during the

24   course of these proceedings that causes me to revisit this, I

25   can, of course, before I decide on an ultimate sentence.  But

1    at this point I am going to find that the guidelines are Total

2    Offense Level 18, Criminal History Category II, recommending 30

3    to 37 months of imprisonment.  The supervised release is three

4    years on Counts Two through Five, Seven through Eleven and

5    Thirteen.  That's the max.

6          The one to three years supervised release, Counts Six

7    and Sixteen to Twenty.  Two to three years supervised release,

8    Counts Twelve, Fourteen, and Fifteen.

9          I remind everybody that whatever the supervised

10   release term is, it's always concurrent.  So that's -- so it

11   will just be one term of supervised release that will be

12   concurrent.

13         Community restitution is a possibility under

14   Counts Two through Fifteen.  There is a fine range of 10,000 to

15   1,000,000.  And there is $1900 in special assessments.

16         I will now hear from the government by way of 3553(a)

17   and any recommendation as to sentence.

18         MR. MIKE:  Good morning, Your Honor.

19   Dr. Hollington's crimes in this case are egregious as they are

20   unconscionable.  His conduct motivated by greed and personal

21   desires was a complete disregard for the wellbeing of his

22   patients.  It represents a profound violation of the trust

23   society places in medical professionals.

24         As this Court considers an appropriate sentence, I

25   ask you to consider the profound impact the defendant's actions

1    had on his victims and a broader community.

2            Dr. Hollington stands convicted of 19 serious

3    charges, 14 counts of unlawful distribution of controlled

4    substances outside the usual course of professional practice

5    and not for legitimate medical purposes.  Five counts of

6    obstruction of justice.  These are not technical violations or

7    minor offenses.  They are deliberate, calculated acts of

8    criminality that harm vulnerable individuals and undermine the

9    integrity of the medical profession.

10           The nature and circumstances of this offense or the

11   gravity of the defendant's crimes -- let's stop cutting the

12   edges here, Dr. Hollington used his position as a licensed

13   medical professional to exploit his patients in the most

14   shameful way imaginable.  He was trafficking high -- highly

15   addictive narcotics, amphetamines, benzodiazepines,

16   buprenorphine, without any legitimate medical justification and

17   doing this at his own addiction clinic.

18           He is doing the exact opposite of what his clinic was

19   meant to do.  This was not a case of a physician making a poor

20   -- you know, poor judgment calls or an isolated mistake.  This

21   was a pattern of criminal misbehavior where the defendant chose

22   to line his pockets at the expense of the very people he was

23   supposed to help.

24           The evidence at trial that you heard, Your Honor,

25   included undercover video recordings and testimony from

1  victims, which painted a chilling -- a chilling picture of a

2  doctor who, for months, operated a pill mill.  He willingly

3  prescribed controlled substances to patients without ever

4  performing basic medical assessments, like blood pressure,

5  checking oxygen levels, just very basic stuff.

6          He disregarded drug screens, which are important to

7  know what is in the system of the patients struggling with

8  addictions, before you prescribe them something that could

9  possibly harm them.  And then he engaged in inappropriate and

10 manipulative behavior doing things and talking about things

11 that no doctor should ever be discussing with their patients.

12         And at one point he even discussed patients' drug

13 preferences as though they were some customers to his business,

14 like if someone was rolling up to a drive-through ordering from

15 the dollar menu, "Pick a prescription.  What do you want?  What

16 type of prescription do you want?"  Not treating the

17 individuals struggling with addiction and seeking help, but

18 doing the exact opposite.

19         The defendant's conduct cannot be excused as --

20         THE COURT:  Excuse me one second, Mr. Mike.

21         Tim?

22    (Brief conferral between the judge and the courtroom

23 deputy.)

24         THE COURT:  Go ahead, sir.

25         MR. MIKE:  The defendant's conduct cannot be excused

1    as just poor medical practice.  It was a deliberate and

2    dangerous decision to profit from addiction and dependency.

3    Dr. Hollington acted with reckless disregard for his patients'

4    health and lives.

5         And the guidelines just don't illustrate the full

6    picture here, Adderall with over 8,000 milligrams, did not

7    contemplate the people he victimized for prescriptions, using

8    their own addictions against them for his own desires.  It

9    doesn't calculate a two-level increase every time he

10    inappropriately touched a client.

11         We have over 30 women who called about this doctor,

12    over 30.  My phone was ringing off the hook after we indicted

13    him and it was announced.

14         MR. FALLGATTER:  Your Honor, I know it's argument,

15    but, you know, I have no -- I don't think it's fair that the

16    government started talking about hearsay from a prosecutor with

17    anonymous calls.

18         THE COURT:  Thank you, sir.

19         Go ahead, Mr. Mike.

20         MR. MIKE:  Your Honor, this doctor intentionally hurt

21    people in this community, a lot of people.  And the harm caused

22    by Dr. Hollington's actions were immeasurable.  The victims in

23    this case were already vulnerable.  They were seeking help for

24    addiction, struggling with personal crises and attempting to

25    gain control of their own lives.  But instead of receiving the

1    care they needed, they were victimized even further.

2           Four -- four female -- four female victims testified

3    during this trial about how they were manipulated and coerced

4    into providing sexual favors in exchange for prescriptions.

5    Dr. Hollington used his position as a doctor to exploit their

6    desperation, turning their vulnerability into an opportunity

7    for personal gain.

8           One victim described Dr. Hollington as a monster,

9    because he knew everything that she had been through, they

10    talked about it.  And another shared how he preyed on her

11    emotion -- on her emotional distress.  These women did not come

12    to him for exploitation.  They came to him in good faith hoping

13    for medical treatment.  Instead they found themselves caught in

14    a cycle of abuse and addiction.  Their stories heard in this

15    court were heartbreaking and they further emphasize the need

16    for justice in this case.

17           In addition to the physical and emotional tolls of

18    his victims, Hollington's actions reverberated far beyond his

19    office.  His crimes contribute to the larger opioid epidemic

20    that continues to devastate this community and across the

21    country.  His disregard for proper medical treatment allowed

22    the cycle of addiction to continue creating victims, not just

23    in his immediate vicinity, but in the broader public health

24    system.

25           Dr. Hollington's criminal behavior extended beyond

1    just illegal prescribing, because after being indicted he

2    attempted to obstruct the investigation by altering the medical

3    records, further demonstrating his disregard for the rule of

4    law and his desire to cover up his own actions.

5           This was not a momentary lapse in judgment but an

6    intentional effort to deceive the authorities and avoid

7    accountability for the harm he caused.  His actions in

8    obstructing justice are yet just another clear indication of

9    the depths of his criminality.

10          So, Your Honor, a sentence in this case must reflect

11   the seriousness of Dr. Hollington's actions and promote respect

12   for the law and provide just punishment.  It must also send a

13   strong, clear message to others who might consider exploiting

14   the vulnerability of -- or others' vulnerability for financial

15   gain, that this behavior will not be tolerated.  And those who

16   engage in it will face significant consequences.

17          The medical profession relies on public trust.

18   That's important.  Patients trust their doctors with their

19   lives.  When that trust is betrayed, especially in such a

20   harmful, manipulative, and exploitative manner, it must be met

21   with a sentence that reflects the gravity of that violation, a

22   sentence that holds Dr. Hollington accountable, not only for

23   the damage he caused his victims, but for the harm he inflicted

24   on the medical profession and the healthcare system at large.

25          Dr. Hollington's conduct was not an isolated lapse in

1    judgment.  He systemically and repeatedly engaged in criminal

2    behavior over an extended period of time, preying on vulnerable

3    individuals and acting -- actively obstructing justice when he

4    was caught.  The pattern of crimes make it clear that this was

5    not a momentary lapse in judgment, but a deliberate decisions

6    to abuse his power and exploit others who trusted him.

