Volume 7 - 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

          Plaintiff,          Case No. 3:22-cr-141-TJC-PDB

  vs.          July 25, 2023

SCOTT ANDREW HOLLINGTON,          8:34 a.m.

         Defendant.          Courtroom No. 10D

_____

JURY TRIAL PROCEEDINGS
(Volume 7 of 7)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


GOVERNMENT COUNSEL:

      **ASHLEY WASHINGTON, ESQ**.
      **KIRWINN MIKE, ESQ**.
      United States Attorney's Office
      300 North Hogan Street, Suite 700
      Jacksonville, Florida  32202


DEFENSE COUNSEL:

      **CURTIS SCOTT FALLGATTER, ESQ**.
      Fallgatter & Catlin, PA
      200 East Forsyth Street
      Jacksonville, Florida  32202


COURT REPORTER:

      Shannon M. Bishop, RDR, CRR, CRC
      2442 Atlantic Boulevard
      Jacksonville, Florida  32207
      Telephone:  (904) 396-1050
      s.bishop@firstcoastcr.com

    (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

Volume 7 - 2

T A B L E   O F   C O N T E N T S

<u>Page No.</u>

Rule 29 Motions............................... 3

Jury Charge Conference........................ 19

Closing Argument by Mr. Mike.................. 52
Closing Argument by Mr. Fallgatter............ 94
Rebuttal Closing Argument by Mr. Mike......... 134

Jury Instructions............................. 141

Alternate jurors excused...................... 165

Jury retires to deliberate.................... 168

Verdict....................................... 172

E X H I B I T S

<u>Government's Exhibits:</u>

(None)

<u>Defendant's Exhibits:</u>

(None)

<u>Court's Exhibits:</u>

Exhibit 1 (Jury Note)

P R O C E E D I N G S

July 25, 2023                                          8:34 a.m.

(All parties present; defendant present; jury not present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is back in session.

Please be seated.

THE COURT:  So overnight I have considered the Rule 29 motion, and -- and also took another look at our instructions and so forth.  And so I'm -- I'm ready to go forward.

Mr. Mike, does the government wish to be heard further on the conspiracy aspect of the motion?

MR. MIKE:  Your Honor, we've had an opportunity to go back and look over the evidence and review some of the transcripts.  And we -- at this moment we have nothing else to add to it, Your Honor.

THE COURT:  So is the government -- I'm not sure what you're saying.  Are you saying the government is satisfied that there's a sufficient basis to go forward or not?

(Counsel confer.)

MR. MIKE:  Yes, Your Honor.  We'll just stand on -- stand on our previous argument.  And we've leave it to the Court to make that determination.

THE COURT:  Really?

I'll be back.

(Recess from 8:37 a.m. to 8:41 a.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is back in session.

Please be seated.

MR. FALLGATTER:  May I briefly address Count One, Your Honor?

THE COURT:  Yes, sir.

MR. FALLGATTER:  During the trial when the government wanted to put in their exhibit dealing with the e-mails between Ms. Pittala and Ms. Christensen, the Court made the observation that the only way it would be admissible would be a co-conspirator statement.  And in that dialogue the Court correctly pointed out that at that point the Court had not heard any evidence of an agreement.

As the trial progressed, no such evidence came in. And more to the point, both of them testified -- let me correct myself.

Ms. Pittala and Ms. McCallister, the only two alleged conspirators, testified, said they were not members of any conspiracy, reinforcing the Court's prior observation.  None of that has changed.

And if it wasn't sufficient to admit it under a hearsay exception for co-conspirators, with all due respect, it shouldn't be sufficient to let that count go to the jury.

THE COURT:  Thank you, sir.

With respect to Count One of the superseding indictment, the Court has before it a Rule 29(a) motion, which directs that after the government closes its evidence -- or after the close of all the evidence, the Court, on the defendant's motion, must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

Under Rule 29 the Court applies the same standard used in reviewing the sufficiency of the evidence to sustain a conviction; that is, the evidence is viewed in the light most favorable to the government, and any conflicts in the evidence are resolved in favor of the government.

The Court must accept all reasonable inferences that tend to support the government's case, and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find the evidence established guilt beyond a reasonable doubt.

So it's a -- it's a very forgiving standard for the government, but, nevertheless, it -- it does require there to be evidence from which the jury, even in the light most favorable to the government, could render a verdict in favor of the conspiracy charge or in favor of the government on the conspiracy charge.

In this case the government has charged that the two nurses, McCallister and Pittala, were unindicted co-conspirators.  However, when they actually testified on the stand, that designation never really came through in their testimony.

They, of course, denied being conspirators, but that in and of itself wouldn't -- wouldn't be enough.  But their testimony simply -- and the Court had an opportunity to review the entirety -- with the assistance of Ms. Meyer, review the entirety of the nurses' testimony overnight.  And I looked at it and she looked at it.  We discussed it this morning.

And there is a paucity of evidence that really goes toward conspiracy.  We certainly have nurses who could be said to have acquiesced in certain conduct that the government alleges to be unlawful on the part -- part of Dr. Hollington, but acquiescence in and itself is not enough to prove that -- that, in the words of the jury instruction, two or more persons in some way agreed to accomplish a shared and unlawful plan as charged in the indictment.

There's just a real lack of evidence -- if you look at the nurses' testimony and you look at all the other testimony -- I even considered whether the phone calls -- you could hear Dr. Hollington on the phone with the nurses.  And I even considered, you know -- that wasn't their -- the nurses' own testimony, but it was testimony about -- that showed

communications between Dr. Hollington and the nurses.

And those phone calls, I suppose, either by direct evidence or by inference, could potentially implicate Dr. Hollington in some -- in some aspect of wrongdoing, but they just did not do anything to establish a shared and unlawful plan with these nurses.

That's not to say that the nurses, I think, were -- not to say that there were questionable aspects of the nurses' conduct that might draw attention, but that's not really the issue.  The issue is whether there's any evidence of a shared and unlawful plan, and the object of which was to dispense these medicines without a legitimate medical purpose or outside the usual course of professional practice.

And after looking at everything and even giving the government all benefit of the doubt, and carefully listening to the nurses' testimony, which either didn't come out the way the government expected it to or just simply is what it is -- but either way, I don't think you can use the nurses' testimony as a sufficient jury question on conspiracy when I looked at it, even in the light most favorable to the government.

And so, of course, granting a judgment of acquittal on any count is always a difficult decision for a Court to make, because the Court is well aware that that's an unreviewable decision and it's not something that should be done lightly.

On the other hand -- and then this morning I wanted to give the government an opportunity to -- having had the opportunity to think about it overnight -- and, as I said, we looked at all the nurses' testimony, we looked at all the evidence, to try to determine whether there was viability on the Rule 29 motion or not.

I gave the government an opportunity this morning to educate me in a more complete way as to how the conspiracy count should go forward.  And the government declined that opportunity and asked me to rule based on its previous arguments.

And so for all those reasons, the Court -- even under the standards that I think are favorable to the government in these types of cases, the Court is going to grant the conspiracy Rule 29 motion.  And -- and at the end of the case the Court will enter a judgment of acquittal as to Count One on behalf of Dr. Hollington.

Now, having said that, a couple of things.  And this is just for -- by way of -- by way of moving forward.  I am going to deny the Rule 29 motion on the remainder of the counts.

I think, in my mind, the --

MR. FALLGATTER:  If I may have a brief argument on that, Your Honor, or not?  You mentioned I might have a moment or two.

THE COURT:  Yes, sir.

MR. FALLGATTER:  I'll be real quick.

THE COURT:  Yes, sir.

MR. FALLGATTER:  But let me start with this observation.  I mentioned when Judge Klindt picked the jury how hard everyone, particularly on the Court's side of the equation, works.  And just as an example, reading transcripts overnight is very telling as to the dedication of this Court and its staff.

So very briefly, I understand I've lost the argument on the substantive counts, but I did want to address the obstruction of justice.  As you recall --

THE COURT:  And I will -- I will say to you that -- I was just getting ready to say before you asked me to be -- for time to speak.  I will say to you the obstruction of justice counts are something that has given me pause.  And let me tell you where I am right now, and then you can argue.

I think that there's enough evidence that -- post indictment that -- that Dr. Hollington went back -- it wasn't -- it wasn't just the stuff that's been highlighted about deceptures and false -- false patients and so forth.

There were other entries made into these charts post indictment that I think a jury would be authorized to conclude was obstruction.  And the -- and I have a case that we found that is pretty similar.  And I'll just cite it into the record

here.  Let me find it.

What page is it on, Courtney?  Oh, here it is.

*United States versus Ghearing*, G-h-e-a-r-i-n-g.  It's a Tennessee case, Middle District of Tennessee, February 13th of 2023.

In that case the obstruction of justice charges were predicated on the doctor's substantive alteration of medical records following a return of the indictment.  And the Court denied the defendant's motion for judgment of acquittal at the close of the case.

And it doesn't have a prolonged discussion, but it's at least another court that has looked at this and determined that it presented a jury issue in similar circumstances.

And I will grant you that it's not -- it's an unusual obstruction of justice case.  But when I look at the jury instructions and I look at the case law on obstruction, I think it's sufficient to go to the jury.  At least that's my view right now.

But, Mr. Fallgatter, I'll be happy to hear from you.

MR. FALLGATTER:  And thank you for that guidance, because that does -- that does help.  May I approach?  This is what we used during the trial.  I'm just going to give you two examples.  One is Kevin Lee.  And the other is Amanda Fleming. Kevin Lee is a little bit unique because of the transcript and recording.

And, Your Honor, if I may respectfully suggest, there is -- I understand why I would get denied based on the Court's belief that entries were added in other parts of the chart, but that isn't correct.

The only entries that he made were those that I displayed to you.  Let me start with Kevin Lee.  And that was added a week or so after the indictment.

You've got a -- I apologize.  The date up there is November something or other.  So that was right after the October 27th indictment.

You heard the recording.  And Mr. Lee admitted that of the 16 items that I articulated -- or, pardon me, that were added to the chart, those come almost verbatim, because questions were asked during the recording.

And I numbered them.  He went over them.  "Yes, yes, yes, those are exactly what was asked of me."  And that's all in that transcript.  So there's nothing distorted about it. And there's no entries that were made in the chart that go back and change anything else.

You know, we have multiple exhibits.  They were all the sub 5s.  Here's -- here's the one on Kevin Lee, for example.  That's the original court exhibit.  And there were no changes whatsoever made anywhere else in the chart.  And, of course, they're all dated.  So these are electronic entries.

And you can tell what entries are made.  The only one

that was made is the one that the government -- the government themselves have acknowledged that that's the entry made by Dr. Hollington, and particularly with Lee, since his verbatim from the transcript -- you know, I thought it was a bulletproof on that in terms of JOA arguments.

THE COURT:  Hold on a second.

(Judge confers with law clerk.)

THE COURT:  All right.  Go ahead, sir.

MR. FALLGATTER:  And, of course, the entire theory --

THE COURT:  Why wouldn't the jury be authorized to conclude, Mr. Fallgatter, that Dr. Hollington was trying to go back and rewrite history, that he was going back to try to get information and he wanted to go back and put things in his chart that were efforts to -- just like when he sent the notes to the nurses which said, "Here" -- "when the person says they denied" -- "denied usage, well, that's a classic addict thing," and when a person says -- I mean, those -- those could have innocent connotations, but they also could have malignant connotations, what you're -- that you're trying to get the story straight, or whatever.

Why isn't -- why wouldn't a jury be authorized to think that this was some version of trying to make lemonade out of lemons?

MR. FALLGATTER:  So that's not the allegation.  The allegation is he made additions to the medical files, and those

additions are 100 percent accurate, verbatim from the recording.

So regardless of what's going on, the entry was exactly 100 percent honest.  And you'll recall the recording, "I just want you to tell the truth."

Mr. Lee, half a dozen, seven times, I think, tried to get him -- to put words in his mouth.  And he said, "No.  I want you to be true."

There's no way a jury could hear that recording and believe that Dr. Hollington is doing anything other than trying to find out who this person is and was he pretending to be a fake patient, which is exactly what he's attempting to accomplish.

But, again, the focus of the indictment is that alterations were made to the records.  There were no alterations.  It was a documentation of another call that was made.  It's not obstructing.

THE COURT:  Well, they -- were the -- I mean, he didn't talk to every one of these folks, though, right?

MR. FALLGATTER:  No.

THE COURT:  So -- and the entries were made in all cases, right?

MR. FALLGATTER:  Right.  So -- but let me -- you know, Lee is separate, because the allegation is he obstructed justice by making an addition, but he made an addition that's

100 percent accurate.  They didn't charge him with obstruction because you're trying to go back and beef up the records.  He's asking honest questions and trying to get honest answers.

No way can that be obstruction.  And it's 100 percent accurate.  So you can't obstruct justice by having 100 percent accurate entry in your chart.

The others -- he didn't call the others.  As an aside, Your Honor, I'll tell you that I learned from him that he had made that call.

And I said "Well, don't call the others, because who knows what the government might say."  And, of course, lo and behold, look what they did.

So the other -- you've got the one for Amanda Fleming.  That's one where it says the false entry -- all the rest of them are identical to that, basically; in other words, a false entry -- it's a false patient.

And then there's a summary of some of the entries from the chart itself that are cross-indexed into everything that was put in the chart previously either by him or by the other patients.

He did not go back -- and you can look at the dates on those.  Ms. Fleming -- I forget -- they're all like the 7th or 8th or something of November.  You've got it.

They are -- all those are an entry he made simply to document they're a fake patient.  No changes were made

whatsoever to the records.

And let me be clear on the records.  These are the records.  The allegation is that he changed the medical files of the office.  The --

THE COURT:  I understand.  I understand.  I -- if I said beyond that I didn't intend to.  So I understand that this is what we're looking at.

MR. FALLGATTER:  No.  I didn't mean that you -- I didn't mean to suggest -- I didn't mean to suggest that you had.  But we've seen the government throw some computer in-the-sky records up.  They're unintelligible, hard to read.  I don't know where those -- got there.

For example, one says obesity on Amanda Fleming.  You're not going to find the word of "obesity" in the Amanda Fleming patient chart.

How that got in some computer in the sky, I don't know, but this is the only chart for which he has custody.  And he only made a single entry on each of them after the indictment, after we were told they were fake patients.  And, really, the call to Lee was before we knew there was a fake patient.  After that we found out that he was.

THE COURT:  Okay.  I'm going to -- I hear what you're saying.  Let me hear from the government, please.

MR. MIKE:  Yes, Your Honor.  As far as the Kevin Lee chart, the defendant called Kevin Lee on November 4th and had a

conversation with him and asked him all the ADHD questions he should have asked on the initial visit.

Then he went back into the chart, which he never accessed in the first place -- he never even opened that chart, which we have showed the jury that, and we had the nurse practitioner get up there and say he never uses Practice Fusion.

"We don't know what he uses.  He keeps medical records at his house or in the office."

So without using the medical records that he never accessed, and he accessed the nurse practitioners' files and put ADHD questions that he should have asked in the first place, which we believe now it covers up, and it shows that he is showing that he -- he should have -- you know these questions in the first place and you should have asked them in the first place, and now he puts them in the record to make it look like he went through those.  And those are time-stamped from before.

And then there's also subsequent e-mails.  You heard the nurse practitioner said he reached out to them in November. They didn't respond to him.  And then he went into the medical records on November 16 and started adding in more and altering more notes about all the other -- all the other UCs.  And some of those, as mentioned, they were inaccurate.

MR. FALLGATTER:  No alteration of existing notes.  A

new entry noted they're fake patients, which the government knew.

And as a matter of law, whether or not they were changed in it, how can you obstruct justice by telling the government that which they already knew because they had all the recordings?

THE COURT: Okay. All right. The Court has heard argument on the Rule 29 motion with respect to the obstruction of justice counts. And I will reiterate the standard -- and I looked -- we looked at some obstruction of justice law.

The standard is the evidence is to be viewed in the light most favorable to the government. Any conflicts in the evidence result in favor of the government. And the Court must accept all reasonable inferences that tend to support the government's case.

And I think it's a -- a typical obstruction of justice charge, but it's also a little atypical type of conduct that a person who is indicted would then go make entries onto records which would be part of the -- certainly part of the government's case.

I think the arguments Mr. Fallgatter is making -- I'm sure he'll make to the jury, and -- but I don't think it -- I don't think that in the words of Rule 29 that there is insufficient evidence of obstruction to sustain a conviction.

I do think that there are -- I think the evidence

could lead to a conviction on those counts if the jury was so persuaded.  So the Rule 29 motions, including the ones involving Mr. Lee, are denied.  They'll go to the jury.

Okay.  And the only other thing I'll say is -- we're obviously going to have to re- -- redo the jury instructions a little bit here to get rid of the conspiracy count.

But one thing I won't countenance, Mr. Fallgatter -- and I don't know what your intentions would be.  But in my view, when the Court grants the judgment of acquittal on a count -- which it doesn't happen all that often, but it does happen some -- and the trial goes further, there's just no further mention made of that count.

It's not -- so, in other words, it is not, in my view, an appropriate argument to get up and say the government charged a conspiracy but now they haven't been able to prove it or anything like that.

I think you know that, but I want to be clear on the record that -- that the word "conspiracy" and the -- the idea that this was -- these were charges made -- obviously the jury heard it in opening.  They heard it some during the case.  But that's just the way this goes.

And so I don't think there's going to be any further mention of conspiracy.  It's just not going to -- not going to be in the case.

All right.  Now --

MR. FALLGATTER:  May I on that?

THE COURT:  Yeah.

MR. FALLGATTER:  I didn't understand that to be the requirement.  You know, the government stood up in opening and said there was a conspiracy.  And I certainly want to talk about how the witnesses said there wasn't.  That was the evidence in the case.  You know, part of my role is to demonstrate that the government has got this wrong.

THE COURT:  I don't think -- I don't think you get it both ways, Mr. Fallgatter.  I don't think you get to -- if that was the argument you wanted to make, that made sense when the conspiracy charge was in the case.  It doesn't make sense now.

And so you have successfully gotten Count One thrown out, but I don't think you get a benefit, so to speak, to be able to get up and argue against a straw man.

And so my view is that the conspiracy is out of the case and -- and it doesn't need to be -- it does not need to be referred to.

So that's where we are.

MR. FALLGATTER:  Okay.  Can I -- can I not talk about the evidence of Pittala and McCallister, that they didn't engage in any criminal acts or any conspiracy with the doctor?

THE COURT:  You can -- yes, certainly you can characterize their testimony.

MR. FALLGATTER:  All right.  Thank you, sir.

THE COURT:  Okay.  We now have the Court's proposed jury instructions which we'll undertake and review here.  But what I'm going to do is -- and this is the way I normally do it.

I'm just going to go through these -- because many of these are, I assume, uncontroversial.  And I'm going to go through these.  And unless somebody yells "stop," I'm just going to keep going.  Obviously when we get to the substantive instruction, we can have some discussion as needed.

All right.  Jury Instruction No. 1 is the standard pattern introduction.

Jury Instruction No. 2, duty to follow instruction, pattern, when a defendant does not testify.

Jury Instruction No. 3, pattern on reasonable doubt.

Jury Instruction No. 4, consideration of evidence, pattern.

Jury Instruction No. 5, credibility of witnesses, pattern.

Jury Instruction No. 6, impeachment of witnesses, pattern.

Jury Instruction No. 7, people under addiction in their -- in the way that you consider their testimony.

Jury Instruction No. 8, expert witness, pattern.

Jury Instruction No. 9, it's not a pattern, but it's a standard instruction on note-taking.

Jury Instruction No. 10 we cobbled together just a little bit.  I just changed the second paragraph to say I've admitted transcripts prepared by both the government and the defendant for the limited purpose.  And it goes from there.

Jury Instruction No. 11, trial charts and summaries.

All right.  And then we get into the substantive counts.  Obviously we'll take out Counts -- Count One.

MR. FALLGATTER:  Do you tell the jury that that count is no longer before them?  How do you handle that?

THE COURT:  Yeah.  I'll just tell them it's not -- I'll tell them that -- I'll just simply say "Count One is not for your consideration."  They're not going to remember what Count One is.  So I'll just say it's not for their consideration.

And obviously we'll have to change the redacted indictment as well, and the verdict form.  So we'll have a little work to do here, but...

All right.  And then Jury Instruction No. 13 will be admitted -- I mean, omitted.

All right.  And then we get to the substantive count.  And as I indicated to you, we -- we tried to follow *Ruan.*  We tried to follow *Heaton.*  We tried to -- we got some help from Judge Honeywell, what she did in her case.  And we looked at your suggestions.

So, anyway, we tried to do the best we could to put

this together, understanding there's no pattern and that we have to account for *Ruan*.

So I'll stop here and ask the government, first, if -- what the government's position is on the -- what is now Jury Instruction No. 14 -- it won't be 14, but what your position is on it.

MR. MIKE:  Your Honor, I have no objection on the Court's instruction for the substantive count.  We've sort of identified *Heaton* as well, was aware of where the Court was going with this one.  So we believe that this applies in this case.  And we're satisfied with it.

THE COURT:  Okay.  All right.  Mr. Fallgatter?

MR. FALLGATTER:  First, Your Honor, may I adopt my proposed instructions and the jury verdict, rather than -- as well, I guess, the JOA, so I'm not having to repeat all the arguments and whatnot in there with regard to my comments on this instruction?

THE COURT:  Yes, sir.

MR. FALLGATTER:  And let me just -- if I can take them one at a time for convenience, a housekeeping matter, the title at the top says "possession with intent."  You generally send these back to the jury, don't you, or not?

THE COURT:  I do, but I take the headers out.  So, in other words, all that -- when this -- when this goes back to the jury, it will literally just say Jury Instruction No. 14.

It won't have any of the other information.

MR. FALLGATTER:  Okay.  Because it had -- it says --

THE COURT:  I understand.  But those headers get taken out, so they're just to help us keep track of things.

MR. FALLGATTER:  Very good.  Yes, Your Honor.

So Element No. 3 down at the bottom, of course, is the ultimate litmus test, in terms of my concern about the distinction between the -- the mens rea element and the underlying actus reus that I describe.

And here it permits a conviction based on the intent of the doctor.  And I do disagree with the "or."  I understand that *Heaton* said that.  Now, *Heaton* was a pill mill case with 1,000 pill mills and patients.  So I would ask the Court not to consider that as very authoritative on the importance of this, with a real doctor who was treating addiction patients, and not a pill mill, which is a cookie cutter -- all those cases are pill mill cases.  So I do think it's -- there's one continuous sentence in the C.F.R. and it shouldn't be separated by a disjunctive.

But, of course, the most important concern I have is this permits a conviction based on the active intent of the doctor and ignores the objective need.

I've made the argument repeatedly -- you're probably tired of hearing it -- that traditionally, long before *Ruan* came around, the government had to prove that the prescription

was not for a legitimate need.  They had to prove that objectively.  They were happy for years doing that.

The Supreme Court says, "No, that's not enough.  You also have to prove subjectively the doctor didn't think it was for a good purpose."

I don't think you get to leap from -- you can't be a drug dealer distributing drugs if the person needs them.  This is not a -- a mental element, mens rea only crime; never could be.  But that's what this permits, is the jury to convict based on their belief that the doctor wasn't doing the right thing, notwithstanding the fact that it was.  So a conviction based on mens rea is my concern on that.

THE COURT:  And I understand -- I understand you've been consistently making that argument.  I just simply don't agree with it.  I've read *Ruan*.  I read *Heaton*.  I read that *Chaney* case.  I've read a couple of other cases.  And I just don't -- I just don't agree with that.

