IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

           Plaintiff,          Case No. 3:22-cr-141-TJC-PDB

 vs.          August 10, 2023

SCOTT ANDREW HOLLINGTON,          10:03 a.m.

        Defendant.          Courtroom No. 10D
_____


MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


GOVERNMENT COUNSEL:

      **KIRWINN MIKE, ESQ.**
      United States Attorney's Office
      300 North Hogan Street, Suite 700
      Jacksonville, Florida  32202


DEFENSE COUNSEL:

      **CURTIS SCOTT FALLGATTER, ESQ.**
      Fallgatter & Catlin, PA
      200 East Forsyth Street
      Jacksonville, Florida  32202


COURT REPORTER:

      Shannon M. Bishop, RDR, CRR, CRC
      2442 Atlantic Boulevard
      Jacksonville, Florida  32207
      Telephone:  (904) 396-1050
      s.bishop@firstcoastcr.com


(Proceedings recorded by mechanical stenography;
transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

Page No.

WITNESSES:

**JEAN HOLLINGTON**

Direct Examination............................... 6

# E X H I B I T S   R E C E I V E D

Page No.

Plaintiff's Exhibits:
(None)

Defendant's Exhibits:
(None)

Court's Exhibits:
1, 2, 3, 4, 5, and 6............................38

1           P R O C E E D I N G S

2   August 10, 2023                              10:03 a.m.

3           COURT SECURITY OFFICER:  All rise.  The United States

4   District Court in and for the Middle District of Florida is now

5   in session, the Honorable Timothy J. Corrigan presiding.

6           Please be seated.

7           THE COURT:  Good morning.  This is *United States*

8   *versus Scott Hollington*.  That's 3:22-cr-141.

9           Mr. Mike represents the government.

10          Mr. Fallgatter represents Dr. Hollington, who is

11  present in the courtroom.

12          At the conclusion of the trial last month, the

13  government -- following the conviction of Dr. Hollington on the

14  qualifying drug counts, the government moved for his immediate

15  remand into custody pursuant to the statute.

16          The Court determined that it was not in the position

17  at that point to make a decision and that Dr. Hollington had

18  been compliant with his pretrial conditions of release;

19  therefore, the Court determined to hold over the consideration

20  of the government's motion to remand until today.

21          As I recited at the time that the government made its

22  motion, this is a qualifying -- or these are qualifying

23  convictions under 18, USC, Section 3143(a) (2), which requires

24  the Court to remand the defendant into custody in drug cases

25  upon a conviction, absent certain requirements which are not

1    present here.

2         However, notwithstanding that provision, another

3    provision, 18, USC, Section 3145(c), allows the Court to

4    continue a person on bond release and to allow that person to

5    voluntarily surrender for the service of sentence for

6    exceptional reasons.

7         So it seems to me that -- Mr. Mike, does the

8    government's position remain that they're seeking remand at

9    this time?

10        MR. MIKE:  Yes, Your Honor.

11        THE COURT:  Okay.  It seems to me that that's all the

12   government needs to say.  They don't really have to make a

13   showing.  None of the exceptions to that statute apply.  So now

14   the question is whether, Mr. Fallgatter, Dr. Hollington intends

15   to argue for exceptional reasons and, if he does, for you to go

16   ahead and make that argument.

17        MR. FALLGATTER:  Thank you, Your Honor.  Just a

18   precursor, with your permission, Ms. Jean Hollington, his wife,

19   is here.  I was going to call her to provide some of that

20   information about exceptional circumstances.  Then I have a

21   number of exhibits and argument.  So I would shift gears after

22   her brief testimony.

23        During her testimony we have a three-minute video

24   that their son recorded.  And if you'll permit, I would ask

25   that that -- we'll play it with your permission, but I'd ask

```
 1    that the thumb drive be perhaps sealed, just because it's a
 2    little bit sensitive.
 3              THE COURT:  Okay.
 4              MR. FALLGATTER:  So may I call Ms. Jean Hollington to
 5    the stand?
 6              THE COURT:  Yes.
 7              THE WITNESS:  Good morning, Your Honor.
 8              THE COURT:  Good morning.
 9              COURTROOM DEPUTY:  If you could please stand.
10              THE WITNESS:  Oh, stand.
11              COURTROOM DEPUTY:  Please raise your right hand.
12              Do you solemnly swear that the testimony you are
13    about to give before the Court will be the truth, the whole
14    truth, and nothing but the truth, so help you God?
15              THE WITNESS:  I do.
16              COURTROOM DEPUTY:  If you could please state your
17    full name and spell your last name for the record.
18              THE WITNESS:  It's Jean Hollington,
19    H-o-l-l-i-n-g-t-o-n.
20              COURTROOM DEPUTY:  Thank you.
21              MR. FALLGATTER:  Just I forgot to thank you -- I know
22    I was off on vacation last week.  Setting it today was a
23    blessing in terms of my getting back and being able to prepare,
24    so -- I know your schedule is busy, so --
25              THE COURT:  Yes, sir.
```

1           MR. FALLGATTER:  -- thank you for accommodating me.

2      **JEAN HOLLINGTON, DEFENDANT'S WITNESS, SWORN**

3                    **DIRECT EXAMINATION**

4    BY MR. FALLGATTER:

5    Q.   Ms. Hollington, would you tell His Honor a bit about your

6    background.

7    A.   I am Scott Hollington's wife, Jean Hollington.  I'm a

8    painter in St. Augustine.  I have a representation in a gallery

9    there.  I am also a stay-at-home mom with a 32-year-old son who

10   has multiple disabilities, mostly impulse control, but I have

11   been limited in my ability to leave him because he does a lot

12   of crazy stuff when he's left to his own devices.  So Scott and

13   I have been a team in parenting Kevin for 32 years.  And we

14   have a younger son, Brian, who is married and lives in

15   Minnesota.

16   Q.   You've had some familiarity with Dr. Hollington's work at

17   the clinic, have you not?

