1

```
                    IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
                        JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

               Plaintiff,          Case No. 3:22-cr-141-TJC-PDB

   vs.                             March 28, 2025

SCOTT ANDREW HOLLINGTON,           10:11 a.m. to 12:08 p.m.

               Defendant.          Courtroom No. 10D
_____



                     PRONOUNCEMENT OF SENTENCE
           BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                  UNITED STATES DISTRICT JUDGE


 COUNSEL FOR GOVERNMENT:

        KIRWINN MIKE, ESQUIRE
        ASHLEY WASHINGTON, ESQUIRE
        DOJ-USAO-Jacksonville Division
        300 North Hogan Street
        Suite 700
        Jacksonville, Florida 32202


 COUNSEL FOR DEFENDANT:

        CURTIS SCOTT FALLGATTER, ESQUIRE
        Fallgatter & Catlin, P.A.
        200 East Forsyth Street
        Jacksonville, Florida 32202


 COURT REPORTER:

        Heather Randall, RPR, FPR-C
        221 North Hogan Street, #185
        Jacksonville, Florida 32202
        Telephone:  (904) 549-1307
        randall4817@yahoo.com

 (Proceedings recorded by mechanical stenography; transcript
 produced by computer.
```

1                    P R O C E E D I N G S
2     March 28, 2025                          10:11 a.m.
3                          - - -
4              COURT SECURITY OFFICER:  All rise.  The United States
5     District Court in and for the Middle District of Florida is now
6     in session, the Honorable Timothy J. Corrigan presiding.
7              Please be seated.
8              THE COURT:  I apologize for running a few minutes
9     late.  There was a last-minute letter that was received, and I
10    wanted to give everyone a chance to read it before I began.
11             This is the case of *United States of America versus*
12    *Scott Andrew Hollington*.  The case is 3:22-cr-141.
13             Mr. Mike and Ms. Washington are representing the
14    government.  DEA Special Agent Hollingsworth is here as well.
15    I guess Agent Martin from the DEA is also here.
16             Mr. Fallgatter represents Mr. Hollington.
17             MR. FALLGATTER:  Yes, Your Honor.
18             THE COURT:  So we're here today, really, at my
19    instance.  On February 6, 2025, we had a full sentencing
20    hearing in this case.  And the record of that sentencing
21    hearing is found at Doc 254, and I'm incorporating that hearing
22    into this one by reference.  And all matters which were
23    discussed at that time are part of this record.
24             At the conclusion of the hearing, the government had
25    recommended an upward guideline sentence, which was 37 months.

1    I know Mr. Fallgatter, on behalf of Mr. Hollington, had

2    requested a lesser sentence.  On the Court's own motion, I

3    determined that I was obliged to consider an upward variance in

4    the case.  And -- but because I had not fully thought that

5    through and because I wanted to give the parties, especially

6    Mr. Hollington and his counsel, time to consider the matter, I

7    put it off until today.

8            I did give the parties an opportunity to either

9    submit supplemental briefing or any other materials that might

10   bear on the issue of an appropriate sentence.  And I did

11   receive a character letter from Mr. Fallgatter and -- I believe

12   it was just one.  It was from his brother, Mr. Hollington's

13   brother.  And, of course, I had also already received letters

14   previously and -- that were part of the original sentencing

15   record.

16           And then I also received a letter just -- it was just

17   to me from a family member of Mr. Hollington's wife -- former

18   wife, a family member of hers.  And since the letter was just

19   addressed just to me, I felt like I needed to share it with the

20   parties.  And I did that a couple of days ago, I think.  And

21   I'm going to go ahead and make that a court exhibit.

22           We already have Court Exhibits 1 and 2.  So this will

23   be Court Exhibit 3.

24       (Court Exhibit No. 3 received into evidence.)

25           THE COURT:  And just this morning I received --

1   addressed to me, but apparently coming through the U.S.

2   Attorney's Office -- and a copy was provided to Mr. Fallgatter

3   and Mr. Hollington as well -- another letter from an individual

4   who had been a patient of Dr. Hollington's, and for lack of a

5   better term, I will call it a victim impact letter.  It's a

6   rather lengthy letter, so that's why I wanted to give everyone

7   a chance to read it before I started the session today.

8           And I will make that letter Court Exhibit 4.

9       (Court Exhibit No. 4 received into evidence.)

10      (Judge and courtroom deputy confer off the record.)

11          THE COURT:  Okay.  I was in error.  The other two

12  letters, the victim impact letters from before, which were

13  read, I believe over objection, if I recall correctly, they

14  were actually government's exhibits.  So it's Government's

15  Exhibit 1 and Government's 2.

16          The two letters I have now, one from the family

17  member of Mr. Hollington's former wife and one from another

18  individual who was Dr. Hollington's patient, I don't know

19  whether the government wants to ask me to make them

20  government's exhibits or whether I should make them Court

21  exhibits.

22          Mr. Fallgatter, I saw you stand up.  I'm on the topic

23  of these letters and what I ought to do with them.

24          MR. FALLGATTER:  May I be heard on that?

25          THE COURT:  Yes.

1          MR. FALLGATTER:  Your Honor has already ruled on
2    the -- well, I guess you've not ruled on either one, so I need
3    to object to both.  I view them as hearsay.
4          I make an additional notice argument on the second
5    letter that I will call the Smith letter.  We did get it right
6    before 10:00 when the hearing was set.  It's a long letter.
7    Thank you for giving us time to read it.
8          Let me also thank you for continuing the hearing
9    today because of my family obligations.  I appreciate that.
10         But in a more substantive objection, obviously
11   without notice I have no ability to chase this down.  But I
12   will point out -- and these are not numbered pages.  But
13   there's a claim about an Alexa who supposedly overdosed.  That
14   event, it's my understanding, took place about three months
15   after the clinic was closed by DEA.  So this hearsay claim that
16   there's some attribution to the treatment of Dr. Hollington is
17   absolutely wrong and very prejudicial.
18         Obviously I don't have the time or ability to provide
19   Your Honor with death certificates and newspaper articles,
20   things like that.  But Dr. Hollington was aware of that because
21   it was a former patient.  As you heard during the trial, the
22   prescriptions are good for 30 days.  So assuming they died
23   three months after the clinic closed could not possibly
24   attribute to him.
25         That's just one of the many harmful claims.  That

1   writer says that she reported this to Dr. Hollington and he

2   never responded.  DEA seized his phone.  He didn't have his

3   phone.  So there's so many harmful claims in here that are just

4   absolutely false.

5           For those reasonable substantive reasons, I would ask

6   the Court to not accept that as an exhibit.

7           THE COURT:  Thank you, sir.

8           Does the government wish to be heard?

9           MR. MIKE:  Your Honor, other than -- I don't believe,

10  just for the purposes of this hearing, that hearsay would apply

11  for this letter.

12          But as Your Honor had it -- we received this letter

13  late last night and we brought it before the Court.  We haven't

14  had a chance to vet out all of the facts in the letter, but we

15  wanted to make sure it was provided.

16          THE COURT:  Well, I want to be respectful of the

17  letter writer, who obviously wanted to have her story told.

18  But I will say that I think I -- I think it might be -- while I

19  am permitted to consider almost anything at a sentencing

20  hearing, whether it be hearsay, whether it be -- I mean,

21  because we have letters all the time.  I mean, we have --

22  Mr. Fallgatter has given me letters in support of

23  Dr. Hollington.  So, I mean, we deal with that type of evidence

24  all the time.

25          However, in this case, I do think that both because

1    of the late nature of the filing of the letter and because of

2    some of the claims in there that are serious claims and -- but

3    are -- would have to really be investigated to know whether or

4    not that they could be attributable to Mr. Hollington -- I'm

5    especially thinking of the claim regarding the young woman

6    Alexa.

7            And so I think it probably is prudent for me not to

8    consider this letter without -- I want to be clear.  I am not

9    disregarding what the writer has said to me.  And I'm not

10   saying that she's wrong or anything like that.  I'm just

11   talking about procedurally.

12           And as a matter of notice and opportunity to be heard

13   from Mr. Hollington, I just think it's better for me to not

14   consider this late-filed letter, because, as Mr. Fallgatter

15   correctly points out, it would -- if I was going to be fair to

16   Dr. Hollington about it, it would require investigation and

17   more information for me to be able to accept what the writer

18   has said.

19           So what I'm going to do is this.  I do have the

20   letter from the family member of -- Ms. Hollington's family

21   member.  I will -- I will go ahead and make that Court

22   Exhibit 1.  That was in -- you know, I have -- that was more in

23   the nature of -- I had character letters in support of Mr.

24   Hollington.  And this is a character letter that's decidedly

25   not in support of him.  But I do think it was within the

1    framework of what we typically would see.

2            So I'm going to go ahead and accept that and make

3    that Court Exhibit 1.

4        (Court Exhibit No. 1 received into evidence.)

5            THE COURT:  I'm going to make the letter from the

6    other writer -- and I'm going to call her M.S.  Those are her

7    initials.  And I'm going to go ahead and make that Court

8    Exhibit 2.

9            But I am saying for this record that I will not be

10   considering the claims made in that letter.  But I think now

11   that it's been given to me, I have to make it part of the

12   record.  But I am specifically disclaiming any reliance on that

13   letter in arriving at the sentence that I am going to impose

14   today.