7              Your Honor, a sentence that is too lenient will send

8    the wrong message, one that suggests that healthcare

9    professionals who exploit their patients for personal gain

10   might be able to avoid full consequences for their actions.  I

11   stand with this Court in sending -- that sending a message to

12   those who exploit vulnerable individuals for personal gain will

13   be fully held accountable and that the penalty for such

14   egregious behavior will be significant.

15             Your Honor, I have four statements of victims who

16   would like to be heard that I would like to read to the Court.

17             THE COURT:  Are these the individuals who testified?

18             MR. MIKE:  So we have one from Danielle Ashley, who

19   did testify.  We have one from Ms. Mahan who also did testify.

20   And we have two others for -- who did not testify but who

21   was -- who were Dr. Hollington's patients.

22             THE COURT:  Do you -- the person that Dr. Hollington

23   pled guilty to in -- is it St. Johns County?  What was the

24   county?

25             MR. MIKE:  Volusia County.

1          THE COURT:  -- Volusia County, was she a different

2    individual than the four that testified here?

3          MR. MIKE:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.  Well, I'm permitted to

5    hear testimony and statements in a sentencing hearing in a much

6    broader fashion.  If these individuals, the two that didn't

7    testify, had come here today to appear in person, I would have

8    heard from them.  And so I'm willing to hear their statements.

9    I understand there may be objection to that, but I'm -- I think

10   it's perfectly proper, so I will let you go ahead.

11          MR. FALLGATTER:  Your Honor, I will go ahead and -- I

12   appreciate the Court's ruling, but I do have -- I know you can

13   listen to victims.  What puzzles me is we do all this work to

14   prepare for sentencing, I assume the state -- the government's

15   had these statements for some period of time.  Why haven't they

16   been disclosed to me?  Why wouldn't I have the opportunity to

17   prepare for it?  So why the ambush?  And particularly two that

18   were not witnesses in the case, I don't have a clue who they

19   are or how they'd be relevant.

20          I respect your ruling, but I certainly want to make

21   that objection.  Again, it's just the -- no notice is

22   disturbing.

23          THE COURT:  Mr. Mike, what's your response to the

24   lack of notice?

25          MR. MIKE:  Your Honor, I received a couple of these

1   yesterday by e-mail.  And then the other other two I received a

2   few weeks ago.  It wasn't determined how I was going to present

3   this to the Court at the time.  You know, I was going to do

4   this -- I was trying to get people to show up here in person.

5   But, of course, a lot of them, they just decided they didn't

6   want to face him, they didn't want to see him.  They didn't

7   want to relive this, but they would rather just turn in a

8   letter so I could read it to the Court.

9           I'm not trying to ambush Mr. Fallgatter.  If he would

10  like an opportunity to read through them before I present them

11  to the Court --

12          THE COURT:  I'll tell you what, let's go ahead and

13  read the two that -- for the witnesses who testified at trial.

14  And then we'll see where I go with that.  All right?  Go ahead.

15          MR. MIKE:  The first one is from Danielle Ashley.

16  She said, "It took some time to figure out how much

17  Hollington's actions affected me.  While in drug court I had

18  the opportunity to get sober for a year and five months" --

19          MR. FALLGATTER:  Does counsel have copy for me at

20  least?

21          MR. MIKE:  I don't have a copy for him, Your Honor.

22          THE COURT:  I'll tell you what we're going to do, we

23  will take a brief recess and copies can be made and then we'll

24  proceed from there.

25          All right.  Five minutes.

1          COURT SECURITY OFFICER:  All rise.

2      (Brief recess from 10:44 a.m. to 10:51 a.m.)

3      (Ms. Washington not present.)

4          MR. MIKE:  Your Honor, we're still waiting for

5  Ms. Washington to get back.

6          THE COURT:  Well, while we're waiting, let me go

7  ahead and -- I've clarified my thinking on -- while it may have

8  been better practice for the government to have disclosed the

9  statements before the sentencing, I don't think it's required.

10  And the reason I don't think it is is because if these

11  individuals had appeared in person, even without notice to the

12  defendant, I would have allowed them to speak.  Even if they

13  weren't those who testified, I would still likely have allowed

14  them to speak, because I'm allowed to consider evidence in

15  sentencing that I wouldn't necessarily be able to consider at

16  trial.  And, of course, I give it the weight it deserves in the

17  way that it's presented to me.

18          But it is not uncommon for victims to appear in

19  person.  It's not uncommon for those victims to not necessarily

20  be persons who testify or were the subject of a count or

21  anything like that.  And under the sentencing rules, I'm

22  permitted to consider their views.

23          And in this case I don't really see it being much

24  different.  If Mr. Fallgatter or Dr. Hollington want to dispute

25  it or they want to talk about it in some way, then I'll, of

1    course, listen to that as well.  But I'm inclined to allow the

2    statements.  I'm going to give Mr. Fallgatter a copy of them

3    and then we're going to proceed.

4              (Ms. Washington entered the courtroom.)

5              THE COURT:  Mr. Mike, you may proceed.

6              If you have one.  Thank you.

7              (Tenders documents.)

8              THE COURT:  So let's take the statements from the two

9    individuals who testified first and then we'll go from there.

10              MR. MIKE:  Yes, Your Honor.  The first one is from

11   Danielle Ashley.  It's an e-mail I received yesterday.  It

12   says, "To whom it may concern:  It took some time to figure out

13   how much Hollington's actions affected me.  While in drug court

14   I had the opportunity to get sober for a year and a half" --

15   "for a year and five months in the program.  And until that

16   time I tried to block everything out, but realized how much his

17   actions and words still affected me today.

18              "I completed drug court June 29, 2024.  During my

19   time in the program I had to really get to know myself again

20   and relive past traumas.  Hollington abused his authority.  And

21   after our initial appointment, when I reached out for help, he

22   took advantage of knowing I couldn't pay for my medication.  I

23   know what his other patients went through was a lot worse than

24   mine.  But what Dr. Hollington did is unethical and wrong in so

25   many ways.  I was diagnosed with anxiety, PTSD, major

1    depression.  And what he did helped make my disorders worse.

2         "I was glad to know he was found guilty of all counts

3    on the federal charges.  I hope he is found guilty on all of

4    the state charges as well and brought to justice to the highest

5    extent for all of the harm he mentally, emotionally, and

6    physically caused all of his patients.  Danielle Ashley."

7         "This next is from Elizabeth Mahan.  "When I lost my

8    mom and then my doctor of 14 years in the same year, I wasn't

9    all that hopeful about finding another doctor or a provider

10   that would be able to take on the kind of care that I had been

11   receiving for so long with my former doctor.

12        "But to my surprise, after going online, doing a

13   little bit of research, looking for a Subutex or Suboxone

14   provider in my area, there was a new and seemingly amazing

15   doctor right down the road from my house.  After reading the

16   reviews of Dr. Scott Hollington and his practice, I was more

17   impressed.  He had great reviews.  He was highly rated.  With

18   30 years of experience I saw, he really sounded like a rockstar

19   in medicine.

20        "It said he treated anxiety, major depressive

21   disorder, and then psych evals too.  I thought he was more than

22   what I was looking for.  He was perfect.  So after discussing

23   my findings online with a friend, I found out that she could

24   get me in to see this superstar doctor that at one point in

25   time didn't have any availability for new patients.

1    "It would only be after my two-in-one new patient

2    exam sexual assault that I would find out that he was nothing

3    more than a fraud and a predator.  Working in the medical field

4    myself, I prided myself on my knowledge of the ins and outs of

5    the doctor's office and the professionalism that is expected in

6    a medical setting.