And the *Chaney* case had a good example of -- of why that was -- was not the right way to think about it, and that was that the doctor goes out on the street and just starts handing out prescriptions to people.

And if it turns out one of those persons actually needed the prescription, that doesn't mean the doctor is not committing a crime because of his -- of his intent.  And I think that's right.

I don't think *Ruan* meant to distinguish or to -- to say that -- that you can have -- you can be acting knowingly or intentionally without a legitimate medical purpose or outside the usual course of professional practice, but even if the patient happens to need the medicine that you're -- that you're giving them, that that's sufficient.  I just don't -- I don't -- I don't agree with that.

And the fact that these patients were addicted and that a -- even if it's true -- and I'm not sure it is.  But even if we accept what you're saying as true, that in a -- in a proper environment -- the proper medical environment that these medications, or something similar to them, could have been prescribed for these witness -- for these individuals, I don't think that absolves Dr. Hollington in this case of -- if it can be shown that he knowingly or intentionally acted without a legitimate medical purpose or outside the usual course of professional practice.  And so I don't know what else to say to you other than I think we're just going to have to agree to disagree.

MR. FALLGATTER:  Let me -- I understand.  Let me put two things on the record.

First, *Ruan* specifically says that the government has to prove that it wasn't a legitimate prescription.  That, they can never do.  They're on record telling you that they understand that the four ladies in particular were lifelong

addicts and they needed a prescription.

So we'll have the anomaly of the government conceding, which they've never done in any other case -- conceding that those four in particular needed the prescription. But if he had some bad thoughts, let's go ahead and convict him of being a drug dealer, I don't think that's right.

I understand the example that you cite in that case, that example doesn't apply here. These are patients that came into the office. He's not on the streets soliciting people. So, you know, the elements should conform to the facts and not deal with some hypothetical that doesn't apply. But thank you, Your Honor, for that.

On page 20 of your -- in the third full paragraph that starts with the term "legitimate medical purpose" --

THE COURT: Hold on one second.

MR. FALLGATTER: Yes, Your Honor.

THE COURT: Yes, sir.

MR. FALLGATTER: So down -- I guess the fourth line down, you start, "You heard testimony about what constitutes prescribing controlled substances." And it goes on on the State of Florida, United States, but that's Dr. Kennedy only.

To me, that's a directed verdict. I don't think that should be -- I'm asking you not to put it there, because you have it covered in the last paragraph.

The last three lines you talk about they can look at the circumstances surrounding the prescribing, the -- the statements of the parties. And then you end on the last line "any expert testimony."

I am asking you not to put in language that would basically direct the verdict, because he's the only expert that testified. And we don't agree with his purpose. You've got it covered by the expert instruction. You've got it covered at the bottom.

So that long sentence that basically, to my ear, adopts Dr. Kennedy as the standard in this courtroom has failed, to our defense. And it's surplusage, because you already covered the expert at the bottom. And, of course, you have a separate expert instruction.

THE COURT: All right. Mr. Mike, what do you -- what do you have to say about that?

MR. MIKE: Your Honor, I believe that I -- I'm reading it now, Your Honor, again. And I think it's fine. I don't think it insinuates that. I mean, for abundance of caution, if Your Honor wanted to strike it, I wouldn't object, but I --

THE COURT: Yeah. I think -- I think Mr. Fallgatter -- I mean, I'm not sure it's a directed verdict, but I see what he's saying. It does -- it does make you wonder if that's potentially just directing you to the expert

testimony.  It has a little bit of that ring to it.  And so --
and I don't think it's necessary.  So I'm just going to take it
out.

I'm looking down at the bottom here where
Mr. Fallgatter pointed out that we do kind of have a catchall
at the end here which tells them how to -- we say that "you may
consider all the defendant's actions and the circumstances
surrounding them," which is true...

Yeah.  I think that's all we need to say.  I was
going to see if I wanted to add in "and weigh the evidence the
same as you would," but that almost, again, sounds like expert
language, so I think I'll just leave it the way I've got it.

So, Mr. Fallgatter, I'll accept your amendment there
and we will take out the second sentence on -- the second
paragraph -- no, the third paragraph of page 20.

MR. FALLGATTER:  And I apologize.  Maybe a directed
verdict was too strong.  I'm trying to think of a shorthand way
of explaining how much I thought it might hurt my defense.

THE COURT:  Okay.

MR. FALLGATTER:  And then, Your Honor, on page 21 --

THE COURT:  Yeah.

MR. MIKE:  One second, Your Honor.  I do want to make
sure I at least note on the record that the government never
conceded that -- that the prescriptions were a legitimate --
were for a legitimate medical purpose to any of those -- any of

the patients.  We never conceded that fact.  I just want to make sure that that's on the record.

THE COURT:  Okay.  All right.

Go ahead, Mr. Fallgatter.

MR. FALLGATTER:  On page 21 --

THE COURT:  I never understood you to do that either, Mr. Mike.

But go ahead, Mr. Fallgatter.  Page 21?

MR. FALLGATTER:  Right.  The first little paragraph, I appreciate the addition, by the way, about the medical malpractice, but I thought that that would be a good place, right after that paragraph, to insert our good faith instruction, or wherever else you deem it appropriate.

But our good faith instruction was at 5, our page 10 for Hollington, of course.  Page 5 was our good faith instruction, at page 20 of my proposed instructions.  And it seemed like that would be a good place to fit it in there.  And it has --

THE COURT:  Let me get to it, Mr. Fallgatter.

MR. FALLGATTER:  Yes, sir.

THE COURT:  All right.  I've got your -- no, I don't.  That's your verdict.  What page of your instructions?

MR. FALLGATTER:  Page 20.

THE COURT:  No.  I'm -- page 20 of yours?

MR. FALLGATTER:  Yes, Your Honor.

THE COURT:  Okay.

MR. FALLGATTER:  Document 144.  My proposed instruction No. 5, good faith.  And, of course, all the nurses talk about their diagnosis being in good faith.

THE COURT:  Mr. Mike?

MR. MIKE:  Your Honor, I'm going to oppose that.  I mean, there is multiple case law out there, if you'll give me some time to pull up the report, that says it's an inappropriate instruction in cases like these.  And I believe it's the same -- same here, and it doesn't -- it doesn't apply.

MR. FALLGATTER:  How could it not be appropriate when the -- Your Honor believes that it's a mens rea element, that that's really what catches him a conviction?  So how could good faith not apply when the mental element is the overarching element that would lead to his conviction?

THE COURT:  And what's the source of the good faith instruction, Mr. Fallgatter?  Remind me.  It says S-17 modified.  I don't --

MR. FALLGATTER:  Yes.  S-17 is the pattern instruction, the special 17.

(Judge confers with law clerk.)

THE COURT:  I'm just looking at -- Ms. Meyer is sending me the pattern instruction.  I just wanted to see what it says.

I'm a little bit -- I note that Judge Honeywell did

not use it in her post *Ruan* case.  The focus in *Ruan,* as we've been discussing, is the intent of the doctor.  And if the government can't prove guilt beyond a reasonable doubt of his intent, then they're not going to win the case.  And so I'm wondering whether good faith is a necessary instruction, but let me take a look at the pattern here.

Yeah.  You know, the pattern instruction -- the pattern instruction on good faith defense is -- is based on fraud cases.  It says, "Good faith is a complete defense to a charge that requires an intent to defraud.  A defendant isn't required to prove good faith.  An honestly held opinion or an honestly formed belief cannot be fraudulent intent."

And then it says "but an honest belief that a business venture would ultimately succeed" -- so it's really a fraud instruction.

And then there -- the notes say that -- that you should give a theory of defense charge when it's -- when it's appropriate.

It says, "Note, however, that there must be some evidentiary basis.  If the usual instructions are given defining willfulness and intent to defraud, that will ordinarily suffice in the absence of evidence of good faith."

I don't know.  I don't know, Mr. Fallgatter.  It's not -- I'm not sure that this instruction really is applicable in this type of case.

MR. FALLGATTER:  Well, again, this is the first case, to my knowledge, where the government is going to have legitimate drug addicts, and particularly the four ladies that were in for, you know, two years plus.  And every one of them testified that -- I mean, two of them said they needed the drugs to not die.  So it's going to be undisputed that these drugs were necessary for them.

And, again, I thought this good faith -- like, the blood and the urine, you're talking about medical malpractice, medical negligence, reasonable medical care.

Again, I like that.  Thank you for adding it.  But it doesn't really define what that means.  My last two paragraphs talk about honestly held opinion about the medical treatment, honest belief in -- can't constitute an unlawful prescription.

And, sure, you know, we've dealt with fraud cases all our lives, but this is the first time where the -- where truly the key focus on convicting him is going to be his mental state as to whether or not he believed these were legitimate prescriptions.  And if good faith doesn't fit into that like a glove, I don't know what does.  But, again, my last two --

THE COURT:  I'll tell you what I'll do -- I will do this.  I will -- I'll add to the back of that -- of the malpractice paragraph.  I'll add your paragraph 3.

I'm not going to talk about good faith as a complete defense, but I will -- I will -- because I don't think it

really -- I don't think as a defense it's really applicable when there is a requirement that the government prove willfulness and intent here, which is what this comment says.

But I will add the sentence that reads "an honestly held opinion about medical treatment."  I think -- I think that's -- kind of goes hand-in-hand with the malpractice.  And I'll add that in.  But I will overrule the request for the remainder of the instruction.

MR. FALLGATTER:  Yes, sir.

THE COURT:  All right.  You got that, Courtney?

LAW CLERK:  Just the third paragraph?

THE COURT:  "An honestly held opinion" in Mr. Fallgatter's proposed.

LAW CLERK:  Yes.

THE COURT:  Okay.  All right.  And that will go right after the malpractice.

All right.  What else, sir?

MR. FALLGATTER:  That was all for that instruction, Your Honor.

THE COURT:  Okay.  Mr. Mike, did you have any -- did the government have anything else on that instruction?

MR. MIKE:  Your Honor --

THE COURT:  You had already told me it was fine.  And now I've added in a couple of things, but --

MR. MIKE:  I --

THE COURT:  -- is there something --

MR. MIKE:  You're not using the good faith language? That's what you said, Your Honor?

THE COURT:  What I'm saying is -- oh, I see.  Do you have Mr. Fallgatter's request?

MR. MIKE:  Not --

THE COURT:  Oh, here's what I'm doing.

MR. MIKE:  Yes, Your Honor.

THE COURT:  Here, the -- where I have the brackets, I'm including that at the end of the malpractice, but I'm not including the rest of the instruction.

I'm sorry.  I thought you were with me.

(Counsel confer.)

(Judge confers with law clerk.)

THE COURT:  Yeah.  You know, as I'm looking at this, I'm becoming less convinced that this is the right thing to do, especially the way it's written.

I don't want to -- I don't think I want to say it cannot constitute an unlawful prescription, because that's not -- that's not even what the good faith defense in the -- let me see here.

MR. FALLGATTER:  Pure medical negligence, it says, can't constitute a crime.  I'd be satisfied to substitute "unlawful prescription" for "crime."  That's the word in your instruction.

THE COURT:  Yeah.  I think I'm not going to include it.  I'm changing my mind.  So I'm going to overrule the objection to the lack of the good faith instruction.

And the reason I'm doing that is that I just don't think that it fits in this scenario.  And I'm looking at the instructions.  We're -- we're clearly telling the jury that in order to convict, the government -- and it says so in the very next paragraph, that the government has to prove beyond a reasonable doubt that when Dr. Hollington issued the controlled substance, he knew he was acting, or he intended to act, without a legitimate medical purpose or outside the usual course of professional practice.

And if the government can't prove that -- and so if an argument -- if you want to make an argument that he was trying to be a good doctor and that he believed what he was doing and so forth, I think you're allowed to do that.

But I think adding this language is potentially confusing, and, also, I don't know how to word it in a way that wouldn't be -- wouldn't be overkill.  And I don't think it's necessary in a -- in a case like this.  And so I'm going to decline to give a good faith instruction as proposed.

I do note that the pattern good faith instruction in the Eleventh Circuit patterns, which is S-17, really applies more in fraud cases and in business fraud cases.

It doesn't mean it couldn't be possibly used in a

different scenario, but I'm not -- I think I'm not going to give it.  So I'm going to change my mind and overrule the objection.

MR. FALLGATTER:  That's the problem.  You know, you have the language "reasonable medical care."  That's what their expert says.  They're going to drive home that it wasn't reasonable medical care.  That doesn't capture the defense that there's a mistaken belief that it was valid.

So that's why I -- mistaken judgment, mistaken belief, that's -- you know, nothing in there.  You focus on the government's theory that there was improper medical care.  And if the jury isn't told what medical malpractice or negligence is, that's a mistake.

So not having that in there, you know, just harkens back to the government's theory and doesn't -- doesn't advance our defense.

THE COURT:  Are you asking me to take out the malpractice language?

MR. FALLGATTER:  No.  I'm just saying the medical malpractice or negligence is -- is bound and connected it to your continuing saying it's a reasonable medical care, which is -- really rolls right back to what the government is trying to prove.

And none of that -- that is the government's mantra, that it wasn't reasonable medical care.  None of that captures

the concept that you can have mistakes, a mistake in judgment. We don't tell them medical negligence can be a mistake in judgment. That's a pretty simple addition that would breathe some life into that so the jury has some idea what that means.

But, again, you continue with the sentence. And you say "in other words," which means I'm telling you medical negligence means you didn't exercise reasonable medical care.

Well, that's what the government is going to argue. I don't get any benefit with the jury hearing that, you know, a medical negligence means somebody might have made a mistake that's not criminal.

It's a circular definition is what I'm saying. And it ends up defining exactly -- in the lap of the government's expert on not being reasonable medical care.

(Judge confers with law clerk.)

MR. FALLGATTER: I mean, it could be something simple, medical malpractice, negligence, or mistake. You know, it doesn't have to be too elaborate, but at least I'd like the word "mistake" in there somewhere.

And, again, I don't think they know what negligence is. Everybody knows what the simple word "mistake" means.

THE COURT: Yeah. I think it's all right. Because, Mr. Fallgatter, the -- in the -- in the page 17, which we haven't gotten to yet -- or Jury Instruction No. 17, we tell the jury, "The word 'knowingly' means that an act was done

voluntarily and intentionally and not because of a mistake or by accident."

And so I think that concept is already in the instruction.  So I'm going to overrule the objection and allow -- obviously you can argue off of that instruction if you wish to.

All right.  Obstruction of justice.  So I'm going to lock down the substantive instruction, No. -- which is now No. 14.

Anybody want to be heard on the obstruction of justice charge?

MR. FALLGATTER:  I do, Your Honor.

THE COURT:  All right.  Yeah.

MR. FALLGATTER:  So our Defense Instruction No. 6 repeats, of course, the elements from the pattern.  At the bottom of our 6 -- is that available to Your Honor?

THE COURT:  Yeah.  Hold on a second.

Yes.

MR. FALLGATTER:  So, basically, from the last sentence at the bottom of page 21 over is the theory of defense.  And you have the generic obstruction charge, but here the government theory is that he added that note.

And I'm asking the Court to consider my insert as the theory of defense, which, of course, the law permits us to ask you to do so.

THE COURT:  I guess, Mr. Fallgatter, this strikes me more as your closing argument than it does a jury instruction. And it's not really a theory, is it?

It says, "Here the government's theory of obstruction is that Dr. Hollington added a final note to the patient file of each of the five local officers the government sent to the clinic who were pretending to be real drug addiction patients."

I'm not going to tell the jury that.  I mean, if you want to tell them that in closing, you certainly can.

"Thus, you will need to decide" -- it's too much of an argument and not -- and I don't think -- I don't see anything wrong with the pattern.  And I think it allows you to argue what you want to argue.  But I -- I don't -- I'm not going to put it in the jury instruction.

So to the extent that you're asking me to do so, and that is -- just so the record is clear, Mr. Fallgatter is asking me to give -- after the pattern, his request to Jury Instruction No. 6 on obstruction of justice asks for additional language concerning -- and it starts with the phrase "here the government's theory of obstruction," and goes from there.

To the extent Mr. Fallgatter is asking me to add that to the instructions, I deny that request and overrule that objection.

MR. FALLGATTER:  Your Honor, I -- I think my introductory comments about adopting my jury instructions

probably are sufficient.

But just in an abundance of caution, my H-2 and H-2A -- H-2 is the distribution.  And H-2A was distribution for sexual activities alleged.  I just want to make sure I'm clear in asking Your Honor to add that.  I assume it's been denied, and has been.

THE COURT:  Yes, sir.  I'm -- because by -- by adopting the instruction on the substantive counts that I have, I've -- to the extent that they're inconsistent with the ones you've proposed, I'm denying those instructions.

MR. FALLGATTER:  Yes, sir.

THE COURT:  All right.  No. 16, aiding and abetting.

No. 17 -- and this is the definitions, "knowingly" -- and I -- by the way, I'm just going to -- there's a little scrivener's thing here.  We -- we have the word "knowingly" and then we have the term "intentionally" and then we have the word "willfully."  So I'm just going to change the term -- the words so it's all the same.

No. 18, conjunctivity.

No. 19.

MR. FALLGATTER:  Again, I object to that based on my arguments before, because I think the only way it applies is a conjunctive -- I'm sorry, disjunctive use of the elements of a legitimate medical purpose versus usual course.  So I would object to that on that ground.

THE COURT:  All right.  And I'll overrule that objection.  As I said, I'm following the Eleventh Circuit's decision in *Heaton* on that.

No. 19 is just a pattern to get us to the end.

No. 20, duty to deliberate.

21, verdict.  And I will go over the verdict form with the -- with the jury.

All right.  Those are -- would be my instructions as decided this morning.  If anybody wants to put anything else on the record or say anything else, now is your chance.

(No response.)

THE COURT:  Okay.  All right.

Now, the verdict form, of course, we'll -- we'll take out the conspiracy.  So we'll start with Counts Two through Fifteen.  I've already told the jury that Count One is not for their consideration, so...

But I think we need to keep the numbers, because it -- it tracks with the indictment.  We'll also have to further redact the indictment to take -- take Count One out.  And then we'll go from there.

So the verdict form would start with Counts Two through Fifteen.  And you see what we did in order -- in order to meet *Heaton*, and also in order to -- in order to get the jury to talk about each drug if they found guilt.  Obviously, if they find not guilty at the get-go, then they don't have to

do any of this.

So I'm entertaining comment on the Court's proposed verdict form.

(No response.)

THE COURT:  I'm not hearing any --

MR. FALLGATTER:  I've got some.  I'm sorry.  I was waiting for the government to --

THE COURT:  Well, let's do it that way.

Mr. Mike, are you -- is the government satisfied with the verdict form?

MR. MIKE:  Yes, Your Honor.

THE COURT:  All right.  Mr. Fallgatter?

MR. FALLGATTER:  So I just want to reiterate, on the Counts Two through Fifteen, same objections that -- what it does is it rolls past the underlying objective issue as to whether or not the medication was legitimate and in the ordinary course and goes straight to the defendant's intent, and that bypasses the fundamental prerequisite that it has to be something that they don't need.

I understand the Court's ruling, but I want to reiterate that this simply reinforces what I see to be an error in allowing a conviction based on mens rea alone.

THE COURT:  All right, sir.  You've noted that for the record.

Any other comment?

MR. FALLGATTER:  I think not.

Oh, I'm sorry.  There is one other.  On the -- I forgot.  Dr. Kennedy testified about giving the benefit of the doubt to Dr. Hollington that the buprenorphine for Amanda Fleming was okay.  That's Counts Four and Nine.

Now, I understand that the government can reject the testimony of their own expert, but that wouldn't seem to be an appropriate approach in this case.  So right now you have the particular drugs listed.

So at page 4 of your instructions, Count Four you have buprenorphine for -- that's for Ms. Fleming.  And then over on page 7 you've got buprenorphine.  And I would ask the Court to inquire of the government as to whether or not they agree it would be appropriate to eliminate that.

MR. MIKE:  Your Honor, it's -- Dr. Kennedy did mention he would give the benefit of the doubt even though it was somewhat of a stretch.  But then when asked if he should have -- the defendant should have went further and confirmed, he said, yes, more evaluations and treatment should have been done in order to confirm whether buprenorphine was appropriate.

And in the end, when asked whether in his expert opinion if it was done for a legitimate medical purpose and in the usual course of professional practice, he said that it was not.

MR. FALLGATTER:  The case is not about asking more

questions.  His opinion was that he believed that it wasn't -- he could not render an opinion it was not for a legitimate medical purpose for buprenorphine for her for those two counts.

THE COURT:  Well, I think -- I think it's certainly something you can highlight, Mr. Fallgatter.  But it's clear to me that the law is that expert testimony is not required to prove up these charges.  And the jury has heard an awful lot about the situation.  I think they would be authorized to make a determination.

It certainly can be highlighted to them that the expert gave him the benefit of the doubt, and -- but if the government is not withdrawing it, then I don't -- I don't think that there's a failure of proof on that.  And so I'm inclined to allow it to go forward.

And, Mr. Mike, as I understand it -- so I'm looking at Count Four here.  Are you asking me to continue asking the jury to determine whether the buprenorphine is appropriate in Count Four and it should stay in there?

And in Count Nine --

MR. MIKE:  Yes, Your Honor.

THE COURT:  -- is the government -- let me see Count Nine.  So Count Nine has two other medications which would be left.  Obviously I would leave the amphetamine in Count Four if that wasn't the subject of this discussion.

But I guess I'm -- are you arguing to me that it

ought to stay in because there is sufficient evidence that the jury could consider, notwithstanding your expert's testimony?

MR. MIKE:  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  Yeah.  I think I'm going to leave it in. So I'll overrule that objection.  I do think that the case can be proved by both lay and expert testimony and -- and so I think I'm going to leave it in.

Certainly, I'm sure -- I'm sure both Mr. Mike and Mr. Fallgatter will probably address the expert and what he had to say about that, but -- and obviously a jury will decide.

All right.  Anything else?

(No response.)

THE COURT:  All right.  Then we will -- we will re- -- we will prepare a final verdict that takes out Count One and otherwise is unchanged.  And we will prepare a redacted indictment that is -- that will reflect the Court's JOA on Count One.  And we will then also make the changes on the instructions.

And the next time you see the instructions, they will -- they will not have this facing page that has all the numbers and everything.  It will literally just be the instructions that we're going to give to the jury.

And we'll run that as quickly as we can.  Obviously, with these changes, we're not going to have it right away.  And so you -- you certainly are free to refer to instructions, but

be careful -- you know, until you get the final version, which I guess we'll need to be working on right now, you know, be careful what you -- what you're saying.

MR. MIKE:  Your Honor?

(Judge confers with law clerk.)

THE COURT:  Yes, sir.

MR. MIKE:  Yes, Your Honor.  Just briefly, due to some of the -- some of the arguments Mr. Fallgatter has been making before the Court this morning, I just -- I may have some concerns that the standard that he may argue before the jury may be a little inconsistent with what the jury instructions are, considering that he stands on this point where all you need is a legitimate need in order to convict.

And that would be contrary to what's in the jury instructions, as well as the verdict form, and it may cause some confusion.  So I just -- just want to see what the Court's instruction would be on -- on those type of arguments.

MR. FALLGATTER:  So do I hear him saying that I can't tell the jury that the addicts were lifetime addicts and needed these drugs?  Is that what the government is saying I can't argue?

THE COURT:  Yeah.  I think...

MR. FALLGATTER:  That was their testimony.

THE COURT:  I'm not sure -- I'm not sure how else -- Mr. Mike, I'm not exactly sure -- I hear what you're saying.  I

mean, the law -- the law will be what I instruct the jury.  And I think you can make it clear to the jury that -- if you're focused on Dr. Hollington's intent, I think you can make that clear to the jury.