18   A.   Yes.

19   Q.   And do you have a general understanding as to his

20   dedication to his patients?

21   A.   Yes.

22   Q.   Would you share that with His Honor?

23   A.   You know, because of confidentiality I don't know a whole

24   lot about his patients, but I do know that the few times that

25   I've interacted they've always been very grateful.  Scott would

1    discuss them with great respect.  And he was always looking for

2    the best way to help them.

3            I never saw the disrespect or behavior that the court

4    has sort of portrayed him as.  I -- he always had the utmost

5    respect and was true to his Hippocratic Oath, really, and "do

6    no harm."  He would -- he would think very carefully.  He was

7    reading medical texts and new papers to find out what was the

8    best course of treatment.

9            He's very scholarly.  He's a very intellectual man.

10   But he's also a very compassionate person.

11   Q.   And, Ms. Hollington, in the vernacular of our judicial

12   system, "the Court" means His Honor.  You mean the court's

13   system has portrayed your husband, not His Honor?

14   A.   Not Your Honor.

15           THE WITNESS:  So I'm sorry if I mischaracterized your

16   opinion of him.  I don't know, but...

17           THE COURT:  Yes, ma'am.  That -- I understood what

18   you meant.

19           THE WITNESS:  Actually, it was the media that I read.

20   I wasn't in the courtroom.

21   BY MR. FALLGATTER:

22   Q.   So I think you're familiar with the fact that we did file

23   a motion for -- to declare Dr. Hollington indigent.  That never

24   got granted.  But can you briefly explain to His Honor your

25   modest lifestyle.

1    A.    We moved here because we wanted to live in a place where

2    we could -- we wouldn't need to travel away from Kevin, who is

3    very difficult to travel with.  So we moved here to be close to

4    family and to have a family-centered, faith-centered life.  We

5    attend Catholic church together.  We are, you know, really

6    close to our neighbors, close to my family here.  And we do

7    not -- we do not live extravagantly.  We live very simply.

8    Q.    You live in a townhome --

9    A.    We live in a townhome.

10   Q.    -- which is in a duplex?

11   A.    Yes.

12   Q.    And you own your half of it?

13   A.    Correct.

14   Q.    Your husband -- the raid was back in October of last year.

15   He's not been employed since then, other than doing tour -- a

16   couple of tours for St. Augustine?

17   A.    Yeah.  Yeah.  He was unable to secure any work because of

18   this indictment.  So he did choose to lead a little tour.  And

19   it's only been three times that he's gone.

20   Q.    And am I to understand that's $50 a time?

21   A.    Yes, it is.

22   Q.    Okay.  So he's been the principal breadwinner with your

23   family over the years?

24   A.    Yes.  For our entire marriage he's been the sole support,

25   really.  I've had smaller jobs, but nothing sustaining.

1  Q.    If we can have -- share briefly with His Honor some

2  background about your son Kevin.  Can you briefly report to His

3  Honor the health issues that you and your husband have been

4  dealing with since his birth and what caused it.

5  A.    Yeah.  Kevin was born and he was brain damaged at birth.

6  He has poor impulse control.  He is very, very emotional.  He's

7  very, very bright.  He can fix computers.  He can do all sorts

8  of wonderful things, but he can't cross the road without

9  support, because he just doesn't look.  So we really have to be

10 with him 24 hours a day.

11 Q.    He's been diagnosed with autism?

12 A.    Autism and cerebral palsy.  And he also has a neurogenic

13 bladder.  Which he has to cath himself throughout the day.  And

14 his kidneys are in decline right now also.  We've been seeing a

15 urologist.  And he's not -- not doing very well.

16 Q.    At what age did he actually become competent in talking?

17 A.    It took many years.  We were told he'd be untrainable,

18 mentally handicapped.  And then at seven he was able to be

19 understood by his teachers.  And they found out he was reading.

20 They found out his vocabulary was without a cap, and stuff that

21 Scott and I had already figured out.

22        But his formation of the words, because of his

23 physical dysfunction, he couldn't do it.  So it was hard for

24 him to communicate.  But he is very highly -- highly verbal

25 now, and really a delight to be around.  He's a -- he's a joy

1   in our lives.

2   Q.    And at what age was he able to get around without a walker

3   or a wheelchair?

4   A.    That was also around seven.  He -- prior to that he also

5   was using a wheelchair or using a walker.  And then he does

6   ambulate around now.  He's very cautious on the stairs, I mean,

7   because we have to watch him.  But we -- we luckily have an

8   elevator.

9         So on the days he's in -- really sort of feeling like

10  he's not got good balance, he can use the elevator.  He often

11  does that.  He'll come in from being fatigued and he'll just

12  hop into the elevator and go to his room.  But he does have

13  some physical -- it's hard for him to walk.  And he does need

14  to take breaks when we're out and sit down.

15  Q.    You had planned to come to the trial but did not.  Would

16  you explain to His Honor why not.

17  A.    We have a -- through APD we have a paraprofessional who

18  comes and stays with Kevin or takes him out in the community.

19  That young woman's life just completely imploded and she was

20  unavailable to me.  We had booked the date for me to come.

21        And I can tell you she -- her car was repossessed.

22  Her home -- you know, it was terrible.  And it was like a

23  storm.  And so I was unable to secure anybody who Kevin would

24  accept.  And I was more in fear of Kevin losing his temper or

25  losing control while I was at court.  So I chose -- prioritized

1  Kevin, although I really did want to be here.

2  Q.  Today how did you make those arrangements?

3  A.  Today my sister came in from -- last evening she came in

4  from New Hampshire, actually.  And she's -- she's very close to

5  Kevin.  So I knew that Kevin would be safe this morning.  And

6  she arrived at our home this morning and is there present with

7  him now.