15       (Court Exhibit No. 2 received into evidence.)

16           THE COURT:  All right.  I think that -- if I'm

17   correct -- and I also did -- as I mentioned, I received from

18   Mr. Fallgatter about a couple of weeks ago now, I guess, a

19   letter in support of Mr. Hollington from his brother.  And I do

20   have that as part of my consideration as well.

21           If I am not mistaken, that's the only new material I

22   have.

23           Mr. Mike, is there any other new material that the

24   government has brought forward or that I have that I haven't --

25   everything that was in the hearing before is already part of

1    the record.  But I've -- have I dealt with everything that

2    you're aware of post-hearing?

3              MR. MIKE:  Yes, Your Honor.  No additional

4    information from the United States.

5              THE COURT:  Mr. Fallgatter?

6              MR. FALLGATTER:  I agree, Your Honor.

7              THE COURT:  Okay.  All right.  So we all know where

8    we are.  And, as I said, we had a full sentencing hearing the

9    other day, and so I do not mean to or intend to recapitulate

10   that hearing.  And at that hearing, also, Mr. Hollington had a

11   full opportunity to allocute as well.

12             And so we were at the point, as a matter of fact --

13   let me verify this.

14             Yes.  I had asked the parties whether there was any

15   legal bar to the imposition of sentence.  And both parties,

16   Mr. Mike and Mr. Fallgatter, replied no.  It was after that

17   that I announced that I was considering an upward variance and

18   that I wanted to both think about it and give the parties an

19   opportunity to be heard on that with notice.

20             And so I'll now ask if anybody wishes to be heard

21   further before I determine a sentence.

22             Mr. Mike, does the government wish to be heard any

23   further on the matter?

24             MR. MIKE:  No, Your Honor.

25             THE COURT:  Mr. Fallgatter?

1          MR. FALLGATTER:  Yes, Your Honor.  Thank you.

2          The -- I'm in sort of a novel situation.  I've been

3    before Your Honor in a number of cases, so -- I've not had the

4    experience where I'm here to talk about whether or not a

5    variance above the guidelines would be appropriate.  So I find

6    that a bit stressful, so -- but I appreciate the notice because

7    obviously it gives us a chance to address it.

8          I appreciate the Court's invite to file a memorandum

9    of some kind that would address it.  I thought about it, and I

10   couldn't really figure out a way to concisely capture my

11   comments.  So --

12         THE COURT:  Well, I think you told me -- at the time

13   you asked me whether it would be all right if you just argued

14   the point, and I told you it was fine.  I was not requiring

15   briefs.  I was not requiring anything.  I was just giving

16   opportunities.  And so the government didn't file anything

17   either, and so we kind of are where we are.

18         MR. FALLGATTER:  Let me basically apologize, because

19   normally we do things in writing.  And I just didn't think it

20   lent itself to that.  So with your permission, I will share

21   some oral arguments.

22         And in that regard -- because part of the issue was

23   the remorse and apology for the sexual misconduct.  I want to

24   further address that briefly factually, and then I'll share

25   with you, with your permission, some closing comments.

1           His wife is here.  If I could call her forward to

2    readdress the issue and also the letter you mentioned from her

3    sister.  May I call her forward?

4           THE COURT:  Sure.

5           MR. FALLGATTER:  Ms. Hollington.

6           MS. HOLLINGTON:  Good morning, Your Honor.

7           THE COURT:  Good morning.  Let's just go ahead and

8    get the record clear.  Just give your name and your

9    relationship to Mr. Hollington.  I know you've spoken before,

10   but I just want to make sure I've got your information in the

11   record.

12           MS. HOLLINGTON:  Okay.

13           THE COURT:  Go ahead.

14           MR. FALLGATTER:  State your full name.

15           MS. HOLLINGTON:  Jeanne Hollington, ex-wife of Scott

16   Hollington.

17           THE COURT:  Okay.  Go ahead, ma'am.

18           MR. FALLGATTER:  There are two components.  One is,

19   she drafted a short response to the letter that her sister sent

20   to the Court.  We're going to keep it brief.

21           THE COURT:  That's fine.

22           MR. FALLGATTER:  But would you share with His Honor

23   your brief comments on that letter.

24           MS. HOLLINGTON:  Yes.  I just found out about the

25   letter yesterday, sir, so I've had a really brief time to

1    write.

2              Our family has been plagued by divisions for many

3    years.  And I do not wish to further exacerbate that situation.

4    I find Maria's letter to be a profound betrayal of my trust.

5              It's important to clarify that my son's video

6    testimony was entirely his own creation.  It was devoid of any

7    coaching, any editing.  He expressed his honest feelings.  He

8    is his own man.

9              To ensure my son's and my own financial security, I

10   have taken a step of getting a full-time job.  I am not waiting

11   for my husband to come back to support me.  What my sister

12   claims in the letter is patently false.

13             I would also like to say that my plea for mercy in

14   this sentencing is not at all driven by any sort of fear of my

15   ex-husband or a delusional desire to recreate and capture the

16   past.  It stems from Scott's unwavering commitment throughout

17   his life to supporting the health and well-being of countless

18   individuals.  And I've witnessed this repeatedly.

19             MR. FALLGATTER:  If I can have one moment, Your

20   Honor.

21       (Brief pause.)

22             MS. HOLLINGTON:  Yeah, I can read that now.

23             MR. FALLGATTER:  And because of the invite to further

24   address the various issues, Ms. Hollington has written a second

25   sentencing statement.  May she proceed with that?

1           THE COURT:  Please.

2           MS. HOLLINGTON:  That one was just in response to

3    yesterday's discovery.

4           And today I want to thank you, Your Honor, for taking

5    time to review my statements.

6           Scott Hollington remains a significant figure in my

7    life.  A three-decade marriage and collaborative efforts to

8    provide for our children make the separation an arduous

9    endeavor.  I find it difficult to express the emotional pain I

10   experience in listening to the testimonies of harmed patients

11   read aloud by Mr. Mike and his colleague.  My heart aches for

12   these women.

13          During Scott's tenure at Sawgrass Health Addiction

14   Medicine Clinic, I was completely unaware of any such

15   activities.  Scott had an astute and compassionate female

16   counselor available to all patients.  Our son even worked there

17   as a receptionist.  And Scott employed an office manager and

18   maintained a team of dedicated and caring nurses.

19          In our personal interactions Scott demonstrated

20   compassion and respect for his patients.  He was always

21   cautious and professional in refraining from discussing

22   specific details, but I gathered that many of his patients were

23   homeless and struggling with addiction.  They'd been rejected

24   from other clinics and doctors due to their inability to pay

25   and their noncompliance with treatment protocols.  Scott

1    frequently sought assistance from pharmacists, explaining these

2    patients would resort to dangerous street drugs if they were

3    denied access to his prescribed medications.

4           Our lives together were comfortable and secure, but I

5    would not characterize them as luxurious or effortless.  We

6    shared the responsibility of providing 24-hour care for our

7    adult vulnerable son, Kevin.  Scott possesses a unique approach

8    to assisting Kevin and comprehending that accountability for

9    his actions is the path to greater independence and a

10   fulfilling life.

11          Without Scott's stabilizing influence at home,

12   Kevin's behavior has become increasingly challenging, leading

13   to profound depression in Kevin.  Last week Kevin was

14   hospitalized -- actually several weeks ago Kevin was

15   hospitalized due to a severe kidney infection.  I was compelled

16   to call an ambulance because I could not lift or motivate him

17   to leave his bed.  He was experiencing a 104.5 degree fever.

18   In the past Scott played a pivotal role in Kevin's health and

19   safety during these crises.

20          During Kevin's time helping at Sawgrass, patients

21   frequently attempted to establish personal friendships with

22   him.  Scott managed these situations with the utmost care and

23   clarity, repeatedly emphasizing the importance of maintaining

24   professional boundaries.  Kevin's proficiency in repeating and

25   reciting the HIPAA code remains evident to this day.  He knows

1    it by heart.

2           While I cannot absolve or justify the behavior

3    reported in court, I can assure you that Scott was profoundly

4    affected by this testimony.  He has experienced severe --

5    significant weight loss due to stress and depression, resulting

6    in a noticeable decline in his typical confident and jovial

7    demeanor.

8           He has endured substantial hardship while

9    incarcerated, enduring recurring physical intimidation from

10   inmates and prison staff.  I have been repeatedly inquired

11   about the possibility of abuse.  And I can affirm that while

12   Scott occasionally exhibited moments of frustration, he never

13   engaged in physical or sadistic behavior.  He abhors violence

14   and is deeply moved by movies that graphically depict violent

15   scenes.  He consistently demonstrated kindness and compassion

16   towards family, friends, and strangers.

17          We acknowledge there's no possibility of returning to

18   the past, but we harbor our hope for a brighter future through

19   prayer and unwavering desire to be reunited as a family.  Scott

20   and I maintain regular phone conversations, always sharing a

21   prayer.  Scott's most fervent wish is to return to us and

22   provide the support that we desperately need at this time.

23          So we implore you to consider our circumstances when

24   making your decision, please.