7    "But after my, quote, new patient visit at Dr. Scott

8    Hollington's amazing office, I would come to find out that his

9    office was anything but professional.  It was a guise to prey

10   on women and he used his license to practice medicine to get

11   patients to perform whatever sexual acts he wanted right there

12   in his practice.  I never dreamed that I would be going in and

13   paying for this kind of experience that I ended up getting.

14   Scott Hollington would say to me the most vulgar and offensive

15   things that I ever had spoken to me.  And this is from someone

16   I'm paying to care for me.

17   "I left his office that evening feeling so much pain

18   and so much shame.  I only know that I will never be able to

19   look at another male doctor the same.  And there will be so

20   many other unfortunate things that would come out of my

21   experience that evening.  It's unbelievable how one person in

22   one day can change the course of the rest of your life.

23   "I have to wonder how many other women feel the same

24   way I do but that decided to stay silent because of the

25   embarrassment of having to say that something unspeakable

1    happened to them while they were in the care of Dr. Scott

2    Hollington.

3         "I met him one time.  And this man was amazingly so

4    comfortable and brave with what he was apparently doing behind

5    the scenes that he had the audacity to put his hands on me with

6    no problem, forcing his body that outweighed me by at least

7    150 pounds up against mine and disregarding my continuous pleas

8    for him to stop, to please stop, and to please, please not do

9    what he was doing.  'Please don't touch me,' I said repeatedly.

10   'Please, you have to stop,' I said, and he continued to smile

11   as if he didn't hear a word I was saying or care for how I

12   felt.

13        "Dr. Hollington doesn't deserve the title of doctor.

14   He did no such thing.  He acted like just another brutal rapist

15   like you see on any given crime show.  And just like the

16   victims on T.V., he made me feel the same embarrassment and

17   shame like I had done something wrong.  It was so much so that

18   I almost didn't come forward to the police about my story.

19   .and what happened to me there at his office, the place where I

20   thought I was going to get this amazing treatment and have an

21   awesome experience like I had read about so many other people

22   having.

23        "I can honestly go on and on about things that I feel

24   and what I hope comes his way in sentencing, but you'd be

25   reading for days.  So I just want to finish by saying it's a

1  real shame that he took away from the community what this

2  county needed so badly, which was a doctor in a practice that

3  was specialized in addiction therapy and buprenorphine

4  treatment.

5       "Unfortunately because of Scott Hollington's selfish,

6  despicable perversion, so many people that would have been his

7  patients, like myself, are now missing out on the care that the

8  practice would have provided.  I hope he realizes some day that

9  he took away from all the women he hurt" -- "what he took away

10  from all the women he hurt when he put his desires and his sick

11  fantasies first instead of his patients' care.  He really did

12  cheat this town out of a resource that is desperately needed.

13       "Former patient and victim, Elizabeth Mahan."

14       THE COURT:  All right.  Now, over objection, I'll

15  allow you to read the two other statements from women.  And, as

16  I said, I would have heard from them in person if they had been

17  here today.  I'll hear from them by way of -- and I can also

18  understand why they would not want to be here in person.  And

19  so I think given all of the parameters that I'm operating

20  under, I think it is appropriate for me to listen to these two

21  additional statements even though these persons did not

22  actually testify at trial.

23       Go ahead, sir.

24       MR. MIKE:  Thank you, Your Honor.  Ms. Washington is

25  going to read these next two for me, Your Honor.  Give me a

1    slight break.

2         THE COURT:  Sure.

3         MS. WASHINGTON:  I will start with Mackenzie Ann

4    McDougall, "To the Honorable Judge Timothy Corrigan, no words

5    on paper will ever truly encapsulate the devastation of my

6    experience that Scott Hollington inflicted upon me.  Still, I'm

7    here to give voice to my pain and the pain in millions of other

8    women who have been silenced and similarly robbed of their

9    trust and innocence.  This was not just an assault on my body,

10   but one of the most violent betrayals by someone who was

11   officially categorized the same as the professionals in a place

12   of trust.

13        "There will be no reference to Scott Hollington as a

14   doctor, past or present, nor abbreviated initials anywhere

15   within my letter because he does not deserve them.  They should

16   be forcefully stripped from him the way he forcefully stripped

17   the clothing from my shaking, defenseless body.

18        "I grew up in a household of caregivers, nurses,

19   doctors, and military members.  At a young age I learned those

20   caregivers are truly angels on earth, ones who work tirelessly

21   to earn the privilege of being a safe space for those at their

22   absolute lowest.  They are the heroes holding the hands of

23   those taking their final breaths and ushering in new life

24   taking their first.  These are the heroes that save lives in an

25   OR or the ones that diagnose cancer.  These caretakers are the

1    ones who comfort children during their first shots and those

2    who we trust to write prescriptions to cure illnesses.

3         "Your Honor, my point in this long-winded

4    introduction is I feel it is important that you understand my

5    separation, level of disgust, and overall shock once all of

6    Scott Hollington's crimes and victims came to light.  I will

7    elaborate more on that later in this letter.

8         "I have been working on this statement for over a

9    week now and there have been multiple instances where I've had

10   to step away because revisiting this chapter of my life is

11   nothing short of hell.

12        "At the time of my visit to Scott Hollington's

13   office, I was newly engaged.  Once I felt the room begin to

14   change and panic set in, I gushed over my new fiancè.  I showed

15   off my engagement ring and went as far as disclosing my fiancè

16   was outside of the office waiting in the car.  None of that

17   mattered.  I was a vulnerable target and he had an itinerary.

18        "Dr. Scott Hollington's assault against me, there was

19   a fleeting moment when there was even my own body failed me.  I

20   used every breath to escape from his grip.  And I knew I could

21   no longer overpower or fight off a man three times my size.

22   I'm sure if I would make it out of that room, I recall coming

23   to the harrowing acceptance that I may never see my mother's

24   face again, the kisses from my dog, walk down an aisle, hear my

25   best friend's laughter, or become a mother.

1     "No matter the therapy, the time that has passed, or

2     the justice that is served, human beings are physically

3     incapable of forgetting that level of trauma.  In the days,

4     weeks, then months after the assault, the fault was not

5     healing.  It was survival.

6          "After countless hours of searching for a female-only

7     therapist, I attended a few sessions, desperate to bring myself

8     back.  I compartmentalized the assault to a near inaccessible

9     part of my mind.  And out of fear of Scott Hollington's

10    possible retaliation, it required over seven sessions, paid out

11    of pocket, for me to finally build the connection where I felt

12    safe enough to disclose the assault.

13         "For most people, finally sharing their story of

14    assault should bring closure or piece of mind.  But, for me, it

15    ushered in the worst, most gut-wrenching chapter of my entire

16    life.

17         "Once Scott Hollington's practice was shut down and

18    the news was broadcasted in every source of media possible, it

19    was then that I came to understand the magnitude and depth of

20    his crimes.  Learning that those crimes were specifically in

21    relation to and linked with not only gross sexual misconduct

22    and molestation, but also involved serious classified

23    narcotics, both fusing to create one large monster.

24         "Upon this realization, I fell into a dark abyss of

25    depression and believed that I would be categorized among those

1  who willingly participated in creating that monster.  The

2  psychological toll that took on my mental health, my

3  relationship, and my sanctity of life reached a new war within

4  me and every day dragged me deeper into darkness.  The anguish

5  consumed me and I saw no escape, no light at the end of the

6  tunnel, and no one to hear the screams within my own body.

7          "In the moment of unimaginable pain I attempted to

8  take my own life.  I was desperate to stop the suffering and

9  silence the world around me.  Again, what has followed these

10  chapters has not been healing.  Physically, my scars may not

11  all be visible but they are there.