I don't think that -- I don't think I can preclude Mr. Fallgatter -- I mean, the entire examinations were about the medical charts and how many times they had visited and all that.

I don't think I can interfere with Mr. Fallgatter talking to the jury about all that and to try to argue to the jury that -- as a way of arguing the legitimate medical purpose and so forth.  I don't think I can stop him from doing that.

And I won't -- I agree with you, I won't -- I don't think Mr. Fallgatter should -- and I don't expect him to argue that the law says that as long as the person might have needed it, then it didn't matter what Dr. Hollington's intent was.  I would not permit that type of argument, which has been the argument that's been made here.

But I don't think that translates into not letting Mr. Fallgatter talk about the patient relationship and what these -- whether these folks needed the medication.

And so I think -- I think there's a distinction there that I'll -- and if you feel like that line has been crossed, then you can make an objection.  I think -- hopefully we will not have a problem with that.

MR. MIKE:  All right.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  So, as I said, you know, in the perfect world we have the instructions all ready for you and everything, obviously, with the change -- substantial changes we made today.  But, you know, it will take us a few minutes to do that.  We'll get them to you just as soon as we can.

I need to take another look at them before they -- before I give them out to you, and need to make sure they look okay.  So -- but I don't intend to -- to delay the arguments.

I assume, Mr. Mike, you can proceed in the way that -- we'll probably have them by the time Mr. Fallgatter argues.  But are you prepared to proceed even without the final version of the instructions and so forth?  I mean, are you going to be referring to them?  I'm trying to figure out, you know, where we are here.

MR. MIKE:  Yes, Your Honor.  I -- I do refer to them.

THE COURT:  Do we -- yeah.  Go ahead.

MR. MIKE:  I will -- I have PowerPoints.  I want to make sure that I didn't -- I'm not putting something up that Your Honor has changed.

THE COURT:  Yeah.

MR. MIKE:  Give me one second.

THE COURT:  That would be the -- that would be the concern.  Yeah, just take a look.

MR. MIKE:  Your Honor, I'll be good to go.

THE COURT:  Okay.  All right.

And, Mr. Fallgatter, same for you.  Hopefully -- I would think by the time you get up, we'll have the final versions, but I just want everybody to be careful not to refer to prior drafts or anything that we're -- that we're not solid on.  Okay?

MR. FALLGATTER:  Yeah, I'm fine.  Would you anticipate taking a short break after his, then?

THE COURT:  I probably will.  Yeah, I probably will.

All right.  So here's what we're going to do -- you're ready to go, Mr. Mike?

MR. MIKE:  Yes, Your Honor.  Just --

THE COURT:  Yeah, yeah.  No, I'm going to give you -- but other than that, you're ready to go?

MR. MIKE:  Yes, Your Honor.

THE COURT:  Okay.  So why don't we take five minutes, get our ducks in a row, take -- take a comfort break if you need to, and then we'll begin the closings.  All right?  We're in recess for five minutes.

COURT SECURITY OFFICER:  All rise.

(Recess from 9:59 a.m. to 10:09 a.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  Are you ready?

Let's have the jury, please.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury enters, 10:10 a.m.)

COURT SECURITY OFFICER:  Please be seated.

THE COURT:  Well, good morning, ladies and gentlemen. Sorry we're running a few minutes late, but I told you we might -- we might need a little extra time.

So what's happened overnight is that after you left the lawyers and I met to talk about the instructions that I'm going to be giving you after they finish their closing arguments.

You cold?

JUROR:  I am.

THE COURT:  Is it too -- are y'all all cold or...

JUROR:  No, I'm good.

JUROR:  (Nods head affirmatively.)

THE COURT:  Okay.  All right.  So, anyway, we worked last night and then we met early this morning and we just finished a few minutes ago.  But we've got the instructions now that I'm going to be giving you after the closing arguments. So I appreciate your patience.

So what happens now is that the lawyers will give you their closing arguments.  So these are the arguments that both

sides will make to -- to try to educate you on -- on the case as they see it.

And, obviously, it is argument.  What the lawyers say is not evidence, but they're, of course, permitted to argue. And the way it works is because the government has the burden of proof in the case, which I'll be describing again to you during the instructions, Mr. Mike is going to present the closing argument on behalf of the government, and then Mr. Fallgatter will, of course, present argument on behalf of Dr. Hollington.  And then Mr. Mike gets the final word.  We call it rebuttal argument, because -- is that the way it's going to work?

MR. MIKE:  Yes, Your Honor.

THE COURT:  Okay.  I didn't know if y'all were tag-teaming.

Okay.  So Mr. Mike will then present the rebuttal argument.  It's a much shorter argument.  But he gets the first word and the last word, because the government does have the burden of proof in the case.  So that's the way it works.

Now, they're both given, though, the same total amount of time.  It's just the way that they use their time. And, of course, they're not required to use all the time I've given them.

If they get close to the time that I've given them, you may hear some time cues come.  So that will let you know

that we're getting close.  But they are under some time cues.  Okay?

So I know you'll give both sides your undivided attention.  We'll take a break somewhere in there just to give you a little break.  But for now I'll ask you to give both of them your undivided attention.

And, Mr. Mike, you may proceed.

MR. MIKE:  Thank you.

Madam Courtroom Deputy.

Members of the jury, at the beginning of this trial, my co-counsel, Ms. Washington, she stood before you and she told you that this case is about care.  She used the word "care."

Now, we all know what that word is.  We're familiar with it.  We all know when we go to a doctor what we expect from that doctor.  We expect care; care for our needs, our well-being, and to help us improve, to help us get better.  That's just what we expect from a physician.

But what's interesting was when Ms. Washington mentioned that this case was about care, she sort of highlighted that something was -- was different about this case, like it was the lack of care.

And you sat here throughout this entire trial -- and you heard a lot of evidence, a lot of evidence that came from this witness stand, evidence we presented on this projector.

You saw videos.  You heard audio.  You saw documents, evidence you'll be able to take back with you and deliberate.

Now, members of the jury, the evidence was -- was really obvious from the beginning that what you saw and heard was not care.  It was something else.

Evidence showed you when the defendant met with the four vulnerable patients that came here and sat on this stand, A█ B████████ -- you remember her -- E████████ M████, D████████ A█████, K████████ W█████ -- it showed you that the defendant -- all he really cared about was himself and satisfying whatever other sexual desires he had in his mind.

You didn't need medical records to show you that, because there wasn't any treatment on those visits.  It was all about self-fulfillment for the defendant.

You saw video evidence which clearly showed you that when the defendant met with the five undercover officers, Kevin Lee, Amanda Lee -- Amanda Fleming, Thomas Breo, Joseph Mast, Ricky Johnson, that that wasn't about care.  The only thing it showed was that he didn't really care at all; just giving out medicine, giving out prescriptions without a purpose.  You saw it.  You had front row seats to it.

And all we saw that -- we saw that it wasn't about treatment, that it was about payment.  And the evidence also showed you that once the defendant was indicted for the charges, the only thing he cared about was himself, because

then he went back to cover up his own tracks.  And we saw that.

We spent a lot of time on those medical records going back and forth.  And you saw it, adding notes, altering notes, covering questions that he should have asked in the first visit, but then he put it in there later.

As a matter of fact, he never even documented his first visits in those records.  But now he's going back into records that nurse practitioners had opened and put his notes in there?  That doesn't make any sense.  And you can use your common sense here today.  And the judge will instruct you on that.  But what common sense will tell you, that he was covering his own tracks.  That's all he cared about.  So, yes, it's a different type of care.

And today, at the end of this trial, when you go in the back, you're going to carefully go through all the evidence and you're going to have to decide on 20 counts, 20 different counts that we charged -- well, 19 -- 19 counts that we charged.

And you will -- you will see all the evidence -- you have seen all the evidence and you heard all the evidence.  And we have proven to you beyond a reasonable doubt that the defendant is guilty on all of those charges.  That's the highest burden in our legal system.  And we gladly accept that burden and we embrace that burden and we've met that burden.

Now, I want to walk through some of the -- some of

the evidence.  I'm sure you remember all the evidence, and you will go through it again.  But some of the points I want to highlight to you and show you how we met that burden and how the defendant is guilty of all charges.

Let's start at Count Two with Kevin Lee.  You remember Kevin Lee?  On February 14th, that was the first visit.  We have to prove that the defendant knowingly and intentionally distributed -- distributed or dispensed amphetamine, which is the Adderall, and knew at the time of the distribution and dispensing that the amphetamine was a controlled substance, and he knowingly and intentionally acted without a legitimate medical purpose or outside the usual course of professional practice.

Now, the first two parts, they're somewhat quite obvious, right?  I mean, the defendant is a doctor.  He knows what a controlled substance is.  The defendant, he -- he wrote the -- well, he directed the prescription be written by Molly Christensen.

Here's the prescription on February 14, 2022, for Adderall.  Nurse Practitioner Molly Christensen wrote it, Adderall 10 milligrams on 2/14.

Now, what do we remember about Molly Christensen?

Well, we heard some talk during the trial that the defendant's name might not have been on the prescription, so maybe -- maybe he's not liable for that.

Well, the judge will instruct you on the law regarding aiding and abetting an agency.  You'll be able to see that what aiding and abetting means is that the defendant does not have to personally perform every act he's charged.

The defendant is also responsible if he directs or authorizes the acts of an agent, an employee -- Molly Christensen -- or the associate.  That's exactly what happened in this case.

As a matter of fact, the defendant called Molly Christensen and misrepresented why Kevin Lee was in his office. We heard that.  We saw it.  And we went through the transcripts on that.

And then Molly Christensen depended on it.  The defendant said that during that -- during that interaction the defendant, "Oh, so I have a patient here looking for street Adderall."

That's what he said.  "He's dependent on it and he can't function without it."

That's not what happened in that call.  That's not what happened in that -- excuse me.  That's not what happened in the initial interaction with the defendant.  We saw that. We saw the interaction with Kevin Lee.  He went in there.

"Have a seat."

"I'm trying to get Adderall."

"Okay.  Are you taking any other controlled

substances?"

"No."

He started asking about the prescriptions and he said, "I don't -- I don't think I ever had a prescription."

"Okay.  So you've been taking street Adderall?"

"Yes."

"Methamphetamine, coke?  Any other medications like that?"

"No."

That's it.  That's about everything that happened in that conversation.  It doesn't matter how many questions after that Molly Christensen asked on the subsequent call, because it all started with a lie.  The base lying of the whole engagement beginning -- began with a lie.  He's dependent on it.  He can't function without it.  Where did that come from?  It came from the defendant.

And the defendant -- he didn't document any of that in his medical records.  He didn't put that initial encounter in the records.  It would have been good for Molly to know that, because that's what actually happened.  And we heard later that she said -- she took the stand and she sat there and she said that she was appalled when she actually saw what happened in the clinic.  She said she never would have seen the -- she never would have seen the defendant in the first place if he was saying things like that.

She quoted, "I just need this.  And I need you to prescribe me, like, the max dose."

That's what she thought he was saying, "I need as much Adderall as possible."

She said that was inappropriate.  "I would not have seen the defendant."

Everything that started off in that whole interaction was a lie.  And the defendant sort of shielded himself from it, because if someone else goes and looks at that medical record, it doesn't even show he had an initial encounter at all.  The only person it shows was Molly Christensen.  Smart.

So what do we have after this first interaction? Dr. Kennedy told you Kevin Lee presented as a drug seeker, not an addict.  There was not one ADHD question mentioned; did not obtain any vitals; signed a policy for the wrong drug, which was for Suboxone; did not request, did not review any past medical records at all.

Dr. Kennedy told you that in his opinion this was not done for a legitimate medical purpose.  This was outside the usual course of professional practice.

If that's the case, when you take that jury form -- verdict form and you go through it, there's guilty and there's not guilty.  That proves you right there, just in this interaction alone, Count Two is guilty, not for a legitimate medical purpose or in the usual course of professional

practice.  Nothing about that was professional.  And he didn't need that medication.

Count Two, the government met its burden.

Count Three, same thing, right?  Because now you have February 20th, which is a few days later, because Molly Christensen just called him to re-up the medication.  That was the basis from the first visit.  Everything as we just talked about having the first visit, the baseline was based on a lie.

Same thing for Count Three.

So now we move to Count Four.

This is when Amanda Fleming went into their office with a couple of the UCs.  Now, it's important to know that Amanda Fleming did not have an assigned nurse practitioner -- excuse me.

This is when Amanda Fleming went in with Kevin Lee. This was the whole, like, old lady ordeal that we kind of went back and forth about, which doesn't insinuate at all that because that's someone's old lady they're standing in the same aisles or that they're using drugs together.  "Old lady" just means girl.  It's a colloquial term they use out there.  That's all it means.

But Amanda Fleming does not have a nurse practitioner.  She's the only one that does not have a nurse practitioner out of all of them.

So he -- the defendant had to put notes in the

system.  He's the one who prescribed this medication for Amanda Fleming.  He stood on the front line for this one.

She was prescribed buprenorphine.  She was prescribed amphetamine.  All from the defendant on that visit.  She was not asked not one ADHD question at all.

Dr. Kennedy talked about this visit and said it was -- the same thing, it was not done for legitimate medical purpose in the usual course of professional practice.  He went through all of this with you.  And he showed you why that prescription was illegitimate.

Here's some of the recounts of it.

"What are you looking for?  When you go out on the street, you want to do drugs, what are you looking for?"

"Adderall."

"Adderall?  How many milligrams of Adderall?"

"Do you do extended release?"

"I can."

"All right.  What about anxiety?  What else you got going on for you?"

I mean, that's the extent of the questions for Adderall.  That's it.  Someone can go in the office and say, "I'm looking for this."

As a matter of fact, I'm going to his office.  I'm dictating the amount that I want.

"I want 30 milligrams.  As a matter of fact, I want

extended release.  I want to feel it all day.  Can I get more than that?"

"Okay.  Sure.  What else you looking for?"

It's like a candy shop.  You go in there and you get what you want.  Throw a couple of trigger words here and there, "focus, concentration," that's all he needs.  Notate it.  You leave with a prescription.

What else did we see that happened in that office?  Nothing.  That's not care.  What is that?  That shows you don't care at all.

"Here you go."

That shows that he didn't operate the way he's supposed to.  That shows it wasn't for a legitimate medical purpose.  It shows that it wasn't used in the usual course of professional practice.  And it shows that he's guilty of that charge.

The doctor has to do what he has to do.  But in here we're looking at just handing out drugs.  He's just got a prescription pad.  That's all.

Dr. Kennedy mentioned something important about this.  You recall when asked, he said, "Even if this person presented as an addict, you don't treat opioid use disorder with an amphetamine.  It's contraindicated," which we heard, like, you can't do it unless there's a really, really, really good reason to do it.

But I also asked that -- "Would you treat Adderall -- addiction with Adderall?"

He said, "That's ridiculous.  That's like treating cocaine with additional cocaine."  Or he even talked about that's like treating alcohol addiction with alcohol.  What are we doing here?  What are we doing?

If this person really presented as an addict, are you just going to give them the drug they want?

"I'm addicted to Adderall.  Give me more Adderall. As a matter of fact, give me the most dose Adderall.  And I want the extended release Adderall."

"Here, sign a form."

It has nothing to do with the drug.  You're good to go.  You leave.  Covered his own bases, have a nurse practitioner get in there, put their stuff in the notes.  It doesn't even look like he had an encounter at all.

Count Four -- the government has met its burden for Count Four already.  It's guilty.  When you see that verdict form, big bold letters that says guilty, the government met its burden.

And Kevin Lee came back into the office as well. This time he left with buprenorphine and amphetamines.  This visit is not anything different from what we've seen from the other visits.  As a matter of fact, what really stood out about this visit, when he came in, the doctor had no idea that he was

treated with Adderall the first time, not buprenorphine.

But the first thing he says, "All right.  Well, how much buprenorphine do you take?"

"Buprenorphine?"

"Yeah, like milligrams."

"Like milligrams?"

"Subutex?"

Well, he's confused.  It's the UC.  Now he's like, "Oh, I can get something else.  How can I get them?  I ain't got a scrip right now."

"Okay.  Well, when you had a scrip, how much did you get?"

"I don't have a scrip."

"She didn't give you anything?"

"No.  Molly -- Molly gave me some Adderall and she would write me what you said -- she would write me what you said," because we know Molly gave him 10.  He wanted 30s.

How do we solve this problem?

Well, if you had a complete medical record, if you had some type of notes of your previous intake, you would know that this guy had Adderall.  You wouldn't start a conversation talking about a completely different drug that he wasn't using.

And that's the extent of the questions for buprenorphine.

Here's the Adderall.  He wants to get back on 30

milligrams.

"Doctor, you say you can do the max.  Molly wouldn't give me the max.  I want the max."

Then he dictates, "Patient complains of difficulty concentrating.  Feels that -- requires 60 grams of Adderall daily," period, new line.  Completely made that up just so he can cover his tracks.  He doesn't care.

And then afterwards he goes -- Kevin Lee goes back to it.  "Well, he mentioned subs last time.  Let's see if I can actually get it."

"Can you do me the subs?"

"Suboxone?  Uh, you can take Suboxone.  Do you need Subutex?"

"Doc, you take care of me."

"So Suboxone is way easier to get -- much easier through the pharmacy.  How much Suboxone?  When was the last time you took Suboxone?"

Suboxone is way easier to get?  Are we talking about treating someone that has an opioid addiction, a real patient, or what's easier to get from the pharmacy?

"Easier to get," which also means "What's not going to be any red flags?  What's not going to come back on me?  What's easier to get?  How much you need?"

That's it.  That's all the questions for Suboxone.

Does this show you that he's really trying to care

and treat his patients?  He's really concerned about the 100,000 people that -- that died last year regarding this -- regarding opioids?

No, not at all.  I don't know what his motivation is here, but it is definitely not to treat a patient.

So when it comes to amphetamines and buprenorphines, in Count Five and the verdict form, you're going to see both buprenorphine, amphetamines.  They both are not for legitimate medical purpose in the usual course of professional practice.

You have an option to pick either/or.  Which one do you think it wasn't?  Which one did the evidence prove?  And I'm telling you right now the evidence has proved that.  And I showed you the evidence proved it, regardless of what they put in the medical records, because you saw it firsthand.

Even though the records we know are incorrect, or inaccurate, what you saw firsthand -- you had front row seats to the conversation.  And you saw how he just handed them out like candy.

And, again, Dr. Kennedy came and reiterated.  They weren't addicts.  They were drug seekers.  Those are questions of drug seekers.

He said -- as a matter of fact, what was also key was Dr. Kennedy talked about, if you would have looked at the PDMP report, the prescription of what came out, what was dispensed, he would have saw that three days prior Kevin Lee refilled that

prescription from Molly Christensen for Adderall, three days before he came into that office.  So he came into that office with already a bottle full of Adderall and asked for more.  He's a drug seeker.  That would have been a red flag for any doctor who pulled it up.  Maybe this person is out here selling the drugs.  No questions like that asked.

"125.  Put it right here.  You paying in cash?  Got it."

Prescription sent.

"Anything else you need?"

That's how it went every single visit.  Nothing in care about that.

Count Six -- this is April 4th.  This is the time where Amanda Fleming went in with Thomas Breo, Joseph Mast.

And you know what's interesting is that at the end of the last visit she said, "Hey, can I bring some friends?"

Y'all remember that?

"I can bring some friends with us.  If we bring them, can you hook them up?"

"Bring whoever you need.  Bring anybody.  I can see all these patients.  Bring them."

So she came in with two new people.  And during that visit Amanda Fleming left with Valium.  Why?  Because she had a chance to pick what she liked best.

The conversation started like this with Amanda

Fleming.

"They were taking -- oh, my God, meth?"

"No.

"Lorazepam, also known as Ativan.  Klonopin, also known as clonazepam.  And Valium, also known as diazepam.  Do you take any of these?"

"Oh, Valium, yes.

"Well, which one?  Which one of these three do the you like best?"

He just opened up a charcuterie board of pills and put it right there on the table.

"Which one you want?"

Let her choose, the patient dictating.  How about symptoms?  How about asking the questions that are appropriate for someone who wants Valium or who needs Valium?  None of those questions were asked.

"I'll give you three choices.  You pick which one you want."

I don't know who is the physician in the room.

There were no pertinent questions.  And she only inquired about Valium because -- if you recall, Valium was only brought up because she said she wanted Xanax.  He said he couldn't prescribe Xanax, and then he went into this whole spiel of different drugs.  This isn't addiction medicine.  It's drug dealing with a prescription pad.  Let's be honest.

And that's not the worst part.  That's -- and that's the extent of the -- for the five diazepam.  That's the extent.

And on Count Six -- Count Seven, Thomas Breo, this might have been one of the worst interactions, Dr. Hollington said, "Okay.  What else?  What else you do?"

"Coke every now and then."

"Coke?  Okay.  So probably Adderall would be best for you.  That's probably the best choice for you."

And then he goes down and says on line 12, "It's not FDA approved for that.  Okay?  Just so you know.  So your nurse practitioner will go through the ADHD crap, okay, with you, but -- because we cannot give it to you for cocaine, even though that's what we'd be really doing."

There's a lot of wrong about that.  And it also shows that no matter what happened on the subsequent calls, he's calling ADHD questionnaires crap.  He doesn't really care. Nurse practitioners -- this is what he thinks about what you're doing.

"You're going in.  And if you're asking these questions, you're putting it in the system, but it's crap.  It doesn't -- I don't care.  It doesn't even matter, because I just need it in there because they won't" -- he can't give it to you for cocaine anyway.

"So let me cover it up and make sure they ask a few questions, put it in the notes, and I'll give it to you even

though it's not approved for that."

Is this really valuing these super advanced nurse practitioners we heard so much about?  Are you really -- they already came on to his practice, didn't have any experience in addiction medicine, any experience.  He trained them, told them what to do.  They did it.  They thought he was telling the truth.  They didn't know what was going on in those office visits.  And I'm sure they didn't know also that he was referring to whatever they were doing was ADHD crap.

There's not much time to spend on this count, members of the jury.  This is flat-out guilty.  This is it.  He said it himself it's not approved for it, but he's going to do it anyway.

Count Eight, Joseph Mast, same visit, April 5th, has to prove the same thing.

And you're going to see -- so you have prescriptions for all of these counts.  You're going see it.  You'll take it back there.  You'll be able to see it was prescribed on the dates listed in the indictment.

Count Seven is Joseph Mast.  It was pretty bad as well.  When he asked him what he's looking for, he said, "Something like Adderall, something like that."

"Yeah.  ADHD medication?"

"Yeah."

"Right.  So what street meds are you using?"

"Well, I can get -- I can get that cocaine and stuff like that."

"Cocaine?"

"Yeah."

"Cocaine, crystal meth?"

"Yeah."

"Okay.  Anything else?  Any other prescriptions, meds you need?"

"I don't really think so."

That's it.  That's it.  All you've got to say is, "Oh, I do a little coke out on the street."  That's it.  You can leave out with Adderall.  And that's what he left with.

They did a urine test.  You heard he gave them a urine test.  They said they went to the bathroom and filled it up with faucet water and gave it back to him.  You couldn't tell the difference?  Well, he first said he didn't care.  He didn't care what the results were.

"I don't care.  I don't care.  I don't care what the results are.  I don't care what it comes back with.  I don't care.  You just have to do it."

So he went in the bathroom and filled it up with water.  It was clear.  Looked like water.  Probably was cold like water.

"I don't care."