8         And I can't just leave him with a neighbor.  I can't

9  just leave him on his own -- to his own devices, because he'll

10 end up out in the street walking around, talking to people he

11 shouldn't, maybe looking in windows.  He is a full-time job.

12 Q.  So the brain damage at birth involves a prefrontal cortex,

13 I understand?

14 A.  Yes.

15 Q.  And that causes serious control issues?

16 A.  It does.  He doesn't have a very good sense of pain

17 either.  So he can injure himself without being -- without

18 realizing it.  And, also, he can be aggressive and not actually

19 understand that he's being aggressive.  It affects his

20 control -- his impulse control.

21 Q.  Has he assaulted you in the past?

22 A.  He has.

23 Q.  Has he assaulted his grandmother?

24 A.  Yes.

25 Q.  So you don't have the physical strength as your husband

1   does.  How important is it for your husband to be around to

2   help you --

3   A.   It's vital.

4   Q.   -- with your son?

5   A.   It's vital.  Scott is a stabilizing presence in the house.

6   They have a wonderful relationship, very respectful.  Kevin

7   respects me also, but he really needs a male presence in his

8   life.

9          THE WITNESS:  And his father has always been a big

10  support to Kevin, Your Honor.

11  BY MR. FALLGATTER:

12  Q.   I had asked that you-all -- I understand -- let me back

13  up.

14          For Kevin to be in court in an emotional situation

15  would be pretty difficult for him, would it not?

16  A.   Yes, sir.

17  Q.   And so I had asked you-all to -- asked Kevin if he would

18  do at least a video or something.  Have you done that?

19  A.   Yes.  I asked Kevin to do a video.

20          THE WITNESS:  And he read an outline of what

21  Mr. Fallgatter put together.  And then he just sat in his room

22  and he made his own video.  So you really can't tell Kevin what

23  to do.  He has a mind of his own.  So this is his own

24  testimony.

25  BY MR. FALLGATTER:

1    Q.    The outline you're talking about, I drafted some character

2    letter instructions.  But he didn't really follow those, did

3    he?

4    A.    No, No.  He went on his own -- own path.

5          MR. FALLGATTER:  Your Honor, we have a three-minute

6    video of Kevin.

7          THE COURT:  All right, sir.

8          MR. FALLGATTER:  It's -- it would be Exhibit 1.  I

9    have a thumb drive.

10         THE COURT:  I will say to you that I don't -- I mean,

11   obviously, the government is going to be entitled to

12   cross-examine if they wish, but I don't really have any doubt

13   about what Mrs. Hollington is saying.  I just don't.

14         And so if it's traumatic for the family or

15   traumatic -- would be something that Kevin wouldn't appreciate,

16   I don't feel the need to have it publicly displayed, but I'll

17   leave that up to you.

18         MR. FALLGATTER:  It's a very sweet video.

19         THE COURT:  All right.  Go ahead.

20         MR. FALLGATTER:  If we can publish it.

21      (Video played.)

22   BY MR. FALLGATTER:

23   Q.    Now, Ms. Hollington, Dr. Hollington's mother resides in

24   Jacksonville, does she?

25   A.    Yes.

1  Q.    How old is she?

2  A.    She, I believe, is 85.  And she is in assisted living.

3  Q.    Can you tell us -- well, let me back up.  He does provide

4  support to her as well?

5  A.    Yes.

6  Q.    What conditions is she suffering?

7  A.    She is not very good at walking around.  So she uses a

8  walker or a wheelchair, for the most part.  She is on the

9  early -- well, middle stage of dementia at this point.  She

10 will repeat herself and forget what she's been told.  She has

11 difficulty with her finances.  And we are very involved with

12 her.  Scott sees her more than once a week.

13 Q.    And she has osteoarthritis as well?

14 A.    Yes, she does.  She's in severe pain, actually.  And she's

15 also been having a lot of trouble with swallowing and chest

16 pain.

17 Q.    Does he provide transportation for her to, among other

18 things, medical appointments?

19 A.    Yes, because there's a shuttle, but it doesn't always run

20 when she needs it.  So her doctors' appointments, Scott has

21 been filling in.

22 Q.    You're aware that your husband served in the military,

23 right?

24 A.    Yes, sir.  He was in the Air Force beginning in medical

25 school, just because it assisted him in paying for medical

1  school.  And then he did his residency through the military as

2  well.

3          MR. FALLGATTER:  Your Honor, I have the DD-214 marked

4  as Exhibit 2.

5          THE WITNESS:  We lived on Air Force bases -- on an

6  Air Force base once, but we moved around from the military,

7  from San Antonio to Dayton, Ohio; lived on Wright-Patterson Air

8  Force base.  And Scott finished up as a major when he

9  separated.

10  Q.    And then went out into private practice.  And he got an

11  honorable discharge, did he not?

12  A.    Yes, sir.

13  Q.    So he worked from some topnotch facilities and hospitals

14  after that, did he not?

15  A.    He did, Warford Hall and Wright-Patterson Air Force base.

16  Q.    Let me ask you:  Are you aware of some health issues that

17  Dr. Hollington himself has?

18  A.    Yes.  Scott struggles with his blood sugar, controlling

19  it.  He has diabetes.  He also has some limited range of motion

20  with his shoulders and arms.

21  Q.    And does he have a bladder dysfunction?

22  A.    Yes, he does.  He has a very -- it's been many years now.

23  He has chronic infections and has a slow bladder, so he

24  requires a toilet for many hours in the day.

25  Q.    Is he also suffering osteoarthritis?

1  A.   Yes.

2  Q.   So -- and he's rather obese?

3  A.   He is.

4        MR. FALLGATTER:  Your Honor, Exhibit 3 is a composite

5  of his medical records, reciting various medical conditions.

6  BY MR. FALLGATTER:

7  Q.   So, Ms. Hollington, you know the purpose of the hearing

8  today is to determine -- you've heard His Honor explain whether

9  or not there are exceptional circumstances such that prior to

10 sentencing your husband should be remanded into custody.  You

11 recited a number of reasons why you and your son and his mother

12 need him.