25          THE COURT:  Thank you, ma'am.

1          MS. HOLLINGTON:  Thank you.

2          MR. FALLGATTER:  Thank you.

3          Dr. Hollington further -- wants to further address

4    the Court, particularly on the -- of course, based off our last

5    hearing.  May he come forward?

6          Dr. Hollington?

7          Dr. Hollington, have you prepared a statement to

8    further address the Court and the sentencing issues?

9          THE DEFENDANT:  I have a statement.

10         MR. FALLGATTER:  All right.  Would you read it,

11   please?

12         THE DEFENDANT:  I apologize to the Court for my

13   failures, especially my failure to recognize my own

14   shortcomings.  It should never have come to this.  While I am

15   more cognizant of my personal inadequacies and the boundaries

16   I've crossed, the moral issues that this Court has grappled

17   with, regardless of all my failure, I know that I have

18   undermined the helpful recovery of my victims.  I failed to

19   deliver the resources that my patients needed.  I was

20   overwhelmed and I fell short.

21         While I enjoyed princely treatment, my victims felt

22   they had no alternatives.  I was generally convinced that I was

23   admired.  You may wonder how it is possible for me to sort of

24   deceive myself.  Beyond denial, I did not face the hidden

25   undercurrent of anger.  All of my online reviews were five

1  stars.  And many of my colleagues were so supportive.  My

2  superior still to this day tells me she knew nothing of

3  complaints.

4          I believed my own denial, taking gratification in

5  every patient's success, shirking blame, ascribing failures to

6  the economic social isolation and despair.  Patients invited me

7  to go drinking.  I laughed it off as seeking fellowship.  I was

8  blind to this crisis.

9          My public service was not seen as such.  Each

10 chilling and angry letter from distraught victims decries false

11 promises and misleading reviews.  I am seen as a predator, not

12 a support.  I am mortified to know this.

13         I have come to understand through enduring my time of

14 emptiness, isolation, and abuse in correctional institutions,

15 the fear and anxiety that is reflected in my victims'

16 complaints.  Indeed, in our society at large, I see such

17 desperation and hopelessness.  So many face this daily, and I

18 seek to find myself in improvement through study and through

19 contrition.  I accept that this Court must protect the

20 vulnerable and extract punishment from those who cannot be

21 forgiven.

22         My family now struggles financially and cannot pay

23 the mortgage, along with the debts accrued through my failures.

24         I met Jeanne Marie in 1989.  I was 24 years old.  And

25 she was the first and only relationship of my life.  I never

1    went on a date in high school, no prom, no homecoming.  I'm not

2    romantic.  I have difficulty relating to others.  She sees me

3    as nobody else has.  That she truly loves me is a miracle.  I

4    love her completely.  I desire for her happiness and that she

5    find her true path in this world with our lord.

6            Of all of my failures, my failure to live up to my

7    promises to protect and support my family, is the most painful.

8    My mother and my brother and his wife, my children, and

9    especially Jeanne believe in me still today.  I owe so much to

10   our society, to its people.  But my failure with the love of my

11   life is an all-consuming disease for me.  Every moment I remain

12   committed to the most important pleasures of my life, my

13   service as a physician and to support my beloved Jeanne.  I am

14   lost without the sound of her voice and her kind words.  True

15   love knows no limits and has no bounds.

16           I hope that some -- I hope that some can be -- some

17   way can be found to allow me to financially support my

18   dependents, as I have promised, rather than to squander what my

19   generous God has given me.

20           My son, Kevin, has his whole life right under my

21   care, my constant care.  One consequence has been -- one

22   consequence of his brain injury is his pathological

23   self-neglect.  I'm the only one in his life whom he listens to

24   for his helpful habituation.  Without me he has slipped into

25   kidney failure and has lost 20 years of improvement.  Surgical

1   reversion to his previous disability is not recommended.  I am

2   losing my son.  He is losing his fight.

3          My mother's family were the poorest of the poor field

4   workers knowing these hardworking people, it was my wish to

5   serve the disenfranchised.  I am so greatly privileged to have

6   had my education paid for.  Without the U.S. Air Force I could

7   never have afforded medical school.  There have been years of

8   extreme poverty in my life, yet I have never felt desperate and

9   have always found a way.

10         In a personal insight, I find it quite difficult to

11  connect to other people.  A physician is sometimes called upon

12  to cause pain in order to -- to cure.  This, I am able to do.

13  But I recognize my emotional disconnection from others is a

14  failing.  My mission to improve the lives of those in the grasp

15  of our society's culture of death has had a tearful end.  My

16  tears are mocked.

17         If there were words to erase the harm that I have

18  caused, I would say those words.  But pain cannot be undone.  I

19  offer my sincere prayers for those I have harmed.  And I

20  remain -- and I will remain in complete departure from my

21  practice.  I owe an unpayable debt.  I am thankful and greatly

22  privileged and relieved by the closure before more harm

23  resulted.

24         I thank the Court for its time, its patience, and

25  mercy.

1        MR. FALLGATTER:  May I share some closing points with

2    Your Honor?

3        One of the issues, of course -- and I think I did a

4    little misstep with the last hearing, and I let the Court down

5    with my representation on the remorse, and that really is part

6    my fault.  Those were all his personal words.  I didn't write

7    them, as you can tell.

8        But one of the issues is, is he remorseful and

9    apologetic about the underlying misconduct with the ladies?

10   And he most certainly is.  You've heard me acknowledge that

11   before and on behalf of Dr. Hollington repeatedly.  I did it in

12   front of the jury.  Of course, I've done it in front of you

13   during our past hearing.

14       But I also ask the Court to recognize that, as his

15   counsel, I'm in a rather difficult situation, driven by the

16   fact that this federal prosecution is not isolated.  We have

17   been assured for the last two and a half, three years that

18   the -- what I call the joint task force is one that is leading

19   to -- we were told several criminal cases were brought in state

20   court.

21       We originally were told St. Johns County and then we

22   learned there was a prosecution in Volusia County.  So that was

23   a bit puzzling.  I've waited and I'm waiting -- and I hope it

24   does materialize, but I don't know if there's going to be

25   St. Johns County cases filed.

1    So two or three years later, Dr. Hollington has dealt

2    with what is a single-witness case in Volusia County with a

3    lady who apparently admitted, part of the plea, she had no

4    memory and she has dementia.  That case has been resolved.

5    I mean, what about the other cases that we're told

6    are coming?  Dr. Hollington and his family are scared to death

7    of more cases being brought.  What does that require of me as

8    his counsel?

9    There were three ladies who testified in this case

10   who theoretically could become victims in state criminal

11   prosecutions.  And we have no assurances that the joint task

12   force will not use them for further state prosecution.

13   So, in my view, it would not have been appropriate

14   for me, or fair for him, to start discussing much details of

15   those matters at a federal sentencing hearing where there's a

16   record that could be used against him in what is clearly a

17   joint state/federal prosecution.

18   Every undercover officer, as you know, except JSO

19   came from counties of the Fifth Judicial Circuit, which is

20   St. Johns County, Putnam, et cetera.  So it's my duty -- the

21   appropriate action for us to take was to do what he's done most

22   of his life, acknowledge that sexual misconduct with a patient

23   is wrong, apologize for those incidents.  And I thought we'd

24   done that.  I hope we've done it better today.

25   But here we are in a federal case where the charge is

1    giving lawful prescriptions to drug addicts, which I repeat,

2    and they've all admitted, was to save their lives.  Every one

3    of them said so:  "We would have died without them."

4              And so I, again, am here today respectfully

5    disagreeing with the prosecution in the case.  Your Honor has

6    rejected my arguments.  I respect that, but it doesn't change

7    my opinion.  I do think it was not a valid prosecution.

8              So given my long-term belief to this day that it's

9    not a valid prosecution, I'd ask the Court that there's no one

10   to blame but me for not admitting we did a Title 21 violation.

11   I've always assured Dr. Hollington of that.

12             So his original statement from the prior sentencing

13   hearing expressed a lot of content about his devotion to his

14   profession, trying to help people from dying on the street, all

15   of which is true.  But none of that heartfelt dedication is to

16   be read as condoning misconduct through sex with patients.  And

17   in the last statement, a couple of quotes from that, "I accept

18   I've done wrong."

19             So, of course, we're here today to further satisfy

20   the Court of his awareness of that.  So we've never disagreed.

21   We always have agreed that sex with patients is wrong, maybe

22   illegal under the right circumstances.

23             But all four of the real patients charted in this

24   case, they're all real addicts.  Their prescriptions were all

25   for legitimate medical purpose.  The government agrees in their

1    Document 117.  They said so back on the July 5th, 2023,

2    hearing.  All four of the ladies who testified said that was

3    true and they would have died without their scripts.

4              So what's the relevance with that to Your Honor's

5    various issues?  The only case for the conviction here is the

6    claims of sexual relations, because, but for that, this would

7    not be a Title 21 violation.  The prosecution is based on the

8    claim, which you've supported with your jury instructions, that

9    although this may have been a legitimate prescription for an

10   addict, if part of the purpose of the prescription was to have

11   improper contact with the person, that qualifies as a Title 21,

12   which means, but for that sexual activity, which is the basis

13   for the prosecution, we wouldn't be here, which means there

14   would not be a base offense level at all but for those sex

15   claims.