12          "I finally began seeing a doctor again at the end of

13  2023 but only accompanied by someone else.  And I physically

14  cannot have the door closed even with someone next to me.  I

15  require Zoom meetings for those appointments that cannot be

16  accompanied.  And even those must be by a woman.

17          "I developed crippling anxiety that takes over my

18  entire body that required multiple ER visits for

19  anxiety-induced tachycardia and intensive therapy.  I developed

20  a severe drinking problem that to this day I am still battling.

21          "My previous engagement ended shortly after my

22  attempted suicide and my life has changed in more ways than I

23  can even put in words.  Despite all of these things and the

24  toll that continued to take on me as a woman, as an advocate,

25  and most importantly as a survivor, I would like to bury this

1    and heal for good.

2           "In writing this letter I found it much more

3    challenging to find aspects of my life this experience did not

4    impact.  I found my way back to God, which has looked much

5    differently and began" -- "and been more painful than I could

6    have imagined.

7           "Your Honor, I and many other victims within and

8    outside of this case are seeking justice.  I deserve to be

9    released from these chains.  And I hope my words reach you and

10   resonate in a way that brings justice and reason in closing a

11   chapter that should have never been written.

12          "Due to the insidious nature of Scott Hollington's

13   crimes and the lasting impact his intentional, premeditated,

14   predatory, and perverted actions left on copious vulnerable

15   individuals, now victims, I firmly believe Scott Hollington

16   deserves to spend 30 years or more in prison to be held

17   accountable for his actions.  Mackenzie Ann McDougall."

18          And I have a second letter from Laura Evans.

19   "To the Honorable Timothy J. Corrigan, my name is Laura Evans.

20   And I'm writing in reference to the sentencing procedure for

21   Scott Hollington in federal court in Jacksonville, Florida.

22          "I was raised in a long line of law enforcement.  My

23   uncle, Mario Evans, was a chief of police around Lady Lake.

24   And my father was Dade County and Palm Beach County Sheriff's

25   Office.  I was taught from a very young age that these were

1    people in this world that deserve respect.  The males in my

2    family were 30-second [verbatim] degree reasons" --

3              THE COURT:  I think it's masons.

4              MS. WASHINGTON:  Thank you, Your Honor.

5              -- "masons and the females were Eastern Star.

6              "Discipline and respect, along with serving, are a

7    priority.  You respected without question law enforcement,

8    ministers, the law community, doctors, and human decency.  I am

9    not perfect but I have spent my life trying to serve and help

10   others, including animals, in the capacity needed.  It has been

11   an eye-opening experience.

12             "Now, to the" --

13             THE COURT:  Former, I believe.

14             MS. WASHINGTON:  Thank you, Your Honor.

15             -- "former doctor, Scott Hollington.  He has in every

16   way imaginable broken every law of character and decency.  What

17   he has done to myself and others is beyond despicable and

18   tortures the wounds of decency."

19             THE COURT:  I believe that's, "the bounds of

20   decency."

21             MS. WASHINGTON:  Thank you.

22             -- "the bounds of decency.

23             "I'm living in a homeless facility as far away from

24   this as possible, from the destruction he has caused me.  From

25   the evidence I have provided, he has molested me in every way

1    imaginable, mentally, physically, emotionally, and spiritually.

2    From the actual physical molestation to the mental torture of

3    the memories and thoughts of what he did to me, I have CP" -- I

4    don't know if you can tell --

5              THE COURT:  I don't know what that is.

6              MS. WASHINGTON:  What may be, "CPSD, along with other

7    childhood issues, that at my age, 66, I will never recover

8    from.

9              "This injustice follows me every waking day.  It has

10   also ruined any trust I have in men in the medical community.

11   My evidence is being presented, quite a bit of it.

12             "Sir, I implore you, on behalf of myself and the

13   probably hundreds of people he had done this to, that the

14   maximum sentence be brought down on him to run concurrently

15   with any other charges that are being brought against him.

16   Everything he has taken from us he should have to live with for

17   the rest of his life.

18             "It made me physically sick when I had" -- "when I

19   heard about the money and possessions that were confiscated

20   from him.  He truly lived a life of luxury at the expense and

21   manipulation of others who trusted him.

22             "I also would like to add that we were threatened by

23   staff that noncompliance would cause us to lose medical care

24   anywhere else.  I am terminally ill and can't lose medical.

25             "Since this incident, I've had" --

1          THE COURT:  Five.  I think five

2          MS. WASHINGTON:  -- "five heart attacks and numerous

3    pulmonary embolisms.

4          "Thank you for your time and help.  Sincerely, Lauren

5    Lynn Evans."

6          And then there's a two-page addition of, "On a more

7    personal note, Scott, what you have done to me is the most

8    diabolical, insidious" --

9          THE COURT:  I think that is probably supposed to be

10   misogynistic, but I don't know for sure.

11         MS. WASHINGTON:  -- possibly "misogynistic act that a

12   human can perform.  You have taken away my peace.  And you have

13   raped me physically, emotionally, mentally, and in any other

14   way imaginable all without any thought or conscience of" --

15         THE COURT:  "To your actions."

16         MS. WASHINGTON:  -- "to your actions."

17         Thank you, Your Honor.

18         "There is not a day that goes by that I don't think

19   of the molestation I suffered at your hands.  I seriously doubt

20   that you have the capacity to think or feel in any emotional

21   way, at least the things you've done to me.  I won't speak for

22   the hundreds, probably more, that you have done this to, but

23   they have their own voice.

24         "I hope you find a different path and come to terms

25   with whatever spiritually you follow.  From this day forward, I

1    won't allow you to rule my thoughts on my health.  I am way

2    stronger than your abuse, I hope, but I am working on it.

3            "I forgive you because I have to for my own

4    wellbeing.  Don't get me wrong, I pray that justice is served

5    and you spend the rest of your life in the cage that you tried

6    to put us in.  You didn't win.  Life in prison is my plea for

7    you.

8            "Sincerely, Lauren Evans."

9            For the record, the challenging way this was read was

10   due to the handwritten nature of the statement from this

11   witness.

12           And that completes those statements.

13           THE COURT:  All right.  I am going to -- so the

14   record is clear -- let's see, Ms. Ashley and Liz Mahan are the

15   two that testified?  Is that correct?

16           MR. MIKE:  Yes, Your Honor.

17           THE COURT:  All right.  I'm going to make that

18   Government's Exhibit 1 to the sentencing.

19       (Government's Exhibit No. 1 received into evidence.)

20           THE COURT:  And then the two impact statements as to

21   which there was objection, I will make those Government's

22   Exhibit 2.  That way if there's ever any challenge to them, we

23   will have separated that out.

24       (Government's Exhibit No. 2 received into evidence.)

25           THE COURT:  They will be composite exhibits of the

1    two statements.

2              All right, sir.

3              MR. MIKE:  Yes, Your Honor.  By no means -- we

4    appreciate them writing the letters and presenting that to the

5    Court.  I know by no means it encapsulates, you know, the --

6    what they're going through and what they are continuing to be

7    suffering through since their encounters with Dr. Hollington,

8    but as more of an effort to address the Court, even if they

9    could not be here in person to do so.

10             Your Honor -- with all of that, Your Honor, the

11   United States is requesting that Your Honor -- that a sentence

12   necessary will be the top end of the guidelines.  We ask for

13   the 37 months, Your Honor, and for that to run consecutive to

14   what he received in the state sentence.  We believe that is

15   sufficient and not greater than necessary, and that that

16   sentence reflects the severity of Dr. Hollington's crimes and

17   the need for deterrence, and that it will send a strong message

18   that those who violate their professional oaths for personal

19   gain will be held fully accountable.  We respectfully ask that

20   the Court impose that sentence and that it reflects the full

21   scope of the defendant's criminal behavior and the lasting

22   damage he has caused to others.