Well, not caring is a guilty, because you didn't do

anything.  It's not medicine.  It was something else.

Count Nine, Amanda Fleming, he had amphetamine, buprenorphine, alprazolam.  That's what she was given on May 23rd.  This is when she went with Ricky Johnson.

He doesn't evaluate her.  He just gives her what she needs.  No talk about tapering it down from the drugs, none of that.  And she also asked can she switch out Valium for Xanax.  And he let her dictate that.  "Can we just sub -- can we just sub this out, please?  Can we do a switch?"

"Okay."

And then this is the one where he states that Lexapro was a throw-away drug.

All right.  So no questions on how it was working, just no questions of whether she needed -- no ADHD questions.

"So you need your Adderall?"

"Yep."

"Buprenorphine?"

"Yep."

"Valium and your Lexapro -- you still taking Lexapro?"

"Yeah, I'm out of it."

Then at the bottom, "Do you think that I could get Xanax if I take one off?"

"You could do what, Xanax, instead of Valium?"

And then the top right it says, "Thanks.  Unless

Lexapro is one that you can take off."

"Oh, no, that's just a throw-away drug."

And we heard from Dr. Kennedy what that meant, just a throw-away drug, just something he put on there just so that it won't be suspicious.

He put a throw-away drug.  He's telling a patient it's a throw-away drug, somebody he's supposed to help, or something you just don't care about.

That's it.  That's the extent of this interaction. She left with -- she left with prescriptions.  All three of them -- all three of them are on the verdict form.

And you can decide today whether the evidence proves that this was sufficient -- and, again, Amanda Fleming is the only patient that has no other nurse practitioner.  That's it.

These are the questions he asked when she left with prescriptions.  No wonder business was booming.  800 patients, he said.  125 a pop.  That's a lot of money.  The nurse practitioner was getting 80.

This was not medicine.  This was something else.

Count Ten, this was the Ricky Johnson situation.  If you remember, Ricky Johnson, there was -- the whole entire time in this conversation, Ricky Johnson was talking about Xanax.

"I want to get Xanax, alprazolam.  I'm here for the lams," or whatever he called them.  And then they went into a whole tirade of, like, "Well, I can't give you alprazolam and I

don't do Xanax.  I don't do Xanax.  Well, let's talk about some other drugs, Lexapro, Valium."

And that's when he was like, "But Valium -- you may want to go with Valium.  It's got a high street value."

And then he even said "the street" -- "the street has spoken," Valium.  That's -- that's the drug.  So now we're talking about what's the street spoken?  That's how we decide how to give our patients drugs, what the streets say?  And we also heard street terminology, "footballs," "bars."

I understand these are addicts, or supposed to be addicts, so maybe you meet them where they are.  You have these conversations.  They understand, you know, "football," "bars," but that's -- that's not in the usual course of professional practice.  That's not how doctors operate.

So here's that conversation.  And then Ricky Johnson then all of a sudden switches it up.  After a long -- I mean, the conversation had to at least go for, like, 30 minutes.  Way towards the end of the video, "Oh, you know what, I meant Adderall.  That's what I wanted to do.  That's what I meant to say.

"Oh, so alprazolam, that's not your thing?"

"I don't know why I said that."

"So Adderall is your thing?"

Then he says, "Two of the 20s, yeah, that's totally doable.  Interesting, Xanax is a Schedule IV, but they give us

the hardest f'ing time with Xanax, right?  And Adderall is Schedule II, much more controlled.  But they're not enforcing it.  So we can give you Adderall all day."

What does that tell you?  That tells you right there he was just giving out drugs.  They're not enforcing it.  Who is "they," DEA, pharmacies?

What he's saying is, "I'm not getting caught.  It's not an issue with it.  I can give it to you all day.  Two -- two 20s?  That's totally doable."

No ADHD questions.  No anything.  Someone just switches up.

The government met its burden on Count Ten.  And that right there alone is also one of the most egregious interactions.

All right.  So on Count Eleven, Amanda Fleming goes back by herself, July 18, essentially gets all the same drugs she got before.  No questions, basic conversations.  He may go -- he goes through a few things, but nothing -- no ADHD questions, nothing about buprenorphine, Xanax.

But I do recall this part of the conversation.

"Do you prescribe oxy?"

"Oxycodone?  I can't."

Then he says, "Besides, you're taking buprenorphine. Oxy is not going help you."

"Well, if I traded it out."

"Oh, I see."

So buprenorphine is for opioids, right?  So talking about maybe getting her back on that?  That's not making any sense.

"Yeah, I treat addiction.  I treat -- I don't treat pain.  But there is a pain place.  And are you in pain or do you just like it recreationally?"

"The second one."

"You just want to do drugs."

But you're an addiction place.  You know, she was -- supposedly just wanted to do drugs, but yet you're still offering her drugs and you're supposably treating with buprenorphine?

Well, you can't give it to them, but "I know a place, and the place is actually on my website.  So if you want to call them and see if they give it to you."

Is this treatment?  Is this counseling?  What is this?  This is drug dealing in a lab coat, except he just didn't wear a lab coat and didn't have shoes on.

No workups.  No questions.  We heard all about this MAT treatment and all this -- where is this?  All that is a distraction.  It's right before you, everything.  Everything is in the videos themselves.  They tell the story.  They tell the story.  They paint the picture.  You've got front row seats to the action.

The defendant is guilty.  The burden is met on those three elements.  And he's guilty for amphetamines, buprenorphine, alprazolam.

Dr. Kennedy came up and told you about it, how it wasn't for a legitimate medical purpose in the usual course of professional practice, explained why.

And, honestly, I don't think you really need it. That extra explanation with the video itself was self-telling. But he came and told you, too.  All those counts is not for a legitimate medical purpose in the usual course of professional practice.

So those are the five UCs.  Those are the five different visits, Counts Three through Eleven, all of them met.

Now, we did have Counts Twelve through Fifteen. These are the patients that came in.  They're one of the first four witnesses we called after we called David Martin.

Count Twelve is A▮ B▮.  She got prescribed buprenorphine.  You remember her.  She turned around in her chair.  You saw her storm out of the courtroom.  She was angry. She was loud.  Understandably.  She had been victimized since the age of 12.

She told you how people used to treat her on the street, explained how -- she even mentioned how she was, you know, sort of pimped out, she said, on the streets and how her mother got her addicted to opioids and how she was battling

this every day.

And she also told you that she was going to a doctor, this doctor, who she trusted, someone to help her, but instead she ended up meeting a monster, called him a monster from the stand.

Someone took advantage of her financial situation, because when she came in the office that day she said she didn't have any money.  She started crying she didn't have any money to pay for her visit, but she needed her meds.  She needed buprenorphine, right, to help her with her opioid addiction.

And instead of helping her, he said, "Come sit right here on the couch next to me."

She said, "I knew what was going to happen from there.  I couldn't pay for it."

And she knew what she had to do in order to get her prescription.  So she explained to you the story, and sexual acts took place right there in the office, right on that couch, right behind the desk.

She was emotional about it.  She said she got up quickly, put her -- put her pants back on and left, but not before the defendant handed her some -- a couple hundred dollars, put a prescription in.

Also, what happened during this visit, this visit right here, the visit that's in Count Twelve that you'll see?

Yes, there were medical records about other interactions.  But what happened here?  She didn't have any money.  She was in need.  And the defendant took advantage of her.  That's not for a legitimate medical purpose, paying for prescriptions with sex.  That's not in the usual course of professional practice.  She was angry, but she was honest, brutally -- brutally, graphically, and unfiltered in her responses, right?

But she had the right to be angry at the defendant about what he did.  It's just how she told the story.  But, again, during that visit there was no other medical questions asked, no vitals asked -- no vitals taken, excuse me, no workups, no exams, nothing either, prescription sent in.  He got what he wanted.  He sent the prescription in.

Now, Count Thirteen, that's K███████ W██████.  She got the Adderall.  She got the Ambien.  She's the one that said she came in, and after going -- after she lost her doctor she moved down to Florida to change her life from Baltimore.  She was addicted to heroin.  For eight years she battled with it.

She was trying to finish up her treatment, but she needed -- she realized she had ADHD and she needed Adderall.  She first reached out to the defendant.  The defendant texted her, said, "Hey, go check out something on the website."

She went on the website.  It said no Adderall at all.  She texted back and said, "Never mind."

"Oh, no, it's okay.  I just had to put that there."

She goes in to the visit.  And she said it just got weird.  She testified that the defendant wasn't interested in the referral that she had in her hand that had a diagnosis on there for Adderall for ADHD, which she tried to hand him three times, but yet he kept waving them away each time she tried to hand it to him.

What he was interested was, "So tell me about your life as a stripper when you were in Baltimore.  Tell me about that stuff.  You got a sugar daddy?"

Making proposals?  No questions about symptoms. Nothing about ADHD.  She said she felt like, you know, she knew how to deal with guys like that, because she said she worked in a dance club, so she knew what was happening, how they try to groom them, how they ask some of those questions.

Ultimately she did leave with a prescription, but not before sitting there a couple of hours and just not giving in to what the defendant was trying to say or what he was asking about.  But I'll tell you what he didn't ask her about was her symptoms.

"Do you really have ADHD?"

It's the first time he's meeting you.

"Do you really need Adderall?"

No.  Same manner he treated the UCs, same manner here.

She also stated that she was sleeping just fine.  She was taking ZzzQuils, told the defendant she was sleeping just fine, didn't need Ambien.  But, I mean, she's a recovery addict.  You just handing her pills?  She's going to take it.  She said and now she can't -- she cannot sleep without Ambien.  She cannot sleep without it.

That interaction with K███████ W█████, that visit was not for a legitimate medical purpose.  That visit was not in the usual course of professional practice.  No doctors just go around inquiring about your dance life and stripping on the pole and all this stuff.  For what?  What's the reason behind that?  For the Adderall, because you got a lack of focus?  No.  You got something else on your mind.  That's the purpose behind that prescription.

Count Fourteen, E█████████ M████, she came in here literally shaking during her entire testimony.  And she told you how she got her prescriptions.  She talked about when she walked into that office, introduced by a -- from a -- from a good friend, introduced Dr. Hollington.

She was excited to see a doctor because she really wanted to get back on the medications, but she also stated she got a little nervous at some point, the point where he got up, he went out of his office, went to the front door, locked the door, essentially locking her friend outside, which she said she was trying to mouth to her "help me," because she felt

uncomfortable about it.

And then he comes in and closes his door, same MO, couch, "Come sit next to me."  She said he started putting his hand on her leg, uncomfortable conversations, and next thing you know he got down on his knees right in front of her, leaned on her and started trying to pull down her yoga pants.

Now, she was trying to fight back, if you recall her testimony.  She was trying to fight back.  She said no.  And at some point she did mention that the defendant somehow was able to sort of digitally penetrate her.  But she got up quickly, ran to the bathroom.  She said she was on that time of the month and luckily he couldn't get that far, but he called out into the bathroom, "Hey, you okay in there?

"Yeah."

She said she needed her medication so she went back in the office.  Come sit back over there and again he repeats the same thing.  This time she fights back, fights back.  He gets -- gets the yoga pants down some, but luckily her change fell out of her pants distracting him.  She was able to get up and move really quickly, grab her money and say, "Hey, can I get my prescription?  Can I get my prescription."

So you know what he does?  Yeah, he's irritated.  He charges her more money.  I think it was 140 bucks or something like that for the visit.

She got her prescription.  The next time she said she

came back with her stepfather or something like -- a stepfather, because she didn't trust him.  He was the only doctor who could prescribe in St. Augustine.  It was easy access for her.

But was that encounter anything to do with buprenorphine, alprazolam?  No.  It had to do about what he wanted.  He tried to take what he wanted.  That's not for a legitimate medical purpose.

And in Count Fifteen, that's D███████ A██████. Buprenorphine, benzodiazepine.

THE COURT:  Mr. Mike, you have used 50 minutes.  You have 20 minutes of total time left.

MR. MIKE:  Okay.  Thank you, Your Honor.

And D███████ A██████, she mentioned that she was in a -- she went previously to him, never had any problems.  But then once she got out of jail, went to jail for about four months, came out, she needed her medicine, she had no money. Again, someone with no money.  He knew that.

When she went in on that visit, he took advantage of that.  But nothing happened there, because luckily someone barged into the office, if you recall.  But the defendant said, "Don't worry about it.  I'll take care of you.  I'll take care of you."

You remember, it wasn't that -- it wasn't until she got -- well, he said, "I'll take care of you."

And then he later met up with her.  And that's when you saw they went to Denny's, took them on a shopping spree to American Eagle down at the outlets, and then the Best Western. You'll be able to see the Best Western receipts.  You'll be able to review all of that.  All that corroborates her story. No need to hear what happened in that room.  No need to really go over that.  Before she left, he handed her 80 bucks -- before he left, he handed her 80 bucks and walked out.

Nothing about that prescription had anything to do with buprenorphine or benzodiazepine.  It had to do with the defendant and his quenching whatever sexual desires he had. She even said from the stand, "Well, what was" -- that was for the prescription.

Those are not -- all those three, their stories that they told you, you'll recall that, remember it.  I'm sure you have notes on that.  Nothing about that -- there was nothing about buying.  There was nothing about any other things that happened on those specific dates.  The government met its burden on those.

So quickly I'm going to run through some of the things that each -- each of the four women, they did say, all of them, "I'll take care of you.  Come sit next to me on the couch."

Well, three of them said that.

A██ B█████████ and E████████ M████ talked about him

locking the door to the lobby and then closing the door and having -- A███ B██████████, too.  She testified to that as well.

And the three of them stated he wanted to perform oral sex on them; two went along with it, to make sure they got their prescriptions.

So Count Sixteen through Twenty is the obstruction piece.  There was a proceeding before this Court, this one, and "the defendant knowingly and corruptly tried to influence, obstruct, or impede the due administration of justice in this judicial proceeding."

Now, we went through the medical records.  No need to go back and put up the medical records and show you again so you could see what happened on November 16th.  No need to do that.  November 4th, no need to put all that stuff up again. You saw what happened.  You saw what he put in the record.  He put it in later.

Now, Dr. Kennedy said to think about whether there was a -- you know, to protect other doctors from these fake patients, that just doesn't really make any sense, because then they would have to go back to the defendant and say, "Hey, can you release those records to me?  I know I'm not a real patient, but release them to me so I can take them to another doctor and get the same thing."

It just doesn't make any sense.  So why would he go in and correct these records?  Why would he go in and put in

notes of the ADHD -- well, especially, Kevin Lee -- ADHD questions that he called him afterwards and he just put them in the notes?  Why would he go and do that, to show that he went through those questions correctly?

There's this brief timeline.  In October of 2022 the defendant was approached by DEA and his medical records requested.

November 4th, the defendant called Kevin Lee, post indictment, to ask him those questions about ADHD.

On November 4th, the defendant uploaded PDMP reports to the undercover's medical records; reports that should have already been there, uploaded.

You'll see those in the -- you can see those in Government's Exhibit 1K on the Excel sheet.  It has timestamps and everything.

On November 4th, 2022, the defendant added subjective notes to Kevin Lee's medical records.

November 14th, 2022, he reached out to Molly Christensen to warn her about undercovers.

He started reaching out to nurse practitioners and calling nurse practitioners.  They wouldn't talk to him at this point.  They knew that he was -- he was in trouble for something.  And they didn't want any involvement.  So who's going to go in now and put stuff in the records?  He can't get them to do it now.

So on November 16th he goes in.  He adds the notes. He puts the notes in there.  He's trying to cover his own tracks.  The only person he's caring about is himself, not patients.

So, members of the jury, as you go through the evidence that's going to be presented to you -- well, it was already presented to you.  But as you go through the evidence and you go and deliberate, you will see that the government met its burden beyond a reasonable doubt.

I just walked you through some snippets, some highlights, but you sat here through the entire trial.  And we've proven to you that the defendant is guilty of all counts. And we ask that you return a verdict of the same.

Thank you.

MR. FALLGATTER:  Your Honor, may we approach very briefly?

THE COURT:  Yes, sir.

(Sidebar conference:)

THE COURT:  Do you want to -- do you want a break before we -- you start or not?

MR. FALLGATTER:  Yeah.

THE COURT:  Why don't we do that.  And then we don't have to be at sidebar.

MR. FALLGATTER:  This may be something you may want to correct.  You recall Ms. Washington tried to recall

Mr. Martin and tried to put in something about records being requested by subpoena -- a subpoena, I moved to quash, and you struck that testimony.

THE COURT:  Uh-huh (affirmative).

MR. FALLGATTER:  I just heard in closing argument Mr. Mike said that the alterations were made after the request of the records.  That's a reference back to the subpoena that was stricken.

I would suggest that the remedy for that is to ask Mr. Mike to go back in front of the podium and correct what he just said and say the records were corrected after the indictment.  That was how it came out with Mr. Martin.  Now -- again, to make it look like we really are obstructing justice because we didn't produce them in response to a subpoena or are we changing things because of a subpoena, a subpoena you struck from the record.

So I think the remedy would be for him to politely correct himself to the jury.  I don't think it's helpful for you to strike it.  I think it would make more sense for him to cure it, with him curing it, but I'll defer to the Court.

MR. MIKE:  I didn't reference anything to the subpoena.

MR. FALLGATTER:  Yeah, you did, the --

THE COURT:  You both can't talk at the same time.

MR. FALLGATTER:  There was no evidence of any records

being requested but for the subpoena that got stricken.

MR. MIKE:  Your Honor, I -- all I said was they requested the records.  And I didn't say that he decided not to give it to them, or I didn't go into the manner of what happened.  I said they requested the records and then later we got the records.

MR. FALLGATTER:  First of all, they weren't requested but for a subpoena that got stricken.  The second -- the entire import of that is a records request, and then he went back and altered records.

(The following proceedings occurred in open court, in the presence of the jury:)

THE COURT:  All right.  Ladies and gentlemen, it's kind of traditional to give you a little break between the arguments.  And so we're going to do that.  But it will be a relatively short break.  Let's just do ten minutes, okay, to give you a chance for a comfort break.  And if you'd be back in ten minutes.  So that would be 11:21 to be exact.

All right.  Thank you, ladies and gentlemen.

COURT SECURITY OFFICER:  All rise for the jury.

THE COURT:  All my instructions still apply.

(Jury exits, 11:12 a.m.)

THE COURT:  All right.  Be seated.

All right.  So I'm looking here at the reference -- so, Mr. Fallgatter, I did -- I did strike the reference to the

subpoena, because you were concerned that that made it seem like that -- that your client had refused to provide it, or that it was some type of comment on -- on his requirement to do so, but I didn't -- I don't -- I didn't really strike the evidence that it was requested in October of 2022.  And so -- and that's all Mr. Mike said.  So I'm not sure what -- what the -- but go ahead.

MR. FALLGATTER:  Well, that would be a mistake then on my part and, all due respect, on all of ours, because the whole import of the request was based on a subpoena in October.

So anything related to a request, whether it be the date or by October -- any request is what the harmful information is, but that request was undisputedly based on a subpoena they got quashed.  Again, no burden on the defendant. It got quashed.

So the nexus there of, "Hey, we requested it and you went and changed it," that is precisely the message that is now harmful.  And if I didn't catch every word of how Ms. Washington tried to get that evidence in through Mr. Martin, my apologies.  But you went back and looked at it. I remember the word "subpoena" for sure.  And the subpoena was the form of the request.  That was what the request was.

So if they slipped in the word "request" in addition to "subpoena," we should have it all stricken.  And it's certainly not appropriate to put that burden on the defendant

now, regardless of what slipped in when I'm trying to get up there at sidebar to explain how that's not proper evidence, so...

THE COURT:  All right.  So, Mr. Mike, what's the -- I guess I'm not -- what is the -- what's the basis upon which you made that statement?  I mean, what are you trying to say?

MR. MIKE:  Well, Your Honor --

THE COURT:  It said -- you said in your closing, "There's a brief timeline in October of '22.  The defendant was approached by the DEA and his medical records requested. November 4th, the defendant called Kevin Lee, post indictment, to ask him those questions about it," and then you go on from there.

So what was the -- what's the issue there with -- with the October '22?

MR. MIKE:  Well, it shows -- for the obstruction piece, it shows, one, that the defendant knew that we needed -- we wanted those medical records.  Then he went back and made the call to Kevin Lee, asked all those ADHD questions, and then he went back after and then gave us -- and put those in the notes in sort of subsequent from -- I mean, so on from there, Your Honor.

THE COURT:  Okay.  All right.  Mr. Fallgatter, I just don't -- I'm not seeing this as being a big issue.  I didn't think it was a big issue yesterday.  But I did strike the

reference to the subpoenas.

But I do think it shows knowledge on your -- the part of your client that the record had been requested.  It doesn't say anything about he declined to produce them or anything like that.  So I'm not -- I'm not thinking that requires a clarification from the government.

MR. FALLGATTER:  Counsel just told you it was for the obstruction piece.  They want to argue the obstruction of justice because he was aware they wanted records, but he had a lawyer that moved to quash it.  It's totally irrelevant and inadmissible, but they want to use it to show the nexus.

He just clearly said it's for the obstruction piece.  That's precisely how they intend to argue intent to obstruct.  And it's not proper, because it was based on a subpoena I moved to quash and they withdrew it.

THE COURT:  All right.  I'm going to overrule the objection.  I just don't think it's -- and if the government wants to clarify in rebuttal what its -- what its position is, I'll let them try to do that, but I don't -- I'm just not -- just on that one reference, I don't think it requires the government to clarify it.  And I'm not -- I'm not agreeing with that, so -- unless, Mr. Mike, you feel like you need to.

MR. MIKE:  No, Your Honor.

THE COURT:  All right.  I'm not going to require it.

All right.  We've got five more minutes.

And then, Mr. Fallgatter, you're up.

COURT SECURITY OFFICER:  All rise.

(Recess from 11:17 a.m. to 11:23 a.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  You ready?

You know, I -- let me just -- before we bring the jury back out, let me just go back to the ruling I just made on Mr. Fallgatter's objection.

It does seem to me that that evidence does -- does go toward Dr. Hollington's knowledge about the pertinency of those medical records, the fact that they were requested of him. And -- so I do think it's appropriate.  And I think the way it's been handled is appropriate as well.

We -- I struck the reference to the fact that it was subpoenaed.  I have not -- you know, we have not gotten into the motion practice about how it was quashed and all that. That, of course, wouldn't be for the jury.

And so I understand the argument by Mr. Fallgatter, but I just simply don't agree with it.  I do think it does go to the issue of knowledge.  And I think it's a very fleeting and -- reference.  It doesn't implicate Dr. Hollington's right to remain silent or anything like that, especially after I

struck the reference to the subpoena.

And so I think it's an appropriate piece of evidence as to knowledge and it is not unduly prejudicial to Dr. Hollington's rights.  And so I wanted to state that for the record.

All right.  Let's have the jury, please.

MR. FALLGATTER:  Your Honor, may I ask for a 15-minute alert on my --

THE COURT:  Sure.  Yeah.  Ms. Manrique will let me know when you're -- so I gave you 70 total minutes.  So that means you'd want a 55-minute note, right?

MR. FALLGATTER:  I think 50, just to be on the safe side.

THE COURT:  50?  That's fine.  So that means you'd have 20 minutes left.

MR. FALLGATTER:  Yes, sir.  Thank you.

THE COURT:  Okay.  And we will give you that.

Okay.  Let's have the jury, please.

And, Mr. Mike, I think you have 13 minutes left, I think.

MR. MIKE:  Okay.  Thank you, Your Honor.

THE COURT:  I'll verify that, but I think that's right.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury enters, 11:25 a.m.)