13       Can you share any other comments with His Honor about

14 your assurance that, of course, your husband will show up for

15 court and sentencing, but also as to how important it is

16 that -- for all those reasons, including his health, that he

17 not be incarcerated at this time?

18       THE WITNESS:  Yes.  Your Honor, it's important for me

19 and my family, but it's also important for him.  I think he's

20 been exemplary as a citizen.  He has -- he, in my experience,

21 has always been a positive influence in the community.

22       I do not see any risk of a flight or any sort of

23 worry about him not appearing before the sentencing date.  He

24 will be here on time.  He has always been faithful with that,

25 with showing up and being there and supporting us.  And I -- I

1    trust that he will continue to do that.  And I believe he would

2    absolutely honor the Court's decisions.

3         MR. FALLGATTER:  Thank you.  No further questions.

4         THE COURT:  Mr. Mike, do you wish to cross-examine?

5         It's not required.

6         MR. MIKE:  No, Your Honor.

7         THE COURT:  Ma'am, I'm going to -- I'm going to let

8    you step down in a minute, but let me just say something to

9    you, because I think it's important.  I'm going to make a

10   decision this morning about the limited issue of whether your

11   husband will be permitted to remain on conditions of release

12   until his sentencing, which right now is set for October 18th.

13        THE WITNESS:  Yes, sir.

14        THE COURT:  And I'll make that decision based on what

15   I think the law requires and so forth.  But if I do -- if I do

16   allow him to remain out for the -- for the reasons that you've

17   talked about, because there have to be exceptional reasons, but

18   you articulated some reasons that -- that I could consider.

19        THE WITNESS:  Thank you.

20        THE COURT:  I just -- of course, what made me think

21   about it was when I'm listening to you talk I'm imagining many

22   of the things you're saying to me this morning you would also

23   say to me at the time of his sentencing hearing, right?

24        THE WITNESS:  Yes, sir.  Yes.

25        THE COURT:  So I just want you to understand that

 1    it's two different things.  And so if I'm able to allow him to

 2    stay out on release now, that doesn't necessarily mean that --

 3    that he won't be required to serve time.

 4              THE WITNESS:  Yeah.

 5              THE COURT:  And I always know, and especially -- and

 6    this case is a great example of this.  Most often these

 7    situations are not hardest on the person who's before the

 8    Court.  They're hardest on the family.  And I can see that

 9    that's -- would likely be true in your case.

10              And the only reason I'm telling you all this is that

11    I think, to the extent you can, both -- that you have to be at

12    least prepared for the possibility that --

13              THE WITNESS:  Yes, sir.

14              THE COURT:  -- that there will be a sentence of

15    imprisonment.  I'm not making any decisions about that.  The

16    way it works is that -- is that everybody -- the government

17    will be able to put on all its positions and why and so forth.

18    I have sentencing guidelines which help me to decide but don't

19    make the decision for me.

20              Mr. Fallgatter will be given a full opportunity to

21    put on everything.  It would not be unusual to hear from you.

22    It would not be unusual to hear from -- from your husband.

23    Obviously I've heard from Kevin.  And if that tape was played

24    again at sentencing, that would be -- all those things -- so I

25    have to take all that into account.

1    But I will say to you that I understand how you feel,

2    I really do, but it is true that your husband stands convicted

3    of some very serious crimes.  And so I just want, to the best

4    you can, you and your family to be prepared for what comes,

5    because I -- I wouldn't want you thinking that if I allow him

6    to stay out today that that means --

7    THE WITNESS:  Yes.  I'm well aware of that.  And I

8    know you have a tough decision ahead of you.

9    THE COURT:  Yes, ma'am.

10    THE WITNESS:  I understand the felony charges.

11    THE COURT:  Okay.

12    THE WITNESS:  And so I do see, you know -- but I'm

13    here because I believe the less damage we can do to my family

14    is better.

15    THE COURT:  Okay.  Well, and I don't mean to -- to

16    give you more stress than you already have.  I just -- I just

17    don't -- I would hate for you to come here and not at least

18    appreciate the reality of the situation.

19    THE WITNESS:  Yes, sir.  Thank you.

20    THE COURT:  All right.  Thank you.  You may step

21    down, ma'am.

22    Mr. Fallgatter, do you wish to be heard further?

23    MR. FALLGATTER:  Yes, Your Honor.

24    So focusing on 3145(c), exceptional circumstances,

25    just to kind of tick off some of the factors -- I won't belabor

1  it -- we've got a disabled son who needs a father around; an

2  elderly mother also needs Dr. Hollington's assistance.

3  Military service is certainly an impressive one, with the years

4  he spent serving our country and -- in a medical capacity,

5  honorably discharged.

6          Pretrial services, as I think the Court I think

7  noted, he's maintained a perfect record of compliance with the

8  Court's conditions of release; proved he's not a risk of flight

9  or a danger to the community.

10          THE COURT:  One question I did have -- I'm looking at

11  Judge Barksdale's order setting conditions of release.  And I

12  didn't see any restrictions on Dr. Hollington's ability to

13  prescribe medicine or practice medicine during the period of

14  supervision.  What can you tell me about that?

15          MR. FALLGATTER:  I don't recall, but I -- if it's not

16  there, I guess it's not there.  And, of course, as -- you know,

17  he hadn't been convicted.  The Board of Medicine has not done

18  any- -- anything.  As a practical matter, Your Honor, he's shut

19  down.  He can't do anything.

20          DEA took his controlled substance license.  So he has

21  no ability to prescribe controlled substances.  He can only

22  prescribe non-controlled.  But he has no place to practice.  If

23  you felt that was a necessary condition, it wouldn't affect

24  what is happening now, because he's out of the healthcare

25  business pretty much anyway.