16             And, of course, in addition to that, he picked up two

17   additional levels because he's a doctor that abused the trust,

18   the role, which already puts his guidelines higher to get us to

19   the range which you conclude where we are now.

20             So, in short, the sex claims are embedded in the

21   current guideline calculations, which has not only driven us to

22   an indictment, but has driven us to a level that Your Honor has

23   found to apply, and, thus, respectfully enhanced the guidelines

24   by upward departure due to sexual misconduct with the patients

25   would be punishing him for conduct that's already captured by

1    the guidelines.

2         I've made that argument before.  I know you don't

3    agree with me.  But since we're talking about a variance, I

4    need to remind the Court of what I think is a pretty valid

5    point.

6         And, of course, because of that conduct and the joint

7    task force, he's picked up a three-year sentence down in

8    Volusia County.  And now the government wants Your Honor to

9    consider -- and I think, if I heard you correctly last time,

10   there's no chance for him to get a concurrent sentence.  It

11   would be a consecutive sentence.  And the point is, is that

12   sexual conduct, which I think is the primary topic here today,

13   is going to result in whatever you decide today plus three

14   years.

15        So Your Honor had announced when you informed us that

16   we would have an opportunity to address the variance issue --

17   I've been fighting a cold so I apologize about my sore voice

18   here -- that you thought the guidelines are coming in lower

19   than what you would have expected.  And, perhaps, for all of us

20   who deal with Title 21 cases, that's absolutely true.

21        But, as I said, this is not your standard Title 21

22   case.  It's a case about a physician.  And so this is a

23   natural -- the lower guidelines is a natural consequence of

24   applying Title 21 guidelines to a physician.  And the

25   guidelines are where they are because this is a physician

1    prescribing lifesaving drugs, not some drug dealer.  So these

2    are minuscule quantities, and, thus, the guidelines take into

3    account based off his level, based on the quantities.  So this

4    is not a drug dealer who's dealing in kilograms.  These are

5    prescriptions in milligrams.

6              And Ms. Anderson accepted my mathematical

7    calculations, and I am grateful for that, all of which

8    translates into what Your Honor indicated was a bit of a

9    surprise about the lowness -- lower level of the guidelines.

10   But, again, that's strictly a product of applying Title 21 to a

11   doctor who's prescribing milligrams and not selling kilograms.

12             So the guidelines naturally follow the drug

13   guidelines as applied to a physician and, respectfully, then

14   resulted in an appropriately lower -- not modest, but lower

15   based off his level.  We're somewhere around a three-year

16   guideline now, I think, based on your calculation.

17             I don't think any doctor would consider that to be a

18   lenient sentence, especially when they're forfeiting countless

19   years that they spent earning their medical degree and their

20   license.  And, thus, the premise that the Court should consider

21   departing upward from the guidelines, I respectfully submit

22   it's already a very harsh guideline for a physician.  And this

23   application of Title 21 here, particularly when you add the

24   adjustments, does yield a very harsh sentence.

25             And, as I said, the Court's already applied the

1    enhancement for the special skill, which means the very conduct

2    for which he's been prosecuted in his role as a doctor has now

3    added two levels.  And if I understand the math of the

4    guidelines, that's a 25 percent increase in the base offense

5    level.

6             Your Honor, here is what I think of the most

7    important points as it deals with the criminal history issue:

8    There's already, what I will submit, not technically but

9    practically, a variance because of the postponement of a

10   sentencing hearing and the impact of that on his criminal

11   history.  What happened is, he moved from a criminal history I

12   to a II, which had an offense level -- plus he lost the two

13   offense levels of the zero-offense points.  That's three

14   levels.  So he went from a Level 15, level -- Criminal History

15   Category I, which is 18 to 24 months, to what I think you are

16   now is a Level 18, Criminal History II, 30 to 37 months.

17   That's a 67 percent increase on top of the 25 percent increase

18   for him being a doctor with a special skill.

19            So unless Your Honor recognizes this adverse

20   consequence as a result of us all waiting to have the

21   sentencing hearing, his guideline range has already doubled.

22   And any sentence in the 30- to 37-month range will already be

23   above the guideline range he was entitled to if we had done the

24   sentencing prior to the state case being sentenced, about a

25   100 percent increase.

1          So how did we get to the point where we are today?  I
2    guess it's my fault.  When he got picked up in state court,
3    Your Honor requested status reports.  The first one came out,
4    and I'm thinking -- I know how studious you are.  I read your
5    Law Review article -- so why would Judge Corrigan want a status
6    report on a state case?  I'm thinking, Well, I'm sure he wants
7    to know what the state sentence is going to be, what the
8    results are going to be.  That makes perfect sense.
9          Is there a possibility that that would be taken into
10   account to, perhaps, resolve the federal sentence in a more
11   lenient way?  That was my thought.
12         I deferred to the probation office.  And I had -- was
13   aware of, in years past, the general counsel memorandum from
14   the Bureau of Prisons on state versus federal sentences running
15   concurrently and that Your Honor could designate the state
16   prisons a place of confinement or vice versa.  And Ms. Anderson
17   was kind enough to give me a copy.
18         If you recall that in my sentencing memo I included
19   that memorandum all because I thought, apparently mistakenly,
20   that my support for a continuance would yield an opportunity
21   for the Court to consider the impact about what turned out to
22   be a fairly harsh state sentence in the federal sentence and
23   possibly ask for concurrent time, which I know we're out the
24   window now.  I've heard from the government.  I heard from Your
25   Honor last time.  So whatever happened, I guess we're getting a

1    consecutive sentence.  I was dead wrong.

2            I told Dr. Hollington, "Dr. Hollington, here's my

3    thought.  Here's the memorandum.  Yes, you're going to pick up

4    a criminal history point.  I don't think that Judge Corrigan is

5    going to hold that against you.  And I think we should do a

6    continuance.  It seems like that is what is the correct

7    approach, if I'm reading the tea leaves."  I didn't read them

8    correctly.

9            And the result of that is, in essence, I've committed

10   malpractice.  I should have not supported a continuance.  I did

11   it four times.  I should have asked that the Court reappear on

12   a writ, like you can do, like you did this time, and proceed

13   with the sentencing.  I did not anticipate the potential harm

14   that would come to him by me supporting a continuance.  Again,

15   there's nothing that you said, Your Honor.  It was a request

16   for a status report.  I guess I'm not as talented as an

17   attorney that I thought I was.

18           So in each of my status -- joint status reports, and

19   mindful of the potential harm to him of picking up the criminal

20   history points and losing two of the zero-offense points, I put

21   a footnote in each one of them that said, "Counsel for

22   Dr. Hollington is mindful that a conviction in the state case

23   might adversely affect the Federal Sentencing Guidelines but

24   remains hopeful the Court will recognize that is a consequence

25   of the parties adhering to the principles of judicial economy

1   in suggesting that any federal sentencing hearing should be

2   abated pending the outcome of the state case."

3           Well, I look pretty foolish now that I put that in

4   there.  And, of course, the principles of judicial economy can

5   never be more important than me effectively representing my

6   client.

7           So my cooperation and poor advice in considering a

8   sentencing results in a sentence higher than the guidelines he

9   already faces.  And, really, should the Court not award some

10  variance of consideration due to the unexpected -- let me

11  correct myself -- certainly expected, but could have been

12  avoided enhanced criminal history, then I truly have provided

13  ineffective assistance of counsel to Dr. Hollington.  And my

14  footnote in each of those status reports is a record of that.

15          Thus, I ask the Court to carefully consider the

16  position we find ourselves in today and how that has skewed the

17  guideline calculations such that no additional punishment is

18  necessary.

19          And lastly I would thank the government for

20  maintaining a recommendation of 37 months.  They've had the

21  case -- with the case for two and a half years.  They're very

22  familiar with the case, with all of the pros and cons.  And

23  both counsel are very intelligent, skilled attorneys.  They're

24  not the judge.  Obviously you get to impose the sentence.  But

25  obviously I would ask the Court to consider and add great

1    weight to their recommendation, particularly to the sentence

2    they maintain.

3           And you know the psychology of the Court peers.  We

4    all want to please the Court.  So when we were here last time,

5    you invited us all to consider an upward departure.  The

6    government could have done that in writing; they could have

7    done it here.  And not that they're not going to please you,

8    but you can be assured that their recommendation today was

9    deliberately reached.  And none of us want to disappoint Your

10   Honor.  So they surely -- if they're making that position,

11   surely believe that that's the correct position,

12   notwithstanding the Court's prior advice to the parties that we

13   could address that.

14          So for all of those reasons, I'd ask the Court to not

15   sentence anywhere above the range of 30 to 37 months and to

16   consider a possible variance below that for those reasons.

17          Thank you, Your Honor.

18          THE COURT:  Thank you, sir.  Does that conclude your

19   presentation, Mr. Fallgatter?

20          MR. FALLGATTER:  It does, Your Honor.  Thank you.

21          THE COURT:  Mr. Mike, does the government wish to be

22   heard?