23             Thank you.

24             THE COURT:  Thank you.

25             Mr. Fallgatter, I will turn the presentation over to

1    you, sir.

2              MR. FALLGATTER:  Thank you.  Dr. Hollington's ex-wife

3    -- they got a divorce but she is still here.

4              THE COURT:  Yeah.  I wasn't sure.  I got a letter

5    from her that identified her as his wife.  But they are

6    actually divorced?  Is that correct?

7              MR. FALLGATTER:  They are.  They still consider

8    themselves husband and wife, but technically divorced but --

9    because of all the financial issues that have been implicated.

10             May I ask her to come forward?

11             THE COURT:  Sure, of course.

12             MR. FALLGATTER:  Do you want her to come to the

13   podium?

14             THE COURT:  That's fine.  If it's just in the nature

15   of character and her talking about him, I don't -- I don't need

16   her -- that's fine.

17             Ma'am, if you will get that microphone in front of

18   you.

19             Are you going to ask questions, Mr. Fallgatter, or

20   is -- I apologize.  Do you want to make a statement?  How do

21   you-all want to do this?

22             MR. FALLGATTER:  A little bit of both.  A character

23   letter was provided.  We have a duplicate, kind of updated, but

24   it's pretty much the same information.  But you read the

25   character letters --

1             THE COURT:  I have.

2             MR. FALLGATTER:  Our character letters are a part of

3     the sentence memo.  And I will provide you with a duplicate of

4     that one.  Again, it's -- we're not going to take the time of

5     her reading --

6             THE COURT:  That's fine.  Let me --

7             MR. FALLGATTER:  It was Exhibit M to our sentencing

8     memo.

9             THE COURT:  Yes.  I was just looking for the letter

10    that I received.  Well, I guess this is it; right?  This is

11    just a copy of it?

12            MR. FALLGATTER:  It is.  It's pretty much a

13    duplicate.  I think we changed the date, but otherwise it's

14    pretty much the same.  It's not identical.

15            THE COURT:  All right.  And do you refer to yourself

16    as Ms. Hollington?

17            MS. HOLLINGTON:  Yes.

18            THE COURT:  All right.  Ms. Hollington, I'll be happy

19    to let you speak or answer questions, however you want to do

20    it.

21            MS. HOLLINGTON:  Thank you, Your Honor.

22            MR. FALLGATTER:  Let me ask a couple of questions.

23            Ms. Hollington, the letter I just entered to His

24    Honor, you adopt the accuracy of that letter here as you speak

25    today, do you not.

1          MS. HOLLINGTON:  Yes, I do.

2          MR. FALLGATTER:  So would you address the impact of

3     your now ex-husband'S incarceration on your family?

4          MS. HOLLINGTON:  Your Honor, you remember my son,

5     Kevin.  Every day is very difficult for him.  He is living in a

6     limbo waiting for his dad to come home.  My household is very

7     difficult.  He is 32 years old, has autism and cerebral palsy.

8     And he dearly misses his father.  He provided so much comfort,

9     stability, and order to our home.

10         Kevin's kidney function has gone down because he's

11    not taking good care of himself.  I've had to take on a

12    full-time job which means that my attention is divided from him

13    all day.  We do not have outside services available to help us.

14    The person who has been helping us is not available through her

15    own family crises.

16         So it is a very, very difficult day.  And we

17    anticipate and hope that he will -- Scott will return to us at

18    some point to become part of the family again.

19         MR. FALLGATTER:  Ms. Hollington, you were present,

20    there was a hearing after the conviction and His Honor was

21    determining some bond issues.  And there was a video played

22    that your son had recorded himself, had he not?

23         MS. HOLLINGTON:  Yes.

24         MR. FALLGATTER:  And His Honor saw that video at the

25    time.  Is Kevin still displaying the same concerns to you that

1    he displayed and as recorded in that video?

2         MS. HOLLINGTON:  Yes.  Kevin really troubled himself

3    over coming.  He does not have good self-regulation.  So he

4    wanted to come, but he knew that he could probably lose his

5    temper or lose his control here.  So he did not come.  But he

6    loves his father dearly and he wants him back home.

7         MR. FALLGATTER:  I have explained to you that His

8    Honor has authority -- obviously with regard to the sentence in

9    terms of what that would be, but also has authority to

10   determine whether that sentence might run concurrent with the

11   state sentence that your husband is serving now and also has

12   authority to possibly direct the sentence of -- the federal

13   sentence in the state sentence, where your husband is now.

14        Are you asking His Honor to allow the federal

15   sentence to run at the same time and hopefully no longer than

16   the state sentence?

17        MS. HOLLINGTON:  Yes. Your Honor, I would like it to

18   be concurrent.

19        MR. FALLGATTER:  And you know that's a three-year

20   sentence that your husband got in state court?

21        MS. HOLLINGTON:  Yes.

22        MR. FALLGATTER:  Tell His Honor why it's important

23   that the sentence be concurrent, if possible.

24        MS. HOLLINGTON:  There are -- Your Honor, there are

25   many reasons.  One is, of course, the fact that our family is

1  broken and we had a lovely, beautiful home life.  And a lot of

2  what we had is lost.

3       Scott's mother is 87.  She has not seen her son.  She

4  continues to e-mail on a daily basis with him.  When he was

5  free, he was able to see her on a weekly basis without fail.

6  And she is suffering very desperately as well.

7       Seeing him to come back and be productive in society

8  and knowing that he has taken responsibility for any wrongs

9  that the Court has found, I believe that this is the right

10 choice, that his sentence run concurrently and that we have a

11 family member reunited with us.

12      MR. FALLGATTER:  Thank you.  Is there anything else

13 you wanted to add?

14      MS. HOLLINGTON:  No.

15      MR. FALLGATTER:  Thank you, Your Honor.

16      MS. HOLLINGTON:  Thank you, Your Honor.

17      THE COURT:  Thank you, ma'am.

18      MR. FALLGATTER:  Your Honor, Dr. Hollington has

19 prepared a statement and it's reasonably long.  Should he read

20 from the podium?  Would that be preferable?

21      THE COURT:  I think so.

22      MR. FALLGATTER:  Dr. Hollington, join me, please.

23      MR. FALLGATTER:  State your full name, please.

24      THE DEFENDANT:  Scott Andrew Hollington.

25      MR. FALLGATTER:  Dr. Hollington, have you prepared a

1    statement to read to His Honor with regard to this case and the

2    sentencing issues?

3              THE DEFENDANT:  Yes, sir.

4              MR. FALLGATTER:  May he read it, Your Honor?

5              THE COURT:  Yes.

6              THE DEFENDANT:  Your Honor, I believe that every

7    person has the right to receive fair access to health care.  I

8    don't mean free access, but access.

9              A physician may, by law, choose not to treat any

10   patient for any reason.  Because of this, a person with long

11   hair and no teeth who sits in a physician's waiting room and

12   who, by his mere presence, frightens the other patients may

13   well be turned away by a good physician simply to protect his

14   practice.  I would never turn away a patient who honestly seeks

15   my help.  I have had some very difficult and horrible people

16   seek my help.  And with every one of them, I tried.

17             I believe that honestly seeking my help means that my

18   patient meets the first three steps in Alcoholics Anonymous.

19   They must first admit that they have a problem.  Next, admit

20   that they've gone into this problem beyond their ability to

21   control.  And, third, that they give the problem over.

22             Alcoholics Anonymous says, "Give the problem to God

23   and seek God 's help."  Since I am God's servant, asking me for

24   help is, in my opinion, good enough.  I have turned patients

25   away who refused to admit that they have a problem or who told

1    me that they only wanted drugs and it was not their fault.