THE COURT:  Actually, 14 minutes.

COURT SECURITY OFFICER:  Please be seated.

THE COURT:  All right.  Ladies and gentlemen, I know you'll give Mr. Fallgatter the same close attention you gave to Mr. Mike.

And, Mr. Fallgatter, you may proceed.

MR. FALLGATTER:  Thank you, Your Honor.

And good morning, ladies and gentlemen.  Thank you for your tremendous attention over the last, what, six or seven days now.

So I obviously have a lot to cover here.  I want to start with a sports analogy.  You know they use the analogy in sports "keep your eye on the ball."  Well, sports analogies apply in the courtroom just as well.

So here -- we like our PowerPoints, so we'll use some PowerPoints.  What is the ball that we're supposed to keep our eye on in this case?

THE COURT:  Mr. Fallgatter, would you do me a favor and pull that microphone just a little closer.

Thank you, sir.

MR. FALLGATTER:  Yes.  Is that better?

THE COURT:  Yes, sir.  Thank you.

MR. FALLGATTER:  So let's look at the charge, because all the rest of it is kind of -- obviously it all depends on what the charge is.

So the charge -- you've seen it before.  Did Dr. Hollington knowingly and intentionally distribute controlled substances which involved prescriptions issued not for a legitimate medical purpose in the usual course of professional practice?  That is the standard about which everything in this case is going to be judged.

I want to use that standard.  And I don't say it to insult you.  "Keep an eye on the ball" is not a -- not to be mean.  It's just here's the ball, right?  So we're supposed to take a look at that.

So what we know is this case is not about blood pressure.  There's not one word in the indictment -- you'll get the indictment.  Not one word about blood pressure.  There's not one word in the indictment about sex.

And let me apologize now.  And I'll do it again.  If there was sex, there shouldn't have been.  That's bad.  But why is it not in the indictment?

Because this case is not about a sex charge.  It's about that.  It's a drug case.  And it's not a drug case if the government doesn't prove beyond a reasonable doubt that prescriptions were not issued for a legitimate medical purpose in the usual course of professional practice.  And Mr. Mike tells you they proved the case beyond a reasonable doubt.  Quite to the contrary.

All of the evidence shows that's exactly why the

prescriptions were issued.  So it's about whether the fake undercover agents and the real four ladies needed their prescriptions and Dr. Hollington understood they needed them.

And so when you heard the ladies tell you that they would have died literally -- they tell you in the direct examination they would have died without their lawful prescriptions -- that's all you need to hear to know they were lawful prescriptions.

We went through the recordings.  We went through the patient files.  Pretty tedious.  I apologize.  We're going to go through some again today.  Why?  Because this is that medical issue.

And so it's important to go through that so that you can see that every prescription was absolutely based on the needs of the addicts.

But because that was so obvious, the government had to try to cloud the issue and try to take your eye off the ball.

Here's some examples.  The very first witness was Mr. Martin.  And he was talking about the undercover investigation, the five detectives coming in.

Is there anyone on the planet that doesn't and wouldn't agree they were fake patients?  Yeah, there's one person, Mr. Martin.

How many times did I ask him, "Won't you agree

they're fake patients?"  He would not use that word.

Why would he not answer that question?

Because the government knows how silly that prosecution theory is.  In my opening statement I discussed the government's theory of prosecution.  The DEA sends in fake patients.  Whoops.  Mr. Martin doesn't want to call them fake patients.  That would -- he saw my opening statement, pretending to be drug addicts using street drugs, sends them to Dr. Hollington and his staff -- and they know the clinic treats addicts -- and then prosecutes Dr. Hollington for doing exactly what he's supposed to do, give them life-saving prescriptions.

And Mr. Martin used that ridiculous theory that they weren't really fake patients crying out for help, worried about dying and flopping on the ground to strip Rachael Pittala, a license that she had worked 20 years to earn -- the same Rachael Pittala that gave the heartwarming angel speech to Mr. Breo, who admitted in front of you, under sworn testimony, he was an addict.  And who would have the heart to punish a lady that sincere about helping people?  All these folks at these two tables.

Mr. Breo admitted, as he must, he even looked like a drug addict.  He was the fellow with the long hair.  Why does he look that way?

He told you he's an undercover narcotics officer who has played that role in countless street drug deals where he's

buying drugs and has to look like an addict.

So the government has used him in countless undercover cases where he expects everyone they're trying to catch to believe he's a drug addict, and then wants you to think he did not pose as a drug addict in this case?

And you know how important it was for them to avoid to agree they're drug addicts because of the testimony of Dr. Kennedy, who did not want to admit they're drug addicts, because he admitted that would destroy his entire opinion.

And even -- the undercover agents testified, and so did Mr. Breo, that he presented himself as a drug addict who's using cocaine, crystal meth, Adderall, all off the street, and worried about flopping on the ground.

And they took away her license, Ms. Pittala's, for trying to help an addict.  And now they want to take away Dr. Hollington's license and make him a convicted felon for helping out what appeared to be street addicts.

And poor Ms. Pittala, she's on the stand and they continue to terrorize her because they're still holding over her head this claim that she's a member of a conspiracy.  They call her a target, when she did nothing more than to try to save a person who played the role he played in countless undercover investigations as a drug addict.  And she said, "No, I'm not part of any conspiracy."

Now, Mr. Mike obviously had to know that would be her

testimony, because they had talked to her ahead of time.  And that's why he never asked her on his direct examination about whether or not she thought she was doing something wrong.

And he could have told her, "Hey, stop worrying about it.  We don't plan to indict an innocent lady like you" --  who would? -- a lady that's talking about angels, bringing drug addicts to save them?  But instead they keep twisting her with fear, worrying about whether or not she's going to be prosecuted with this entire table staring at her while she's testifying.

That's how they keep control over her.  And I'm going to ask that your verdict help stop that type of bullying.

Well, who else in this courtroom tried to get you to take your eye off the ball and pretend that the deputies were not fake addict patients?  These prosecutors.

When Mr. Mike called the undercover agents -- remember him asking the leading question of every single deputy, "You weren't pretending to be an addict, were you?"

"Oh, no, I wasn't."

Of course they were.

But, again, that is the central theme of their case. Let's pretend they're not addicts, because if they're addicts, every one of these prescriptions are legitimate for them.

And you heard the recorded words of those undercover agents in the recordings.  And you heard their sworn

testimony.  Every one of them admitted in my examination they were drug addicts.

The government's efforts to pretend they're not drug addicts is nonsense.  And it's fatal to their entire case.

Mr. Mike heard my opening statement.  He saw that same chart, the silly government theory.  And so it was incumbent on him to try to avoid that because it's fatal to their case.  So he knew that would -- testimony where they're admitting they're addicts would destroy his prosecution theory, as it has.

So why would he ask such a misleading question -- "you weren't trying to be an addict, were you?" -- when he had heard the recordings.  He's got the transcripts.  Did he really think they'd lie on the witness stand about their own words?

Well, he gets to get back up on rebuttal.  And maybe he can explain to you why it is he tried to pretend that those undercover folks weren't real addicts.

And both Ms. Pittala -- Nurse Pittala, Nurse McCallister got those target letters threatening to prosecute them with conspiracy.

And I listened to Mr. Mike.  He gets to go first. He's asking the questions.  And I kept thinking, "Well, he's going to ask them about that target letter.  He wants to probably clear that up, doesn't he?"

But he never did.

I kept expecting he was going to ask them, "Hey, admit you're part of some illegal conspiracy and you're helping to commit this crime," but he never did.

And, of course, you know why.  He knew what their answer was.  He just decided to ignore it.  He ignores the threatening letter.  He never asked them if they were the conspirators he accused them of being.  Now, why was it my job to ask that when I got back up?  He's the prosecutor.

Why did he not ask those questions and let you know these ladies are not the conspirators they accused them of being?  They all testified, "We did everything in good faith. We did our best.  Maybe we made a few mistakes, but we listened to their symptoms, when they talked about concentration problems, when they talked about the long-time drug addiction. I'm trying to help them."

Of course, when I asked them that, they immediately said they were not and they were all acting in good faith. That was the government, again, trying to take your eye off the ball.

And then we have the patient charts.  And I'm going to ask you -- you're going to get -- this is all evidence coming back to you.  You'll recall that I'm the only one in this courtroom that put in the actual patient charts from the Sawgrass clinic.

They're not -- some are shorter than others.  There's

a chart for every one of the five fake patients.  There's one for all the four ladies.  The four ladies obviously are long.  There's something over 30 pages long.  And the charts look like that.  They're easy to read.  They're the official charts of Sawgrass.

What the government used was some incredibly difficult-to-read computer printout from some agency that wouldn't even know who they are.  None of them have been here to testify.  And they have ignored our charts.  Why?  Because the charts are accurate and they're thorough.  And they have all the notes of the advanced practice registered nurses.

And why is that important?  Because with regard to five fake patients, with the exception of Ms. Fleming -- you heard the nurses say it was their responsibility. Dr. Hollington has a brief meeting, gets a urine test, and passes them off to highly trained advanced practice registered nurses, who then did the more detailed inquiry of the patients to ask the questions.

Maybe they didn't ask every question, but they asked enough to find out about their street drug use, how it helped them, their lack of employment, some people without cars, all of the symptoms of drug addicts, which they know very well.

Not Dr. Kennedy, who, by the way, is so interested in this case he's still sitting back there.  Maybe he's still making his $500 an hour.

They're experienced in asking him -- he hadn't seen an addict in his office in years.  He won't see them.  The clinic sees them all the time.  They know the questions to ask.  They don't need to give them the third degree to know if they're using cocaine and crystal meth and Adderall and opioids off the street.  They're drug addicts.  And you don't need to know that, because they admitted it on the witness stand.

So we went through all the charts with the nurses, the real charts, not some fake computer printout.  And you heard their testimony, "Ma'am, these are your notes.  You wrote them in there.  At the time you wrote them, did you believe them to be correct?"

"Absolutely."

Of course they did.  They're not going to end their 20-year careers to falsify notes.

And you heard them say they did not think they were committing a crime when they wrote the diagnosis.  And it was their diagnosis based on their detailed interviews, all of which are tape-recorded, with the fake patients.

And they told you those were their notes, not Dr. Hollington.  He relies on them.  That's the standard practice.  And they agreed that anyone reading the diagnosis they wrote would believe they correctly prescribed the medications.

And, of course, the person that would have read some

of them was Dr. Hollington, because you can't issue the prescription without pulling up the patient notes.

And, again, a couple of them say, "Well, maybe I made a few mistakes."  But mistakes are never a crime.  You'll hear some jury instruction from His Honor that tells you mistakes are not a crime.  Medical malpractice is not a crime.  That's where doctors make mistakes.

So we have two sets of patients.  We've got the fake ones, the undercover, and then we've got the four real ladies. So let's talk about them separately.

And we need to start with the purpose of treatment, the purpose of the clinic.  And you saw it repeatedly in all the charts, "No more street meds, get lawful prescriptions, medical stability with proper medication," meaning not taking dangerous street drugs, and, three, "reduce the controlled substance use prescriptions to zero over time."

That's the MAT, medically-assisted treatment.

How many times did we see that goal and plan in the patient charts?  Every time, with virtually every visit.

And you'll remember what Dr. Hollington told Nurse [sic] Fleming when she brought in her drug addict friends Mast and Breo?  Right out of the box, Dr. Hollington says, "Obviously, you're coming to me for addiction service.  We're an addiction place.  Our job is to try to help you with your addiction."

That's what they do for a living.

You remember me asking Mr. Mast and Mr. Breo about that?  And I asked them, "Did you get up and walk out?"

"No."

Because that's precisely why they were there:  As addicts.

Mr. Mike says Dr. Hollington doesn't care.  Let's talk about the sincerity of Dr. Hollington to help addicts. How do we know he's sincere?  Let's start with all of his years of education and training.

And, remember, Nurse Christensen talked about what a great background he had and how knowledgeable he was.

Well, how else do we know?  Remember the Mary Magdalene speech?  It's kind of hard for me to tell it, but he broke down in tears.  He didn't have to.  That's sincerity to strangers.  But he wanted to make them better, not let them think they're sinners the rest of their life.

"We can fix this."

How about his November 4th, 2022, call to Mr. Lee? He got indicted October 27th.  We didn't have a clue who these people were.  Is it a real patient?  Is it a fake patient?

And Dr. Hollington, being the diligent doctor that he is, called Mr. Lee, who tape-records the call.  And you heard it.  I had to play it.  They didn't play it.  Now, why not?

Because Detective Lee, on no less than seven

occasions, tries to get Dr. Hollington to convince Lee to lie. No.  He finally told him he had to stop.  That's an honest doctor.  He kept telling him, "Just tell the truth."

As you know, in the AA program there's a religious component to treatment.  And so what does Dr. Hollington say in that call?

"God will handle it.  Just tell the truth.  If you get interviewed by a lawyer, tell the truth. "

You could hear in his voice how sincere he was about trying to help people.  Here's another way.

The government put in a rather detailed e-mail in November, again, right after the indictment, from Dr. Hollington to all of his nurses, sent after he was arrested.

And you know they were worried to death, just like they were on the witness stand.  And that e-mail proves he doesn't care just about his patients, but he cares about the nurses that had dedicated their lives to his work.

He knew they were concerned about his arrest.  Of course, he didn't know the government was going to threaten three of them with prosecution.  That came later.

But he certainly wanted to reduce their anxiety and assure them they're all acting in good faith, exactly like they told you on the witness stand they were.  And they were.

So let's get back to the five officers.  Did they

admit they were drug addicts who did not want to die off the street?  Of course they did, in the recordings, in their sworn testimony.

A little recap, Nurse Fleming -- Nurse Fleming -- Undercover Agent Fleming testified -- now, remember, she's the old lady.  When does that become a girlfriend?  "Old lady" is a wife.  They admitted on the stand they're a wife.  That was what he meant by old lady.  She came in with Lee.  She came in with the other three.  She knows all five of them.

And so I asked her, "Did all five of you pretend to be drug addicts?"

What did she say?

"Yes."

Well, she didn't understand how the government was trying to hide the ball on that.  So she told the truth.

Mr. Mast, the one with the shorter beard, older gentleman, again, "Yeah, I -- I dress like a drug addict."

"Did you pretend to be a drug addict?"

"Yes, I did."

Of course, the best was Mr. Lee.  He was the first one in, the young fellow.  And you'll remember my questions.  And the questions I asked of him came right from -- all due respect, I call it the government's theory of prosecution on the fake patient, the silly theory.  I thought, "Well, let me just ask him if he agrees with my theory."

You'll remember me asking those questions.

"So, Mr. Lee, when you were sent in, were you pretending to be a drug addict, a street user, who was worried about dying from street drugs?"

What did he say?

"Yes," because that's the truth.

Second, "And when you were sent in to an addiction clinic, whose doctor and nurses have dedicated lives to helping themselves, you knew it was an addiction clinic?"

"Of course."

Because that's what he says, "We're an addiction clinic."

"Were you instructed to ask for lawful prescriptions to get off street drugs?"  Which is precisely what addiction clinics do.

Answer, "yes."

And then I said, "And Mr. Lee -- and then the government indicted the doctor for doing the very things this entire practice here -- to accomplish, which was to help addicts?" -- that was the substance of my question.

Answer, "Yes."

"Do I have that right?"

"Yes."

He just admitted the foolishness of the government's theory of prosecution on addicts.  They won't admit it, but

you've heard the sworn testimony admitting it.

And, again, you heard my opening statement.  Mr. Lee didn't hear it.  They all heard it, which is why Mr. Mac [sic] -- pardon me, Mr. Mike asked every single witness, "You weren't pretending to be an addict, were you?"

"Oh, no -- oh, yes, I really was."

The very first fake patient admitted 100 percent accuracy of this silly theory.  And it is a silly theory.

We know it's silly also because of the actual records.  And, again, I'll try to zip through this, because you've seen it all.

But let's talk about Mr. Lee.  He came in.  He's using buprenorphine, Adderall, crystal meth, one of the most dangerous street drugs, Suboxone, which is buprenorphine, which is used to stop opioid use.  That's an addict.

And it's an addict based on what he said in the recordings, based on the records, and based on his sworn testimony.

Nurse Christensen saw Mr. Lee.  She prepared his chart.  And, remember, he was passed off to her by Dr. Hollington.  That recorded interview where she goes through in detail -- and they want to really ignore, I guess, all the questions that were asked and all the things she talked about, about the symptoms of drug use and not having jobs and not having a car and can't concentrate, and they don't -- doesn't

have prescriptions.  They did their job.

And she told you she believed that her diagnosis was correct, and it was her diagnosis in the chart, not Dr. Hollington.  She believed she was giving him life-saving, lawful prescriptions.

Now, Ms. Washington handled Ms. Christensen.  And so I'm going to call Ms. Christensen Ms. Washington's time machine witness.

Because you know what happened?  They bring them in. I don't get to talk to them.  They get to talk to them all the time they want.  They can take them up to their office.  And she showed her a tape of when Mr. Lee first saw Dr. Hollington. And you remember how foulmouthed he was, the F words all the time, snorting like he's on cocaine?

"Did I show you that tape?" Ms. Washington asked her.

"Did that upset you?"

Yes, it upsets you.

Well, Dr. Hollington has a little thicker skin.  He knows addicts can be wild.  Just take a look at Ms. B███████. She's bipolar, threatened to walk off the witness stand, turns her back to us.

Does that mean she doesn't need life-saving medication?  Of course not.

And so foulmouthed Mr. Lee was perceived as a drug addict that needed help from Dr. Hollington.  And, again, Nurse

Christensen said, "At the time I'm talking to him, personally hearing from him, I believe my diagnosis was correct."

Criminal cases are not about would have, could have, should have.  We can't ride a time machine back a year and a half and her say, "Well, maybe I wish I had done things a little bit differently at the time."

And, of course, she says that with a target letter that has not been removed, and these same prosecutors staring at her while she's testifying.

But she told you Dr. Hollington had no involvement with her diagnosis, which is true with all of them.  In fact, she never even discussed it with Dr. Hollington.  It was her scrips to Mr. Lee.

But now Dr. Hollington gets prosecuted, based on her saying a year and a half later, on a diagnosis that she wrote, that now she thinks Lee was a jerk, which he was.

I'm going to ask you to not take Dr. Hollington on that time machine ride that Ms. Washington tried to take us on.

Was Ms. Fleming a legitimate drug addict based on her own testimony?  And, yes, she's taking Adderall, Dilaudid, which you heard everyone say is probably the most dangerous opioid, crystal meth, incredibly dangerous, marijuana and Valium.

And, by the way, Mr. Mike says, well, he changes from Valium to Xanax.  That's a decrease.  Xanax is less dangerous

than Valium.  That's good medicine.

That's an addict, which is why she came to the clinic, and she said so.  Not only that she was, but all five of them pretended to be addicts.  And, of course, you don't solve addiction on the first visit.  Mr. Kennedy admitted that. She had to come back.  You don't get her off right away.  It takes sometimes months for the poor ladies that they brought in, and some had been on it for years.

I kept hearing the government say there's a false entry about obesity in Ms. Fleming's chart.  Now, they're looking at those computer printouts -- remember, the fine print stuff, wherever that came from.  Look at her chart, the official chart.  Not one word about obesity.

And even if there was, would that make a difference on treatment of a drug addict?  You don't save overweight addicts?  You just save ones that aren't?  But they're taking advantage of the wrong charts.  Use the real ones, please.

Mr. Breo, the undercover gentleman with the shorter beard, he's on Adderall and weed.  And let me -- let me digress a second.

Adderall.  Dr. Kennedy says you don't treat Adderall with Adderall.  How does that make sense?  I'm using street Adderall off the street, where it can be laced with bad drugs and die, and I come in to a clinic to try to get off my addiction on Adderall, and they're not supposed to give me

legitimate prescription Adderall to save me?  That's nonsense.

So you heard recordings about him taking street Adderall to help him.

"I just don't want to buy it from a friend anymore." Again, obviously street drugs.  He used it daily.  That's an addict.  Taking street Xanax.  He's worried.

"That scares me.  I don't want to be flopping on the ground."  If that is not the ultimate litmus test of a person that wants to avoid dying from an overdose, I don't know what is.  That's an addict.  And he agreed he was.

And then we get the angel speech with Ms. Pittala. "You know you did the right thing by coming to Dr. Hollington. You did, because sometimes, you know, there's angels out there watching over you.  And this guy's here to protect you."

And Breo says, "Right."

And if he was a real addict, he would say "right." He would want to be protected.  He'd want angels watching over him.  He'd want a provider that cared enough about him to have angels watching over him.

So a year and a half later, Ms. Pittala, who's now under threat of prosecution for some imagined conspiracy with a target letter, and having had her license taken away from her, with those same powerful people right at this table staring at her, tells you, "Well, maybe I did make a few mistake.  Maybe I could have asked a few questions."

Again, mistakes are not crimes.  But here's the key point.  She did the scrips.  She did the diagnosis.  She never told Dr. Hollington -- we heard it for the first time on the witness stand.

"Well, in hindsight, maybe I made a few mistakes."

But she never even discussed the scrips for Breo.  And she is the one that issues the scrips.  On that count she issued it, not Dr. Hollington.  So how can he be criminally responsible when she tells us in good faith there was a correct diagnosis and a correct prescription?

And, once again, the government cannot in a criminal case ride a time machine back a year and a half and say that a nurse wishes she asked a few more questions.

Mr. Mast was the undercover fellow with the particularly long beard.  And was he an addict?  Let's see.  Uses Adderall, cocaine, one of the most addictive drugs on the street, crystal meth, an incredibly dangerous drug, and weed.

And, of course, he's worried about dying, doesn't want to want go back on the street.  There's bad drugs.  Talk about, "Don't want to hit fentanyl."

You've heard everyone say how dangerous fentanyl is, 50 times more dangerous than heroin.  You can die instantly from fentanyl.  And he's there with -- Mast, Breo, and Fleming are there.  These are addicts.

Mr. Johnson comes in.  He's the bald fellow.  He's

using alprazolam, which is Xanax.  Klonopin was benzodiazepine; taking Adderall off the street, a couple of years at least.  Why doesn't the government want to talk to you about the longevity of what these folks said about their drug addiction?

Well, because that would be admitting they are real addicts.  And, again, I'll remind you they don't want to admit these are real addicts, because that demonstrates the foolishness of the prosecution, and it completely eliminates the testimony of Dr. Kennedy.

He's now talking with Nurse Hazelwood.  She's asking, "How are you getting the drugs?"

That's what you ask drug addicts.  And it's on the street, not from some pharmacy.  Every one of those ladies, remember, checked that PDMP, whatever it's called, that electronic printout on pharmacies.  None of the fake patients obviously had any, which nobody knew they were fake.  So to an addiction treater, you look at that and you think, "Well, that confirms they're getting drugs off the street."  And all the ladies told you that.

Let me back up.  Sorry.

So Nurse Hazelwood ends up saying, "Yes, I'm glad you're coming to us."

Again, similar to the angel speech.

"You know, we want to keep you safe, because you don't know what you're getting on the street."

That's what addiction specialists do, keep addicts safe.  And these were addicts.  Dr. Hollington and his staff was trying to save them.

Let's talk about the real patients.  And I told you at the outset Dr. Hollington and I owe you an apology.  If you believe that any improper sexual activity took place, it shouldn't have ever happened.  No one in the courtroom is going to say that that was right.  Not me.  Not Dr. Hollington.

But you know that Mr. Martin and these folks had plenty of options to deal with ethical or disciplinary matters, which is what that is.  But that's not what this indictment charges.  There's not one word in the indictment about sex.