1          THE COURT:  Okay.

2          MR. FALLGATTER:  But -- and, obviously, we weren't

3     expecting the verdict.  We are grateful that you were willing

4     to keep him under the conditions of release after the verdict.

5     And to his credit, and consistent with your sense of judgment,

6     he's proven himself worthy of that period of grace.

7          He has his own health conditions.  He weighs 320

8     pounds.  His BMI is 40, which is morbidly obese.  All medical

9     science tells us that morbid obesity pretty much complicates

10    his other conditions, which you've heard include hyperglycemia,

11    diabetes, bladder dysfunction, osteoarthritis.

12         Your Honor, I have -- there's a great deal of medical

13    information about that.  And I don't know how much -- I'm

14    prepared to recite it.  But what I've also done this morning,

15    in preparation for the draft PSI, I -- my practice is to always

16    prepare a letter to the probation office with background

17    information about the client, including medical, family

18    background, children, parents.

19         And then I also attempt to provide my thoughts on

20    sentencing guidelines.  So all this medical information is in a

21    packet that I'm going to mark as an exhibit here in a moment,

22    with your permission.

23         And I know you're inclined to want to rule today, and

24    perhaps you'll have the necessary information to make that

25    decision.  But -- I apologize, again, but it's part of my due

1  diligence, both with the probation officer and to prepare for

2  this hearing -- it occurred to me as I was finalizing the

3  presentation last night -- I delivered it to Ms. Anderson this

4  morning -- that it sort of does double duty for the exceptional

5  circumstances issue that's before the Court today.  So in a

6  moment I will share that with you, whether you feel the need to

7  totally review that, because it is --

8          THE COURT:  If you want to put it in the record,

9  that's fine.

10         MR. FALLGATTER:  I will do that.

11         THE COURT:  Yeah.

12         MR. FALLGATTER:  So I'll come back in a second.  But

13  let me digress.  We're here because of 3143(a)(2) and because

14  of Title 21 convictions.  It picks up all Title 21 offenses

15  where the maximum penalty is ten years or more.

16         As the Court knows, there's not a drug statute on the

17  books that doesn't have at least ten years, unless it's the

18  843(b), the use of a phone, which I think is four years, or

19  misdemeanors.  They're 10 to -- pardon me.  They're zero to 20,

20  10 to 40 -- pardon me, 5 to 40, 10 to life.  Every one of them

21  pick up 10 years, every one.

22         So it's an awfully broad brush.  And it's all the

23  more so, with all due respect, for physicians charged under

24  Title 21.  I would hope that Congress did not intend to group

25  physicians with medications that are being prescribed with

1  those multi-kilogram dealers that were designed to be remanded

2  on serious drug felony convictions.

3        So here we're dealing with prescriptions that are

4  milligram quantities, not kilogram, and obviously a milligram

5  is one-millionth of a kilogram.

6        So we're -- I understand the technical application of

7  that statute.  And maybe with true criminal doctors that we see

8  prescribing thousands of patients, you know, they could be

9  grouped properly by Congress in with the, you know, drug

10  dealers and whatnot.

11        But I ask the Court to consider that Dr. Hollington

12  really isn't the type of person -- he prescribed for nine

13  people, five of the -- they call the fake patients and four

14  real, all of whom agree they were either drug addicts who

15  needed their licensing prescription or pretended that they did.

16        THE COURT:  So, Mr. Fallgatter, I'm not -- I'm not --

17  I appreciate your arguments.  And I appreciate that you want to

18  be complete, but I feel like we're kind of getting into more of

19  a sentencing area than we are exceptional reasons area.

20        And if you'll -- how about if we do this.  Let me

21  hear from the government.  And if I feel like I need more from

22  you, I'll get it.  So why don't we do that.

23        MR. FALLGATTER:  Can I give you the rest of my

24  exhibits then and then I'll stop?

25        THE COURT:  Yes.  That would be fine.

1          MR. FALLGATTER:  One deals with the sentencing

2    guidelines, and I'm hopeful ultimately satisfying the probation

3    office and Your Honor that he's a probation candidate under the

4    sentencing guidelines.

5          To that end, it's a -- Title 21 2D1.1 guidelines are

6    dictated by the quantity.  So I took the effort to put together

7    a chart of drug weight based on the counts of conviction and

8    the weight of the prescription.  It's Exhibit 4.

9          It's also an exhibit to -- again, Your Honor, it's a

10   lot of detail.  And you may not need to review it today.

11   That's an exhibit to the probation office report.

12         And in looking at the drug weights, then I put

13   together what I hope is a valid sentencing guideline chart,

14   which I marked as Exhibit 4.

15         And then most importantly is my letter to the

16   probation office -- the letter today.  Those are exhibits to

17   that.  And that exhibit covers all of the sentencing issues,

18   which, again, in my mind, many of which overlap with this.  But

19   the bottom line is, the best I can tell, it appears to me

20   that -- I hope I can satisfy Your Honor that when the time

21   comes for sentencing that Dr. Hollington is a proper candidate

22   for a probation type of sentence.

23         In the PSI letter, Exhibit 6, starting at page 11, I

24   list a number of variance grounds, many of which possibly we've

25   touched upon here today.  And at page 9, under part (d), I have

1    six potential departure grounds.

2        So the guidelines chart I give you doesn't, of

3    course, take that into account.  And, of course, as we know,

4    the guidelines are advisory only.

5        The bottom line is I -- I hope I can satisfy the

6    Court that he is a probation candidate.  If that's true, as we

7    know, one of the reasons that bond on appeal is granted would

8    be the length of appeal would exceed the length of sentence.

9    This is sort of a microcosm of that.

10        So I'm hoping that the Court is satisfied that we

11    have an opportunity to ask the Court for a probation type of

12    sentence.  If that's -- if that bears fruit, then I would ask

13    the Court to consider that as another exceptional circumstance.