23          MR. MIKE:  Yes, Your Honor.  Just a few comments,

24   Your Honor.  And I don't want to spin our wheels here and

25   circle the drain over and over again on these issues.  And,

1    honestly, it's really trying to hone things and refocus back on

2    the victims here.

3            But being a physician in itself does not absolve him

4    of his misconduct.  There is no specific delineation within

5    Title 21 that says that that's the reason why the guidelines

6    are lower right now.  We know it's because of the amount of

7    weight, the milligrams versus the grams.

8            But, essentially, we have 19 counts that he's found

9    guilty of, and they're for drug dealing.  He just had a

10   prescription pad and he's wearing a white coat.  He's just like

11   every other drug dealer, he's providing drugs to someone.  In

12   this instance they're controlled substances not for a

13   legitimate medical purpose.  That's why we're here.

14           And the fact that someone may need them -- he's

15   saying, "Well, they need them so I provided it to them."  But

16   the caveat is, in order to do that, you had to provide him

17   sexual favors.  That's a problem.  That's a mistake that -- and

18   in itself -- I mean, even Mr. Fallgatter said that's the

19   underlying conduct.  But we haven't really heard him say the

20   words, "I'm sorry for the actual misconduct in itself."

21           He said he's overwhelmed.  He said he was admired.

22   He had five-star reviews.  But it looks like it's still the

23   patient's fault for inviting him out to a drink.  He fell for

24   it, and now he's more concerned that he's actually seen as a

25   predator, not worried about -- you know, he's worried about

1   what everyone else thinks, not about his own misconduct.  And

2   that's still a problem here.

3        So, I mean, yes, he said, "I offer my prayers for

4   those I've harmed," but he still won't say, "I'm sorry for the

5   misconduct."  I think that's a problem.

6        And these are true victims here.  And even then,

7   without those victims, we still have undercover buys where he

8   just blatantly disregarded the need for those medications that

9   he prescribed.  So it's not just them.  It's that he was also

10  prescribing to these undercover officers who just came in and

11  literally said, "I want drugs," and he offered a smorgasbord

12  of, "What do you want?  Here's the menu.  Pick from it."  And

13  that's a problem.

14       And so these victims are real victims.  As you read

15  through the letters, they're still just -- they're screaming

16  out even from the letters of how much it still affects them to

17  this day and how tough it was for them to write those letters,

18  and they have an everlasting, long impact on their lives.  And,

19  yes, they were addicts, someone who had a legitimate issue and

20  problem and came to a clinic to be fixed and to be helped, and

21  they left out worse than when they came in.

22       Thank you, Your Honor.

23       THE COURT:  Mr. Fallgatter, anything further, sir?

24       MR. FALLGATTER:  Your Honor, just very briefly.  I've

25  got the copy of the statement.  I don't -- the government's

1  characterization of the statement, I think, is not accurate.

2  "I offer my sincere prayers for those that I have harmed.  I

3  owe an unpaid debt.  I am thankful for closure before more harm

4  occurred."  If that's not an apology, I don't know what is.

5       Thank you, Your Honor.

6       THE COURT:  Thank you.

7       Is there any legal bar to the imposition of sentence,

8  Mr. Mike?

9       MR. MIKE:  No, Your Honor.

10      THE COURT:  Mr. Fallgatter?

11      MR. FALLGATTER:  No, Your Honor.

12      THE COURT:  All right.  I'm going to take a brief

13 recess.  I'll come out and pronounce sentence.

14      COURTROOM SECURITY OFFICER:  All rise.

15    (Recess from 11:04 a.m. to 11:07 a.m.)

16      COURTROOM SECURITY OFFICER:  All rise.  Court is now

17 back in session.  Please be seated.

18      THE COURT:  In light of -- this is a matter that is

19 not as important as what I'm getting ready to do, but it's on

20 my mind.  In light of the identities of these folks that have

21 written me letters being disclosed in the letters, I'm going to

22 order, at least for now, that Government's Exhibit 1,

23 Government's Exhibit 2, Court Exhibit 1, and Court Exhibit 2

24 all be placed under seal.  So they will be in the file,

25 available for review but not available to the general public.

1        I saw, I believe, that the -- I know Mr. Fallgatter

2    filed Steve Hollington's letter as a filing, and I would be

3    happy to do the same if there is a request to do so, and any

4    other letters if there is a request to do so.

5        But with respect to those letters, I am going to

6    place them under seal at this time until further order of the

7    Court.

8        So from the moment that this case was assigned to me,

9    it's been an extremely challenging and difficult case.  And

10   today is kind of the culmination of that.  I want to address --

11   before I actually make my statement, which will have some

12   length to it, I want to address things that happened this

13   morning that I did not anticipate.

14       First I'll address Mr. Hollington's allocution this

15   morning, which certainly had a different tone to it than his

16   allocution previously in February.  And to the extent that

17   Mr. Hollington is accepting responsibility for his conduct, to

18   the extent that that statement was intended to, in his way, try

19   to apologize, try to make amends, then I will credit that.

20       You know, people -- it's hard for people,

21   necessarily, to speak that way.  His acceptance and apology is

22   still somewhat stilted, but it may just be that's the way

23   Mr. Hollington talks.  I don't know.  But I do recognize an

24   effort was made.  And I will credit that effort to the extent

25   that I think it's appropriate to do so.

1        With respect to Mr. Fallgatter's statements to me

2   today, I just have to say, I think, Mr. Fallgatter, that you

3   and I have a fundamental misunderstanding about what happened.

4   And the reason -- you can have a seat, sir.

5        MR. FALLGATTER:  Yes, sir.

6        THE COURT:  The reason that I say that is that you're

7   beating yourself up over whether you should have delayed the

8   state case or whether you should have gotten a continuance or

9   not agreed to a continuance of this case because it changed the

10  guidelines for Mr. Hollington.

11       You've continued to maintain the view that this whole

12  case was not properly brought.  You know, you're certainly

13  entitled to that view.  And if that's the view that's put

14  forward on appeal, then, of course, the appellate court will

15  determine that.  I just fundamentally disagree that this is not

16  a proper case.  I think the jury's verdict is righteous.  And I

17  think that the Court has to give voice to that verdict.

18       With respect to your concern about, that you

19  misadvised Mr. Hollington and you've committed malpractice and

20  ineffective assistance of counsel, you know, those are trigger

21  words that will not look good in the transcript.  And I want to

22  say unequivocally that the decision as to whether or not to

23  continue this case and the sentencing in this case as opposed

24  to going forward before the state case was resolved and the

25  effect that it had on the guidelines, which was fairly minimal,

1   that's going to have nothing to do with the ultimate sentence

2   that I give in this case.  Because the ultimate sentence I'm

3   going to give is a reflection of my view that under 3553(a),

4   the sentence I'm going to give is sufficient, but not greater

5   than necessary.  And the guidelines are advisory and they are

6   just one facet of what the Court considers.

7          And I can tell you without a trace of a doubt that

8   whether we had conducted this sentencing before the state

9   matter was resolved or after the state matter was resolved is

10  not going to change Mr. Hollington's sentence by one day.

11         And so if you are concerned that you have somehow

12  misadvised Mr. Hollington by advising him to wait on this

13  sentencing, you can absolve yourself of that concern because it

14  was not going to make any difference.  It never was and it's

15  not going to today.

16         We're here today on the case that's before the Court.

17  And I will consider the advisory guidelines of 30 to 37 months

18  as part of my thought process, but it -- the matter that you're

19  concerned about is going to play no role in the ultimate

20  sentence that Mr. Hollington receives.

21         And my observation, for what the record is worth, is

22  that you've done nothing but advocate zealously for

23  Mr. Hollington from the beginning of this case until -- through

24  today and that he has had the benefit of experienced and able

25  counsel within the meaning of the Sixth Amendment.  That is my

1    observation.

2            All right.  Now -- so now we get to my analysis of

3    this case.  And because I plan to upwardly vary in this case, I

4    try to be explicit in every sentence that I give, but I know

5    that, especially when a Court determines to upwardly vary,

6    even -- especially in a case where the government has not

7    sought such an upward variance, that the Court needs to be

8    explicit and clear as to why it's doing what it's doing so that

9    a reviewing court, and frankly the people who are affected by

10   the decision, will know why I'm doing what I'm doing.  And so

11   this is my effort, under 3553(a), to tell you why I'm going to

12   impose the sentence that I am and why I believe it to be

13   sufficient, but not greater than necessary.

14           We start, as Mr. Mike mentioned, with the actual

15   charges in the case.  And although we have focused on the

16   counts that involve the victims, that is the victims of sexual

17   activity, that wasn't the only charge in the case.  There

18   are -- there are 19 counts that Mr. Hollington was convicted

19   of, Counts Two through Twenty.  Four of those are obstruction

20   of justice, which I will not really focus on too much, but it

21   is a part of the case and it's something that I think is part

22   of the overall thinking of what a sufficient sentence would be.

23           But what the evidence showed at trial was that -- and

24   the jury determined by its verdict, was that Dr. Hollington was

25   routinely prescribing medications that -- in the words of the

1    statute, "Prescriptions which were issued not for a legitimate

2    medical purpose in the usual course of professional practice."