2            But for a person to give up all street drugs and take

3    only the medications I prescribe and to agree to take

4    responsibility for their own drug use is a good enough place to

5    start.  Many of these patients are untruthful.  Society has so

6    damaged them so much that their relationship to physicians,

7    many feel that they must be untruthful in order to receive

8    care.  I expect this.  I accept this.  And I try to help them

9    anyway.

10           I believe that the easiest patients to treat for

11   addiction are those who fell into it, usually these are

12   automobile accidents who were led into painkillers and then

13   they just cannot escape them.  Pain is a common onramp for

14   addiction and many addicts have pain.  Pain is not what an

15   addiction doctor treats.  But pain does not disqualify one from

16   addiction treatment.

17           The most difficult to -- patients to treat are those

18   who fell into addiction through recreational use.  Recreational

19   users may understand that they have a problem and want to get

20   rid of the problem but still be seduced by their desire for

21   recreational drugs.  With treatment, this desire can be

22   tempered.  With treatment, one may discover that a sober

23   lifestyle has benefits that are worthwhile.  And the most

24   difficult patient can yet be saved.

25           I believe it is wrong to trade money for drugs, drugs

1    for money, money for sex, sex for money, drugs for sex, or sex

2    for drugs.  I have never made any of these trades.  When I'm

3    offered these types of trades, which I offered -- have often

4    been, I always say no.  I have offered addiction treatment for

5    free.  There has never been a quid pro quo and there never

6    would be.

7           I believe that a physician should always act in ways

8    that they perceive are in the best interest of the patient.  I

9    have told this to every physician that I have worked with many

10   times.  It is the first thing I say, always the first thing I

11   say, "By the patient's best interest."

12          I do not mean to give a patient anything they ask

13   for.  What I mean is that a physician must find the treatment

14   that will best get the patient on the path to good health

15   without putting that patient at undue risk.

16          I would always take the time with my patient to

17   explain any treatment plan that I was giving them that they

18   asked about.  I would take the time to explain any treatment

19   plan that a fellow physician or caregiver would give them that

20   they asked about.

21          My fellow physicians may disagree with my care plan.

22   This proves that all of us have our own honest opinion, and I

23   would never fault another physician for following their own

24   conscience.  I do not ask my fellow physicians questions in

25   order to ridicule them, but rather to learn from them even if I

1    disagree with them.  I believe a physician should be willing to

2    do whatever he can to assure a patient's good health even if it

3    may seem to others that the risk is too high, so long as laws

4    are not broken and what is done is believed to be in the

5    patient's best interest.

6            The American Society of Addiction Medicine, an

7    organization to which all Suboxone doctors were associated, has

8    made the statement, "Adderall is an appropriate treatment for

9    the stimulus use disorder."

10            MR. FALLGATTER:  That's a new statement, is it not?

11            THE DEFENDANT:  That's a new statement.

12            I believe that a physician is bound by the law, bound

13    by the ethical codes to prevent enabling patients to do ill to

14    others or to themselves.  I am willing to risk being seen as a

15    fool so long as I am legally helping my patient and not

16    endangering others.

17            I believe that patients deserve to be treated fairly

18    even if the patient is having a bad day.  I believe the third

19    patient in a row on a given day who asks for the same thing as

20    the first and the second patient that asked for it, the third

21    patient deserves the same kind of answers that the first two

22    received, even if the physician is frustrated.  I believe that

23    every patient deserves fair and truthful answers to the

24    questions even if these questions are inconvenient.  If a

25    patient wants to know what the maximum legal amount of a

1    medication is, that patient deserves an honest answer, not an

2    obfuscation that would undermine their trust.

3           I believe that a patient deserves an explanation as

4    to what a medication does and an explanation as to what

5    alternate medications might be, even if the physician is not

6    willing to prescribe those alternate medications.

7           I believe that a patient has the right to refuse to

8    take any medication provided by the physician, even if the

9    physician believes this medication in question should be taken

10   and even if the physician believes that that medication is

11   critical.  I do not believe that anyone should ever be declined

12   care because they would not take a medication.

13          I believe that there are things that, if a patient

14   refuses to do and refuses to cooperate, would mean the care has

15   become futile.  Futile care results in a lack of helpful

16   progress.  Anything that leads to a lack of helpful progress

17   should be considered enabling.  Enabling is harm.  A physician

18   is sworn to do no harm.

19          If a physician comes to believe that a treatment has

20   become enabling, then the physician must cease care.  I have

21   ceased care many times for such reasons.   When a physician

22   ceases care, he must put on to the chart a discharge note

23   explaining that he ceased care and what reasons he gave for

24   ceasing care.

25          This discharge note should recapitulate things that

1    are already in the chart word for word and explain that these

2    are the reasons.  They must be done this way, because if a

3    patient feels that they were discharged from care unfairly,

4    they should know exactly why and what statements were made that

5    they might have to take back.  That is what a discharge note

6    is.

7    Q.    I asked you to address that because you were convicted of

8    some obstruction charges for adding -- what they call adding

9    notes to the undercover officers?

10   A.    That is correct.  Those were discharge notes for the

11   undercover officers.

12   Q.    And you added them because you believed you had an

13   obligation to complete the accuracy of those notes and explain

14   why you were no longer going to treat them?

15   A.    Right.  My charts are read by ten other physicians.  And

16   if they did not have a discharge note, they would not know why

17   the chart was locked and they might unlock the chart, which

18   they are able to do, and continue treatment, which would have

19   been inappropriate.

20         I need to also note that my charts have been called

21   altered.  I used Practice Fusion.  If you talk to Practice

22   Fusion, you will find that my charts, all charts in Practice

23   Fusion, once signed, cannot be altered.  There is no mechanism

24   by which the charts can be altered.  Anyone who says that those

25   notes were altered is incorrect.

1          I am no legal expert.  And point of fact, I can

2     honestly say I knew very little about the system of American

3     justice, but I believe that I will get justice.  When I was

4     charged, I had no words.  I went to trial and I was told to sit

5     in silence, and I did.  It was my understanding that at the end

6     of arguments, the judge was supposed to evaluate if there was

7     any validity to the charges and throw them out if they were not

8     valid.

9          The first count was conspiracy.  It is a legal

10    concept.  The judge is an expert on this, and he threw the

11    count out.

12         The second charge was prescriptions.  It's one that I

13    didn't write.  I didn't sign.  It was not written on my

14    credentials.  Now, it could be that I had stolen the

15    credentials of somebody else, and then I would be criminally

16    liable for this prescription.  But that is not true.  That is

17    not what happened.

18         In court testimony it was shown that this

19    prescription was written based on a diagnosis by another

20    physician.  The diagnosis was considered to her and is

21    considered to be valid.  I am not accused of having coerced her

22    or forced her into writing the prescription.  However, I was

23    found criminally liable for this physician -- for this

24    prescription that she received.  Respectfully I don't think

25    that that was fair, that I have been failed by the system, but

1    I remained silent in court.

2         Having said all of this, I understand that I am a

3    felon.  I'm still in shock that this would be true, but it is

4    so.  Having been convicted, I accept that I have done wrong.  I

5    did not believe at the time that what I did was wrong.  I acted

6    on my honest belief that my actions were for the good of my

7    patients and were legal and justified.  But I was wrong.

8    Society and the law have spoken, and I was wrong.

9         I have been convicted of prescribing medications that

10   I should not have prescribed.  At the time that I prescribed

11   these medications, I believed that these were necessary.  I

12   could have and I should have spent more time to be certain of

13   my actions.  I could have and I should have been more cautious.

14        I should have kept more distance from my patients.  I

15   should have been more discriminating in my willingness to

16   accept certain patients.  It is said that some of my reasons

17   for prescribing were unjustified.  I am forced to accept that I

18   should not have used every medical treatment that I believed

19   would help.  Not every treatment does help, and I know this.