What's in the indictment?  Let's look at the indictment, because that's the ball.  Again, the crime is issuing prescriptions not for a legitimate medical purpose in the usual course of professional practice.

And so the criminal issue here for those ladies is: Was the prescription the correct one for their treatment?  Any ethical considerations are a disciplinary matter.  And we know that DEA handles disciplinary matters, or the board of medicine can, because they've done it.  Ethical and disciplinary matters are not criminal.  And it sure doesn't make you a drug dealer, which is what he's charged with here.

Why do they talk so much about that?  Because they want you to take the eye off their ball.  It is their ball.

And their standard, it's in the two part, legitimate medical purpose and usual course.  So let's talk about legitimate medical purpose.  Of course it was.  The ladies under oath admitted they would have died without these drugs.  You know it was legitimate.

And the next part, usual course, what life-saving prescription would not be consistent with the usual course of professional practice?

So what is the practice of medicine?  Dr. Kennedy admitted the practice of medicine means the diagnosis, treatment, prescription for any mental condition.

Does it talk about sex?  No.  It's a diagnosis, which they got; treatment which they got; prescription which they got, for their mental condition.  And those poor ladies had it for years.

The patient charts prove that's exactly what they got.  For an addiction doctor and his staff like Dr. Hollington -- his professional practice was practicing addiction medicine, not fixing broken bones, not heart matters, Dr. Kennedy admitted, "Yep, that's the practice area for Dr. Hollington."

That's the measure by which his professional practice should be judged by you folks.  And it's undisputed that that addiction profession -- folks that need addiction medicine should get it in the usual course of the professional practice

of addiction medicine for an addiction doctor to prescribe their life-saving medicine.

And here's a little summary about the four ladies. And I'm going to talk about them individually.  But you heard that they got the exact same prescription for anywhere between 10 and 23 times while at the clinic, and they got the same prescription not just from Dr. Hollington, but from the advanced practice registered nurses.  All the ladies admitted those were necessary prescriptions they needed pursuant to their drug addiction treatment.

Let me apologize to you.  I'm going to try to zip through -- you've seen these before, on the summary of the four ladies.  And since Dr. Kennedy did not even testify about them, this may be a waste of time, but this is important.

And I want to make sure that I've made it clear that these ladies were genuine addicts -- bless their heart.  They were -- and how this medicine was absolutely necessary for them.

We'll start out with Ms. B██████.  21 visits to the clinic during a 26-month period.  The government takes one day out of a 27-page patient chart where she was seen by three advanced practiced registered nurses who prescribed the exact same prescription.  And what was her diagnosis?  You've seen it.  Opioid dependence, et cetera, et cetera, all bad things, all diagnosed under the DSM-5, which is that big, thick book

which is a bible for addiction medicine, and speaking of which, Dr. Kennedy doesn't have that bible in his office.

"I think I have it online."

Yeah, he doesn't have it in his office because he doesn't see addicts; hadn't seen them in years.  Dr. Hollington has it.

And so the diagnosis was opioid use dependence, OUD, which she admitted.  She'd been receiving Adderall from her prior physician, again, consistent with what -- you would expect her to do that; been suffering addiction, unfortunately, since age 14.  What was she getting off the streets:  Lortab, Percocet, oxy, Roxy, Dilaudid, heroin, fentanyl.  That's a sad history of a genuine addict.

She said she relapsed on heroin, recently stopped using crystal meth, purchasing Adderall off the street.  She's at risk for street-drug use if not using it.  Of course she was, because she's a lifetime addict that needed these life-saving prescriptions so she wouldn't die from them.

She admitted taking street benzos.  In the midst of her 26-month treatment, she went into rehab.  Not uncommon to have a relapse.  No reason to criticize her.  And I hope I made it clear I wasn't.  But it's just more evidence of how absolutely undisputed it is that Ms. B████████ needed these live-saving medicines.  On one of her occasions she'd relapsed two weeks ago on IV and needle heroin.  And the Suboxone is the

life-saving prescription to keep her off opioids like heroin so she wouldn't relapse.

So what's her prescription charge?  Mr. Mike put it up on the screen.  Buprenorphine.  That is the drug of choice to keep you off the opioids.  She asked for them.  She needed them.  And she needed it throughout all of her 21 visits.

Let's talk about K███████ W█████.  20 visits at the clinic over a two-year period.  Again, the government picks one day out of a 31-page report.  She too was seen by another advanced practice registered nurse.  You'll see that in all the charts, of course.  It shows the names.

Who prescribed the exact same prescription?  Her diagnosis.  What do you expect with an unfortunate drug addiction, opioid dependence, anxiety disorders, all of those items.

She had just come to the clinic on methadone.  She was visiting a separate methadone clinic; was on methadone for the entire duration of her 20 visits.  That's a sad story of an addict.  She was.  She had been on them for three and a half years.  She had been on Adderall for two and a half years.  She was having weekly panic attacks.  That's why they need the right medicine.

What is her charge?  Amphetamine and zolpidem tartrate.  Amphetamine is the Adderall.  Zolpidem tartrate is the drug for the -- you know, Ambien for the insomnia.

So, No. 2, what's the amphetamine for?  It is the drug of choice for attention deficit hyperactivity disorder, the condition she had throughout all 20 of her visits.  And now all of a sudden Adderall is given to, what, six million children?  A very safe drug is now some dangerous controlled substance?  No, it's not.  Our children use it when they need it.  And she needed it.

Ambien is a standard prescription to treat a sleep disorder, like the insomnia condition that she reportedly said she had throughout her 20 visits, and yet she comes in a year and a half later and says, "Well, you know, I have insomnia, but now I wish I wouldn't have taken it."  Would have, could have, should have.  But at the time that was a perfectly valid prescription.

And here's what's really crazy about that case.  She testified that Dr. Hollington did nothing inappropriate with her, nothing.  And they want you to prosecute her [sic] for what, for getting the drugs that she was supposed to have?  She didn't claim any sex.  No touching.  Nothing.  That's Count Thirteen.

E█████ M████ paid ten visits during an 18-month period.  The government takes one day out of a 21-page patient chart.  Here's the crazy thing, nine of those ten visits were with an APRN, not Dr. Hollington -- nine of the ten -- who prescribed her the exact same prescriptions that Dr. Hollington

did.

Her diagnosis, again, common diagnosis for drug addicts, opioid dependence, anxiety disorder, had just had a panic attack. Her addiction history, been on benzodiazepines for years. And they -- you know, the nurse checked that out. That's how she got the E-FORCSE note. Benzodiazepines are for treating anxiety disorders, of which she had several, as documented by the nurses.

Her addiction history, she needed help for anxiety. Panic attacks. Continued to have panic attacks and anxiety. They kept asking her -- you know, they're trying to wean her off. So, No. 10, she's feeling more depressed at her fifth visit. Not ready at this time to decrease. They kept asking her that, the nurse practitioner did.

What's the charge? The two drugs, buprenorphine and alprazolam, both life-saving and medically necessary; buprenorphine the drug of choice for opioid use disorder that she got prescribed to her throughout her ten visits. How is it a crime to give her the drug she needs?

Alprazolam, Xanax, which she had been taking for years to treat the anxiety disorders that she documented with the nurse practitioners -- a condition she had throughout her ten visits, how can that be a crime to give her that life-saving drug?

Lastly, D█████ A██████, she paid 23 visits during a

32-month period.  Again, the government picks one day out of a 35-page patient chart.

Her addiction history, she was seen by two of the APRNs for her last four visits; prescribed the exact same prescription as they're charging Dr. Hollington with; same diagnosis, opioid dependence, anxiety disorders.

And the DSM-5, the bible for treating mental health addiction issues, she was diagnosed with the opioid use dependence and obsessive compulsive disorder, both of which require the medicines she got.  She talked about her addiction history going back many, many years, where she was introduced to morphine, and later opioids.

When she came to the clinic, she was using clonazepam for anxiety.  She was using Suboxone.  Again, that's the life-saving buprenorphine.  She just borrowed opiates last month, which means she's using dangerous street drugs.  She was particularly in acute need to have the right kind of medication for a lawful prescription for buprenorphine to keep her safe.

By her fifth visit she reported not using cocaine or crystal meth, which, of course, means she'd used it before.  And buprenorphine works.  It does work.

And part of the goal of an addiction doctor is to listen to what they have to say.  The government wants to say that's bad?  No, that's good.  You listen to them.  And that was keeping her off street drugs.

But she still had an increase in anxiety and panic, and, thus, the continued need for the benzodiazopines, which she assured the clinic helps with anxiety and panic, as it most certainly medically does.

Her prescription charge is the buprenorphine and benzodiazepine, the life-saving medical drugs; again, buprenorphine, used to treat opioid disorder, the condition she had throughout all 23 of her visits.  The alprazolam, Xanax, treating anxiety disorder, which was a condition she had throughout all 23 of her visits, as confirmed by the other APRNs.

A███████ is the motel gal.  Remember?  She got out of prison, out of jail, and she came back on August 21st, four days out of jail because she told him she didn't want to have a relapse.  Good goal.

Who gave her the scrip?  Nurse Pittala.  Not Dr. Hollington; gave it to her three days earlier.  It got filled three days earlier.  She claims sex three days later, but she already had the scrip from Nurse Pittala, not Dr. Hollington.

And the motel records show 38 more days in the same room with people she called as clients.  And if she had sex at the motel, that's not good.  But either way the prescription she got three days earlier from Nurse Pittala was exactly the prescription she needed for treatment.

So why are we here?  That was not ethical if the doctor had sex with her, but that's not a crime.  And DEA can handle that as a disciplinary matter, just like they did with Nurse Pittala.

So please don't let them make Dr. Hollington a convicted felon for supposedly having sex when no such crime is charged.  If it happened, it happened three days after she got her same prescription.  And if it happened, it's an ethical violation that does not belong in federal court, as confirmed by the very words of their indictment, where the word "sex" is nowhere to be found.  It's just:  Was it legitimate medical purpose in the usual course?

Let's talk about Dr. Kennedy.  As you can see from his résumé, he basically works for DEA.  He runs a pain clinic, not an addiction clinic.  Never treats addicts.  They don't set foot in his door.  He refers them out.  He makes more in one hour, $500 an hour, than Dr. Hollington does seeing 11 patients in a day.

Three months before the indictment he wrote an opinion saying, "I can't render an opinion as to whether or not there's a legitimate medical need," but he had all the recordings.  He had every single word.

In the recordings of the interaction with the nurses, the nurses told you, "Well, all I did was summarize it in the patient charts."

You'll have them.  And they're pretty good summaries of the undercover recordings.  The basic information is the recordings.  It's got some in the patient charts.  He had everything he needed to render an opinion.  Now he's got to come in and say because he changed his opinion, "Oh, I didn't have enough.  I needed to see the charts."

You had everything off the charts in the form of the undercover recordings.  You had every word.  And more accurate even in the charts because it is the actual words that were spoken.

THE COURT:  Mr. Fallgatter, you've got 20 minutes, sir.

MR. FALLGATTER:  Yeah.  And I -- thank you, Your Honor.  I should be -- should be good.

So what happened in the interim?  Well, he changed his opinion and charged another 25,000.  And he tells you, "Well, one of the reasons I'm critical is the clinic didn't get all of the medical records."

Well, that isn't fair.  They couldn't get the past medical records because they were fake patients.  They didn't have any medical records.

But here's the real key.  He told you the linchpin to his opinion was that the undercover officers -- and he only testified about the undercover officers.  Remember?

The linchpin of his opinion, that they were some --

drug seeker is a term that he made up, told us about. Refused to admit they were addicts. Well, why doesn't he want to call them addicts? The same reason Mr. Mike in his first question of every single agent is, "You didn't pretend to be an addict, did you?" Because they know that destroys their case and his opinion.

And this is not like Perry Mason, where people confess on the witness stand. But you heard that eventually when I asked Dr. Kennedy, "Well, wait a minute. You heard the recordings. You see all the drugs they're taking. The undercovers come in. Every one of them said they pretended to be addicts."

"Didn't he say that?"

"Yeah, I heard that testimony."

"Well, then, Dr. Kennedy, if they were addicts, you would agree that your opinion would be out the window?"

"Yes."

Because to support his new opinion and his $25,000 fee, plus whatever he's charging here in court, he has to ignore all the trial evidence. I'm asking you not to ignore the trial evidence, because that evidence clearly demonstrated that to Dr. Hollington and his staff, they had every reason to believe those five fake patients were real addicts.

Why did they believe that? Because the undercover officers in all the recordings highlights, which he had

admitted, they were worried about dying off the streets and had been using addicts forever.  Ms. Fleming, Breo, Lee, all of them told you under oath that "we pretended to be addicts."

And, again, I asked him if he heard that testimony.  Of course he did.  But he's like a dog with a bone.  "Here's my opinion, I paid -- got paid a lot of money for it.  I'm not going to change it."

I couldn't ask him to.  He wouldn't change it on the witness stand.  It would be pointless.  But I'm asking you to understand that when he admits that if they're really addicts his opinion is out the window, please throw it out the window.

And let me ask you this fairness question.  How fair is it for the government to send in undercover agents, pretending to be real addicts, and then spend $50,000 on a doctor who doesn't even treat addicts, and asks you to convict Dr. Hollington based on their doctor pretending that the undercover officers were not real addicts?  Is that fair?

And I hope you heard Mr. Mike in his opening tell you that the undercover officers were supposed to be addicts.  No kidding.  That's the first time he's admitted it.  Every other question he's asked of the agents, "You weren't pretending to be an addict, were you?"  Now he tells in his closing they were supposed to be addicts.

There's an old fable from Hans Christian Anderson about the emperor's clothes.  You may have heard about that,

where there was an emperor that wanted his tailors to design a set of clothes for him and wanted them to be particularly fancy and they couldn't come up anything, so they tricked the emperor and said, "Here they are."  And they weren't real.  There were no clothes.

And the emperor is so proud of his clothes, thinking he's got real clothes on, that he goes and marches out in the street and all the subjects, of course, were afraid to say something, and a little girl says, "He's naked."

So here's the government's version of that fable. Let's pretend that the undercover officers did not present themselves as drug addicts; let's pretend they're some fictitious drug seeker, when, in fact, they wore the clothes of genuine addicts, which means the legitimate scrips for addicts were legitimate, and Dr. Kennedy agrees that if they were legitimate addicts they were legitimate scrips.

And, of course, it's not just the undercover officers who admitted that.  Plenty of other people -- we talked about the recordings.  They cry out to be addicts.  The advanced practice registered nurses understood that; said their diagnosis was correct.

And here's the other thing you need to remember from Dr. Kennedy's testimony.  He told you that professionals can have a difference of opinion.  He told you he didn't believe the nurses were committing a crime, the nurses that came up

with a diagnosis for these addicts.  They're not committing a crime.  So why is Dr. Hollington here?

They came up with a good faith diagnosis.  You're going to hear one of the instructions His Honor is going to tell you.  This is not a civil case.  It's not about medical malpractice.  It's not about making a mistake.  It's not about a misunderstanding.  It's not about failing to exercise reasonable medical care, which, of course, Dr. Hollington and all of them did.

Dr. Kennedy, the government kept talking about the equipment should be in an office.  Blood pressure?  Again, not one word in the indictment about that.  This is about them needing life-saving medications.  And that's exactly what the indictment says.

And so now we've got the reality of the -- that's pretty fine print.  You remember that I asked about the DSM-5 and we went through the opioid use disorder, the stimulant use disorder?  There were three of them.

Here is the official bible, diagnostic criteria to determine if someone is an addict.  Not one word in there about blood pressure.  Not one word about equipment.  It's all the history, just like we all have seen on TV, psychiatrists.

"What's your problem?  Let's talk about it.  Your mental health, how do I fix it?"

All takes us to the criteria.  All those fake addicts

qualified in spades under that criteria.  It's the history given to you by the addict.  And they want to make it sound like the nurses and Dr. Hollington weren't practicing good medicine because they didn't go do some battery of tests?  It's not required.  This is the litmus test for it.  And that's exactly how they performed their diagnosis.

So I mentioned Dr. Kennedy -- you didn't hear any opinion of him about the four ladies, right?  He just talked about the five fake patients.  Well, what could he possibly say about the four?  Would he say they're not lifetime addicts?  Would he say he didn't hear them say that they would have died without the prescriptions?  Any testimony that those real addicts didn't need the prescriptions would have been foolish.

And so the government has absolutely no medical evidence to support their claim that the ladies did not get the medicine pursuant to their treatment plan.

Let me talk about the obstruction counts very briefly.  Again, the fine print.  Remember Mr. Lee was on the stand.  The first count in the obstruction, Mr. Lee -- because when the indictment was returned and we didn't know who these people were, a phone call was made by Dr. Hollington to check out this Kevin Lee guy.  And there's the date of it, November 8th, I think it says, or 4th at the top.

And I went through the same chart with Mr. Lee.  And you could hear in the recording, the one that kept telling to

tell the truth, it's in God's hand -- I went through the 16 questions, and there they are numbered.  I'm sorry the print is so small, but you'll have the actual patient chart for Mr. Lee, and Mr. Lee admitted that that's exactly what he said.

How does that obstruct justice to document exactly what the man said when they've had the tape recording this whole time?

The others then -- once that call was made, Dr. Hollington went back in -- you can't make that bigger for me?  But you've seen it in the chart before.  It's all about him noting their fake patients.  How does that obstruct justice, to tell them what they already knew, with their recordings they had for months?

And the notes down below are not new notes.  It's a summary of what's in the patient file.  He didn't add something.  He went back and picked up some of the items that you'll see in the patient chart.  Nothing added except documented that they're fake patients.

And, of course, Mr. Mike says, "Well, he did it after the indictment."  Of course he did it after the indictment.  When else would you do it?  That's the first time we learned they're fake patients.

I'm going to wrap up, folks, I promise.

In a criminal case the presumption of innocence lies with the defendant, Mr. -- Dr. Hollington.  And, of course,

they have to prove it beyond a reasonable doubt.  The judge will tell you that that means proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.  And here the government cannot prove that Dr. Hollington or his staff were not trying to help addicts out, out of the danger of street drugs, out of the addiction they were in, or claimed they were in.  And it's not fair for the government to seek to make Dr. Hollington a convicted felon for doing his life's work of trying to help felons [sic].

If you remember what I said in opening, there is someone even more powerful in a courtroom than these folks at these tables.  It's you, the American jury, and your collective common sense, and your sense of fairness in what is right.

And so when this case is over, I'm going to ask you to let the government know they can't send fake patients in pretending to be addicts, or use real addicts and then say a good doctor and his nurses are not supposed to try to help them get off their street drugs.

Ladies and gentlemen, thank you.

THE COURT:  Thank you, Mr. Fallgatter.

Ladies and gentlemen, we'll go ahead and hear from Mr. Mike by way of rebuttal.  He has about 14 minutes left on his time.  And we'll let -- do that.  Then we'll take a lunch break before my instructions.  Okay?  All right.

Mr. Mike, you may proceed.

MR. MIKE:  Thank you, Your Honor.

Members of the jury, you heard about keeping the eye on the ball.  Some of you have heard the phrase "smoke and mirrors," right?  That's where you're trying to redirect someone from the evidence that -- in this case against the defendant, where it would establish the defendant's guilt.  How can you keep your eyes on the ball if all you see is smoke?

Now, listen, the defendant has -- he doesn't have to put on a case at all.  It's not his burden.  It's our burden.  And we put on our case.  But if the defendant does bring out theories, you can listen to those theories.  And today you heard a bunch of them, just now.

And you can use your common sense.  And if they don't fit, you can throw them out the window.  You don't have to listen to them.  You heard a lot of stuff today.  You took appropriate notes.  You listened.  You heard what came from these witnesses.  You use that and your common sense when you go back there and evaluate that evidence.

Like, we heard just now that sex doesn't matter?  So now it's okay to pay for prescriptions with sex?  That's -- that's not okay.  That's not in the usual course of professional practice.  You don't need Dr. Kennedy to come up there and tell you that.  That's common sense.

We heard this evidence about the UCs saying they were

addicts.  Addicts -- you remember your notes, you -- you know what they said when they were on that stand.

What I say out of my mouth is not evidence.  What the defense counsel says out of his mouth is not evidence.  What came out of the mouths of the witnesses on that witness stand, that's evidence.  That's what you should remember.  Let the evidence show you what was said.

I know we're in the state of Florida, but today the evidence you -- make it show me.  We -- it's the show-me state today.  Let it show you.  And they didn't show you that.  They presented themselves as drug seekers.

"I want drugs."  Not "I need it.  I'm dependent upon it."  That came out of defendant's own mouth.  And you saw it not from the UCs.

Rely on your memory, drug-seeking patients, ADHD crap, lack of exams/vitals, inaccurate medical reports that the nurse practitioner said themselves, "He told me what to put in there.  He trained me.  Whenever he said Adderall, I just put ADHD."

There was talk about the charts.  And the charts -- his charts are the accurate charts.  Everything we've seen about the defendant is anything but accurate.  We just seen him lie to his own nurse practitioner.  Why should we believe that what he put in the charts are accurate when he lies to his own employee?  And now he says he's an honest doctor?  Literally

said he's an honest doctor.  But he's lying to his own employees?  Smoke and mirrors.

The criminal cases he mentioned are not about would haves, could haves, and should haves.  And I just disagree.  He could have did a lot of things.  He could have asked the right questions.  He could have performed the right exams.  Should have did the same.  But he didn't.

He was pushing drugs, asking very, very minimal questions, using the nurse practitioners as a shield by putting it in the medical records, shielding himself off.  And it was working.  You saw the transcripts.  800 patients he said he about had.  That's a lot of patients.  That's a lot of money.  125.  And he upped the price to almost 140, 150.  He talked about Dr. Kennedy giving the benefit of the doubt for the buprenorphine.

Dr. Kennedy said it was well-intentioned, but he also said it was sort of a stretch.  And in the end, when I asked him, "Was it done for legitimate medical purpose in the usual course of professional practice," he said, "No."  That is what came out of the witness's mouth.  Make the evidence show you.

He mentioned is it fair sending in undercovers to the -- to Dr. Hollington's office.  Well, we heard so much -- I mean, there is an opioid pandemic.  100,000 people died last year.  You can't have a doctor just handing out pills like candy in a candy shop.  We can't have a doctor just saying,

"Here's one.  Here's two.  Here's three.  Which one do you like best?"

You can't have a doctor prescribing Adderall for cocaine, switching out medication whenever the patients want. That's not care.  That's why you investigate.  That's why we're here.

Use your common sense, members of the jury.  You know what was said.  You sat here this entire trial.  Go through your notes.  Go through the evidence.  The judge will instruct you on -- on how to do so.  Render a verdict that's on the verdict -- that this evidence supports here today.  And that's guilty.

THE COURT:  Thank you, sir.

Ladies and gentlemen, that concludes the closing argument portion of the case.  We're going to go ahead and take a lunch break.  And then when you get back I'll instruct you on the law.

And after we do that, I'll send you in for your deliberations.  But -- let's see.  It's 12:35.  Why don't we -- why don't we say 1:20?  Is that enough time for you?  Would that be enough time to get some lunch?  We can go to 1:30 if you'd rather.  1:20 okay?  Is that all right with everybody?

Okay.  So let's come back at 1:20.  And as I said, I'll instruct you at that time, and then I'll give this case to you for deliberation.  We're getting closer, but, please, all

my instructions still apply.  Pretty soon you'll be able to talk about it to your heart's content, but not yet.  Okay?  So have a nice lunch, ladies and gentlemen.  We'll see you back in the jury room at 1:20.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury exits, 12:35 p.m.)