14        Thank you, Your Honor.

15        THE COURT:  Thank you.

16        Mr. Mike?

17        MR. MIKE:  Thank you, Your Honor.

18        For the Court to take into consideration 3143, 3145,

19    when making a determination here today -- and before we even

20    get to exceptional circumstances, or extraordinary

21    circumstances, what he's -- whether the defendant is a flight

22    risk -- I mean, he showed up to trial.  He seemed to be

23    compliant with pretrial conditions.

24        But it is the United States' position that -- I mean,

25    he -- I mean, he's an absolute danger to the community.  He's

1    been convicted of 14 counts of drug dealing.  This is not a

2    doctor.

3            I mean, I hear -- I understand just -- the evidence

4    just presented, but let's not downplay Title 21 offenses.

5    Whether it's amphetamines or whether it's cocaine, like, he is

6    dealing drugs.  He's a drug dealer.  He should be treated as

7    such, no different from any other drug dealer found guilty of

8    14 counts of Title 21 offenses.  It doesn't matter whether he

9    wears a lab coat or off of Beaver Street.  The Court should

10   consider, obviously, taking a lot of things in consideration,

11   but the defendant, I mean, is a drug dealer.

12           And another reason why I want to say, Your Honor, why

13   he's a danger to the community is because not only did he take

14   advantage of his position as a medical professional at the time

15   to prescribe medications, for whatever reason -- not for

16   legitimate medical purpose, but to take advantage of women,

17   which he's been convicted of those offenses, but since the time

18   of indictment over 30 women have came forward regarding a

19   similar type of sexual misconduct from the defendant.

20           And he's still got an open, active investigation in

21   St. Johns County, over 30.  That is the definition of being a

22   danger to the community, taking advantage of his position.

23           And so I think the Court should take that in

24   consideration as well when determining whether we get to the

25   exceptional circumstances.

1    Now, addressing some of the exceptional

2    circumstances, yes, he's been compliant with the terms of

3    pretrial release.  Some courts looking at the district courts

4    and even the circuit courts, they see that as commendable, but

5    that doesn't really justify the release under exceptional

6    circumstances.  He's doing what he's supposed to do.  There's

7    nothing really exceptional about that.

8    I understand the health concerns with his child.  And

9    I appreciate Ms. Hollington coming up and testifying before the

10    Court, and sort of relaying -- giving us a -- a sort of a

11    generic zoom-out view of what he has to deal with.

12    For us, this would be extremely extraordinary, but

13    Dr. Hollington has been dealing with this situation for the

14    last 32 years, it looks like.  It's sort of an ordinary

15    situation for him, which he's been under the same situation

16    while he was committing offenses.

17    And even the -- some district courts I looked up --

18    *United States v. Leopold*, it's a Southern District of New York

19    case, where it mentions that even caring for children with

20    unusual health issues do not typically rise to the level of

21    exceptional reasons.

22    In this situation, yes, that's -- he has to deal with

23    this.  And it's -- it's a tough situation to deal with, but

24    these are circumstances that he -- he's been dealing with for a

25    very long time.  And we haven't heard any reason why that --

1  since during trial, since he's been convicted, that there's

2  been a big downturn in the situation where he is needed.  He

3  made his choice.  He understood the situation he was in.

4          And, I mean, even for the Court to remember, during

5  trial he was confronted with a witness -- well, a witness would

6  hit the stand and she mentioned that she brought -- or she

7  referenced a picture that was in the doctor's office, one of

8  the victims, and brought it to the attention of the defendant

9  before she -- before he advanced her -- or after he tried to

10 advance her and she pulled away.  And he concocted a made-up

11 story.

12         She said -- she talked about, "Listen, you got a

13 picture of your family in your office.  Like, what are you

14 doing?"

15         And he literally -- he concocted a story and said,

16 "Hey, you know, my wife is very ill."  And then he continued to

17 just do what he did to her.  Made up, concocted a story.  So

18 you can't just pick and choose when your family matters.

19         The cases of exceptional circumstances that I've --

20 I've -- I've noted in my research, Your Honor, is whether the

21 defendant -- let's say a spouse was in immediate need of

22 surgery, required several weeks of convalescence, and in the

23 absence of the defendant's earnings during that convalescence

24 period would result in the defendant's family becoming

25 homeless, those are sort of exceptional circumstances.  And I

1    saw that in *United States v. Williams*, 903 F.Supp.2d 292.

2    That's in the Middle District of Pennsylvania.

3        And it's just that under my -- under the United

4    States, we -- our view of the situation, Your Honor, is it's

5    not extraordinary.  These are ordinary situations that the

6    defendant had to deal with for a while, and he had to deal with

7    these circumstances when he committed these offenses.  So

8    they're not out of the norm.  So we believe that the defendant

9    has not met its burden here today in determining whether

10   exceptional circumstances exist.

11       THE COURT:  Mr. Fallgatter, any concluding remarks?

12       MR. FALLGATTER:  Just briefly.  Counsel references

13   one of the ladies.  Of course, he fails to point out that the

14   ladies all testified that these were life-saving drugs, they

15   would die without those prescriptions.  So -- and, of course,

16   he's not charged with any of those state crimes.  This was a

17   drug case.

18       I don't understand counsel's argument that

19   extraordinary factors -- if they are preexisting are not

20   extraordinary.  I think that means they're all the more

21   extraordinary.

22       THE COURT:  Mr. Fallgatter, at the -- at the -- when

23   this case first came before the Court in front of Judge

24   Barksdale, I see that she entered an order setting conditions

25   of release.  Was that -- did the government seek detention at

1    that time, or -- and Judge Barksdale concluded otherwise?  Or

2    did the government agree to order of release?

3         MR. FALLGATTER:  It was an agreement.  He was

4    arrested without my representation, but -- and I believe all

5    that was done before I even became counsel of record.  So he

6    appeared pro se and a condition of release was set.  Obviously

7    the government didn't ask for detention then.