3    That's what the jury found.  And I think the evidence at

4    trial -- and I, of course, presided over the trial.  The

5    evidence at trial substantially supported that finding.

6              And Mr. Hollington has made the defense that these

7    folks needed these prescriptions and that this was all

8    something within the normal course of legitimate medical

9    practice, but the jury has found otherwise.  And I believe that

10   evidence to be supported beyond a reasonable doubt.

11             And so even -- apart from the -- what we call the

12   actual named victims of the sexual misconduct, we have a series

13   of counts that Mr. Hollington was convicted of for prescribing

14   medication to persons he knew to be addicts without the proper

15   medical intercourse that you have to have in order to do that.

16   And the videotapes and the testimony amply demonstrated that.

17             And so even apart from the sexual misconduct, which I

18   will get to, we need to remember that this -- what the jury

19   found was that this was Mr. Hollington's modus operandi.

20   That's how he operated and over the course of -- over a course

21   of a significant period of time.

22             And then we come to the various incidences of sexual

23   misconduct.  And there's a number of references to it without

24   me having to -- and I want to be clear.  Mr. Mike, I think,

25   said at one point during the hearing that he had received over

1    30 phone calls and Mr. Fallgatter objected.  I'm not going to

2    consider that.  I don't think I can really -- that's not enough

3    detail and we don't have -- we don't know who those people are.

4    So I am not going to consider that.  I, likewise, have already

5    said I'm not going to consider the letter I just received

6    today.

7           But even without that, there's plenty of evidence

8    that I can consider that shows a deeply disturbing pattern of

9    conduct by a doctor who has the imprimatur of his office and

10   vis-a-vis his patients.  And there are incidences -- of course,

11   we already know about the conviction in Volusia County for a

12   similar conduct.  That's on -- that's part of the PSR.  And we

13   also know that there are other references to it in the PSR.

14          But what I'm going to do is -- and so I think it's

15   fair to say both -- because of that and then because of the

16   matters I'm going to specifically address, that there's a

17   pattern of conduct here and it's a disturbing pattern of

18   conduct.

19          And the idea, as I believe Mr. Fallgatter tried to

20   argue to the jury at trial, that you can divorce -- "This is

21   really just a drug case, it's about drug distribution, it's not

22   about sexual misconduct," but those two things are inextricably

23   intertwined and because Mr. Hollington was a medical doctor

24   that was seeing patients and prescribing medications to them as

25   an entrée to sexual misconduct with them.  The drugs -- the

1  medical office, the drugs, and the sexual misconduct are all

2  inextricably linked.

3          And I reviewed the transcript of the sentencing

4  hearing we had in February, and I pulled out some references

5  that I want to reference now.  And this is from -- I believe

6  it's Doc 254, is the transcript.

7          And beginning on page 17, the government, Mr. Mike,

8  said, "Dr. Hollington's crimes in this case are egregious as

9  they are unconscionable.  His conduct was motivated by greed

10 and personal desires as well as a complete disregard for the

11 wellbeing of his patients.  It represents a profound violation

12 of the trust society places in medical professionals."

13         Mr. Mike also argued that the Court -- asked the

14 Court to consider the profound impact the defendant's actions

15 had on his victims and the broader community.  He further says,

16 "Dr. Hollington used his position as a licensed medical

17 professional to exploit his patients in the most shameful way

18 imaginable."

19         And I agree with those statements.  I think the

20 evidence amply demonstrates just that.

21         The government further argued, "It was a deliberate

22 and dangerous decision to profit from addiction and dependency.

23 Dr. Hollington acted with reckless disregard for his patients'

24 health and lives and that the guidelines don't illustrate the

25 full picture here."

1          Further the government argued, "The victims in this
2    case were already vulnerable.  They were seeking help for
3    addiction, struggling with personal crises, and attempting to
4    gain control of their own lives.  But instead of receiving the
5    care they needed, they were victimized even further."
6          "Four" -- this is a continuation, "Four female
7    victims testified during his trial about how they were
8    manipulated and coerced into providing sexual favors in
9    exchange for prescriptions.  Dr. Hollington used his position
10   as a doctor to exploit their desperation, turning their
11   vulnerability into an opportunity for personal gain."  I agree
12   with that.
13          And then Mr. Mike, the government, referenced the
14   obstruction as well.  The government argued that,
15   "Dr. Hollington's conduct was not an isolated lapse in
16   judgment.  He systematically and repeatedly engaged in criminal
17   behavior over an extended period of time, preying on vulnerable
18   individuals."  And I agree with that.
19          And then I'm going to read from a couple of the --
20   maybe more than a couple of the victim impact statements.  And
21   let's be clear, there were four individuals who testified at
22   trial and so I have their testimony in mind.  Two of those also
23   provided victim impact statements, which were read at the
24   sentencing hearing in February.  Two additional individuals who
25   did not testify at trial also gave victim impact statements for

1    sentencing purposes.  And the Court has considered all of

2    those.  So you have, essentially, six victim impact statements

3    in the case in addition, of course, to the Volusia County case,

4    which Mr. Hollington already stands convicted of.

5            So one of the victims -- and this starts at page 27.

6    One of the victims, her initials are D.A., "Hollington abused

7    his authority.  And after our initial appointment, when I

8    reached out for help, he took advantage of knowing I couldn't

9    pay for my medication.  But what Dr. Hollington did is

10   unethical and wrong in so many ways.  I was diagnosed with

11   anxiety, PTSD, major depression, and what he did helped my

12   disorders worsen" -- "or worse" -- "make my disorders worse."

13   I'm sorry.

14           The next one is from a victim named E.M., initials,

15   and it's on page 28 of this transcript.  "I would come to find

16   out that his office was anything but professional," this victim

17   says.  "It was a guise to prey on women.  And he used his

18   license to practice medicine to get patients to perform

19   whatever sexual acts he wanted right there in his practice.  I

20   never dreamed I would be going in and paying for this kind of

21   experience that I ended up getting.  Scott Hollington would say

22   to me the most vulgar and offensive things that I have ever had

23   spoken to me.  And this is from someone I'm paying to care for

24   me.  I left his office that evening feeling so much pain and so

25   much shame.  I only know that I will never be able to look at

1  another male doctor the same.  And there will be so many other

2  unfortunate things that would come out of my experience that

3  evening.  It's unbelievable how one person in one day can

4  change the course of the rest of your life."

5       This is the same impact statement:  "I met him one

6  time.  And this man was amazingly so comfortable and brave at

7  what he was apparently doing behind the scenes that he had the

8  audacity to put his hands on me with no problem, forcing his

9  body that outweighed me by at least 150 pounds up against mine

10  and disregarding my continuous pleas for him to stop, to,

11  'Please stop,' please do not do what he was doing, 'Please

12  don't touch me,' I said repeatedly.  'Please, you have to

13  stop,' I said.  And he continued to smile as if he didn't hear

14  a word I was saying or care how I felt."

15       And she goes on on the same page, "And just like the

16  victims on T.V., he made me feel the same embarrassment and

17  shame like I had done something wrong.  It was so much so that

18  I almost didn't come forward to the police about my story and

19  what happened to me there at his office.  The place where I

20  thought I was going to get this amazing treatment and have an

21  awesome experience like I had read about so many other people

22  having."

23       Another impact, this is M.M.:  "To the Honorable

24  Judge Corrigan, no words on paper will ever truly encapsulate

25  the devastation of my experience that Scott Hollington

 1    inflicted upon me.  Still I'm here to give voice to my pain and
 2    the pain of millions of other women who have been silenced and
 3    similarly robbed of their trust and innocence."
 4            And the reference to millions of other women, I want
 5    to be clear, she's not talking about Mr. Hollington.  She's
 6    making a general statement.  I don't want any confusion about
 7    that.
 8            "This was not just an assault on my body, but one of
 9    the most violent betrayals by someone who is officially
10    categorized the same as professionals in a place of trust."
11            And this victim further writes, "I've been working on
12    this statement for over a week now and there have been multiple
13    instances where I've had to step away, because revisiting this
14    chapter of my life is nothing short of hell.
15            "At the time of my visit to Scott Hollington's
16    office, I was newly engaged.  Once I felt the room begin to
17    change and panic set in, I gushed over my new fiancè.  I showed
18    off my engagement ring and went so far as disclosing my fiancè
19    was outside of the office waiting in the car.  None of that
20    mattered.  I was a vulnerable target and he had an itinerary.
21            "Dr. Scott Hollington's assault against me, there was
22    a fleeting moment when there was" -- "where even my own body
23    failed me.  I used every breath to escape from his grip.  And I
24    knew I could no longer overpower or fight off a man three times
25    my size.  I'm sure if I could make it out of that room, I

1   recall coming to the harrowing acceptance that I may never see

2   my mother's face again, the kisses from my dog, walk down an

3   aisle, hear my best friend's laughter, or become a mother."

4        She later says, "Learning from those crimes" --

5   "Learning that those crimes were specifically in relation to

6   and linked with not only gross sexual misconduct and

7   molestation but also involved serious classified narcotics,

8   both fusing to create one large monster.

9        "Upon this realization, I fell into a dark abyss of

10  depression and believed that I would be categorized among those

11  who willingly participated in creating that monster.  The

12  psychological toll that took on my mental health, my

13  relationship, and my sanctity of life reached a new war within

14  me and every day dragged me deeper into darkness.