20   My personal judgment on what and how to treat must have been in

21   error.  I accept the judgment of the Court.

22        I do ask this Honorable Court to consider imposing a

23   sentence that permits me to return to my family, at least when

24   the sentence ends.

25        Thank you, Your Honor.

1           THE COURT:  Thank you, sir.

2           MR. FALLGATTER:  May I proceed with my closing

3    argument, Your Honor?

4           THE COURT:  Yes, sir.

5           MR. FALLGATTER:  As always, I ask the Court to

6    consider the departure grounds that are in the sentencing memo

7    and also, certainly obviously, consider them as a variance.

8           I heard the government say that Dr. Hollington harmed

9    the vulnerable.  We know from the trial that all of the real

10   patients were genuine addicts.  We know that the undercover

11   officers all claimed to be genuine addicts, every one of them

12   concerned about dying from street drugs.  Some of the ladies

13   testified that they would be dead without Dr. Hollington giving

14   them the lawful prescriptions to stay off the street drugs.

15          One of the government lady witnesses chewed out the

16   DEA after the arrest saying, "Now do you know what you've done?

17   You are going to cause a lot of people to die from street

18   drugs."  And, Your Honor, let me hasten to add, obviously sex

19   with patients is nothing we're here to condone and we

20   understand that that would cross the line in terms of conduct.

21   The position I took at trial, legally, and I take it today, is

22   that if the person's entitled to that prescription to help them

23   stay off of street drugs, that's the Title 21 crime charge.

24   The allegations of sex are still reprehensible.  But with all

25   due respect, I see that and I have seen that as separate from

56

1    the Title 21 charge.

2         So clearly a lot of folks are being kept off street

3    drugs to keep them alive.  And that was the uniform testimony

4    of the undercover officers and the ladies that testified.

5         Mr. Mike says Dr. Hollington lined his pockets.

6    Well, first of all, you have modest fees.  They were very

7    modest.  And you will recall, his fee for providing patient

8    care was $100 a month, incredibly modest fee, so he was

9    definitely not lining his pockets.

10        I've had at least one other case before Your Honor

11   where I was absolutely convinced my client was innocent.  The

12   jury found otherwise and he was sentenced.  That's going to

13   happen here today.  And I would not have recommended a trial in

14   this case if I believed that the Title 21 crime was valid.  You

15   found otherwise.  The jury found otherwise.  So that's a

16   disappointment for me.  But I assure the Court that was -- the

17   trial was in no small part based on my analysis of the case,

18   which I shared with Dr. Hollington.  And, as I said earlier, of

19   course, he didn't testify and I don't think we ever refuted any

20   of the facts that came out.  We just refuted how it was applied

21   to the Title 21 charge.

22        The obstruction of justice, again, I remain puzzled

23   about.  That conviction -- it is a conviction, but the notes

24   were entirely accurate in terms of what was said.  One was

25   actually verbatim.  And you heard from Dr. Hollington that in

1    his medical practice, when a patient is leaving, to document

2    why.  And the real irony is, we gave those records to the

3    government during their investigation.  And then he gets

4    accused of obstruction of justice.  Again, that's a conundrum

5    to me in terms of what I try to do to help represent

6    Dr. Hollington.

7             So on the topic of accepting responsibility -- you

8    know, it is always stressful waiting for the jury verdict.  So

9    Dr. Hollington, of course, we're in the anteroom out there.

10   And I made a notice at what he said, he said, "If God's plan

11   was for me to be convicted and end up in prison, that's because

12   he wants me to help people," which, of course, he is attempting

13   to accept.

14            Where he ended up at least initially was in a state

15   jail.  And state jails are certainly a lot -- and prisons are a

16   lot rougher than the federal environment.  So when he got

17   transferred into the general population down in Volusia County,

18   three men were waiting in his room and told him what was his

19   was theirs.  And Dr. Hollington's family had to send them

20   money.  One stood outside as a guard.  After reporting to the

21   jailers, he was told he could either go into solitary or tough

22   it out.  And he went into solitary.

23            So the state jail experience for the last, what, 16,

24   17 months has certainly been much more harsh.  We point that

25   out in the sentencing memo I shared with you again today,

1    because clearly that type of incarceration has -- I would like

2    the Court to think there's a factor of II or III, because of

3    the nature of that type of incarceration.  I won't repeat my

4    argument.  I'd ask the Court to consider the criminal history

5    double whammy of Category II and losing the two points.

6          Other punishments, of course, he consented to the

7    forfeiture of his medical license with the state board.  And

8    obviously we didn't contest it here once the conviction was in.

9          In our sentencing memo, we provided Your Honor with a

10    copy of the Bureau of Prisons Regional Counsel memorandum on

11    Interaction of Federal and State Sentences.  And I'd ask the

12    Court to give favorable consideration to that.

13          Here are a couple of other practical factors:  He

14    went into state custody on September 20, 2023.  He didn't

15    report to prison -- the case took forever down in Volusia

16    County.  You've been patient with us to move this hearing --

17    the sentencing, of course.  And it eventually got resolved, not

18    with a sexual battery, but with a garden-variety battery, in

19    part, because -- as I mentioned, it came up at the end that the

20    alleged victim had dementia and couldn't remember anything.  So

21    -- but the case got worked out.  And, of course, in no small

22    part because, again, we knew we were coming back in front of

23    Your Honor and wanted to anticipate that.

24          Here's the practical consequence of that, the way --

25    in federal court you get gain time, and usually it's an

1    85 percent rule.  State is pretty much the same.  But the

2    Department of Corrections, the state correlates to the Bureau

3    of Prisons, gives you no gain time for the time you spend in

4    state custody.

5            So those 14 months between September of 2023 and

6    reporting to prison in November 2024, state prison, he gets

7    zero gain time.  He gets credit but no gain time.  So it is

8    what they would call in state court dead time.  So, again, I

9    want the Court to consider the math on that and that he would

10   not get credit.  And I suspect that during the time he was over

11   there on a writ, it would be the same thing, the rule in the

12   Department of Corrections, unless you are housed in a Florida

13   State Prison, you get no gain time.  So that will -- that is an

14   important factor.

15           He has been told his approximate release date is

16   April of 2026, which is 15 -- 14 months away, I guess.

17           So, in reality, the incarceration down in Volusia

18   County is a much greater form of punishment.  And if he'd been

19   sentenced, theoretically, obviously he would get gain time and

20   credit in federal court.  So, again, all those are factors -- I

21   think we would anticipate those would come up, so here we are

22   today.

23           In that regard -- I think it's still pending, Your

24   Honor, a motion I had to vacate, the conditions of release.  We

25   filed that back on September 25, 2023, Document 220.  The

1    government filed an opposition, Document 222.  And unless I'm

2    mistaken, I don't think that ever got ruled on.

3            And if I'm correct, the one thing I would ask the

4    Court to consider is imposing a sentence nunc pro tunc,

5    because, again, same situation, he would get zero credit for

6    the time awaiting.  Because if his release would have been

7    revoked, I believe the Bureau of Prisons and Your Honor would

8    consider that to be credit towards the ultimate sentence if he

9    was not out on bond.

10           So, anyway, we would look forward to the Court's

11   guidance.

12           I guess another practical matter, if you're

13   comfortable with a concurrent sentence served in state prison,

14   that'd be great.  If you're not, if you believe that the

15   federal sentence should add on some time, the ultimate question

16   is, should he continue serving that in state custody or would

17   he then be moved over into federal custody?  He has no control

18   over that.  Your order would, of course, control it.