THE COURT:  Have a seat for just a minute.  In going through the instructions, I did -- I've made a couple of what I think are proper but -- and minor changes, but I wanted to let the parties know.

So the -- and they're being printed right now.  But the -- in the substantive instruction, which is Jury Instruction No. 13, when we define the term "legitimate medical purpose in the usual course of professional practice," because the elements as required by *Heaton*, or as I'm -- as I'm guided by *Heaton* -- because they put that in the disjunctive, I'm going to put it also in the disjunctive here.

I'm going to say the terms, quote, a legitimate medical purpose or in the usual course of professional practice -- I guess that -- I'll just make it a term.  The term is defined.  So I'll just leave it.  I'm just putting the word "or" in there, which is consistent with the elements as we've charged it in the -- in the instruction.

There's two other places where that term is used.  And I'm just going to put an "or" in there as well.  There's

another one in the next paragraph and another one in the final paragraph.  So I'm just going to put "or" in there to be consistent with the elements as we're instructing.

And the only other change is that in Jury Instruction No. 14, which is the instruction -- the pattern instruction says the defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt.

I will -- I'm taking the word "facts" out of there. I always take it out.  And we just didn't take it out this time.  I really don't think -- I really don't think elements are facts.  And so I always take that out of the patterns.  And I just neglected to do so this time.

So those are the changes -- those are the only changes that we've made.  Otherwise, I think they're consistent with the charges as settled.  All previous objections are preserved.

Ms. Meyer is on her way down with copies of the redacted indictment, the verdict, and the -- and the instructions.  She'll hand those out to you.  You can take a look at them over lunch and see if you see anything, but I think we're ready to go.

So I'll ask you-all to be back, ready to go at 1:20. All right.  We're in recess.

COURT SECURITY OFFICER:  All rise.

(Recess from 12:38 p.m. to 1:21 p.m.; all parties

present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is back in session.

Please be seated.

THE COURT:  Did anybody see anything that was different from what we agreed to, or not agreed to this morning?  That is, the charge that the Court determined to give after considering all the parties' -- did anybody see anything new I guess is my question.

MS. WASHINGTON:  No, Your Honor.

THE COURT:  Okay.

MR. FALLGATTER:  I had one -- Instruction 12 -- not Instruction 12.  Page 12.  It says the indictment charges 20 separate crimes.  That's true.  But now we're down to 19.  And I didn't know if you meant to leave it there.

THE COURT:  I couldn't decide.

MR. FALLGATTER:  Yeah.

THE COURT:  I mean, because I do say Count One -- I think the jury needs to know there was a Count One, so I'm --

MR. FALLGATTER:  I'm fine -- I'm fine with that.

THE COURT:  Yeah.  I debated myself and I left it.

MR. FALLGATTER:  Yes, sir.

THE COURT:  Okay.  All right.  Let's have the jury, please.

I notice the audience always leaves when the jury

instruction comes.  It's hard to blame them.

MR. FALLGATTER:  We think it's scintillating, Your Honor.

COURT SECURITY OFFICER:  All rise for the jurors.

(Jury enters, 1:22 p.m.)

COURT SECURITY OFFICER:  Please be seated.

THE COURT:  All right.  Ladies and gentlemen, welcome back.  I know it was a little bit briefer lunch hour, but I thought we could go ahead and have me do this and then give the case to you for your consideration.

And so the way this works is, these are the Court's instructions to the jury.  So this is my instructions to you on the law that you'll use in deciding the case.

And I see you with your notepads.  And let me -- let me tell you how this works.  This is -- it will take me probably 20 minutes or so to read this to you.  And I do have to read it, because it's the law, so every single word makes a difference, so -- but you don't have to worry about taking notes.  You can if you want, but you're going to get it in three different ways.

One is, you're going to listen to me say it.  The other is Ms. Manrique is going to put it up on the screen as we go along.  And the third is you'll actually have copies in the jury room with you.

So if that helps you decide whether to take notes or

not -- yeah, I think that's a good choice.

All right.  So if you'll give me your attention.  And, as I said, I -- I apologize in advance.  I'd rather just talk to you like I am right now, but I have to read it to you.

And, Ms. Manrique, if you'll go ahead and...

All right.  You're going to have to get that so it's -- you're going to have to either zoom in or out or do something to get it...

There we go.

Okay.  So you see the name of the case is up there and -- and I'll just start now.

Members of the Jury:  It's my duty to instruct you on the rules of law that you must use in deciding this case.  After I've completed these instructions, you'll go to the jury room and begin your discussions, what we call your deliberations.

You must decide whether the government has proved the specific facts necessary to find the defendant guilty beyond a reasonable doubt.

Your decision must be based only on the evidence presented here.  You must not be influenced in any way by either sympathy for or prejudice against the defendant or the government.

You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my

instructions as a whole.  You must not single out or disregard any of the Court's instructions on the law.

The indictment, or formal charge against a defendant, isn't evidence of guilt.  The law presumes every defendant is innocent.  The defendant does not have to prove his innocence or produce any evidence at all.  A defendant does not have to testify, and if the defendant chose not to testify, you cannot consider that in any way while making your decision.  The government must prove guilt beyond a reasonable doubt.  If it fails to do so, you must find the defendant not guilty.

The government's burden of proof is heavy, but it doesn't have to prove a defendant's guilt beyond all possible doubt.  The Government's proof only has to exclude any "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you've carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs. If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, say so.  If you are not convinced, say so.

As I said before, you must consider only the evidence that I have admitted in the case.  Evidence includes the

testimony of witnesses and the exhibits admitted.  But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and impression -- I'm sorry, your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions.  You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate.  You should decide whether you believe what each

witness had to say, and how important that testimony was.  In making that decision you may believe or disbelieve any witness, in whole or in part.  The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to accurately observe the things she or she testified about?

Did the witness appear to understand the questions clearly and answer them directly?

Did the witness's testimony differ from other testimony or other evidence?

You should ask yourself whether there was evidence that a witness testified falsely about an important fact.  And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

To decide whether you believe a witness, you may consider the fact that the witness has been convicted of a felony or a crime involving dishonesty or a false statement.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately.  So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception.  The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

You must consider some witnesses' testimony with more caution than others.

For example, a witness may testify about events that occurred during a time when the witness was using addictive drugs, and so the witness may have an impaired memory of those events.

So while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about that matter.

But that doesn't mean you must accept the witness's

opinion.  As with any other witness's testimony, you must decide for yourself whether to rely upon that opinion.

You've been permitted to take notes during the trial. Most of you, perhaps all of you, have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations.  You must not give your notes priority over your independent recollection of the evidence.  And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Several exhibits have been identified as typewritten transcripts of oral conversations heard on tape recordings and videos received in evidence.  The transcripts also purport to identify the speakers engaged in the conversation.

I've admitted the transcripts prepared by both the government and the defendant for the limited and secondary purpose of helping you follow the content of the conversation as you listen to the tape recordings or video, and also to help you identify the speakers.

But you are specifically instructed that whether the transcripts correctly reflect the content of the conversations or the identity of the speakers is entirely for you to decide

based upon your own evaluation of the testimony you have heard about the preparation of the transcript, and from your own examination of the transcript in relation to hearing the tape recording itself as the primary evidence of its own contents.

If you determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Certain exhibits in the form of charts, summaries, calculations, and the like have been received in evidence. Such exhibits are received in evidence where voluminous writings, documents, and records are involved.  These exhibits are available for your assistance and convenience in considering the evidence.

The indictment charges twenty separate crimes, called "counts," against the defendant.  Each count has a number. You'll be given a copy of the indictment to refer to during your deliberations.

Count One is not for your consideration.

Counts Two through Fifteen charge that defendant knowingly or intentionally distributed or dispensed -- and I'm going to do my best on pronouncing the drugs -- amphetamine, alprazolam -- I'm sorry, alprazolam, benzodiazepine, zolpidem tartrate, and buprenorphine, Schedule II, III, and IV controlled substances, without a legitimate medical purpose or outside the usual course of professional practice.

Counts Sixteen through Twenty charge that the defendant knowingly and corruptly tried to influence, obstruct, or impede the due administration of justice in this case.

It's a federal crime to knowingly or intentionally distribute or dispense controlled substances, except as authorized by law.

Amphetamine, alprazolam, benzodiazepine, zolpidem tartrate, and buprenorphine are "controlled substances" within the meaning of the law.

And I will ask you to rely on the written statement of how to -- of the medicines, not my not-so-good pronunciations.

The defendant is charged in Counts Two through Fifteen of the indictment with distributing and dispensing controlled substances, that is, amphetamine, alprazolam, benzodiazepine, zolpidem tartrate, and buprenorphine, Schedule II, III, and IV controlled substance, in violation of Section 841(a)(1).  The defendant can be found guilty of this crime only if all the following are proved beyond a reasonable doubt:

Number 1:  The defendant knowingly or intentionally distributed or dispensed amphetamine, alprazolam, benzodiazepine, zolpidem tartrate, and/or buprenorphine as charged;

The defendant knew at the time -- number 2:  The defendant knew at time of the distribution or dispensing that

amphetamine, alprazolam, benzodiazepine, zolpidem tartrate, and/or buprenorphine were controlled substances;

And, No. 3, the defendant knowingly or intentionally acted without a legitimate medical purpose or outside the usual course of professional practice when distributing or dispensing the controlled substances.

I will now provide more detailed instructions on these terms.

To "distribute" means to deliver a controlled substance to another person.  This term also includes the writing or issuing of a prescription.

To "dispense" means to deliver a controlled substance to an ultimate user by, or pursuant to, a lawful order of a practitioner, including the prescribing and administering of the controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for delivery.

The term "without a legitimate medical purpose or outside the usual course of professional practice" is defined by reference to the standard of medical practice generally recognized and accepted by the medical profession in the state of Florida and the United States.

In order to determine whether or not a prescription or prescriptions were issued by the defendant for a legitimate medical purpose or in the usual course of professional practice, you may consider all the evidence admitted at trial,

including, but not limited to, the circumstances surrounding the prescribing of the substance in question, the statements of the parties to the prescription transactions, any expert testimony on the subject, and any other competent evidence bearing on the purpose for which the substances in question were prescribed.

I caution you that the defendant is not on trial in this case for medical malpractice or negligence, neither of which constitute a crime.  In other words, the defendant cannot be found guilty based solely on your finding that he failed to exercise reasonable medical care on behalf of his patients by his prescription practices.

For you to define -- for you to find the defendant guilty, the government must prove beyond a reasonable doubt that, at the time the defendant issued the controlled substance prescriptions, he knew he was acting, or he intended to act, without a legitimate medical purpose or outside the usual course of professional practice.  In considering whether the defendant knowingly issued a prescription without a legitimate medical purpose or in the usual course of professional practice, you may consider all of the defendant's actions and the circumstances surrounding them.

It's a federal crime to try to influence, obstruct, or impede the due administration of justice.

The defendant can be found guilty of this crime only

if all the following are proved beyond a reasonable doubt:

Number 1, there was a proceeding before this Court and, No. 2, the defendant knowingly and corruptly tried to influence, obstruct, or impede the due administration of justice in this judicial proceeding.

To "influence, obstruct or impede the due administration of justice" is to do something to sway or change or prevent any action likely to be taken in the judicial proceeding.

To act "corruptly" means to act voluntarily, deliberately, and dishonestly with the specific intent to sway, change, or prevent some action likely to be taken in the judicial proceeding.

The government does not have to prove that the judicial proceeding was, in fact, influenced or obstructed or impeded in any way.  It only has to prove that the defendant corruptly tried to influence, obstruct, or impede the due administration of justice, and that the natural and probable effect of the defendant's acts would be to sway, change, or prevent some action likely to be taken in the judicial proceeding.

It's possible to prove the defendant guilty of a crime even without evidence that the defendant personally performed every act charged.

Ordinarily, any act a person can do may be done by

directing another person, or "agent."  Or it may be done by acting with or under the direction of others.

A defendant "aids and abets" a person if the defendant intentionally joins with the person to commit a crime.

A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person.  A defendant is also responsible if the defendant willfully directs or authorizes the acts of an agent, employee, or other associate.

But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the defendant was simply present at the scene of a crime or knew about it.

In other words, you must find beyond a reasonable doubt that the defendant was a willful participant and not merely a knowing spectator.

You'll see that the indictment charges that a crime was committed "on or about" a certain date.  The government doesn't have to prove that the crime occurred on an exact date. The government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

These are some definitions for terms used throughout

these instructions:

The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

The word "intentionally" means that the act was done deliberately.

The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad -- with bad purpose -- that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids, before you can find that person acted "willfully," the person need not be aware of the specific law or rule that his conduct may be violating.

Where a statute specifies multiple alternative ways in which an offense may be committed, the indictment may allege the multiple ways in the conjunctive; that is, by using the word "and." If only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction, so long as you agree unanimously as to that alternative.

Each count of the indictment charges a separate crime. You must consider each crime and the evidence relating to it separately. If you find the defendant guilty or not guilty of one crime, that must not affect your verdict for any other crime.

I caution you that the defendant is on trial only for the specific crimes charged in the indictment.  You're here to determine from the evidence in this case whether the defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether the defendant is guilty.  If you find the defendant guilty, the punishment is for the judge alone to decide later.

Your verdict, whether guilty or not guilty, must be unanimous; in other words, you must all agree.  Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.  So you must discuss the case with one another and try to reach an agreement.  While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong.  But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges; judges of the facts.  Your only interest is to seek the truth from the evidence in the case.

When you get to the jury room, choose one of your members to act as your foreperson.  The foreperson will direct

your deliberations and will speak for you in court.

And then I have prepared, ladies and gentlemen, the verdict form that you'll use.  And I'm going to go through that with you.  It's a little bit complicated.  So I just want to go through it with you.  And we're not going to go over every one, but I want to go -- go over it with you to kind of give you a explanation of how this works.

So the first page you see has the name of the case and it says "Verdict."

Now, I told you that there are 20 counts, but I've also told you that Count One was not for your consideration. So there's really only 19 charges that you're going to be considering.  So we start with Count Two.  Okay?

So Counts Two through Fifteen charge that the defendant knowingly or intentionally unlawfully distributed or dispensed controlled substances.

And then you look at each count.  As to Count Two, we, the jury, unanimously find the defendant -- and then you have to unanimously agree.

Now, if you unanimously agree on not guilty, you're done with that count, so you skip over the rest of this stuff in the Count Two here.

Only if you find the defendant guilty and you check that box do you then go on to answer the additional questions. So it -- it specifically says -- and each one are going to be

like this, so I'm only going to go over a couple with you.

But you see it says, "As to Count Two, we, the jury, unanimously find the defendant" -- if you write -- if you agree not guilty, right below it it says, "If you found defendant not guilty of Count Two, skip the next question and proceed to consider Count Three."

So you just keep moving.  Okay?

And now, if you unanimously found guilty, then you do have to continue and answer the next question.  And it is, "If you found the defendant guilty of Count Two, answer this question.  We, the jury, unanimously find that the defendant knowingly or intentionally distributed or dispensed controlled substances" -- and then you check all that apply, "not for a legitimate medical purpose," "outside the usual course of professional practice."

So your options there are -- if you've unanimously viewed it, it can be -- if you unanimously agree on the first one, you check it.  Whatever -- whatever you unanimously agree on, you only check the ones that apply.  Okay?

All right.  And you check all that apply.

All right.  I want to -- and so Count Three, Count Four are very similar to that.  Actually, I want to do Count Four.  Let's do Count Four, because it's got an extra question on it.  Some of them do have an extra question and some of them don't.  But I'll show you what one looks like here.

All right.  So as to Count Four, "We, the jury, unanimously find the defendant" -- same thing, right?  If it's not guilty, then -- if you found the defendant not guilty of Count Four, skip the next question, go to Count Five.

If you found the defendant guilty, then you're asked the same question that was previously asked.  That will be in every one of them.  And, again, you check all that apply.

But on Count Four -- and we'll go over to the next page -- is that the right?  Isn't that the next page?

LAW CLERK:  Yes.  She just has it.

THE COURT:  All right.  I'm sorry.  So this was the next page.  That's what was confusing me.  So you've already -- if you've found guilty, you've answered the first set of questions, now there's a second set of questions involving the type of drug involved.  Okay?

So if you found the defendant guilty of Count Four, also answer this question.  "We, the jury, unanimously find the defendant distributed or dispensed the following" -- same thing.  Check all that apply.  All right?

And you may say, "Well, how -- how am I going to remember all that, or what's the" -- and that's why we give you a copy of the indictment.

So I'm going to ask Ms. Manrique to put up page 3 of the redacted indictment.  And I call it redacted because it doesn't have everything that was in the original indictment.

I've only given you the information you need in order to understand what you're doing.  Okay?  So you'll see there are some gaps.  Don't worry about that.  That was me.  All right?

Okay.  So you see that it says, "On or about the dates set forth below in each count, in the Middle District of Florida and elsewhere, the defendant" -- named, and it -- it lists the crime, "did knowingly and intentionally" -- or the alleged crime -- and I won't read it all, but then it gets down to the counts.

And so when you're -- when you're on this verdict and you're saying, "Well, what's Count Two?" this is what Count Two is.  Or Count Four.  Here it is right here.  Okay?

So you have to kind of go back and forth to make sure you know what you're doing.  You'll see in Count Four two different drugs are listed.  Amphetamine and the one I have trouble saying, buprenorphine, I think.  Something like that.

You'll see that that's listed under Count Four.  And that's why on the form you're being asked to check all that apply.  But -- so some of them have more than one drug and some of them don't.  If they only have one drug, then there's no need to answer a question, because it -- you would have made that decision by your verdict.

So I think -- and, of course, I'm not telling you how to do your business.  But the reason we give you this is so you can use the indictment and the verdict to track each other and

keep track of what you're doing.  Okay?  So that's how it works.

And I don't think I'm going to go -- you know, they go through -- all the way through and -- and it's the same -- some of them have drugs -- if you found guilty -- now, if you find not guilty, everything stops; you just go to the next one.

But if you found guilty, you do have to follow all the questions through.  Some of those -- sometimes, as I said, it's only one set of questions, and other times it's two sets of questions, depending on the charge.  All right?  Everybody with me?

All right.  Now -- and the only other thing I'll say to you is the -- when you get through Count Fifteen, things change, because Counts Sixteen through Twenty -- and this is page 11, Ms. Manrique, if you'll put that up, on the verdict.

COURTROOM DEPUTY:  Page 11?

THE COURT:  Page 11 of the verdict, please.

So now we're on to a different alleged crime.  So that's why it looks different.  "Counts Sixteen through Twenty charge that the defendant knowingly and corruptly tried to influence, obstruct, or impede the due administration of justice in this proceeding."

So that's a completely different type of crime.  And you see all you have to do on this one is answer unanimously not guilty or guilty.  Okay?  There's no other questions that

go with that one.

Okay.  And then look at the last page -- Ms. Manrique, if you'll put up page 12.

Once you -- and it's important that you're unanimous on every decision.  But once you are, your foreperson will put the date in and sign it and that's your verdict.  Okay?

And I will point out to you that the -- a couple of other things I want to point out to you just to help you.  On Counts Twelve, Thirteen, Fourteen, and Fifteen -- Ms. Manrique, if you'll pull up page 5 of the redacted indictment, please.

You see, ladies and gentlemen, the individuals named. These are the four female witnesses.  Those individuals are named by their initials in the indictment, but -- you actually heard their full names here, but I didn't want you to be confused.  Those are the initials of the women.  And it was done for their privacy, of course.  So that's why it's that way.  But I just want you to -- to understand that that's what it is.  Okay?

And then look on page 7.  And I just want to show you that this is the obstruction of justice, Counts Sixteen through Twenty.  And you'll see -- go up.

You'll see it's just listed by the date -- by the alleged date and the alleged patient.  So that's how that's set up.  Okay?

So you'll take the verdict form with you to the jury

room.  When you've all agreed unanimously on the verdict, your foreperson, as I said, must fill in the form, sign them, date them, put it in an envelope, and notify the court security officer.  You'll then return to the courtroom with your verdict.

Now, if you wish to communicate with me at any time, please write down your message or question, place it in an envelope, and give it to the court security officer.  The court security officer will bring it to me, and I'll respond as promptly as possible, either in writing or by talking to you in the courtroom.  But I caution you not to tell me how many jurors have voted one way or the other at any time.  And don't tell me anything about the -- your internal deliberations.

And I will tell you that many jurors -- juries don't have questions.  It's not required to have questions.  If you're -- if you're making progress and you're understanding what you're doing, that's fine.

If you do have a question, then you can write it down and send it to me through your foreperson.  I'll take a look at it.  I generally need to consult with the lawyers about it.  Sometimes it takes a little while for us to get back to you.  So don't be -- don't be surprised.

And I'll tell you in advance, it is not uncommon that we're not able to answer the questions you're asking.  There are limits to what legally I can talk to you about while you're

deliberating, so -- but that is available for you if you -- if you do need it.  All right?

And the way this will work is that -- in a few minutes I'm going to send you back there.  You can take your notepads, of course, and then all the rules about not talking about the case go out the window and you start talking with each other, but only with each other.

And you first elect a foreperson.  And then you organize yourself.  And we don't try to tell you how to organize yourself or how you should deliberate or anything like that.  That's up to you as the group, with your foreperson kind of guiding you.

The only rule that -- that I have is I would like for every juror to hear everything and be a part of everything.  So what that means is -- let's say you take a break to go to the restroom or something like that, or somebody needs a break, once you -- once all of you are not together anymore, stop deliberating and wait until everybody is back together.

Just, likewise, don't have two or three of you go out, take a break, and talk about the case just among yourselves.  I want everybody to be able to hear everything. And so if you'll respect that so that all the jurors can be participating in all of your deliberations, I would appreciate that.

Other than that, how you go about your deliberations,

how long it takes, all that is completely -- completely in your bailiwick.

Shortly after you go back into the jury room, you'll get the following.  You'll get all the exhibits.  And we also have a device to be able to play the video and audio -- right?  Okay -- back there with you, if you choose to do that.

You will also get -- I'm going to -- I usually give you a couple of copies of these instructions.  If you need more, let me know.  In the past it's just a lot of paper and it's not necessary.  But if -- if you need more jury instructions, you can just ask for them and I'll get them to you.  But you'll get two to start with that you can pass around or do whatever.  But if you need more, let me know.

You'll also get the verdict.  There's only one verdict.  And you'll get that form back there with you.  And you'll get a couple of copies of the redacted indictment.  And, you know, as I'm thinking about it out loud here, I think I'm going to -- I think I'm going to make copies for everybody, because between the instructions and the indictment it's probably good for you -- everybody to have their own set.  So I think I'm going to do that.  So that will take us a little while longer, but I think it will be worth it for everybody to have their own copy.  Okay?

Let me see counsel at sidebar, please.

(Sidebar conference:)

THE COURT:  All previous objections to the Court's instructions are preserved.  Are there any further objections to the Court's instructions or the manner in which the Court has instructed the jury?

MR. MIKE:  Nothing from the government.

MR. FALLGATTER:  No, Your Honor.

THE COURT:  Okay.  All right.  I'm going to dismiss the alternates.

What else you got?

MR. FALLGATTER:  Discuss with them the schedule, in terms of 5 o'clock, is that -- is that what we do now?

THE COURT:  I usually go in at 5:00 and ask them what they want to.

MR. FALLGATTER:  Thank you, Judge.

(The following proceedings occurred in open court, in the presence of the jury:)

THE COURT:  So remember when I told you that a federal jury is 12 people?  We still have 14 people.  So -- and remember I told you it wasn't necessarily the two in the back, but, in fact, it is the two in the back, so -- so if I've got this right -- we lost Ms. Lewis.  So it's Ms. Hoover and Ms. Daubert, right?