8         There's one other factor -- I don't know how weighty

9    it is.  But as a procedural matter, you know, we kind of

10   suggested that the 3143 is a fait accompli.  I don't know that

11   that's entirely correct, because I filed my new trial and JOA

12   motions -- and I think it's 3143 factor.  The government hasn't

13   even responded yet.  Obviously I'm not here to predict whether

14   Your Honor would grant any or all of it.  But as a procedural

15   matter, that is still an outstanding issue that may have some

16   bearing in the Court's mind.

17        Thank you, Your Honor.

18        THE COURT:  Thank you.

19     (Judge confers with pretrial services officer.)

20        THE COURT:  As I indicated earlier, the statute under

21   which Mr. -- or Dr. Hollington was convicted normally requires

22   remand upon conviction and -- however, there is an exception in

23   the law for exceptional reasons.  Those are the words of the

24   statute.

25        And over the years we have employed that in various

circumstances.  There's no one test for what constitutes

exceptional reasons.  But it seems to me that the presentation

here today from Mrs. Hollington, the special-needs son, Kevin,

and -- and to a lesser extent the other family obligations --

when you combine all that together, I do think it is an

indication of exceptional reasons.

Having said that, I am concerned, of course -- this

was the first that I had heard from the government that there

were -- I think the government used the number 30 women who had

come forward or had made some type of complaint about

Dr. Hollington's conduct.  Of course, I heard the -- I heard

from the four women at trial.  And I also -- I think there was

some reference to an ongoing St. Johns County investigation.

I'm not aware of any of that.  I don't have any

information about it.  I certainly don't have any evidence

about it.  But it is, of course, a matter of concern.

To the extent that those -- that women are alleging

misconduct that occurred in the treatment setting, which is

what our case was about, then a restriction -- an explicit

restriction on -- on Dr. Hollington from practicing medicine or

from treating patients or from prescribing any controlled

substances I think would -- would be appropriate.

And I also think that some -- although Dr. Hollington

has been compliant on conditions of supervision so far, with

some early bumps in terms of -- of his reporting, which I --

1   the probation -- I'm sorry, the pretrial officer told me has

2   been straightened out and that he has been reporting as

3   required -- given where we are now, that is, Dr. Hollington

4   stands convicted of some very serious charges, and given that

5   the government has at least -- given that the government has at

6   least come forward and said that there are other potential

7   complaints and victims out there, and I -- again, I make no

8   judgment about that.

9           If I had more -- if the government -- if there was

10  more detailed information, that might -- might make me think

11  differently about it.  But I do think that the Court can add to

12  the conditions of release and make that -- to the extent

13  there's any concern that Dr. Hollington outside of the

14  treatment setting would have inappropriate interaction with any

15  women -- to the extent that that even possibly might be true, I

16  think I'm -- I think I can add a condition to his pretrial

17  release and that -- that condition being home detention, which

18  would give more -- give pretrial more tools to -- to keep

19  Dr. Hollington in the home as much as possible and only permit

20  him to go outside the home under whatever controlled

21  circumstances pretrial thinks is appropriate, whether that be a

22  medical appointment or whatever they determine.  I mean, we

23  have a standard protocol for home detention that pretrial could

24  enact.

25          And I think that -- because I think the primary

1   motivation for me to keep Dr. Hollington on pretrial release is

2   really to be able to care for his son Kevin, and to provide

3   that care and to help the family try to figure out and

4   transition to a situation where Dr. Hollington might not be

5   present.  I don't -- I don't make any decisions here today.

6   But as I told Ms. Hollington, that is certainly a possibility,

7   given the charges.

8           And I don't -- I don't -- Mr. Fallgatter has talked

9   to me about the guidelines.  You know, I haven't had a chance

10  to even consider those.  So I don't have any sense of what the

11  guidelines might be or what the government's recommendation is

12  going to be.

13          But it does seem to me we're in a different

14  situation.  And so I'm going to -- I'm going to deny the

15  ore tenus motion to remand.  I'm going to continue

16  Dr. Hollington on conditions of pretrial release.  But I am

17  going to add specific conditions that he not practice medicine

18  in any form or treat patients in any form, that he not

19  prescribe any controlled substances, and that he be subject to

20  a home detention provision under the usual protocols from

21  pretrial, which the pretrial officer will -- will explain to

22  Dr. Hollington in detail.

23          And the only other thing I'll say is this, if I get

24  any indication of lack of cooperation or any type of violation,

25  even if it's a minor violation, I certainly can revisit my

1   decision to leave Dr. Hollington out on pretrial release.

2          So that's the ruling of the Court.  I will be denying

3   the ore tenus motion to remand by the government, but I will be

4   entering a new amended order setting conditions of release

5   that -- that are as I just indicated.

6          (Judge confers with the pretrial services officer.)

7          THE COURT:  So the pretrial officer is pointing out

8   to me that one of the conditions that Judge Barksdale made back

9   in October of '22 was that -- that Dr. Hollington, despite the

10  specific restriction I'm putting now on him prescribing

11  medicine, that he add -- he was continuing to take prescribed

12  medications as directed by a licensed medical practitioner.

13  And at the time he had actually prescribed, I think,

14  non-controlled substances to himself.  I'm not sure about -- I

15  don't know how all that works.

16         But, Mr. Fallgatter, what's the situation now with

17  respect to medications that Dr. Hollington is taking?  I just

18  don't -- I don't want there to be a technical violation if

19  there was a misunderstanding.  So what's your understanding of

20  the situation?

21         MR. FALLGATTER:  He -- he is a doctor.  He's been

22  prescribing for himself.  He just advised me he's confident he

23  can find another physician to make sure that is not something

24  that has to be monitored and -- if that's acceptable to Your

25  Honor.

1       THE COURT:  That is.  So the restriction on

2  Dr. Hollington prescribing any medications will be a blanket --

3  blanket ban, and it would include himself.  And -- but it is a

4  clear prohibition against him practicing any type of medicine,

5  seeing patients.  It is a clear prohibition for him to

6  prescribe any controlled substances or any medicine of any

7  kind.  And then -- excuse me.

8       And then the home detention provision.

9       Mr. Mike, I understand the government wished it

10 otherwise, but do you have any other requests or any

11 clarifications that you need at this time?

12      MR. MIKE:  No, Your Honor.

13      THE COURT:  Mr. Fallgatter?

14      MR. FALLGATTER:  No.  Thank you, sir.

15      THE COURT:  So, Dr. Hollington, we understand each

16 other?

17      THE DEFENDANT:  I do, Your Honor.

18      THE COURT:  All right.  The pretrial officer will --

19 and I will tell you this.  I'm really -- I'm really mostly

20 doing this for Kevin, because it seems to me -- and your wife.

21 It seems to me that -- and I know you've been dealing with this

22 a while now.  But it seems to me that you need some time to try

23 to figure all that out.  And so that's really the only reason

24 I'm doing this.  And so please do not make me sorry that I did.

25      And to the extent that -- you know, I don't know how

1   to -- you'll be on home detention.  And so your other

2   interactions should be fairly limited.  And it will be up to

3   the pretrial officer what you can do and what you can't do.

4   But I just want to be perfectly clear with you about what I'm

5   expecting and that I expect strict compliance.

6                THE DEFENDANT:  I understand, Your Honor.

7                THE COURT:  All right.  You can have a seat.

8                All right.  So Mr. Fallgatter mentioned the two

9   motion -- post-trial motions which have been filed.  They were

10  filed on July 27th.  We had calculated the 17th.

11               Is that right?

12               LAW CLERK:  Uh-huh (affirmative).

13               THE COURT:  We had calculated that the government's

14  response was due by August 17th.  Mr. Mike, does that accord

15  with your understanding?

16               MR. MIKE:  Yes, Your Honor.

17               THE COURT:  Okay.  So I'll -- I'll get written

18  responses to the motions by the government August 17th -- or by

19  August 17th.  I will rule on the motions.

20               Obviously, if -- if the motions are granted or -- in

21  whole or in part, we'll have to figure out where we are.  If

22  the motions are denied, we have already just -- just as a

23  scheduling matter, we already have scheduled a sentencing

24  hearing for October 18th.  But I have not formally adjudicated

25  Dr. Hollington yet in the case.

1    Depending on the ruling on the motions, if the

2    motions are denied, there would be a formal adjudication, and

3    then the sentencing would be set for October 18th.  If the

4    motions are granted or -- any part of it, then we'll figure out

5    where we are at that point.  And I don't -- I don't have a

6    predisposition at the moment.

7    I haven't -- I've seen the motions come in.  I

8    haven't had an opportunity to consider them.  And I haven't

9    gotten the government's response.  But I should be able to get

10   a ruling to you well in advance of any further proceedings in

11   the case.

12   Courtney, anything else?

13   LAW CLERK:  (Shakes head negatively.)

14   THE COURT:  Anything else?

15   PRETRIAL SERVICES OFFICER:  No, sir.

16   THE COURT:  All right.  Anything else from the

17   government?

18   MR. MIKE:  No, Your Honor.

19   THE COURT:  Mr. Fallgatter?

20   MR. FALLGATTER:  On the issue of Mr. Williams.  So

21   I'm sorry we won't be back together at the end of October, but

22   I understand your busy schedule, and looking forward to working

23   with the California judge.

24   THE COURT:  He'll give you a fair trial.

25   MR. FALLGATTER:  I know he will.  Thank you, sir.

1    THE COURT:  Mr. Fallgatter and Dr. Hollington, if you

2    would stay behind briefly so that the pretrial officer can just

3    confer with you.  She's going to have to get my order before

4    everything's official, but she can tell you what you should

5    expect and how you ought to be conducting yourself.  All right?

6    MR. FALLGATTER:  We understand.  We'll do so.  Thank

7    you.

8    THE COURT:  Court's in recess.

9    COURT SECURITY OFFICER:  All rise.

10    THE COURT:  By the way, just for the record -- I

11    should have done this.  But all the exhibits that

12    Mr. Fallgatter tendered, Defendant's 1 through 6, are admitted

13    and the clerk will take custody.

14    (Defendant's Exhibits 1, 2, 3, 4, 5, and 6 received into

15    evidence and placed under seal.)

16    MR. FALLGATTER:  And I apologize, Your Honor.  I

17    would ask, because we have confidential information and Social

18    Security -- Exhibit 1 is a video of Kevin.  So I'm asking that

19    be sealed.

20    THE COURT:  You know, a lot of that stuff is -- I'm

21    going to put it all under seal for now.  It's -- a lot of it is

22    personal and a lot of it's presentence stuff, which is

23    generally not public at this point.

24    I think for now -- I mean, I'm going to put it all

25    under seal temporarily.  If -- you know, I see Ms. Schindler

1    back there.  She probably doesn't like things under seal, but I

2    think it's appropriate, given the status of the -- of the son

3    and his situation, given this has a lot of medical information

4    in there, given that the presentence report that you -- or the

5    letter you wrote to the officer -- to the probation is

6    generally confidential until a report comes out -- it seems to

7    me that -- I'm going to put a temporary seal on these

8    documents.

9         They can -- I'm -- it is very likely that some or all

10   of them will be unsealed at some point, perhaps at sentencing.

11   But I think that's the best play.

12        MR. FALLGATTER:  Yes.  Thank you, Your Honor.

13        THE COURT:  All right.  We're in recess.

14    (The proceedings concluded at 11:12 a.m.)

15                            - - -

**CERTIFICATE**

UNITED STATES DISTRICT COURT     )
                                 )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 9th day of May, 2025.


                        s/Shannon M. Bishop
                        Shannon M. Bishop, RDR, CRR, CRC