15       "In the moment of unimaginable pain I attempted to

16  take my own life.  I was desperate to stop the suffering and

17  silence of the world around me.  Again, what has followed these

18  chapters has not been healing.  Physically my scars may not all

19  be visible but they are there."

20     (Judge and courtroom deputy confer off the record.)

21       THE COURT:  Mr. Fallgatter, is your client awake?

22     (Attorney-client conferral off the record.)

23       MR. FALLGATTER:  He advised me he's listening.

24       THE COURT:  All right.

25       MR. FALLGATTER:  He's resting his eyes.

1          THE COURT:  That's fine, sir.  He had his eyes

2    closed, I just wanted to make sure.

3          MR. FALLGATTER:  Yes, Your Honor.

4          THE COURT:  And then a victim named L.E.:  "My former

5    doctor, Scott Hollington," this is on page 37, "He has in every

6    way imaginable broken every law of character and decency.  What

7    he has done to myself and others is beyond despicable and

8    tortures the bounds of decency."

9          She further writes on the next page, 38, "This

10   injustice follows me every waking day.  It has also ruined any

11   trust I have in men in the medical community."

12         And then she addresses Mr. Hollington personally and

13   she describes -- she is speaking to him and says -- describes

14   it as, "A masochistic act" -- "what you have done to me is the

15   most diabolical, insidious, and masochistic act that a human

16   can perform.  You have taken away my peace and you have raped

17   me physically, emotionally, mentally and in any other way

18   imaginable, all without any thought or conscience to your

19   actions.

20         "There is a not a day that goes by that I don't think

21   of the molestation that I suffered at your hands.  I seriously

22   doubt that you have the capacity to think or feel in any

23   emotional way, at least the things you've done to me."

24         And to the extent that there's any concern about the

25   credibility of these individuals because of their drug

1  addiction or their circumstances -- I think I said this before,

2  but I wanted to say it again, if we had one such victim and had

3  credibility concerns about addiction or whether they were able

4  to be accurate reporters of what happened to them or what the

5  circumstances might have been, then that might be a different

6  discussion.

7          But the stories of these women are incredibly

8  consistent even though they don't -- they're not speaking with

9  each other or they're not -- it's not part of a plan.  They're

10  incredibly consistent with enough variation to make you think

11  they are individualized circumstances.  And for the Court to

12  determine that it's been shown by a preponderance of the

13  evidence, which is the standard at sentencing, that these women

14  are telling the truth and that what they said happened to them,

15  in substance, happened to them.  And so I -- for sentencing

16  purposes, I am accepting their truth.

17          And I recognize that -- although some of them, of

18  course, were cross-examined -- four of them were cross-examined

19  at trial so we actually know what that looks like.  Two of them

20  gave statements.  But we act on victim impact statements all

21  the time that are written and given to the Court before

22  sentencing, just like we act on character letters that are on

23  Mr. Hollington's behalf that are written and given to the Court

24  before sentencing.

25          And so I take these women to be -- I take it these

1    women, if they had appeared in person -- and I can understand

2    why they wouldn't want to -- I take it that they would tell me

3    the same thing.  And so I think I have to accept that this is

4    the way it was.  And if this is the way it was, it's hard to

5    overstate how bad it was.

6              Now, I look at the other 3553(a) factors -- because

7    what I just focused on there was the nature and circumstance of

8    the charged offense and to a lesser extent, the history and

9    characteristics of Mr. Hollington.  And I think the history and

10   characteristics, obviously we've heard the bad, but, of course,

11   he has a family.  I accept that he was the caregiver for his

12   son.  I feel miserable about the fact that his son is being

13   deprived of his father's care and -- but like so many other

14   families who are in these situations, it's the family that

15   suffers more so than the person who committed the crimes.  But

16   I feel terrible for the son.  I feel terrible for

17   Mr. Hollington's former wife.

18             I wish there was something I could do about that, but

19   the only comfort I can bring to the process is that

20   Mr. Hollington made these decisions.  He made these choices.

21   And unfortunately not only he, but his family will have to

22   suffer the consequences of those choices.

23             The need for the sentence imposed has to reflect the

24   seriousness of the offense, promote respect for the law, and

25   provide just punishment for the offense.  I think these are

1    serious matters and they would be -- they would be serious in

2    any scenario, but when it's a medical doctor who has the

3    imprimatur of that office and uses that -- the trust and

4    confidence that that person's placed in him to act the way

5    Mr. Hollington acted, that makes it worse.  And that's slightly

6    acknowledged by the guidelines, but not in a significant enough

7    way in my view.

8              I need to afford adequate deterrence to criminal

9    conduct and to protect the public from further crimes of

10   Mr. Hollington.  And I thought about this quite a bit.  While

11   I appreciated his second statement today, there was nothing in

12   his first statement to me that would have given me any

13   confidence that he understood how wrong what he did was and

14   that he wouldn't do it again if he had the chance.  And perhaps

15   today's statement is a -- and, of course, time as time goes by,

16   Mr. Hollington was able to articulate today an apology of

17   sorts.

18             But, you know, we'd all like to think, of course,

19   that having been apprehended and now serving a state sentence

20   and now to serve a federal sentence that Mr. Hollington would

21   not be a danger to the public and that deterrence wasn't

22   required.  And I suppose that's maybe the most likely, but I do

23   not rule out -- I cannot say with assurance that this isn't

24   just who he is.  I cannot say that this conduct, which I think

25   can be fairly described as predatory, is just not a part of who

1    he is.  And so I do think the protection of the public from

2    further crimes of Mr. Hollington is a relevant criteria.

3              The sentencing guidelines I have to take into strong

4    account.  And I've thought about this quite a bit as I've

5    struggled with this case.  You know, I've had other cases

6    involving sexual misconduct by persons in authority, and the

7    charges are different and the penalties are much higher.

8              So this case was charged as a drug case.  And what's

9    driving the guidelines, which sometimes I think is to the

10   detriment of the defendant and I have varied below, but in this

11   case I think has benefitted Mr. Hollington.  What's driving the

12   guidelines is the quantity of the drugs.  Well, the quantity of

13   the drugs has very little to do with the conduct of

14   Dr. Hollington.

15             It's the conduct -- it's the use of those drugs, the

16   prescribing of them not for a legitimate medical purpose,

17   that's causing harm to patients but also benefitting

18   Dr. Hollington, whether he's getting paid for that, you know,

19   through the normal services or he's using it to coerce sexual

20   favors or, in some cases -- it's, at minimum, sexual coercion

21   and, at least according to some of these victims, rises to the

22   level of sexual assault.

23             And so the guidelines, when they're just looking --

24   when they primarily are addressing the quantity, are not

25   advising the Court well.  And they are advisory.  So I have

1    taken them into account.

2          And to be honest with you, I think the ultimate --

3    because of the way the case is positioned and because it was a

4    drug case and it wasn't about trafficking, it wasn't about some

5    of the other crimes that get charged of a sexual nature, it

6    wasn't about production of child pornography or some of the

7    other cases where the guidelines are much higher -- I

8    understand that I am not sentencing Dr. Hollington -- or

9    Mr. Hollington on the crimes that could have possibly been

10   brought against him.  But I have no hesitancy to take into

11   account in determining his sentence the sexual coercion and

12   misconduct that I have laid out here, because I think it's

13   directly tied to the drug counts.

14          And I need to avoid unwarranted sentencing disparity

15   among defendants with similar records who have been found

16   guilty of similar conduct.  And, again, this is a -- I've not

17   had a case quite like this before, but I am trying to find the

18   appropriate sentence that I think -- given the charges, but

19   also given the conduct, that is sufficient, but not greater

20   than necessary.

21          And then the need to provide restitution to any

22   victims, and that hasn't really been addressed, but we will

23   probably put that off for another day if that's going to be

24   something.

25          All by way of saying that the sentence I'm going to

1  impose is going to be a substantial upward variance from the

2  guidelines.  But even with that, I am trying to anchor that to

3  the drug case and not sentence Mr. Hollington on a case that

4  wasn't brought.  And so what I'm maybe beating around the bush

5  to say, the sentence I'm going to impose is going to be

6  significantly higher than the guidelines, but not as high as it

7  could have been.  Not as high as it could have been.

8         Mr. Hollington, on July 28, 2023, a jury found you

9  guilty of all of the counts -- remaining counts of the

10 indictment.  I had previously directed a verdict on Count One,

11 the conspiracy count.  So that means you were convicted under

12 the indictment of Counts Two through Twenty.

13        Counts Two through Fifteen were the drug counts.

14 Some of them were Schedule II controlled substances, some of

15 them were Schedule III and one was Schedule IV.  And they were

16 all for the same charge; that is, prescribing medications not

17 for a legitimate medical purpose and outside the usual course

18 of professional practice.

19        Counts -- let me make sure I get this right.

20        Of those drug counts, Counts Twelve, Thirteen,

21 Fourteen, and Fifteen involve the four victims who testified at

22 trial.  And then Counts Sixteen through Twenty were the

23 obstruction of justice counts.  And the Court has previously

24 adjudicated you guilty of those offenses.

25        Tim?

1        (Judge and courtroom deputy confer off the record.)

2            THE COURT:  Mr. Mike, what I'm checking on -- or,

3    Mr. Fallgatter, if you recall, I'm checking to see -- when we

4    have a jury verdict, I -- typically when I'm setting the case

5    for sentencing, I will adjudicate guilt pursuant to the jury's

6    verdict.  And I just want to make sure that I've formally done

7    that.  I believe I have, but --

8            MR. FALLGATTER:  And I can't remember either, Your

9    Honor.  I had the same question.

10           THE COURT:  Okay.  If not, I'll do it today.

11           MR. FALLGATTER:  Yes, sir.

12       (Judge and courtroom deputy confer off the record.)

13           THE COURT:  All right.  I am not 100 percent positive

14   I have formally adjudicated guilt.

15           So I am going to formally adjudicate guilt at this

16   time pursuant to the jury's verdict of Counts Two

17   through Twenty.

18           And the Court having adjudicated guilt and the Court

19   now being fully advised, it is the judgment of this Court that

20   the defendant, Scott Andrew Hollington, is hereby committed to

21   the custody of the Bureau of Prisons for a term of 144 months.

22           That 144-month sentence consists of a 144-month

23   sentence for Counts Two through Five, Seven through Eleven and

24   Thirteen; a five-year sentence under Count Six; and a ten-year

25   sentence under Counts Twelve, Fourteen, Fifteen to Twenty,

1    because those are the statutory maximums for those crimes.  But

2    I'm having all of those terms running concurrently for a

3    sentence of 144 months.

4          I will recommend Mr. Hollington for sexual offender

5    treatment in the Bureau of Prisons.  I'll recommend him for

6    mental health programming.

7          Mr. Fallgatter, is there a request for location?

8       (Brief pause.)

9          THE COURT:  You can confer on that.  I will go ahead

10   and finish my pronouncement.

11         MR. FALLGATTER:  Yes, Your Honor.

12         THE COURT:  All right.

13         MR. FALLGATTER:  I believe we would request Jesup,

14   but, now, I don't know if a lengthier sentence, if that's --

15         THE COURT:  Okay.  I'll recommend Jesup.

16         MR. FALLGATTER:  -- permitted or not.

17         THE COURT:  All right.  Again, I want this record to

18   be abundantly clear, so that -- because I know that it will

19   likely be appealed.  So I'm told that I may have inadvertently

20   said it incorrectly.  I don't know that I did.

21         But I am adjudicating today formally Scott Andrew

22   Hollington, pursuant to the jury's verdict, which was Doc 204,

23   I'm adjudicating him guilty of Counts Two through Fifteen and

24   Counts Sixteen through Twenty.

25         All right.  I'll recommend Jesup.

1    Upon release from imprisonment, you'll serve a

2 three-year term of supervised release.  That's three years as

3 to Counts Two through Five, Seven through Eleven, Thirteen, and

4 Sixteen through Twenty, and one year as to Count Six, and a

5 two-year term as to Counts Twelve, Fourteen, and Fifteen, all

6 such terms to run concurrently for a total of three years.

7    While on supervised release you'll comply with the

8 mandatory and standard conditions adopted by the court in the

9 Middle District of Florida, which can be found at 5D1.3(a) and

10 (c) of the sentencing guidelines.

11    In addition you will comply with the following

12 special conditions:  You will have no contact, direct or

13 indirect, with any individuals identified in Counts Two

14 through Fifteen, the victim identified in the Volusia County

15 case, nor any other person who identified themselves to the

16 Court as a victim in the case.

17    You will be evaluated for sex offender treatment and

18 mental health treatment.  DNA collection is required.  I'm

19 going to suspend the mandatory drug testing requirements.

20 Based upon financial status, I'm not going to impose any fines.

21    Any forfeiture issues in the case, Mr. Mike?

22    MR. MIKE:  One moment, Your Honor.

23    (Brief pause.)

24    THE COURT:  All right.  I am -- I want to make sure

25 this record is pristine and people are helping me to do that,

1    which I appreciate.  So let me go back here.

2         I am pronouncing the sentence of 144 months.  That

3    sentence is 144 months under Counts Two through Five, Seven

4    through Eleven and Thirteen.  It's five years for Count Six.

5    It is ten years for Counts Twelve, Fourteen, Fifteen

6    through Twenty.

7         Okay.  And that sentence is to run consecutively with

8    the defendant's term of imprisonment imposed pursuant to the

9    judgment in Case No. 2023-CF-304283, Volusia County Circuit

10   Court, DeLand, Florida.  It is the Court's intent that the

11   federal sentence run consecutively to the current state

12   sentence.

13        And upon release from imprisonment -- I have, I

14   believe, already done the supervised release.

15        Any problem with that?

16        THE COURTROOM DEPUTY:  No.

17        THE COURT:  And I have given the terms.

18        What about forfeiture, Mr. Mike?

19        MR. MIKE:  Yes, Your Honor.  We just want to ensure

20   that that's included.  It's Doc 236, the Preliminary Order of

21   Forfeiture.  We just want to make sure that that's included in

22   the sentencing.

23        THE COURT:  All right.  I will do that.

24        $1900 in special assessments.

25        All right.  So the jury's conviction was on a

1    superseding indictment, so I will dismiss the underlying

2    indictment.

3            Sir, you have the right to appeal from my judgment

4    and sentence within 14 days from the entry of judgment.

5    Failure to appeal within that 14-day period will give up your

6    right to appeal.  You are also advised you're entitled to the

7    assistance of counsel if you wish to appeal.  If you are unable

8    to afford counsel, one will be provided for you at no cost or

9    charge to you.

10           The Court having pronounced sentence, I'll entertain

11   objections to the Court's sentence or the manner in which the

12   Court has pronounced sentence at this time.

13           MR. MIKE:  No objections, Your Honor.

14           MR. FALLGATTER:  I just reiterate the prior points

15   and, of course, point out, that, as the Court has carefully

16   laid out the sentence a number of times, the Court pointed out

17   the importance of the sentencing guidelines, which add, in

18   part, to my fear.

19           And I guess I should add the other point that I

20   thought about on the -- my requiring a continuance, there is

21   always the possibility of the state sentence running

22   concurrently with the federal, so it occurred to me if I had

23   proceeded -- if we proceeded with the federal sentence here

24   before the state case was resolved, Dr. Hollington likely would

25   have had an opportunity to ask that state court -- the state

1    prosecutor to let any state sentence run concurrent.  And since

2    you've required them to run consecutive, that opportunity is

3    also lost.  So that's another concern that I have with regard

4    to the delay.

5          But other than that, Your Honor, I have nothing

6    further.  Thank you.

7          I will say, this unique situation, I don't think I've

8    ever not announced we're not appealing; but as you pointed out,

9    I can't say so in this case.

10          THE COURT:  Well, let me just say again,

11    Mr. Fallgatter, in my judgment you have rendered not only

12    adequate advice of counsel, but in the highest traditions of

13    the bar.  And I don't -- I don't -- I want this record to be

14    clear that nothing you did or didn't do has affected the

15    sentence or the disposition of this case.  And I understand you

16    wanting to take responsibility; but I'm just telling you, from

17    my viewpoint, Mr. Hollington has been ably represented

18    throughout.

19          I understand you've now filed a motion to withdraw,

20    and he will be given a lawyer to represent him on appeal and

21    he'll get the benefit of that counsel.  And he's got all rights

22    available to him.

23          MR. FALLGATTER:  Thank you for your comments, Your

24    Honor.  I appreciate it.

25       (Brief pause.)

1          THE COURT:  Let me just say, as somebody -- there

2    probably will be other people who will be reading this

3    pronouncement.  And let me just say that, because of the number

4    of counts and the different statutory maximums and so forth, I

5    had to try to be very careful as to what I was saying and what

6    I was trying to articulate, and that's the reason that the

7    transcript may look a little jumpy when somebody reads it at

8    the end.

9          But I have tried to capture the correct statutory

10   maximums.  I've tried to make sure I had the right counts.

11   I've tried to make sure I've been clear that I want the

12   sentence to be consecutive to the state sentence.  And so I

13   think I have done all of that.  It may not have been in as

14   linear a fashion as I would have preferred, but I have tried my

15   best to make the record as clear as I can.  And that will, of

16   course, also be reflected in my judgment.

17         Mr. Hollington, I've given you the sentence that I

18   think is the appropriate sentence.  You, of course, have all of

19   your appellate rights.  Mr. Fallgatter has filed a motion to

20   withdraw, so Judge Barksdale will be having a hearing on that

21   and appointing you counsel for your appeal.  And you've got all

22   of your appeal rights.  I don't know what Judge Barksdale's

23   plan is on that.  I heard she might do it right away, but

24   that's up to her.

25         And even though I've given you the sentence that I've

1    given you, I always will wish you well and I'll wish your

2    family well.

3              Court's in recess.

4              COURTROOM SECURITY OFFICER:  All rise.

5         (Proceedings concluded at 12:08 p.m.)

6                                        -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 13th day of May, 2025.


                    s/Heather N. Randall_____
                    Heather Randall, RPR, FPR-C