19           My experience has always been, once someone gets

20   institutionalized, it's sort of helpful just to stay in the

21   same place.  But, again, that may not be something Your Honor

22   deems worthy of addressing.  But those are some of the

23   practical matters of having a three-year state sentence and

24   then obviously your sentence will guide how that math works

25   out.  But it's just a concern of mine.

1        If it turns out that way, then, you know, I always

2   ask for recommendation.  Obviously Jesup is a close facility.

3   If your sentence determines such that he would have to spend

4   some time in federal prison, I would ask you to consider Jesup,

5   Georgia.

6        Thank you, Your Honor.

7        THE COURT:  Thank you.

8        Mr. Mike, does the government wish to be heard

9   further?

10       MR. MIKE:  No, Your Honor.

11       THE COURT:  Is there any legal bar to the imposition

12   of sentence, Mr. Mike?

13       MR. MIKE:  No, Your Honor.

14       THE COURT:  Mr. Fallgatter?

15       MR. FALLGATTER:  No, Your Honor.

16       THE COURT:  All right.  Then I'm going to take a

17   brief recess to consider the matter.

18       COURT SECURITY OFFICER:  All rise.

19     (Brief recess from 11:46 a.m. to 11:58 a.m.)

20       COURT SECURITY OFFICER:  All rise.

21       Please be seated.

22       THE COURT:  I'm presented with a conundrum, as

23   Mr. Fallgatter talked about in his presentation.  But my

24   conundrum's a different one and one that hasn't happened to me

25   too often.  But when I sat through the trial of -- I guess now

1    Mr. Hollington, and I heard the evidence and I saw the videos

2    and I heard the women testify and then I received the jury's

3    verdict, I had thrown out the conspiracy count, because I

4    couldn't figure out who Dr. Hollington had actually conspired

5    with.  But the conduct, the substantive conduct, I thought the

6    evidence that the jury considered and that they found

7    convincing beyond a reasonable doubt was certainly -- was

8    certainly strong.

9          I then -- and I don't remember the detail, but I'm

10   assuming that my bond decision on Dr. Hollington back in the

11   summer of 2023 was primarily because of the special needs son

12   that he has and was convinced that there needed to be some time

13   that would allow the family to try to make arrangements over

14   that before sentencing.

15         And then I think I had been advised, but didn't know

16   the details, there were -- I knew there were some state

17   investigations.  And then all of a sudden I was told that Mr.

18   Hollington had been arrested by state authorities and that he

19   was going through the state process and I was asked to wait

20   until -- for sentencing until that could be resolved.

21         And then as -- when that occurred and I -- we put

22   this on for sentencing, I have to say that given the evidence I

23   heard and given the testimony that the jury obviously credited

24   of the four women, I was frankly surprised the guidelines were

25   as low as they were.

1          I've come now to understand that the reason that

2    they're as low as they are is because the drug counts don't

3    really take into account the terrible conduct of Mr. Hollington

4    towards these women patients.

5          And when you hear their statements, which is

6    consistent, at least two of them, their testimony on the stand

7    and I felt like at the -- in the allocution that Mr. Hollington

8    made today, he attempted to suggest that these women were

9    unreliable reporters of what had occurred to them.  But I don't

10   accept that.

11         You know, if it was one person and they had a really

12   troubled history and maybe there could be some credibility

13   concerns, maybe that's a different case.  But I am not

14   believing that these individuals made this up or that there's

15   some effort to punish Mr. Hollington for things he didn't do.

16   I just -- I don't accept that.

17         So we come to today, and Mr. Fallgatter tells me that

18   he wants me to consider acceptance of responsibility and he

19   wants me to wait until Mr. Hollington makes his statement so

20   that I will see how much responsibility he's accepting.  I

21   didn't hear a word of it.  I didn't hear a word of remorse.  I

22   didn't hear a word of acceptance.  I didn't hear a word of an

23   apology.  I didn't hear anything.  And, of course, that's

24   completely his right.  He went to trial.  He was convicted.  He

25   exercised his right to remain silent.  He has appeal rights.

1    All of that is true.  But I was surprised only because

2    Mr. Fallgatter had told me, "Wait until you hear what he has to

3    say and you will see he's accepting responsibility."

4         So I find myself in the relatively unusual, but not

5    unprecedented, position of, even though the government has

6    asked me for a high guideline sentence to run consecutive to

7    the terms of the state sentence, I find myself considering

8    whether or not the Court should vary upward in this case.  But

9    I don't do that lightly and I always -- I can probably count on

10   this many fingers how many times I've done it when the

11   government hasn't sought it.

12        But when I think of the other sentences I've given in

13   similar situations, I think it's something I have to at least

14   consider, because, after all, under 3553(a) my job is to impose

15   a sentence which is sufficient but not greater than necessary.

16   And I need to think long and hard about whether a 37-month

17   sentence consecutive to the three-year sentence is sufficient.

18   Maybe it is, and maybe I'll conclude that it is.  But it is not

19   apparent to me at the moment.

20        But I don't want to do something without really

21   considering it.  And even though I don't think the law requires

22   it, I wanted to give Mr. Hollington and Mr. Fallgatter prior

23   notice that I was considering that and give them an opportunity

24   to be heard.  I believe the law is, I only have to give prior

25   notice if I'm going to vary upward in the guidelines.  I don't

1    believe I have to give prior notice for an upward variance.

2    But in the occasions in the past where I have considered it and

3    the government hadn't been requesting it so the defendant

4    wasn't on notice, I have felt it fair to provide prior notice.

5          So I'm going to take this matter under advisement.

6    I'm going to reschedule it.  We will not regurgitate what we

7    went through here today.  But I will hear from Mr. Fallgatter

8    and Mr. Hollington and the government as it wishes to be heard

9    as to what an appropriate course of action should be for the

10   Court.  And then I will make a final pronouncement and final

11   decision.

12         And, of course, my focus in considering the upward

13   variance is not on the drug -- actual distributions themselves,

14   although I have watched the videos and though it was -- I

15   certainly think that the jury had a basis to find the way it

16   did.  But I have to say my primary focus on considering an

17   upward variance is not only the prescriptions, but also the

18   using -- the doctor using his office as a doctor to obtain

19   sexual favors from these patients.

20         So the Court is taking the matter under advisement.

21   I'll renotice it for a further hearing when I'm ready to do so.

22   And then we will proceed with pronouncement of sentence at the

23   next session.

24         Anything else from the government at this moment?

25         MR. MIKE:  No, Your Honor.  Question, Your Honor, do

1  you want us to provide a brief of our position on it or wait

2  until you do it orally before the Court?

3          THE COURT:  I'm happy to hear from the government if

4  it wishes to be heard.  And I'm happy to hear from

5  Mr. Fallgatter, if you-all want to file something before we

6  come back, that's fine.  I will permit that.

7          What I'll do is -- here's what I'll do, I will --

8  when I reset the matter for sentencing, I will also give the

9  parties a date by which they can file something additional if

10 they care to.

11         MR. MIKE:  Thank you, Your Honor.

12         THE COURT:  Mr. Fallgatter?

13         MR. FALLGATTER:  Your Honor, my current thought would

14 be, I would better serve the Court if we made a certain

15 presentation at whatever time you set the hearing rather than

16 some pleading ahead of time.  But I will --

17         THE COURT:  That is up to you.  I'm not requiring it.

18 I'm not requesting it.  I'm just saying that in my order

19 resetting the matter, I will give the parties an opportunity.

20 It is only an opportunity.  It is not a requirement.

21         MR. FALLGATTER:  Thank you, Your Honor.

22         THE COURT:  Anything else?

23         This court's in recess.

24         COURT SECURITY OFFICER:  All rise.

25         (Proceedings concluded at 12:11 p.m.)

**CERTIFICATE**

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 13th day of February, 2025.



                        s/Heather N. Randall_____
                        Heather Randall, RPR