Okay.  And so you are the alternates in the case. And so you're not going to be able to deliberate.

So let me just say a couple of things to you.  First

of all, if you wish to remain in the jury assembly room and wait for the verdict to come in, you're welcome to do that. You're not going to be able to be with your colleagues here. But it's not required that you stay.  And many people choose to leave.

I will ask you to do this, though.  Every once in a while -- I've had this happen once to me.  Every once in a while something will happen and we need to replace a juror even while the deliberations are going on.  So I'm going to ask you to remain, for lack of a better term, pure, in terms of don't talk about the case, don't let anybody talk to you about it, don't do any research, all the things that we've talked about, don't look it up or anything, until we call you and let you know there's a verdict.

Once you do that, then those restrictions are lifted. But I'm going to ask you to do that.  Because if we had to call you back, then I'd need to make sure that you hadn't looked at the case.  So please just don't do anything on the case until you hear from us.

But, as I said, you are more than welcome to stay down in the jury assembly room and await the verdict.  I usually will try to meet with the jury after -- after the verdict has been rendered.  And you'd be welcome to sit in on that meeting as well.

You know, it's a funny thing about alternates.  Many

people start out not wanting to be on the jury, but by the time the case is over, they -- they kind of wish they could continue their service.  But your service was just as valuable as anybody else's and it just is the way it works, because we have to have extra people, which you saw how that happened with Ms. Lewis.

So -- so what I'm going to do ask you to do is -- when everybody goes back, I'm going to ask you to gather your belongings, and either -- you need to go downstairs anyway to get checked out and -- from the jury service.  And I'm going to ask you to do that.  And then you can either stay down there or -- or you can go about your business, but we -- we'll call you and let you know when -- when a verdict has been reached.

It is important, though, that you not talk to any of your follow jurors about the case at all.  So -- so thank you for your service and -- and if I see you downstairs later, that's great.  If not, I just want to thank you for your service.

And you'll be given a questionnaire if there's -- if there's anything we can do better, which there always is, don't hesitate to let us know on that questionnaire.  All right?

So with the rest of you, when you go back in, you'll elect your foreperson, after Ms. Hoover and Ms. Daubert leave, and you can say good-bye, just don't talk about the case.

And you'll elect your foreperson.  You'll get

yourself organized.  And as soon as we can, we'll get you all the materials in there and you -- you're under way.  All right?

Everybody good?

(Affirmative response.)

THE COURT:  All right.  And you can take a break, but just make sure it's all at once and everybody is -- is back together before you start talking again.

All right.  Ladies and gentlemen, I'm going to ask you to retire and deliberate upon your verdict.  Thank you.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury exits to begin deliberations, 2:05 p.m.)

THE COURT:  All right.  Everybody can have a seat for a minute.

What I'm going to ask counsel to do is this -- I think Ms. Manrique has been doing a good job of keeping track of these exhibits, but I'm going to ask that the two lawyers -- the lawyers for both sides step up with her, look at everything, be comfortable that what we're sending back there is what we're supposed to be sending back there and that there's no issue.

I did have a question -- the government handed up a redacted 6A and 6B at some point and I gave it to Ms. Manrique. It wasn't clear to me if that's supposed to be the one that's in evidence or not.  What's the deal?

MR. MIKE:  Yeah.  The redacted version is the one

that was supposed to be in evidence.  We didn't pursue the full video.

THE COURT:  Okay.  So -- and that's the only -- there's nothing to replace it with; that's just the one in evidence?

MR. MIKE:  That's correct.

THE COURT:  Okay.  Okay.  That's fine.

Anyway, I'm going to ask y'all to work with her and make sure that all the exhibits are correct before they get taken back there.

I'm going to ask -- I'm going to go ahead and -- Ms. Meyer I think is probably frantically making copies of the jury instructions to give to the jury, and the redacted indictment, because we only had planned for two, but I think it makes sense in this case.

And then, of course, we have the original verdict, which will go back there as well.  There is a machine back there that allows them to play video and audio.  And so -- and then in terms of procedure here, I -- obviously if there's a question we need to be on it, and if there's a verdict we need to be on it.

So I know the government is just a couple of floors away.

Mr. Fallgatter, I'll ask y'all -- you can, of course, remain in the courtroom if you wish, but I ask you to try to

maintain a five-minute call, make sure Ms. Manrique has your information to -- so that we can be back here.  And then if we don't hear anything, my practice usually is at 5 o'clock to ask the courtroom deputy to go in and ask them whether they want to keep going for a while or whether they're ready to go home.

But I will tell you that likely the latest I would let them go would be 6 o'clock, if they want to go.  There's a lot of logistics involved in keeping the courthouse open, so forth.  But if they tell me they want to go a little bit longer after 5:00, I'll let them do that, but not too much longer.  So that's how we'd play that.

So if you-all want to make sure you're back here at 5:00, because if I do -- if I do send them home, at least the first day of deliberations, I'll probably reinstruct them on all the rules and everything, so...

All right?  Anything else?

Anything else?

Yes, sir?

MR. FALLGATTER:  From my office down by the Florida Theater, I can normally be -- if I have a phone call from the office, I would typically be in the courtroom within five minutes, but I don't want to press my luck on that.  But is that -- is that acceptable?  Or would you rather I -- I mean, there's a conference room out here, so...

THE COURT:  Well, there's a conference room here.

There's also a lawyer's lounge on the first floor you can use. You know, I don't know, Mr. Fallgatter.  That -- it's not really five minutes.  And I -- and I don't know -- I just don't like to keep the jury waiting if they've got something on their mind or whatever.  So I'll let you be the best judge of it, but I do want you to be readily available.  And, of course, Dr. Hollington needs to be as well.

MR. FALLGATTER:  We'll probably stay around here for a while, then, Your Honor, to make sure.

THE COURT:  Yeah.  Okay.

All right.  And, also -- Ms. Manrique, do you have the original verdict there?

COURTROOM DEPUTY:  Yes.  And I have it for the jurors.

THE COURT:  Let me see.

(Judge confers with courtroom deputy.)

THE COURT:  Very good.

Anything from counsel?

MR. MIKE:  No, Your Honor.

THE COURT:  Mr. Fallgatter, anything?

MR. FALLGATTER:  Your Honor, it's always -- I'll tell you, before a trial it's hard to comprehend just how much time and effort goes into the work that everybody does, so certainly I'd be remiss if I didn't, on behalf of Dr. Hollington, express my gratitude for everyone in the courtroom for all the diligent

work that's been put in in the last several days.

THE COURT:  Yes, sir.  I think that's appropriate.  I know, for example, Ms. Bishop has been staying up at night to get the transcripts.  Ms. Manrique and Ms. Meyer have been working hard; the court security officers.

It is -- it takes a village, that's for sure.  And -- and I -- and I'll say this to counsel.  You know, this is a complex case.  And -- and I think the case was fairly and well tried and -- and so, obviously, when the verdict comes back, there will be other things on our minds, but I -- I will say that.  And so anything -- I think there's nothing else.  So we're going to stand in recess until the call of the jury.  But make sure you work with Ms. Manrique on the exhibits.

Thank you.

MR. FALLGATTER:  Thank you.

COURT SECURITY OFFICER:  All rise.

(Recess from 2:11 p.m. to 5:15 p.m.; all parties present.)

COURT SECURITY OFFICER:  All rise.  This Honorable Court is back in session.

Please be seated.

THE COURT:  We do have a verdict in the case.  And I'm just going to review it, and then -- you can have the jury come out, please, while I'm reviewing it.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury enters with verdict, 5:39 p.m.)

COURT SECURITY OFFICER:  Please be seated.

THE COURT:  All right.  Ladies and gentlemen, who is your foreperson?

FOREPERSON:  That's me, Your Honor.

THE COURT:  All right, sir.  You have handed me a verdict.  And the only question that I'm asking you right now is:  Is this a unanimous verdict of the jury?

FOREPERSON:  Yes, Your Honor.

THE COURT:  Okay.  So here's what's going to happen now, ladies and gentlemen.  I will publish the verdict, which means -- it just means I read it out loud.

I'm going to ask you to listen carefully to the way I read the verdict, and -- because I'll be asking each of you individually whether this is the verdict that you agreed to.  Okay?

All right.  In the United States District Court, Middle District of Florida, Jacksonville Division, *United States of America versus Scott Andrew Hollington*, Case No. 3:22-cr-141-TJC-PDB, Verdict.

Counts Two through Fifteen.  Counts Two through Fifteen charge that the defendant knowingly or intentionally unlawfully distributed or dispensed controlled substances.

As to Count Two, we, the jury, unanimously find the defendant guilty.

And then under the -- under the questions that the

jury were asked, the jury has found that we, the jury, unanimously find that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

As to Count Three, we, the jury, unanimously find the defendant guilty.

And the jury has also unanimously found that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

As to Count Four, the jury unanimously finds the defendant guilty.  And the jury unanimously finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

Having found the defendant guilty of Count Four, the jury unanimously finds that the defendant distributed or dispensed the following, and they have checked amphetamine. They did not check the other drug.  So just amphetamine was checked.

As to Count Five, we, the jury, unanimously find the defendant guilty.  The jury unanimously also finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical

purpose and outside the usual course of professional practice.

And the jury unanimously finds that the defendant distributed or dispensed the following:  amphetamines, buprenorphine.  The jury has checked both those drugs.

As to Count Six, we, the jury, unanimously find the defendant guilty.  The jury unanimously finds also that the defendant knowingly or intentionally distributed or dispensed controlled substances.  And the jury has found both not for a legitimate medical purpose and outside the usual course of professional practice.

As to Count Seven, we, the jury, unanimously find the defendant guilty.  The jury unanimously also finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

The jury -- having found the defendant guilty of Count Seven, the jury also unanimously finds that the defendant distributed or dispensed the following:  amphetamine and benzodiazepine.  The jury checked both of those.

As to Count Eight, we, the jury, unanimously find the defendant guilty.  The jury unanimously also finds the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

As to Count Nine, we, the jury, unanimously find the

defendant guilty.  Having found the defendant guilty, the jury unanimously finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

The jury also unanimously finds that the defendant distributed or dispensed the following:  amphetamine, buprenorphine, and alprazolam.  All three are checked.

As to Count Ten, we, the jury, unanimously find the defendant guilty.  Having done so, the jury unanimously finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

As to Count Eleven, we, the jury, unanimously find the defendant guilty.  Having so found, the jury unanimously finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, both not for a legitimate medical purpose and outside the usual course of professional practice.

The jury unanimously also finds that the defendant distributed or dispensed the following.  And the jury has checked amphetamine, buprenorphine, and alprazolam.

As to Count Twelve, we, the jury, unanimously find the defendant guilty.  The jury having so found also

unanimously finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, and just outside the usual course of professional practice is checked.

As to Count Thirteen, we, the jury, unanimously find the defendant guilty.  And having so found, the jury unanimously finds that the defendant knowingly or intentionally distributed or dispensed controlled substances, and just outside the usual course of professional practice is checked.

Then the jury unanimously finds that the defendant distributed or dispensed the following:  amphetamines and zolpidem tartrate.  Both are checked.

As to Count Fourteen, we, the jury, unanimously find the defendant guilty.  The jury having so found unanimously finds the defendant knowingly or intentionally distributed or dispensed controlled substances, and just outside the usual course of professional practice is checked.

And then the jury unanimously finds that the defendant distributed or dispensed the following: buprenorphine and alprazolam.

As to Count Fifteen, we, the jury, unanimously find the defendant guilty.  Having so found, the jury unanimously finds the defendant knowingly or intentionally distributed or dispensed controlled substance -- substances.  And the jury checked only outside the usual course of professional practice.

The jury also unanimously finds that the defendant

distributed or dispensed the following:  buprenorphine and benzodiazepine.

Counts Sixteen through Twenty are the obstruction of justice counts.

As to Count Sixteen, we, the jury, unanimously find the defendant guilty.

As to Count Seventeen, we, the jury, unanimously find the defendant guilty.

As to Count Eighteen, we, the jury, unanimously find the defendant guilty.

As to Count Nineteen, we, the jury, unanimously find the defendant guilty.

As to Count Twenty, we, the jury, unanimously find the defendant guilty.

So say we all this 25th day of July, 2023, signed by the foreperson.

So, ladies and gentlemen, I've now read the verdict that you have returned to me.  And I'm simply going to call you by number, not name, starting with you, sir.  And I'm going to just ask you to stand up and tell me whether this is your true verdict; that is, this is the verdict that you agreed to.  All right?

Juror No. 1, is this your true verdict?

JUROR:  Yes, sir.

THE COURT:  Juror No. 2, is this your true verdict?

FOREPERSON:  Yes, Your Honor.

THE COURT:  Juror No. 3, is this your true verdict?

JUROR:  It is, Your Honor.

THE COURT:  Juror No. 4, is this your true verdict?

JUROR:  Yes, sir.

THE COURT:  Juror No. 5, is this your true verdict?

JUROR:  Yes, sir.

THE COURT:  Juror No. 6, is this your true verdict?

JUROR:  Yes, Your Honor.

THE COURT:  Juror No. 7, is this your true verdict?

JUROR:  Yes, sir.

THE COURT:  Juror No. 8, is this your true verdict?

JUROR:  Yes, Your Honor.

THE COURT:  Juror No. 9, is this your true verdict?

JUROR:  Yes, Your Honor.

THE COURT:  Juror No. 10, is this your true verdict?

JUROR:  Yes, Your Honor.

THE COURT:  Juror No. 11, is this your true verdict?

JUROR:  Yes, Your Honor.

THE COURT:  Juror No. 12, is this your true verdict?

JUROR:  Yes, sir.

THE COURT:  The clerk will record the verdict.

Ladies and gentlemen, this concludes your jury service.  I cannot tell you how much we appreciate your service.  This was a difficult case.  And it took a little

while.  It took into the second week.  But you-all were always here on time.  You were always very attentive.  You always followed the instructions of the Court.  And for that, we -- we all are grateful.

As I think you can see from your service, now having completed it, how important it is, how important it is that we have 12 people that will come in who are -- who are citizens, who are persons who don't have any connection to the Court or to the government or anybody else, that they are true -- true citizens.  They come in, they give their time, they listen to the evidence, and they render a verdict according to the law. And we don't -- we don't have a jury system without people like you.

So with my gratitude, I'm going to discharge you from your service.  And given the lateness of the hour -- I typically will -- would come down and meet with you.  But given the lateness of the hour, I know you're probably anxious to get on.  So here's what's going to happen.

When I discharge you, you can go in and pick up your stuff.  Go down to the first floor.  Jim Leanhart, our division manager, is down there.  He'll help you with your paperwork and get you out of here just as soon as he can.

They will also give you a questionnaire in addition to your paperwork.  If you don't feel like filling it out tonight, we do appreciate if you do fill it out and send it

back.  We do like to know what we're doing right and what we can do better, because we're always trying to do better.

I think you can see just from your interaction with the court personnel that we do try to do a good job, but there's always room for improvement.

And the other thing I wanted to tell you is that my instructions to you no longer apply.  So you can talk about the case if you wish to.  People can ask you questions about it.  You can answer them.  You -- there's no further restrictions on your -- you know, looking at -- looking at things online or anything.

The only thing I will say to you is this, that -- it's not a rule, but it's a policy that I recommend to you, and that policy is what went on in the jury room should stay in the jury room.  That's how I feel about it.  That's what I would recommend to you.  But there's no rule that says that.  So you -- you have to just use your own judgment.

Now, one thing that's true is nobody -- nobody can make you talk about it.  I don't know if you might be approached by a member of the media or something like that.  I recommend you not talk about your service if you are.

And -- but I want to be clear, there's absolutely no requirement that you speak with anybody about it, including any member of the media or anybody else.

And so that's my recommendation to you, but it's not

a rule of the Court.  And one thing I can tell you for sure is that the rules of the Court do prohibit the lawyers and the parties from contacting you.  And so that won't be happening.  So that's just kind of the rules of the road from now on.

So, again, because of the lateness of the hour, I'm just going to let you get on your way rather than try to hold you up, because I have to spend some time here before I can come down.

So thank you so much for your service.  Thank you for doing your job as a citizen.  You can all be proud of that.  And with that, I wish you well.  And I'm going to discharge you at this time.

Thank you, ladies and gentlemen.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury excused and exits the courtroom, 5:54 p.m.)

THE COURT:  All right.  I'll be entering an adjudication of guilt and setting the matter for a sentencing pursuant to the jury's verdict.  That sentencing will typically occur in about 90 days, Dr. Hollington.

And during that -- during that period of time, the probation office will be contacting you through your lawyer.  And they do all kinds of work and -- in order to prepare a report that helps me to decide how to sentence you.  They get all kinds of sources.  And Mr. Fallgatter can review all this with you.  But that will be occurring over approximately the

next 90 days or so.  And then we will have a sentencing hearing in the case.

Y'all can have a seat.

So what is the government's position -- Dr. Hollington has been on supervision -- pretrial release for the whole time, and without incident as far as I can tell.  So what is the government's position on a continuation on conditions of pretrial release?

MS. WASHINGTON:  Your Honor, the United States would ask that Mr. Hollington be remanded into custody pursuant to 3143.

THE COURT:  Mr. Fallgatter, do you wish to be heard?

MR. FALLGATTER:  Well, it's shocking to hear that they would ask for that, given our cooperation with them all these months.  And -- and, of course, we're dealing with very modest amounts of drug quantities because of the prescriptions.

I haven't tried to do the weight calculation, but they're very small.  So I haven't researched the sentencing guidelines, but I'm hopeful that they probably don't even call for an incarceration sentence.  These are Schedule -- some were III and IV.  And they're very modest amounts.

And so I'm just really disappointed to hear the government ask for that, given his status as a medical professional.  And, you know, we've been very compliant with the government and the Court.  So I would ask the Court to

continue the conditions of release.

THE COURT:  Well, there's several things at play here.  The statute is -- the statute involved is 3143(a)(2).  And I'm not going read it word for word, but it says:  The judicial officer shall order that a person who's been found guilty of an offense in a case described in subparagraph (a), (b), or (c) of subsection (f)(1) -- subsection (c) of (f)(1) is a drug case.

And I take it, Ms. Washington, this case qualifies -- I believe it has to have a ten-year max on it.  Is that -- I take it that this case qualifies.  Is that correct?

MS. WASHINGTON:  Yes, Your Honor.

THE COURT:  Okay.  And -- and is awaiting an execution of sentence be detained unless the judicial officer finds there's substantial likelihood that a motion for acquittal or a new trial will be granted, or an attorney for the government has recommended that no sentence of imprisonment be imposed on the person, and the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.  I don't think either one of those -- those exceptions are going to apply here.

However, 18, USC, Section 3145(c) does say that a person who meets the conditions of release set forth in subsection 3143(a)(1) or (b)(1) may be ordered released under

appropriate conditions by the judicial officer if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

So, you know, I always -- and the other -- the other thing that's true is that in scenarios where somebody pleads guilty, we typically wait until the time of sentencing to make the decision as to whether detention is going to be appropriate.

So here's where I am. If you -- if the question is whether there's any danger to the community or whether I view Dr. Hollington as a risk of flight, I don't have any reason to think either one of those things are true.

He was released on relatively minor conditions of pretrial release. As far as I know he's been compliant. I certainly have not been given to think otherwise.

However, we do have the statute that says what it says. The government, I have to say, is not always completely consistent about when it invokes it, but they've tried -- they're invoking it now.

But I do think that Dr. Hollington -- if this is really the government's position, I do think Dr. Hollington should be given an opportunity to -- if he cares to, to try to demonstrate exceptional reasons or to have a further discussion about this before I remand him into custody.

And so I'm going to allow Dr. Hollington to remain

under the current conditions of pretrial release pending a further hearing before this Court as to whether detention in advance of sentencing is either required or appropriate, given the law and the facts as will be applied.

And the Court will either set that hearing or ask the magistrate judge to do so, depending on the schedule.  And we'll do it sooner rather than later.  But I'm not worried that Dr. Hollington is going anywhere.  I'm not worried that he's a danger to the community.  I know he knows -- and I'll say it right to your face.

Dr. Hollington, you -- you couldn't possibly -- it would be so against your interest to flee or to do anything other than appear exactly when you're supposed to, because it would just add to your troubles.  And I -- I think you understand that.

Do you not, sir?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Okay.  So I'm not worried about flight. I'm not worried about non-compliance with the conditions until we can have a hearing to sort this out.  But I'm not prepared at this time to remand Dr. Hollington, given the whole circumstances of the case, how long he's been out, the nature of the crime, and the -- and the nature of Dr. Hollington's situation.

So the Court will allow Dr. Hollington to remain

at -- on conditions of release until the Court can convene a hearing to hear the government's motion to have him remanded under 3143(a)(2).

And I'll try to convene that hearing, either myself or the magistrate judge, as soon as I possibly can.

MR. FALLGATTER:  On that scheduling issue, if I might -- I don't know if the Court recalls when we were scheduling the case.  I have a family reunion.  I'm leaving for North Dakota on Friday.  I get back on the 7th of August.  So that -- again, your schedule is more important, but I'm out of state until basically the -- the week of August 7th.

Thank you, Your Honor.

THE COURT:  Okay.  All right.  I'm not aware -- obviously, Mr. -- or Dr. Hollington has his -- whatever rights he has under the rules.  All I have right now is a -- is a guilty verdict.

There will be an adjudication of guilt based on that verdict and setting a date for sentencing.  Any other motion practice or anything would be according to the rule -- the Federal Rules of Criminal Procedure.

Is there anything else from the government, Mr. Mike?

MR. MIKE:  No, Your Honor.

THE COURT:  Anything else, Mr. Fallgatter?

MR. FALLGATTER:  No.  Thank you, Your Honor.

THE COURT:  All right.  So, Dr. Hollington, I want us

to be clear, I'm allowing you temporarily to be on conditions of pretrial release, the same conditions that you're under now, same travel restrictions.  Pretrial will be in contact with you.  So I'm allowing that until we can have a hearing to determine that situation.  And I want your personal assurances that -- that you will appear for all future proceedings as required.

THE DEFENDANT:  Yes, Your Honor.  I will appear at all future proceedings.

THE COURT:  All right.

MR. FALLGATTER:  And I think the Court may know.  He has a handicapped son at home.  He's got a wife unemployed.  So I, you know --

THE COURT:  Well, that's -- Mr. Fallgatter, I don't know his situation whatsoever.  But I have told you that there is an exceptional-reasons provision in the statute.  And that's why we're going to have a hearing.

If the government wants to proceed under the statute, then I think you should be entitled to assert whatever positions, either legal or factual, that you want to.  And that's going to be the purpose of the hearing.

I think it would be unfair today to try to convene that hearing or to make any decisions since, you know, we didn't know how this was going to turn out.

And I always worry -- and, you know, it's a -- it's a

difficult thing.  You don't want to raise these issues in advance, because you don't want to indicate to somebody that you're expecting a bad result or you're -- and so I always worry about it.  I always worry that clients don't really fully appreciate what could happen to them.

But fortunately in this case -- and so I didn't raise it earlier.  Fortunately in this case I'm comfortable that Dr. Hollington can remain on conditions of pretrial supervision until I can get to a hearing and sort the matter out.

MR. FALLGATTER:  Okay.  Thank you.

THE COURT:  All right.  We're in recess.

COURT SECURITY OFFICER:  All rise.

(The proceedings concluded at 6:05 p.m.)

- - -

## CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )

    I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

    DATED this 9th day of May, 2025.

                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC